UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

DARIUS JEAN,

                                     Petitioner,

                  - against -

GARY GREENE, Warden, Great Meadow Correctional
Facility,

                                    Respondent.

--------------------------------------------------------------------------X

Docket No.
07-CV-11530 (VM)

**DECLARATION
IN SUPPORT**

       **JONATHAN I. EDELSTEIN**, an attorney duly admitted to practice in the courts of the

State of New York and in this Court, declares under penalty of perjury pursuant to 18 U.S.C. §

1746 that the following is true and correct to the extent of his knowledge:

       1.      I am the attorney for the petitioner in the above captioned matter and as such am fully

familiar with the facts and circumstances thereof.  I make this Declaration in support of the instant

petition for a writ of habeas corpus.  The sources for the allegations of fact made herein include

conversations with my client, review of the case file and review of other pertinent documents.

**A.**      **Nature of the Case.**

       2.      The charges in the instant case arise from petitioner DARIUS JEAN'S alleged beating

of his stepdaughter KYONA FREDERICKS and natural daughter MENDISSA JEAN.  It was alleged

that on October 11, 2001,[1] petitioner beat both children with a belt and/or lamp cord for failing to

---

[1] It was alleged at trial that the beating continued into the early morning hours of October 12,

1

complete their homework correctly.  Subsequently, when it was discovered that Kyona was not breathing, petitioner called 911 while his girlfriend Leslie Nicolas performed CPR on Kyona.  The girls were rushed to the hospital, where Kyona was pronounced dead and Mendissa treated for physical injuries.  As a result of this incident, petitioner was indicted and convicted on charges of depraved indifference murder, manslaughter in the first degree, assault in the first and second degrees, and two counts of endangering the welfare of a child.

**B.    Hearing on Suppression of Statements.**

3.    When petitioner learned that Kyona was dead, he became so distraught and hysterical that he had to be placed in four-point restraints due to the risk of suicide.  While held in these restraints, he was questioned by detectives.  At the urging of the detectives, his former girlfriend Leslie Nicolas was sent into to the room to speak to the petitioner and elicited further statements from him.

4.    Petitioner moved pretrial to suppress both the statements elicited by the detectives and those taken by Ms. Nicolas.  On July 1 and 8, 2002, Judge William A. Kelly of the Rockland County Court presided over a hearing regarding the motion to suppress.

5.    At the hearing, OFFICER SEAN LEE testified that he arrived at 9 Innington Court and in response to an emergency call and escorted Mr. Jean and Nicolas down to the kitchen. (H.29).[2]  Mr. Jean was in an "excited state" and Lee first spoke to Nicolas.  Nicolas told him that Mr. Jean had brought Kyona into their bedroom and told her that she was not breathing.   Nicolas then

---

but the testimony as to the time the beating began and ended was inconclusive.

[2]  Relevant portions of the hearing transcript are annexed as Exhibit A.

told Mr. Jean to call 911.  (H.29.).

6.     After discussion, Officer Lee drove Mr. Jean to Good Samaritan Hospital in a patrol car.  (H.31).  When Mr. Jean was told that Kyona had died, he began yelling and screaming and ran out of the emergency room.  (H.36, 50).  In the parking lot, Mr. Jean thrashed around and banged his head into the pavement.  (H.37, 51).  Officer Lee testified that he had to hold Mr. Jean while another officer placed him in handcuffs.  (H.37).  Officer Lee then placed Mr. Jean in a wheelchair and turned him over to the hospital staff in the emergency room.  (H.39).

7.     DETECTIVE GLENN GRAHAM testified that when he arrived at Good Samaritan Hospital, Dr. Eric Silva told him that Kyona Fredericks had been dead for a few hours before she was brought to the emergency room and that he suspected that abuse was involved in her death.  (H.65, 69).  Detective Graham first questioned Nicolas and she told him that Mr. Jean had brought Kyona into her bedroom around 3 A.M. and told her that she was not breathing.  (H.69-70).  In response, Nicolas stated that she told Mr. Jean to call 911.  (H.70).

8.     At 6:20 A.M., Detective Graham administered Miranda warnings to petitioner, who was still in restraints on a hospital bed.  (H.71).  At 6:23 A.M., petitioner signed a Miranda rights waiver form.   Subsequently, Detective Graham interrogated him about the incident, elicited statements, and asked for and received oral consent from petitioner to search his home.  (H.71-81).

9.     DETECTIVE LEE YOUNGMAN drove petitioner to the Ramapo Police Station, where he was placed in an interview room.  (H.156-57).  At 7 A.M., Detective Graham arrived at the station and began interrogating petitioner with Detective Youngman.  (H.88-89, 156-57).  Petitioner was questioned for several hours before Detective Graham readvised petitioner of his Miranda rights.  (H.94, 164-65).  At 11:05 A.M., petitioner signed a second Miranda rights waiver form.  (H. 92-94,

127-28).    According to Detective Graham, the Mr. Jean's handwriting on the form was "a little sketchy." (H. 129)

10.    Subsequently, Detective Youngman took a typed statement from Mr. Jean which concluded at 12:55 P.M. (H.102, 131-33).  The statement was essentially the same as the one given at the hospital with the exception that petitioner added that he spanked both children 10-15 times with his belt. (H.161-63).  He added that he was attempting to spank the children on the buttocks, but they were moving around. (H. 162).

11.    According to Detective Graham, Nicolas had been asking to speak to petitioner a few times. (H.100).  Detective Youngman testified that both petitioner and Nicolas had been asking to speak with each other. (H.172).   After they took a statement from Nicolas, the detectives allowed Nicolas to speak to petitioner. (H.100, 172).  Detective Graham testified that he told Nicolas that he did not believe that petitioner's statements regarding petitioner observing Kyona walking down the hallway were accurate. (H.134-35).   Both detectives testified that they were in the interview room while Nicolas spoke to petitioner in mostly Creole for a few minutes. (H.103, 173).

12.    Detective Graham testified that he did not listen to or record the conversation since they were speaking in Creole. (H.139-40).  Detective Youngman testified that he told them to speak English and ended the conversation after a few minutes. (H.173-74).  Both detectives did not memorialize the meeting between Nicolas and petitioner in any police reports or notes. (H.141-42, 192).  Both detectives also testified that they did not instruct Nicolas regarding what to tell petitioner during their conversation. (H.104, 174.)

13.    After Nicolas and petitioner finished their conversation, she told the detectives that petitioner would like to speak to them again. (H. 142).  The detectives allowed Nicolas to go and

began interrogating petitioner again. (H.143, 174). Detective Youngman testified that they told petitioner that they were definitely going to charge him with assault of both daughters. (H.174). Detective Youngman also testified that he told Mr. Jean that he did not believe his statement regarding his observation of Kyona in the hallway before she collapsed. (H.175).

14.    At this point, petitioner changed his statement and told detectives that he discovered Kyona in bed and that she was not breathing when he picked her up and brought her into his bedroom. (H.142, 175). Beginning at 2:40 P.M., petitioner memorialized this version in a second typed statement. (H.143, 148, 151). According to Detective Youngman, petitioner further said that he put the chicken in Kyona's mouth in order to make it appear as if she had choked. (H.178). On cross-examination, Detective Youngman testified that he did not feel the need to memorialize this statement regarding the chicken in typewritten form. (H.203).

15.    LESLIE NICOLAS testified at the hearing on petitioner's behalf. Contrary to the detectives' testimony, Nicolas stated that the detectives asked her twice if she wished to speak to petitioner. She declined on the first occasion, but eventually agreed to speak to petitioner. (H.295-96). According to Nicolas, the detectives told her that the petitioner's statement regarding how he discovered Kyona walking in the hallway "didn't make any sense because Kyona had passed awhile ago." (H.275). Nicolas further testified that the detectives told her to tell petitioner that they did not believe his statement and that it would "make more sense" if petitioner had checked up on Kyona and found her in bed. (H.274-75).

16.    According to Nicolas, she was allowed to speak to Mr. Jean alone in the interview room for 2 to 3 minutes. (H. 275-77, 281). During the meeting, Nicolas told petitioner that the detectives had told her that his statement would be more believable if he had discovered Kyona in

bed and told him that "that makes more sense" and "if that's what happened, you should say that's what happened." (H. 278-79). Nicolas further testified that she told petitioner that if he changed his statement, then the police would not charge him with murder. (H.278-79). Nicolas further testified that the police never told her that they were going to charge petitioner with murder. (H. 298-99).

17.    Oral argument before the court was held on July 15, 2002. In light of the testimony at the hearing, defense counsel argued that petitioner's statements to police after his conversation with Nicolas should be suppressed because they were made involuntarily. Specifically, he argued that Nicolas acted as an agent for the police and induced petitioner to change his story at the behest of the police. (HC. 26-28).[3] Petitioner further contended that Nicolas promised that he would not be charged with murder if he changed his statement. (HC. 28-29).

18.    Moreover, defense counsel further argued that petitioner's waiver of his Miranda rights on two occasions and his consent to search his home was made involuntarily. Specifically, he argued that petitioner's mental and physical condition after receiving the news of his daughter's death made it so "[t]hat he never understood he was giving up his rights mentally, physically, medically." (HC.30). Consequently, defense counsel contended that all the statements made to the police and the physical evidence recovered from his home should be suppressed. (HC.29-33). Lastly, defense counsel argued that petitioner's grand jury testimony should be inadmissible since the testimony was the "fruit of the poisonous tree" deriving from police misconduct. (HC.37-38). Specifically, defense counsel argued that petitioner testified only to dispel the taint of his last, involuntarily made statement to police. (HC.37-38)

---

[3] Relevant portions of the hearing colloquy are annexed as Exhibit B.

19.     On July 26, 2002, Judge Kelly issued a written decision denying petitioner's motion to suppress evidence.  In his decision, the hearing court credited the testimony of the People's witnesses and determined that petitioner's statements were admissible.[4]  According to the court, the first two statements made to Officer Franklin and Officer Lee made at petitioner's house occurred during an ongoing emergency and were therefore not custodial statements.  Additionally, the hearing court concluded that petitioner had voluntarily waived his Miranda rights both at the hospital and at the police station, and that therefore his oral and written statements made to Detective Graham and Detective Youngman were admissible.

20.     The hearing court also ruled that Nicolas was not acting as an agent for the police for the purposes of eliciting a confession and that petitioner's final statement to police was therefore admissible.  Lastly, the hearing court concluded that petitioner's grand jury testimony was admissible at trial.  The hearing court found that, even if the petitioner's second written statement was involuntarily made, his grand jury testimony was attenuated from any preceding taint.

## C.    Conflict of Interest Hearing.

21.     Prior to trial, the Government additionally brought to the Court's attention that petitioner's counsel David Goldstein also represented Dr. Eric Silva, the emergency room doctor at Good Samaritan and a "very significant witness for the prosecution."  (CH.4).[5]  In particular, it was revealed that Goldstein had represented Dr. Silva in connection with a marijuana offense in New Jersey which resulted in a diversionary disposition and a fine.  (CH.18-19, 37-38).  The offense

---

[4] A copy of the decision is annexed as Exhibit C.

[5] Relevant pages of the conflict hearing are annexed as Exhibit D.

7

involved possession of three marijuana cigarettes at Newark Airport.  (CH.37).

22.    The diversionary disposition involved a conditional discharge that required Dr. Silva to remain under supervision for a certain time, so the case was in some ways still pending.  (CH.30, 38).[6]  Moreover, Goldstein's fee had not yet been paid in full so representation had not terminated. (CH.14).

23.    It was further established that Dr. Silva was unwilling to waive the attorney-client privilege so as to be cross-examined about the violation by Goldstein.  (CH.28).  As a result, it was determined that an actual conflict of interest existed.  The court advised petitioner to consult with independent counsel, but did not appoint or otherwise arrange such counsel for him, and he could not consult with outside counsel on his own because he was incarcerated.

24.    At an adjourned proceeding two days after the initial conflict hearing, the prosecutor argued that the conflict was non-waivable and urged the court to disqualify Goldstein.  (CH.61).  The trial court, however, opined that the conflict could be waived and accepted petitioner's statement that he wanted Goldstein to continue representing him.  (CH.64-65).[7]  It should be noted that Goldstein never cross-examined Dr. Silva about the marijuana charge during trial.

**D.    The Preliminary Charge.**

25.    Jury selection took place in the Rockland County Court on August 6 and 9, 2002, and trial commenced on August 12.  During its initial charge, the trial court instructed the jury as follows concerning the principle of reasonable doubt:

> Proof beyond a reasonable doubt is somewhere on the continuum

---

[6] Mandatory supervisory treatment is provided for by N.J. Stat. Ann. § 2C:35-10(a)(4).

[7] The trial court also issued a written ruling, a copy of which is annexed as Exhibit E.

between 51 and 100 percent, and where that is only the juror knows, you make that determination. It's not proof beyond all doubt which would be 100 percent. You can't get that type of proof in human affairs… It's higher than 51 percent and something less than 100 percent... ***to mathematize it, it is 51 percent that suffices***.

(T.51-53) (emphasis added).[8]

26.    Following a lunch recess, counsel objected strongly to this instruction, on the ground that the standard of proof in a criminal case is "a high standard… clearly not the 51 or the 51.2." (T.62). The court then gave a "curative" instruction that did not in fact cure the error:

I am going to hopefully clarify something I said. In a civil case where a mere preponderance of 51 percent is enough and I went on to say in a criminal case is not a mere preponderance but a proof beyond a reasonable doubt and I said it appears somewhere between 51 percent *and the purpose is not to suggest that 53 or 58 percent but it was more than 51 percent and something less than 100 percent*, but the standard being proved is beyond a reasonable doubt.

(T.65) (emphasis added). Trial counsel again requested a curative instruction but none was given.

**E.    The Evidence at Trial.**

27.    At trial, MENDISSA JEAN testified that, on the afternoon of October 11th, 2001, she and her step sister, KYONA FREDERICKS, returned from school to their home at 9 Innington Court in Hillcrest, New York. (Jean: 245, 283). Later, Mendissa had some trouble with rounding numbers and asked her father, DARIUS JEAN, for some help. (Jean: 248). Mendissa then went back upstairs to complete her homework. (Jean: 249, 283). When Mendissa asked for help again, petitioner scolded her and hit her with a belt on two occassions. (Jean: 250, 252).

28.    Ms. Nicolas arrived home from work around 11 P.M. Nicolas went upstairs and saw that Kyona was still working in her room. She washed some of the girls' dirty clothes and then

retired to the master bedroom. (Nicolas: 431-33). Later, she heard Kyona crying and went downstairs to find Mr. Jean and Kyona in the kitchen. According to Nicolas, Mr. Jean held a brown belt. (Nicolas: 434). In the hallway, Nicolas told Mr. Jean to let Kyona go to bed, but Mr. Jean told her that she "didn't know her homework." (Nicolas: 434, 475). Then, Nicolas decided to leave the house and drive to White Castle. (Nicolas: 435, 476-77). When she returned thirty minutes later, she proceeded to the master bedroom and fell asleep. (Nicolas: 435-36).

29.    Later, Mendissa Jean awoke and peeked over her top bunk bed and saw Mr. Jean hitting Kyona with his belt and a piece of blue wire. (Jean: 255-56, 309). Mr. Jean was telling Kyona that the answer to her homework was "right in front of her" and that he would hit her again if she did not have the right answer. (Jean: 257). When she did not answer, he hit her again on her back and her head. (Jean: 258). According to Mendissa, Mr. Jean hit Kyona around twenty times. Mendissa heard Kyona tell petitioner that she could not breathe, move, write or see. (Jean: 259). When Kyona asked to use the bathroom, Mr. Jean ceased hitting her.

30.    Meanwhile, at around 1 A.M., Nicolas heard Kyona crying. (Nicolas: 436). She saw Mr. Jean in the girl's bedroom and told him let Kyona sleep. Petitioner replied that she "was not answering her homework right." (Nicolas: 438). Nicolas then went back to sleep.

31.    Later, Mendissa awoke and saw Mr. Jean splashing water on Kyona's face in the bathroom. She then went back to sleep. (Jean: 262-63)

32.    Then, at approximately 3 A.M., Mr. Jean burst into the master bedroom carrying Kyona. (Nicolas: 439, 480). He awoke Nicolas and placed Kyona on the bed. (Nicolas: 480). Though she was a trained nurse, she left the room for ten minutes and cried while Mr. Jean pleaded

---

[8] Relevant portions of the trial transcript are annexed as Exhibit F.

with her to help Kyona. (Nicolas: 441, 482). Finally, she went back in the bedroom and discovered that that Kyona was not breathing and did not have a pulse. (Nicolas: 442). She then told Mr. Jean to call 911 and began to perform CPR. (Nicolas: 443, 485).

33.   Moments later, Mr. Jean stood outside and flailed his arms at POLICE OFFICER CHRIS FRANKLIN, who had responded to the 911 dispatch. (Franklin: 4, Nicolas: 444). He stopped his car in front of 9 Innington Court and Mr. Jean directed him to the bedroom. (Franklin: 5-6). Unable to find a pulse on Kyona, he began to administer CPR. (Franklin: 9). When he tilted her head back, he found that Kyona's jaw was a little stiff. (Franklin: 10). However, he gave two oxygen administrations and found that Kyona's lungs were filled with air. (Franklin: 10, 20). While Officer Franklin administered the CPR, Mr. Jean paced up and down the hallway, saying "Please don't die." (Franklin: 12).

34.   Soon thereafter, the paramedics arrived and took over the CPR administration from Officer Franklin. (Franklin: 11, Freson: 64-65). BARBARA FRESON, the paramedic, found that Kyona's jaw was stiff, had trouble putting the air tube in her mouth and found that she had no blood circulation. (Freson: 67-69).

35.   Meanwhile, Officers Franklin and SEAN LEE spoke with Nicolas and Mr. Jean. Nicolas told them Kyona had used an inhaler in the past. (Franklin: 23). She further told them that she had felt a weak pulse from Kyona when Mr. Jean first brought her into the bedroom. (Lee: 52). Mr. Jean told them that Kyona had a history of asthma and that he noticed her walking clumsily in the hallway and did not look well. (Lee: 34-35). Then, he told Lee that he brought her into the kitchen, gave her some chicken, and splashed some water on her face. He then said that Kyona was still breathing when he brought her into the bedroom. (Lee: 34-35).

36.     The paramedics put Kyona into an ambulance at 3:51 A.M. Officer Lee drove Mr.

Jean to Good Samaritan Hospital.  At the hospital, Mr. Jean jumped out of the police car and ran

directly to the ambulance.  (Lee: 35, 57).  Once Kyona was brought into the emergency room, DR.

ERIC J. SILVA, the on-duty physician, examined Kyona and pronounced her dead on arrival at 4:14

A.M. (Silva: 342-43).  A further examination revealed "probably" more than twenty wounds on her

back. (Silva: 343-44).  Silva estimated that Kyona had been dead between two to four hours prior to

her arrival at the emergency room.  However, on cross, Silva admitted that he did not know "a great

deal" about the details of rigor mortis and that he did not test her joints for rigor mortis. (Silva: 361,

363).

37.     In fact, Frederick Zugibe, the chief Medical Examiner of Rockland County, who

performed the October 21, 2001 autopsy on Kyona's body, estimated the time of death between 1:30

A.M. and 3 A.M, based on the assumption that the beating occurred at 1 A.M. (Zugibe: 709, 756).

Dr. Zugibe found that Kyona had sustained multiple abrasions to her back.  (Zugibe: 693-696).  In

his opinion, he concluded that Kyona died from blunt force trauma which caused hemorrhages and

pneumothoraxes.  (Zugibe: 698-99). Furthermore, he concluded that the injuries to Kyona's back

were consistent with the belt and the blue cord that had been found in petitioner's home.  (Zugibe:

704-705).

38.     On cross-examination, he admitted that the forensics lab did not find blood on the

blue cord and that he could definitively say whether it was the murder weapon or not.  (Zugibe: 725-

726).  He also admitted that he did not add pneumothoraxes as a cause of death until January 10,

2002.  (Zugibe:740).

39.     In the early morning hours of October 12, 2001, Dr. Silva advised Mr. Jean that

Kyona had died.  Petitioner went into hysterics and ran out of the hospital into the parking lot.  (Lee: 39, Silva: 350, 352).  He flailed his arms and yelled at the top of his lungs until he collapsed on the pavement and began to bang his head, arms and legs into the gravel.  (Lee: 40, 58).  Several officers had to restrain him and help him into a wheelchair.  (Franklin: 15, Lee: 40).  Dr. Silva's diagnosis was that Mr. Jean was suffering from post-traumatic stress disorder and placed him in a stretcher and put him in restraints.  (Silva: 352-53, 356).

40.    It was in this state that DETECTIVE GLENN GRAHAM of the Ramapo Police Department read petitioner his Miranda rights. (Graham: 97-98).  Graham elicited a statement from Mr. Jean that he had "disciplined" the girls with a brown leather belt earlier in the evening. (Graham: 104-05).  Mr. Jean told Graham that, at around 3 A.M., he saw Kyona walking down the hallway and she told him that she wasn't feeling well.  He then told Graham that he gave her a piece of chicken, splashed some water and alcohol on her face, and then she collapsed.  He said that he carried Kyona to Nicolas for help. (Graham: 106).  Additionally, he stated that he "thought Kyona was having an asthma attack." (Graham: 108).

41.    In addition to the signed Miranda waiver, Graham procured a signed search consent form from Mr. Jean while he remained in the restraints.[9]

42.    Meanwhile, Detective Dunn spoke with Nicolas and Mendissa Jean.  (Dunn: 313).  On the way to the hospital, Nicolas had told Mendissa not to say anything about what she saw that night. (Nicolas: 445, 487-88).  At the hospital, DR. FE MURPHY examined Mendissa.  Dr Murphy

---

[9] DETECTIVE MATTHEW WINTERS of the Rockland County Bureau of Criminal Identification, along with several members of the Town of Ramapo Police Department, conducted a search of petitioner's home at 9 Innington Court. (Winters: 178).  Among other pieces of evidence, Winters collected a brown leather belt and a blue amplifier cord. (People's Exhibits 34-35).

observed that her right arm was swollen, but had no limitation of movement, and that her thigh was discolored. (Fe: 334).

43.     At around 7 A.M., DETECTIVE LEE YOUNGMAN of Ramapo Police Department brought Mr. Jean, now out of the hospital restraints, to the police station for further questioning. Subsequently, both Youngman and Graham interrogated the petitioner.  Mr. Jean told them that Kyona suffered from asthma and had one serious attack in the past.  (Youngman: 554-55).  He further told the detectives that, because the girls had urinated in their rooms and were doing their homework incorrectly, he spanked them with a brown belt approximately 10-15 times each.

44.     Mr. Jean maintained that he saw Kyona walking clumsily in the hallway only thirty minutes before the ambulance came.  (Youngman: 556).  He again explained that he splashed some water on her face and fed her some chicken because he thought it would make her feel better. (Youngman: 557).  Mr. Jean told them that when she appeared to choke on the chicken, he rushed her to Nicolas.  He then called 911 as she administered CPR.  (Youngman: 556-58, 559, 573; Graham: 112; People's Exhibit 62).

45.     After this statement was taken, Nicolas kept asking to speak to Mr. Jean. (Graham: 117, Youngman: 573).   The officers then allowed a meeting between petitioner and Nicolas. (Graham: 117; Youngman: 573-74).  However, there is no indication in the police records of this meeting taking place.  (Graham: 133-34, 138; Youngman: 589).[10]

---

[10] Nicolas had hired an attorney shortly after the incident and was testifying pursuant to a cooperation agreement. (Nicolas: 453).  She further admitted that she and Mr. Jean had been having problems with their relationship and that she was upset when women called the house. (Nicolas: 516).  She stated that shortly after the incident, she arranged to have most of the furniture taken out of the house at 9 Innington Court and signed a listing agreement to rent the house with a real estate broker in which she claimed she was the owner of the house, even though Mr. Jean held title.

14

46.    Before the meeting, police told Nicolas that petitioner's statement did not make sense. During the meeting, Mr. Jean was crying and still in shock. (Nicolas: 492). Nicolas spoke to petitioner in Creole for five minutes and told him that if he changed his story, maybe the police would not charge him with murder. (Nicolas: 493-94).

47.    After meeting with Nicolas, petitioner gave a second typewritten statement. (Youngman: 592; People's Exhibit 63). The statement was taken between 2:40 P.M. and 3:10 P.M., during which time Mr. Jean was crying and in shock. (Youngman: 579, 593). Mr. Jean then told Youngman that he found Kyona in bed about 15-20 minutes before the ambulance came and thought she was having an asthma attack. (Youngman: 582). Youngman further testified that Mr. Jean had told him that he had put the chicken in her mouth to make it look as if she had choked. (Youngman: 584). However, this admission was not included in the typewritten statement.[11] (Youngman: 586)

48.    Months later, On May 28th, 2002, Nicolas called Mr. Jean and met him at a diner at 2 A.M. She told him to take a plea offer, but Mr. Jean maintained that he did not kill Kyona. Mr. Jean asked Nicolas if she thought he had killed Kyona. Nicolas replied that she did not believe he had killed her. (Nicolas: 512).

49.    After the prosecution rested, defense counsel moved to dismiss on the ground that the evidence was not legally sufficient to establish depraved indifference murder. (T.762-64). The trial court denied this motion. (T.764).

50.    The defense then presented its case. HERBY CESAR testified that, on October 11,

---

(Nicolas: 503-04).

[11] As for the period before noticing Kyona in distress, Mr. Jean maintained essentially the same version of events as told in the first statement.

2001, he arrived at 9 Innington Court in Hillcrest, New York. (Cesar: 769). He was in the music production business with Mr. Jean and went to work in the home office with a man named Junior, who was also involved in the music business. (Cesar: 767-70). At around 7 P.M., Mr. Jean asked Cesar and Junior to watch the girls in order to allow him to go to Home Depot. (Cesar: 772). Mr. Jean returned home about thirty minutes later. (Cesar: 772). Just before they left the house at 9:40 P.M, Cesar and Junior ate Chinese food in the kitchen. (Cesar: 771, 773). While they ate, Kyona came down to ask a question about her homework and looked perfectly normal. (Cesar: 774). After she left, Mr. Jean told Cesar and Junior that he had spanked his girls because they were not doing their homework correctly. (Cesar: 775). During this time, he did not notice anything unusual about the girls. (Cesar: 774-75).

51.     Between 9:30 and 10:00 P.M., OUMIE CAMARA, petitioner's downstairs tenant, arrived home to find Mr. Jean working in the shower of her bathroom. (Camara: 786-87). She then went upstairs to take a shower. (Camara: 787-89). She saw Mendissa and Kyona doing their homework in the kitchen and said hello to them. (Camara: 789). When she returned downstairs, she talked with Mr. Jean about the progress of her shower. (Camara: 790). During the conversation, Kyona came downstairs and asked petitioner a question about her homework. (Camara: 790). Camara then retired to her bedroom and fell asleep. (Camara: 791).          Sometime between 3:30 and 4:00 A.M., Camara awoke when she heard Nicolas' voice and footsteps upstairs but soon fell back asleep. (Camara: 792).

52.     The next day, Nicolas told Camara that she had to leave because Nicolas was going to sell the house. (Camara: 796). Nicolas further told her that Kyona had died of an asthma attack after Mr. Jean spanked her. (Camara: 796). During the following week, Nicolas had people over to the

16

house, was playing loud music, and removed all the contents from the house. (Camara: 797).

**F.    The Concluding Charge and Verdict.**

53.    At the conclusion of evidence and summations, the trial court gave its charge to the jury.  Although the court did not repeat its "51 percent" instruction on reasonable doubt, it never recanted that instruction or informed the jury that it had misspoken.  Moreover, the court compounded the error during its charge on depraved indifference murder, when it instructed the jury that "[a] person acts recklessly with respect to another person's death when that person... creates a substantial, unjustifiable and grave risk that another person's death will occur and when he or she is *unaware of* and consciously disregards that risk."  (T.922-23) (emphasis added).

54.    Petitioner's trial counsel objected to this instruction but the court refused to correct its charge:

> MR. GOLDSTEIN: Judge, unbelievable, on that same exact statement under recklessly, when you corrected to "and," you stated "And when he is," and then you used unaware as opposed to aware.
>
> THE COURT: No.  I definitely said aware.  I definitely said, "aware and consciously disregards the risk" because that's different then when he perceives a risk.  I'll totally stand on what I said because *that would have been a biggy.*

(T.952) (emphasis added).  In other words, although the court acknowledged that the erroneous charge (which clearly appears on the face of the settled transcript) "would have been a biggy," it denied giving that instruction and refused to instruct the jurors correctly.  On August 19, 2002, under the influence of these erroneous and misleading instructions, the jury convicted petitioner on all counts.

**G.     The CPL § 330.30 Motion and Hearing.**

55.     On September 23, 2002, after petitioner was convicted but before he was sentenced, the court received a letter from trial juror Marie Lewis.  In the letter, Ms. Lewis stated that she had voted for depraved indifference murder under pressure from the other jurors because she "believed it was similar to accidental death."  Thereafter, petitioner moved pursuant to CPL § 330.30 to set aside the verdict based on juror confusion.

56.     A hearing was held on this motion on October 31, 2002 and November 7, 2002.  At the hearing, Ms. Lewis related how a fellow juror explained to her that if the jury concluded that petitioner had intended to cause Kyona's death, they should find him guilty of Murder in the First Degree, but if they concluded her death was accidental, they should find petitioner guilty of Murder in the Second Degree.  (PTH.7-10, 68).[12]  Notably, Murder in the First Degree was not an option before the jury.

57.     Ms. Lewis further testified that she was certain that Kyona's death was an accident since she was certain that petitioner did not intend to harm her. (PTH.11-12).  Moreover, Ms. Lewis testified that she did not cast a specific vote for Manslaughter in the First Degree.  (PTH.85-88).

58.     Juror Marianne Troy testified for the People at the hearing. She testified that the jury spent a good amount of time explaining to Ms. Lewis what intent meant.  (H.158).  Ms. Troy also noted that Ms. Lewis wanted to vote for a conviction of criminally negligent homicide.  (H.160).  Notably, she corroborated Ms. Lewis by stating that it was she (and possibly others) who represented the elements of the charge of Murder in the Second Degree by way of contrast to Murder in the First

---

[12] Relevant portions of the post-trial hearing are annexed as Exhibit G.

18

Degree.  (H.169-70).

59.     Following the hearing, the trial court issued a written decision concluding that Ms. Lewis had experienced "juror afterthought" rather than being confused during deliberations.[13]  The County Court then proceeded, on November 21, 2002, to enter judgment pursuant to the jury verdict and sentence petitioner to a term of 25 years to life.

**H.     Post-Conviction Proceedings.**

60.     Petitioner, represented by Harvard Hollenberg, Esq., appealed his conviction and sentence to the Appellate Division, Second Department.[14]  On May 4, 2004, Mr. Hollenberg filed a ten-point brief in support of the appeal.[15]  Eight of those points alleged that petitioner's trial counsel was ineffective in various ways.  The other two points argued that the trial court erroneously declined to suppress petitioner's statements at the hospital, and that the verdict resulted from impermissible jury confusion compounded by erroneous instructions.

61.     Remarkably, however, although Mr. Hollenberg raised the "51 percent" instruction in his juror confusion point, he failed to mention the "unaware of the risk" instruction, which had been objected to at trial.

---

[13] A copy of the decision is annexed as Exhibit H.

[14] It should be noted that Mr. Hollenberg also filed a post-trial CPL § 440.10 motion which, like the direct appeal, alleged that petitioner's trial counsel was ineffective.  The grounds alleged in the 440.10 motion were the same as those argued on direct appeal with the addition of (1) counsel's alleged failure to apprise petitioner of a plea offer, (2) his failure to call character witnesses, and (3) his failure to prevent petitioner from speaking at sentencing.  Because these three allegations of ineffective assistance are not raised on this petition, the 440.10 motion papers and resulting ruling are not annexed as exhibits.

[15] Copies of the Amended Brief filed by Mr. Hollenberg and the opposition brief filed by the prosecution are annexed as Exhibits I and J respectively.

62.     Petitioner's direct appeal was argued before the Second Department on November 15, 2004.  On December 13, 2004, the Second Department issued a decision affirming petitioner Jean's conviction.  See People v. Jean, 13 A.D.3d 466 (2d Dept. 2004).  With respect to the juror confusion issue, the court found that "[a]ny prejudice to the petitioner resulting from the County Court's improper pretrial instruction was obviated by the final charge given to the jury at the trial."  Id. at 468.[16]

63.     Petitioner sought leave to appeal to the Court of Appeals on all issues raised in the brief.[17]  The Court of Appeals denied leave on June 24, 2005, and a motion for reconsideration was subsequently denied on August 29, 2005.  See People v. Jean, 5 N.Y.3d 764 (2005); see also People v. Jean, 5 N.Y.3d 807 (2005).[18]

64.     On or about June 12, 2006, petitioner filed a *pro se* motion for writ of error coram nobis before the Appellate Division, Second Department.  In July 2006, before the motion was decided, petitioner retained Abraham Abramovsky, Esq. as counsel and withdrew the motion without prejudice in order to provide counsel with an opportunity to review the record.[19]

65.     On August 9, 2006, petitioner moved pursuant to CPL § 440.10(1)(h) to vacate his conviction.[20]  Petitioner contended that the Second Department's decision had been superseded by

---

[16] A copy of the Second Department's decision is annexed as Exhibit K.

[17] A copy of the leave application is annexed as Exhibit L.

[18] Copies of the Court of Appeals' decisions are annexed collectively as Exhibit M.

[19] The undersigned served as of counsel to Professor Abraham Abramovsky on the CPL § 440.10 motion and subsequent writ of error coram nobis. Upon the untimely death of Professor Abramovsky, petitioner retained the undersigned as counsel.

[20] Because the issues raised in the CPL § 440.10 motion are not at bar in this petition, the

the New York Court of Appeals' decisions in <u>People v. Suarez</u>, 6 N.Y.3d 202 (2005) and <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006).  In particular, petitioner argued that <u>Suarez</u> and <u>Feingold</u> had retroactively changed the law regarding depraved indifference, establishing that depraved indifference murder and first-degree manslaughter are inconsistent counts.  The motion was denied on October 25, 2006, and the Second Department denied leave to appeal on February 13, 2007.

66.    On March 7, 2007, petitioner moved for a writ of error coram nobis on the ground that petitioner received ineffective assistance of appellate counsel for (1) not raising the "unaware of the risk" instruction either as a separate point on appeal or as part of the jury confusion point, and (2) not arguing that the evidence at trial was insufficient to sustain a conviction of depraved indifference murder.[21]  The prosecution opposed the motion, arguing (1) that any sufficiency claim raised by Mr. Hollenberg would have been without merit because this case involved the beating of a child, and (2) that the "unaware of the risk" charge, albeit erroneous, was subsequently cured by the court and in any event was unpreserved for appellate review. Petitioner submitted reply papers contending (1) that a single beating of a child, as opposed to an extended course of conduct, doesn't rise to the level of depraved indifference to human life under the law in effect at the time of the direct appeal, and (2) that the "unaware of the risk" instruction was preserved by timely objection and that the manifest confusion of juror Marie Lewis showed that the error was not cured.

67.    On September 18, 2007, the Second Department issued an order denying petitioner's coram nobis motion without opinion.  Petitioner applied for leave to appeal, which was denied on

---

motion papers and the decisions thereon are not annexed as exhibits.

[21] Copies of the coram nobis motion papers, opposition and reply papers are annexed as Exhibits N through P.

December 18, 2007.[22]

I.    **The Instant Petition.**

68.    Accordingly, on December 26, 2007, petitioner filed the instant habeas corpus petition with the Clerk of this Court.  As set forth in the accompanying Memorandum of Law, petitioner is entitled to vacatur of his conviction because (1) the trial court's "51 percent" instruction combined with the jury's manifest confusion deprived him of a fair trial; (2) the police violated his Fifth Amendment rights by interrogating him custodially while he suffering from PTSD and using Ms. Nicolas as their agent to elicit a confession; (3) he received ineffective assistance of trial counsel; and (4) he received ineffective assistance of appellate counsel.  This Court should therefore grant the instant petition and order that petitioner be released unless the State of New York retries him by a date certain.

Dated:  New York, NY
            February 25, 2008

_____/s/_____
JONATHAN I. EDELSTEIN (7827)
Attorney for Petitioner
271 Madison Avenue, 20th Floor
New York, NY 10016
(212) 871-0571 x208

---

[22] Copies of the Second Department's decision, the leave application and the order denying leave are annexed as Exhibits Q through S.

1                          S. Lee-Direct

2    and Darius Jean to where the kitchen area, living room, kind

3    of combines.  I started to ask questions to both of them.  I

4    was trying to determine how long the child was not

5    breathing, what-have-you, to get a better indication so I

6    can relay that to the medical personnel.  I was able to

7    speak to Leslie Nicolas.  Mr. Jean was in an excited state.

8    I was able to speak to him intermittently.

9         Q     Let's do Leslie Nicolas first.  What, if

10   anything, did you ask Leslie Nicolas, and what, if anything,

11   did she tell you?

12        A     I had asked her basic questions -- how long she

13   knew the child wasn't breathing.  She had told me she was

14   asleep in bed, and the child was brought in to her by Darius

15   Jean, and had told her the child wasn't breathing, that she

16   had told him to call 911, and she began CPR.

17        Q     In addition to speaking to Leslie Nicolas in the

18   house at 9 Innington Court, did you also speak to Darius

19   Jean at some point in time?

20        A     Yes, I did.

21        Q     Can you tell us what, if anything, you asked

22   Darius Jean and what, if anything, he told you?

23        A     I spoke to him intermittently, and one time in a

24   little more great detail while we were in the house while

25   the paramedics were still there.  He did state to me he was

1                              S. Lee-Direct

2      informed my sergeant I was going to drive Darius Jean to the

3      hospital and informed Darius Jean to sit in my patrol car in

4      the front seat, and I drove him to the hospital.

5          Q      He was not allowed in the ambulance?

6          A      No.

7          Q      Why was that?  Just for the record.

8          A      Being an excited nature, it's confusing and

9      distracting to the paramedics.

10         Q      So you took him in your patrol vehicle to the

11     hospital, correct?

12         A      That's correct.

13         Q      And what hospital did you go to?

14         A      Good Samaritan Hospital in Suffern.

15         Q      Did you follow immediately the ambulance, or did

16     you leave shortly after the ambulance?

17         A      I stayed with the ambulance.

18         Q      So your car, when you drove out, you were

19     immediately following the ambulance as it drove to Good

20     Samaritan?

21         A      That's correct.

22         Q      Approximately how long did it take you to get

23     from 9 Innington Court to Good Samaritan Hospital?

24         A      Five to seven minutes.

25         Q      And upon arriving at Good Samaritan Hospital,

1                              S. Lee-Direct

2    room with Mr. Jean?

3        A    He's emergency room attending physician, Dr.

4    Silva.

5        Q    And did you enter the room at that point in

6    time?  Or tell us what you did.

7        A    I went back to the same area in the hallway

8    right outside the door.  The door was, I believe, partially

9    open.  I didn't enter the room.  I just stood by.  I knew

10   Mr. Jean was being told by the doctor of Kyona's passing.

11       Q    Did you actually hear him inform Mr. Jean of

12   that?

13       A    I heard some conversation in reference to the

14   child being deceased.

15       Q    And what, if anything, occurred at that time,

16   sir?

17       A    At that time Mr. Jean became very excited and

18   had exited the room and began yelling and screaming and

19   acting very excited.

20       Q    What, if anything, did you do as a result of

21   making that observation?

22       A    I was trying to try to calm him down, tell him

23   to relax, to calm down.  At that point he basically ran out

24   the emergency room doors and had run south in the parking

25   lot, the rear parking lot.

```
 1                        S. Lee-Direct
 2        Q     When he ran out the emergency doors, where did
 3   he go immediately upon exiting the doorway?
 4        A     He went south across the entrance to the
 5   emergency room and then into a parking lot located in the
 6   south part of the hospital.
 7        Q     My apologies.  What, if anything, did you do
 8   upon seeing that?
 9        A     I chased after him.
10        Q     And did you catch up with Darius Jean at any
11   point in time?
12        A     Yes, I did.
13        Q     Where was that?
14        A     Approximately 500 yards or so in the parking
15   lot, Mr. Jean had collapsed and stopped running and began to
16   thrash around on the parking lot.  I was able to catch up to
17   him.
18        Q     And did you try to speak to him at that point in
19   time?
20        A     I tried to calm him down.  I had to hold him.
21   He was going to end up hurting himself.  I was trying my
22   best to restrain him from doing damage to himself and just
23   telling him to relax.  He was incoherent.  I didn't ask him
24   any questions.  I was just trying to get him to calm down.
25        Q     Specifically what was he doing at that point in
```

1                          S. Lee-Direct

2    over again, and not helping us move him.

3               At one point somebody brought over a hospital

4    wheelchair.  We placed him in there, and he was brought back

5    to the emergency room.

6         Q    And who was he turned over to, if anybody?

7         A    There were several of us when we brought him

8    back into the hospital.  I know Officer Hatch had stayed

9    with him.

10        Q    Was he turned over to the hospital staff upon

11   returning there?

12        A    Yes.

13        Q    Now, sir, you testified that upon arriving at 9

14   Innington Court, you spoke to a male later identified as

15   Darius Jean; is that correct?

16        A    That's correct.

17        Q    Would you take a look around the courtroom here

18   today, and tell us whether or not you see him in the

19   courtroom?

20        A    Yes.

21        Q    Would you point him out for the record?

22        A    Sitting at the table (indicating).

23             MR. GOLDSTEIN:  Indicating the defendant,

24             for the record.  We'll stipulate.

25             MR. MOORE:  Thank you, Mr. Goldstein.

1                              S. Lee-Cross

2        Q      Just the best you can.  We always want that.

3        A      Right.  To the best of my knowledge, yes.

4        Q      There came a point when Dr. Silva was in the

5    room speaking to Mr. Jean?

6        A      Yes.

7        Q      That's when you were in the doorway?

8        A      When I had come back to the doorway, the doctor

9    was already in the room.

10       Q      Okay.  Even though you didn't specifically hear

11   what was being said, you knew at that time that Dr. Silva

12   was telling Mr. Jean of the demise of his daughter?

13       A      Correct.

14       Q      And at one point Mr. Jean just burst out of the

15   room, burst out of the emergency room, and ran down the

16   parking lot?

17       A      Yes.

18       Q      Was he yelling anything when he was running?

19       A      Yes.

20       Q      What?

21       A      "No."  From what I can remember, there was a lot

22   of noes.

23       Q      Do you know if he was crying?

24       A      Yes.

25       Q      Was he crying?

1                                    S. Lee-Cross

2          A      Yes, he was crying.

3          Q      And you said he ran screaming, yelling, crying

4    for about 500 yards until he just gave out?

5          A      That's correct.

6          Q      And when he gave out and fell to the ground,

7    even though he couldn't run, that's when he was banging the

8    ground and kicking his feet and continuing to cry and to

9    say, "No," as you described?

10         A      Yes.

11         Q      Eventually yourself and another police officer

12   came upon him and handcuffed him for his own safety because

13   of the way he was acting?

14         A      That's correct.

15         Q      And as you described on direct examination, you

16   were not able to get him to walk or anything.  He had gone

17   completely limp.  All his strength was gone.  Is that

18   correct?

19         A      That's correct.

20         Q      Is that how you would describe it?

21         A      It's a good description.

22         Q      When he was taken back on the hospital in the

23   wheelchair, his hands were tied to the wheelchair, correct,

24   to the arms of the wheelchair?

25         A      I don't recall that.

65

1                              G. Graham-Direct

2      then after that I responded to Good Samaritan Hospital.

3          Q      Did you pick up a police vehicle at the station

4      and then go to Good Sam?

5          A      That's correct.

6          Q      Approximately what time did you arrive at Good

7      Samaritan Hospital, sir?

8          A      Sometime after five o'clock.

9          Q      And upon arriving at Good Samaritan Hospital,

10     what, if anything, did you do?

11         A      At the emergency room, just outside the

12     emergency room, I met Lieutenant Holmes and Officer Lee.

13         Q      And did you have a conversation with them, sir?

14         A      Yes, I did.

15         Q      As a result of that conversation, what, if

16     anything, did you do next?

17         A      After I spoke with the two of them, I went into

18     the emergency room and spoke to Dr. Eric Silva.

19         Q      And can you tell us what, if anything, Dr. Silva

20     informed you about this case?

21         A      Dr. Silva advised me that a young girl had been

22     brought into the emergency room.  She had been apparently

23     dead for a period of time, maybe a couple of hours, and that

24     he felt there was child abuse involved.

25         Q      And did you later learn the identity of that

1                          G. Graham-Direct

2      in that condition, and he said probably a few hours, two or

3      three hours.

4          Q      He told you she would have been dead for a few

5      hours?

6          A      That's correct.

7          Q      After speaking with Dr. Silva, Detective Graham,

8      what did you do next?

9          A      After I spoke with Dr. Silva, I went and spoke

10     with Leslie Nicolas.

11         Q      And where was she?  Do you know?

12         A      She was in a waiting room, which is at the

13     entrance to the emergency room.

14         Q      And what, if any, relation did Leslie Nicolas

15     have to the child Kyona Frederick, if you know?

16         A      She told me that she was a stepmother, the lady

17     who lived with Darius Jean.

18         Q      And what, if anything, did you ask Leslie

19     Nicolas, and what, if anything, did she tell you in regard

20     to this case?

21         A      Well, she told me that she had been sleeping

22     about three o'clock in the morning when Darius Jean brought

23     Kyona into the bedroom, woke her up, and said that she was

24     not breathing, at which time she was asked to start CPR.

25     She supposedly told Darius Jean to make phone calls, dial

1                          G. Graham-Direct

2      911 and get assistance.

3          Q     Did she tell you whether or not she knew

4      anything about what happened prior to the time that Darius

5      Jean carried the body into the master bedroom?

6          A     She said she had gotten home about 10:30 at

7      night; she had been working until that time; came home, took

8      a shower, went directly to bed.  She had no contact with the

9      children at all, had just gone right to bed.

10         Q     Now, Detective Graham, after speaking with

11     Leslie Nicolas, what did you do next?

12         A     I went to the room in the emergency room where

13     Darius Jean was located, and I spoke with him.

14         Q     To the best of your recollection, can you tell

15     us where that was?

16         A     It was in one of the examining rooms, has a

17     curtain on it, almost at the end of the corridor.

18         Q     And were there any other police officials there

19     at that time?

20         A     Just outside the room was Officer Hatch.

21         Q     And did you enter that room, sir?

22         A     That's correct.

23         Q     And did you have a conversation with Darius Jean

24     at that point in time?

25         A     Yes, I did.

1                              G. Graham-Direct

2         Q      Can you tell us what position he was, or

3    describe how you observed him at that point in time.

4         A      He was in a hospital bed.  He had his restraints

5    on, hospital type restraints on, and he was laying down.

6         Q      And either prior to or in the course of speaking

7    to Mr. Jean, were any of those hospital restraints removed?

8         A      I don't recall.

9         Q      Okay.  Let me ask you this.  Did you have a

10   conversation with Mr. Jean?

11        A      That's correct.

12        Q      Start there.  What, if anything, did you say to

13   Mr. Jean, and what, if anything, did he say to you?

14        A      I introduced myself.  I told him why I was

15   there.  I proceeded to give him his rights.

16        Q      When you say you gave him his rights, what

17   rights are you referring to, sir?

18        A      I gave him standard Town of Ramapo Miranda

19   warnings/rights form.

20        Q      How was that done, off the top of your heads or

21   off of a form?

22        A      No.  Off of a form.

23               MR. MOORE:  May I ask at this time this

24               document be marked People's 4 for identification

25               first.

1                     G. Graham-Direct

2               (People's Exhibit 4, Miranda form, was

3               marked for identification.)

4        Q     Sir, can you take a look at what's been marked

5    People's 4 for identification purposes, and tell us whether

6    or not you recognize it.

7        A     Yes, I do.

8        Q     What, if anything, do you recognize that

9    document to be?

10       A     That's a standard Town of Ramapo Police

11   Department acknowledgment of rights form or Miranda warning.

12       Q     Specifically was that the Miranda form that you

13   used in this case in regard to Darius Jean?

14       A     That's correct.

15       Q     And you said it's a standard preprinted form.

16   In addition to the preprinted portions, is there also

17   handwriting on it?

18       A     That's correct.

19       Q     Whose handwriting is on that form, sir?

20       A     Everything on that form is mine except for the

21   signature at the bottom, which is signature, date, and time.

22       Q     And what about initials?

23       A     The initials are not mine also.

24       Q     And where it says, "I, Darius Jean," who put

25   that on there?

1                    G. Graham-Direct

2        A     I wrote, "Darius Jean."

3        Q     So he put the initials on and signed the bottom

4   of it?

5        A     That's correct.

6        Q     Was that in your presence, sir?

7        A     That's correct.

8        Q     And did you sign as a witness?

9        A     Yes, I did.

10       Q     Now I was asking you before about the

11  restraints.  At any point in time as you were speaking to

12  him, do you recall whether or not the restraints were

13  removed when you were speaking to him?

14       A     They must have been because he signed it.

15       Q     Approximately what time did you advise him of

16  his Miranda rights, sir?

17       A     I started at 6:20 and ended at 6:23.

18       Q     And after advising him of his rights, Detective

19  Graham, did he acknowledge to you that he understood them?

20       A     Yes, he did.

21       Q     Did he indicate to you that he wished to waive

22  his rights and speak to you?

23       A     Yes, he did.

24       Q     Is it after that time that he signed that

25  document?

1                       G. Graham-Direct

2        A      That's correct.

3        Q      And is that the original document?

4        A      That's correct.

5               MR. MOORE:  Your Honor, at this time I'm

6               going to ask that People's 4 for identification

7               be moved into evidence.  Let the record reflect

8               it's being shown to Mr. Goldstein.

9               THE COURT:  Mr. Goldstein, any voir dire

10              with respect to that or any objection to its

11              introduction for purposes of the hearing?

12              MR. GOLDSTEIN:  Your Honor, for purposes

13              of the hearing, there is no objection.

14              THE COURT:  It's one page, isn't it, Mr.

15              Moore?

16              MR. MOORE:  One page, your Honor, yes.

17              (People's Exhibit 4, previously marked for

18              identification, was received in evidence.)

19       Q      Now, Detective Graham, just for the record, if

20   you know, was it hospital personnel who put Mr. Jean in

21   restraints in that room?

22       A      I don't know who put him in the restraints.

23       Q      Do you know if he was seen or spoken to by any

24   medical personnel while at the emergency room?

25       A      I know he spoke with Dr. Silva and probably some

1                           G. Graham-Direct

2    nurses.

3         Q    So what I'm asking you, was he under the care of

4    Dr. Silva while he was in the emergency room that morning?

5         A    That's correct.

6         Q    And do you recall when the restraints were

7    removed from his hands or legs?

8         A    No.

9                    MR. GOLDSTEIN:  Objection, your Honor.

10                   THE COURT:  There was no indication they

11                   removed them.  That's your objection?

12                   MR. GOLDSTEIN:  Yes.

13                   THE COURT:  Sustained.

14                   MR. MOORE:  Your Honor, at this time I

15                   know we subpoenaed some medical documents from

16                   Good Samaritan Hospital as to the treatment of

17                   Dr. Silva of Darius Jean.  I'm going to ask, if

18                   I could, and I'll continue the questioning, if

19                   your Court Clerk would produce them so I can use

20                   them as an exhibit as well.  Court Clerk or Law

21                   Clerk.  Sorry.

22                   THE COURT:  All right.  There is a

23                   document here, it's sealed, an envelope from

24                   Good Sam Hospital with the subpoena statement

25                   attached to it.  We're handing it to you, Mr.

1                    G. Graham-Direct

2          Moore.

3               MR. MOORE:  Given that Mr. Jean's

4          condition in the emergency room of Nyack

5          Hospital specifically --

6               MR. GOLDSTEIN:  Good Samaritan Hospital.

7               MR. MOORE:   -- Good Samaritan Hospital.

8          Excuse me.  Thank you -- specifically as to

9          medical restraints is now an issue your Honor,

10         at this time the People are going to move --

11              THE COURT:  I'm not sure it's an issue.

12         Is it an issue, Mr. Goldstein?

13              MR. GOLDSTEIN:  It might be.

14              THE COURT:  All right.  Fine.  Okay.  In

15         that case do you want to utilize a document

16         there?

17              MR. MOORE:  It's a 10-page document with

18         certification attached, medical records of

19         Darius Jean Good, Samaritan Hospital, and date,

20         your Honor.  We're moving in, pursuant to CPL

21         4518, a public record and records of a public

22         hospital.

23              THE COURT:  Any objection?

24              MR. GOLDSTEIN:  I haven't seen it.

25              THE COURT:  Let's show it to Mr.

1                        G. Graham-Direct

2          Goldstein.  There is probably a certification

3          attached to it.

4                  Haven't seen them either.  Is there a

5          certification?

6                  MR. GOLDSTEIN:  There's a front

7          certification page.

8                  I'm not going to object for the purposes

9          of this hearing, but before I do cross-

10         examination of this witness, I would ask to have

11         some time to look at this.

12                 THE COURT:  Do you want to look at it

13         now?

14                 MR. GOLDSTEIN:  That's fine.

15                 THE COURT:  Sure.  Take a look at it.

16         I'm assuming you won't have to resister an

17         objection.  I don't know if you were thinking of

18         something that didn't pertain to treatment or

19         diagnosis or history.  Take a look at and

20         utilize it.

21                 Off the record.

22                 (Discussion off the record)

23     Q   Just by way of reference to get back to track,

24     Detective Graham, you indicated that you had spoken to the

25     defendant Darius Jean at approximately 6:23, and you had

1                              G. Graham-Direct

2    given him his Miranda rights, correct?

3        A      That's correct.

4        Q      And, sir, did you have a conversation with Mr.

5    Jean subsequent to that?

6        A      Yes, I did.

7        Q      Could you tell us what, if anything, you asked

8    Darius Jean and what, if anything, he told you about the

9    events of that night.

10       A      I asked him what had happened, and he told me

11   that he had been home most of the day, that -- I guess you

12   would call his wife -- Leslie Nicolas had been home; he had

13   left the house about 11:30 or so to go to work.  He had a

14   little bit of a dispute with her over money.  She left.  He

15   stayed at home.

16              About 3:10 in the afternoon the two girls had

17   come home from school, and he had a little discussion about

18   their homework.  He had friends at the house with him; a

19   little music, apparently; he's got a little music studio in

20   the house; that during the day he worked on music.

21              THE COURT:  Pardon me.  When you said the

22              girls came home from school, who are you talking

23              about?

24              THE WITNESS:  Kyona Frederick and her

25              sister.

1                          G. Graham-Direct

2          Q      Is that Mendissa Jean?

3          A      Mendissa.

4          Q      So he indicated to you they had come home

5    sometime around three o'clock?

6          A      That's correct.

7          Q      I'm sorry.  Continue.

8          A      That during the evening and the afternoon, he

9    had friends at the house doing music; that the girls had

10   come up and down and talked to him about the homework.  At

11   one time he realized that the girls had peed in their beds

12   and peed in some kind of a vase type of object in the house,

13   and he disciplined them about eight o'clock at night to give

14   them a spanking in the upstairs hallway of the house.

15         Q      Did he tell you how he disciplined them or how

16   he spanked them?

17         A      Yes.  He spanked them with a belt.  He described

18   it as a brown twisted leather belt.

19                      THE COURT:  Both of the girls?

20                      THE WITNESS:  That's correct.

21         Q      Both Kyona Frederick and Mendissa Jean?

22         A      Right.

23                And after that he was downstairs, and at some

24   point in the night he went to Home Depot.  He was upstairs

25   in his room computer room doing his music, and somewhere

1                              G. Graham-Direct

2   around three o'clock in the morning, Kyona walked past his

3   room, said she wasn't feeling well, and went to the

4   kitchen.  He went to the kitchen to see if she was okay.

5   She was by the sink, and he says that he made her a piece of

6   chicken, and she passed out, and he tried to give her a

7   piece of chicken.  Thought she may need something to eat.

8   And she passed out, and he threw water on her face, and he

9   realized she wasn't doing well, she was not breathing, and

10  he carried her from there down the hallway to the room of

11  his wife, Leslie Nicolas, asking her for assistance.

12                    THE COURT:  When you say wife, she's been

13                    identified as a person that lived there.  Was

14                    she married to him?

15                    THE WITNESS:  No.  That's what he referred

16                    to her.

17                    THE COURT:  He called her that?

18                    THE WITNESS:  He referred to her as his

19                    wife.

20       Q    Detective Graham, in your conversation with

21  Darius Jean, he acknowledged to you that in fact he had

22  struck both the children that evening?

23       A    That's correct.

24       Q    And he indicated to you, as far as when he saw

25  Kyona Frederick come walking or staggering down the hallway,

1                          G. Graham-Direct

2      that that was sometime after 3 a.m. in the morning.  Is that

3      correct?

4            A      Approximately three o'clock he told me.

5                  THE COURT:  A.M., he's asking.

6                  THE WITNESS:  That's correct.

7            Q      Did you have any conversation with Darius Jean

8      at that time as to why it was he thought she wasn't

9      breathing?

10           A      He didn't know.

11           Q      Did he mention to you anything about asthma or

12     her having possible asthma?

13           A      I did ask if she had any medical conditions, and

14     she said, "Well, she did have asthma."

15           Q      And you said at some point in time he said he

16     had splashed water on her face in the sink area of the

17     kitchen.  Is that correct?

18           A      That's correct.

19           Q      Did he also indicate to you that at some point

20     in time, he washed her face with alcohol?

21           A      That's correct.

22           Q      What type of alcohol did he say?

23           A      I believe it to be rubbing alcohol.  It was in

24     the bedroom.  And he brought Kyona to Leslie's bedroom.

25           Q      Now, sir, after speaking to Darius Jean in the

G. Graham-Direct

1

2     THE WITNESS:  That's correct.

3     THE COURT:  The witness identified it, so

4     that must be the form.  This is 6.  This is

5     permission to search form of Leslie Nicolas,

6     right?

7     MR. MOORE:  Yes, your Honor.

8     THE COURT:  Very good.

9     Q     Now, Detective Graham, after speaking to Leslie

10    Nicolas, did you ever again speak to Darius Jean?

11    A     Yes, I did.

12    Q     And where did your subsequent conversation with

13    Darius Jean take place?

14    A     At the Ramapo Police Department.

15    THE COURT:  Now this, the timing on this,

16    would be?

17    MR. MOORE:  That's what I was about to ask

18    in the next question.

19    Q     Approximately what time did you return to the

20    Town of Ramapo Police Department?

21    A     After seven o'clock in the morning.

22    Q     And when you arrived there, was Darius Jean

23    already at the station?

24    A     That's correct.

25    Q     And was he in the company of any other police

1                            G. Graham-Direct

2      officers from Ramapo?

3            A      Detective Youngman.

4            Q      So he was already back at the Ramapo Police

5      station with Detective Lee Youngman when you arrived?

6            A      That's correct.

7            Q      And you're telling us -- your testimony is

8      approximately what time you got back?

9            A      It was after seven o'clock.  I don't know the

10     exact time.

11           Q      Sometime after seven o'clock.  Okay.  What, if

12     anything, occurred at that point in time?

13                         THE COURT:  After 7 a.m. this conversation

14                  was.

15           A      At that time I asked Darius Jean to sign a

16     permission to search form.

17           Q      Was he having a conversation with Detective

18     Youngman?

19           A      Yes.  That's correct.

20           Q      And did you participate in any or all of that

21     conversation?

22           A      Parts of it.  That's correct.

23           Q      Did there come a point in time, sir, where he

24     was asked to memorialize his statement in some type of

25     typewritten form?

1                    G. Graham-Direct

2    this case?

3        A    That's correct.

4        Q    At what time did you advise Mr. Jean of his

5    rights or the second occasion?

6        A    11:05 a.m.

7                THE COURT:  Mr. Moore, I'm confused.  He

8                said he came back to the station post 7 a.m.  I

9                was assuming he meant somewhere around 7 a.m. he

10               had this second conversation.

11               MR. MOORE:  He did.

12               THE COURT:  But this says eleven zero

13               five.

14               MR. MOORE:  I asked him.  He said he had a

15               conversation.  We're missing one detective,

16               which I think it will tie in when Lee Youngman

17               testifies.  He said he was present when

18               Detective Youngman had a conversation with him

19               at Ramapo.

20               THE COURT:  That's around seven-ish?

21               MR. MOORE:  Sometime after seven when he

22               comes to the police station.  I asked him if at

23               any point in time Detective Youngman asked Mr.

24               Jean to memorialize that statement in a written

25               form, and he said, "Yes."  That's how we got to

1              G. Graham-Direct

2          11:10.

3              THE COURT:  11:05.

4              MR. MOORE:  11:05.  Sorry.  The statement

5          is 11:10.

6              THE COURT:  I just wanted to make sure I

7          didn't have the wrong time down for the

8          conversation.  There was an oral conversation

9          around post 7 a.m., but this memorialization

10         you're referring to is 11:05 a.m., right?

11         That's People's 7.

12             MR. MOORE:  That's correct.

13    Q     Detective Graham, just so we're clear, was the

14    conversation between Detective Youngman, Darius Jean, and

15    yourself taking place between sometime after you returned to

16    the station after seven o'clock up until this time, 11:05,

17    when you gave him his rights?

18    A     That's correct.

19    Q     So a conversation had been going on that whole

20    period of time?

21    A     That's correct.

22             THE COURT:  Now the sixty-four-dollar

23         question.  I don't know if you asked.  Was there

24         an advisement of rights before the 7 a.m.

25         conversation when he came back to the station?

1                             G. Graham-Direct

2                  I didn't hear that.

3                       MR. MOORE:  I can ask that.  It was

4       originally 6:23 at the hospital.

5                       THE COURT:  We have that, and then he came

6       back, he said, post 7 a.m., he spoke to him, he

7       was with Mr. Youngman.  Did he re-advise him?

8                       MR. MOORE:  You can ask that question.

9                       THE WITNESS:  No, I did not.

10                      THE COURT:  So that was an oral

11      conversation, and readvisement came at 11:05

12      a.m., right?

13                      MR. MOORE:  You can answer.

14                      THE WITNESS:  That's correct.

15           Q    At 11:05, sir, in using that form, was Mr. Jean

16      advised of his Miranda rights?

17           A    That's correct.

18           Q    And how was that done?  Was it done using that

19      form?

20           A    Yes, it was.

21           Q    Did you read directly off that form?

22           A    Yes, I did.

23           Q    Did he acknowledge to you that he understood his

24      rights, sir?

25           A    Yes, he did.

G. Graham-Direct

1

2      Q     Now, sir, at any point in time, did she ask to

3  speak to Darius Jean?

4      A     Yes, she did.

5      Q     And was that on one occasion or more than one

6  occasion?

7      A     She asked it a few times.

8      Q     Now after you took the statement from Darius

9  Jean, did you allow Leslie Nicolas to speak to him?

10     A     Yes, we did.

11     Q     And why did you do that, sir?

12     A     She was asking to speak with him.  She asked a

13  few times, and he had asked to speak with her.  First we

14  didn't think it was a good idea, but at that point we just

15  thought maybe we should let it happen.

16     Q     And this was after he signed the first signed

17  statement?

18     A     That's correct.

19     Q     And where did this -- do you recall

20  approximately what time that was?

21     A     I don't have the approximate time.

22     Q     And where was it that you allowed --

23           MR. GOLDSTEIN:  I missed that.  He didn't

24          have?

25           THE COURT:  He didn't.

1                          G. Graham-Direct

2                          (People's Exhibit 9, VDF form, was marked

3                          for identification.)

4        Q      Do you recognize that report, sir?

5        A      That's correct.

6        Q      Is that a signed written statement from Darius

7   Jean?

8        A      That's correct.

9        Q      And that's the statement you've been referring

10  to that was taken by Lee Youngman?

11       A      That's correct.

12       Q      I'm not asking you anything else other than to

13  look at that and tell us whether that refresh your

14  recollection as to when that first signed written statement

15  was completed.

16       A      It's completed 12:55 p.m.

17              THE COURT:  Completed 12:55.  Okay.

18       Q      Shortly before one in the afternoon?

19       A      Correct.

20       Q      And is it subsequent to that 12:55 p.m. time

21  then that you spoke to Leslie Nicolas?

22       A      That's correct.

23       Q      Do you know how long your conversation with

24  Leslie Nicolas took place before you allowed her to go speak

25  to Darius Jean?

1                          G. Graham-Direct

2          A     I don't recall the exact time.  I don't know.

3          Q     Can you tell us where this meeting took place

4     between Leslie Nicolas and Darius Jean?

5          A     It took place in the interview room, which is

6     located in the detective office.

7          Q     And who brought her into the room?

8          A     I believe Detective Youngman did.

9          Q     Were you also present?

10         A     I was in the office.  That's correct.

11         Q     And can you tell us what, if anything, occurred

12    at that point in time?

13         A     They entered the interview room.  She went into

14    the interview room, Darius was already there, and they had a

15    conversation.

16         Q     And what did she say to him, or what did he say

17    to her?

18         A     I don't know.  They were speaking what I believe

19    to be Creole.

20         Q     They were speaking in Haitian or Creole at that

21    time?

22         A     That's correct.

23         Q     And as a result of that, what, if anything,

24    happened?

25         A     After which time she came out of the interview

1                              G. Graham-Direct

2    room, and she said, "He'd like to talk to you again."

3         Q    Prior to going into the interview room, did you

4    ask her to say anything to Darius Jean?

5         A    No.  She said she was the one that brought up

6    the conversation.  She wanted to have a conversation with

7    him.

8         Q    So she had asked to speak to him, and you

9    allowed it to happen, correct?

10        A    That's correct.

11        Q    What I'm asking specifically is did you tell her

12   to say anything to Darius Jean when she entered that room?

13        A    No.

14        Q    You don't know the substance of any of the

15   conversation that took place because it was in Creole?

16        A    That's correct.

17             MR. MOORE:  Thank you, Detective Graham.

18        I have no further questions of this witness.

19             THE COURT:  Mr. Goldstein, it's twenty to

20        now.  I'll let you pick it up tomorrow.

21             Mr. Moore and Mr. Goldstein, ten o'clock.

22             You can step down.

23                        o0o

             I do hereby certify that the foregoing is
24   a true and accurate transcript of the within
     proceedings.

25                                 _Daniela Fahey_
                               Daniela Fahey

1                          G. Graham-Cross

2        A      That's correct.

3        Q      Both done on October 12th?

4        A      That's correct.

5        Q      You spoke to Darius Jean, and you said, "We have

6    to do this again"?

7        A      That's correct.  We did it again.

8        Q      And that was at the police station?

9        A      That's correct.

10        Q      When you spoke to Darius Jean at the police

11    station and you went over this form again, this was now the

12    second time, correct?

13        A      That's correct.

14        Q      Would you agree with me that going through it

15    the second time was a little quicker than the first time?

16        A      I don't know.  I have to look at the second form

17    to tell you.

18        Q      Would it surprise you that going through it the

19    second time now, the same exact form didn't take the three

20    minutes of the first one, but didn't take four minutes, but

21    took almost twice as long, five minutes?

22        A      Could be.

23        Q      Could you tell this Court what the difference

24    was in doing the second form versus the first form.  Why did

25    it take five minutes instead of three minutes?

1                          G. Graham-Cross

2          A     Maybe I read slower.  Maybe Darius looked at it

3     slower.

4          Q     Is your answer that you took almost twice as

5     long because now you read this twice as slow?

6          A     Well, either myself or Darius.  Usually I

7     initial it and put the time on the bottom when the suspect

8     signs it.  Then I put the time.  So if he took longer to

9     read it, then it would have taken longer to give the

10    statement.

11                          THE COURT:  I wanted to see if the time

12                     was entered on the bottom of the page.  It is.

13         Q     Is it your testimony that the reason this form

14    took five minutes to execute versus three minutes was that

15    even though it's the second time going through it, you read

16    a lot slower, and Mr. Jean must have looked at it a lot

17    longer?

18         A     That's probably what happened.

19         Q     And what was written out by Mr. Jean on that

20    second form, which is Exhibit 7 in evidence?  What's in his

21    handwriting?

22         A     You'd have to show me the form.

23         Q     Sure.

24                     (Court officer handing)

25         A     His name on the top says, "I Darius Jean."

1                             G. Graham-Cross

2       That's not my writing.

3              Q       Whose writing?

4              A       That would be his writing.

5              Q       That's his writing?

6              A       That's correct.

7              Q       Do you notice anything unusual about that

8       writing?

9              A       It's a little sketchy you might say.

10             Q       A little sketchy.  Could you actually read the

11      last four letters which make up his name?

12             A       It's difficult.

13             Q       It's difficult?

14             A       Correct.

15             Q       Would you agree with me if someone came in here

16      and didn't know his last name was J-e-a-n, that no one could

17      figure out what those four letters are?

18                     MR. MOORE:  Objection as to no one.

19                     Speaks for itself.  He asked this witness the

20                     determination.  The idea this witness could

21                     determine what the whole world --

22                     THE COURT:  Maybe if you --

23             Q       Would you agree with me it's completely

24      illegible?

25             A       It's not good.  Put it that way.

1                         G. Graham-Cross

2         A     No, I did not.

3         Q     Were his movements slower at 11 o'clock?

4         A     I don't recall.

5         Q     Was he calmer at 11 o'clock than he was at six

6    o'clock in the morning?

7         A     I don't recall him being any more calm.

8         Q     Again after you took this statement, you asked

9    him, "Will you speak to us"?

10        A     That's correct.

11        Q     Did Mr. Jean ever ask you "why I have to execute

12   a second Miranda form"?

13        A     I don't recall him asking.

14        Q     Did you ever tell him any reason for a second

15   form?

16        A     I don't believe I ever explained why I wanted a

17   second rights form.

18        Q     So he never asked you why there would be one?

19        A     Not that I recall.

20        Q     Now after you took his statement from Mr. Jean

21   at six -- withdrawn.  At 11 o'clock, after the

22   acknowledgment of rights Miranda form, you then took a

23   statement of Mr. Jean; is that correct?

24        A     Detective Youngman took the statement.

25        Q     Were you present?

1                              G. Graham-Cross

2        A      Yes, I was.

3        Q      And that would be a typewritten statement?

4        A      That's correct.

5        Q      Could you tell the Court how you went about or

6   Detective Youngman in your presence went about taking the

7   typewritten statement from Mr. Jean.

8        A      He sat at a typewriter and talked to Mr. Jean,

9   asked questions, and then typed.

10       Q      Okay.  And how long did that procedure take

11  until Detective Youngman was done questioning Mr. Jean?

12       A      I'd have to see the statement.  I don't know.  I

13  don't recall the exact length of time.

14       Q      Could you give us an approximation of how long

15  that took?

16       A      I'd have to see the statement.  I really don't

17  want to speculate.

18       Q      At the conclusion of the typing of the

19  statement, what occurred then?

20       A      Myself and Detective Youngman went to speak to

21  Leslie Nicolas.

22       Q      Maybe you didn't understand my question.  At the

23  conclusion of Mr. Jean speaking and Detective Youngman

24  typing back and forth, what happened after the last thing

25  was typed on that form?

1                              G. Graham-Cross

2        A      Darius signed the form.  Is that what you're

3    getting at?

4        Q      Okay.  Did he make any changes?

5        A      I don't recall.  I'd have to see the statement

6    to tell you.

7        Q      Now after that form was concluded, do you know

8    what time it was then?

9        A      I don't recall the exact time.

10       Q      If you could look at what's been marked,

11   previously marked, voluntary discovery.  Detective, I'm

12   going to show you the first statement that you spoke about

13   that began at approximately 11:10 in the morning.  I'd like

14   you to take a look at that statement and see if it refreshes

15   your memory as to the time you concluded that statement.

16       A      It does.

17       Q      What time was it concluded?

18       A      12:55 p.m.

19       Q      Almost one o'clock in the afternoon?

20       A      That's correct.

21       Q      Thank you.  And, Detective, in that statement --

22   withdrawn.  At one o'clock or right about one o'clock, Ms.

23   Nicolas wanted to speak to Darius Jean; is that correct?

24       A      That's correct.

25       Q      How long had she been asking to speak to Mr.

1                                   G. Graham-Cross

2    Jean?

3         A      For awhile, from my understanding.  She was not

4    with me at that moment.  She was somewhere else in the

5    police station.

6         Q      Was any information given to Ms. Nicolas about

7    statements, oral or written, that Darius Jean had made?

8         A      I don't recall.

9         Q      Would it be proper police procedure to tell Ms.

10   Nicolas details of any statements, oral or written or typed,

11   that Darius Jean had made?

12        A      Well, after we talked to Darius and signed this

13   form, then myself and Detective Youngman met with Leslie in

14   another part of the police station.

15        Q      That's when you met with Ms. Nicolas?

16        A      Right.

17        Q      Did you reveal to her the substance of the

18   written typed statement?

19        A      I believe myself and Detective Youngman told her

20   that he had made a statement.

21        Q      Did you tell her anything else about the

22   substance of the statement?

23        A      Bits and pieces, that we didn't believe his

24   statement was accurate.

25        Q      What did you tell her?

1                          G. Graham-Cross

2        A      That we didn't believe it was accurate.  He had

3   described how his stepdaughter had walked down the hallway,

4   and we didn't believe that to be true.

5        Q      Do you know if anyone else revealed to Ms.

6   Nicolas that bit about walking down the hallway?

7        A      At that time?

8        Q      Or anytime up to that moment.

9        A      Other police officers or --

10       Q      Anybody.  Any police officers.

11              Any police officers.

12       A      I don't know.

13       Q      How long had Ms. Nicolas been in the building,

14   approximately?

15       A      I really don't know when she arrived, so I

16   couldn't say.

17       Q      Well, you said she had been asking to speak to

18   Darius Jean, correct?

19       A      That's right.  She asked myself and Detective

20   Youngman that she wanted to speak with him.

21       Q      Did she say why?

22       A      No.  She just told us she wanted to speak with

23   him.  She didn't say exactly why.

24       Q      Did you ask her why?

25       A      No.

1                              G. Graham-Cross

2        A      Not that I'm aware of.

3        Q      Were you listening?

4        A      Well, we had the door open.

5        Q      Were you listening to the conversation?

6        A      No.

7        Q      Did you think, as the lead investigator on this

8    case, that you might hear something important to your case

9    when the two people that were home with the child when the

10   child died, you might learn something important from

11   listening to them?

12       A      We thought we may, but then they began speaking

13   Creole.

14       Q      When she went into that room, didn't you have

15   the capability in the Ramapo Police Department for

16   tape-recording that which goes on in that room?

17       A      That's correct, we do.

18       Q      Did you do it?

19       A      No, we did not.

20       Q      How long did they talk?

21       A      Short period of time.

22       Q      How long is a short period of time?

23       A      Maybe 10 minutes.

24       Q      How did they appear when they spoke?

25       A      Civil, calm.

1                              G. Graham-Cross

2        Q      Who was doing the talking?

3        A      I believe they both spoke to each other back and

4    forth.

5        Q      Would you agree with me that after that

6    conversation between Leslie Nicolas and Darius Jean, would

7    you agree with me that that's when Darius Jean gave the last

8    statement to you, which was significantly different than all

9    of the prior oral and written statements about the events?

10       A      That's correct.

11       Q      That's the first time you had a significant

12   difference, correct?

13       A      That's correct.

14       Q      The significant difference being that now he's

15   saying the child was in bed, and, "I picked her up basically

16   not breathing and brought her to the room."   Is that

17   correct?

18       A      That's correct.

19       Q      He left out the whole thing about all the other

20   statements that he had given, oral and typed, about the

21   child walking out of the room, correct?

22       A      That's correct.

23       Q      And after all of the investigators spoke to him

24   at the home, at the hospital, and at the Ramapo Police

25   Department, the first time he changes his story to any

1                               G. Graham-Cross

2      significance is after Leslie Nicolas speaks to him?

3          A     That's correct.

4          Q     After she left the room, did you ever ask Leslie

5      Nicolas what she said to Darius Jean in Creole?

6          A     I did not, no.

7          Q     Did anyone?

8          A     Not that I'm aware of.

9          Q     Did anyone mention in any of their reports that

10     she had spoken to Darius Jean before that last statement?

11         A     I'd have to look at Detective Youngman's

12     reports.  It's not in mine.

13         Q     What occurred between you and Darius Jean after

14     Leslie Nicolas left that room?

15         A     He again gave another statement.  Detective

16     Youngman took that statement.

17         Q     Why did you know that he wanted to give another

18     statement?

19         A     We asked him.

20         Q     Why did you ask him if he wanted to give another

21     statement if you had already taken numerous oral statements,

22     you already had a typed statement?  Leslie Nicolas speaks to

23     him, about what, you don't know, and then you walk up to him

24     and say, "You want to give another statement"?  Is that what

25     occurred?

1                            G. Graham-Cross

2          A      If I remember correctly, Leslie came out and

3    said, "He wants to talk to you again."

4          Q      She said, "He wants to talk to you again"?

5          A      If I recall properly, that's correct.

6          Q      And you put that in your notes somewhere?

7          A      I don't believe it's in my notes, no.

8          Q      It's not in your notes or your report or

9    anyone's note, is it?

10         A      I don't know about anyone else.  It's not in my

11   report, no.

12         Q      Don't you think it's significant at all that

13   Leslie Nicolas spoke to Darius Jean alone in Creole and then

14   Darius Jean stated that he would give another statement?  Do

15   you think that's significant at all?

16               MR. MOORE:  Objection.

17               THE COURT:  Sustained.  Whether he thinks

18                    it's significant or not is not impactful on

19                    whether or not the statement was voluntarily

20                    made.

21         Q      The typewritten statement, the second one, the

22   last one, the one after Leslie Nicolas spoke to Darius Jean,

23   what time did that one start?

24         A      I'd have to look at the top of it to tell you

25   the time.

1                          G. Graham-Cross

2        Q      Would you agree with me if I told you it started

3    at 2:40 in the afternoon?

4                    THE COURT:  I'm sorry.  We're referring to

5                what?  It's an unmarked exhibit.

6                    MR. GOLDSTEIN:  Second statement.  It's

7                just part of the voluntary disclosure form I'm

8                looking at.

9                    THE COURT:  Not the statement itself.

10                    MR. GOLDSTEIN:  It's the statement itself.

11                    THE COURT:  It's an unmarked exhibit.

12                    MR. MOORE:  I believe it's 9 for

13                identification.  I used it yesterday.

14                    THE COURT:  What packet is that in?

15                    MR. MOORE:  Copy of the People's VDF form.

16                    THE COURT:  I see.  You made reference to

17                that.  That was attached to the VDF form

18                itself?

19                    MR. MOORE:  It was in fact.

20                    THE COURT:  I don't have the VDF form, but

21                okay.

22        Q      Two forty in the afternoon; does that refresh

23    your memory?

24        A      That's correct.

25        Q      Now the other statement we know ended?

1                          G. Graham-Cross

2        Q      Do you know when that typewritten statement

3    ended?

4        A      I don't have it with me.  I couldn't tell you.

5        Q      I don't have that either.  From the time that

6    the typewritten statement of Leslie Nicolas was concluded,

7    how long was it until you started taking the typewritten

8    statement from Darius Jean?

9        A      It wasn't that long.  I can't give an exact

10   time.

11       Q      Was it more than an hour?

12       A      Probably less than an hour.

13       Q      More than a half hour?

14       A      Probably more than a half hour.

15       Q      When you concluded your statement, the second

16   statement that was actually done by Youngman, you were

17   present, correct?

18       A      I was there for part of that statement.  I was

19   not there for the entire statement.

20       Q      Did you hear Darius Jean say, "This is not

21   correct.  This is false.  This is not the statement that's

22   accurate.  Everything previously was accurate.  This is not

23   accurate.  I'm not going to do that"?

24       A      I don't recall him saying anything like that.  I

25   wasn't there for the entire statement.

1                              G. Graham-Cross

2          A      (Nods)

3          Q      The second voluntary statement marked

4    "voluntary" is a two page document; is that correct?  You

5    have it there.

6                       THE COURT:  You're talking about -- what

7                  you're referring to as 9 now?

8                       MR. GOLDSTEIN:  The statement that begins

9                  at 2:40.

10         Q      It's a two-page document, correct?

11         A      That's correct.

12                      THE COURT:  That's what you referred to as

13                 part of the VDF, Exhibit 9.

14                      MR. GOLDSTEIN:  Yes, your Honor.

15         Q      That two-page document, how long did it take to

16   type out that two-page document?

17                      MR. MOORE:  Again Judge, asked and

18                 answered.  We've had a beginning time and

19                 concluding time.  It's on the document.  We're

20                 just going over the same material.

21         Q      Would you agree with me it took almost as long

22   to do the two-page document as the four page document?

23         A      Well, although I wasn't present during this

24   whole statement, I would have to say yes.

25         Q      Were there any problems when they were doing the

L. Youngman-Direct

Q    Did he indicate to you anything about injuries on the person?

A    He said that she had injuries of past abuse and present abuse on her body.

Q    She had signs of physical abuse on her body?

A    Yes.

Q    Did he indicate to you anything about the time that she might have died?

A    He felt it was several hours prior to her being brought into the ER.

Q    Sir, after speaking to Dr. Silva, were you assigned to do anything else involved in this investigation?

A    Yes.  I was assigned to bring Mr. Jean back to the police station and interview him.

Q    Who assigned you to do that, if you recall?

A    Detective Quinn.

Q    Is that Detective Lieutenant Quinn?

A    Detective Lieutenant, yes.

Q    And after being directed by Detective Lieutenant Quinn, what did you do.  In other words, after he gave you the direction to speak with Mr. Jean, just tell us what you did.

A    I spoke to Mr. Jean.  I asked him if he would come back to the police station, that we needed to talk

L. Youngman-Direct

about what happened to his daughter prior to her being brought into the hospital, and I asked if he would come back with me to the police station.

Q    How was that done, sir?  Physically how was that done?

A    I walked him out to the car, and he was brought back in a marked police car with another officer driving.

Q    Who was the other officer that drove the car?

A    Sean Lee.

Q    Where were you seated in the car?

A    I was seated in the back with Mr. Jean.

Q    And at that time was Mr. Jean in handcuffs?

A    No.

Q    Approximately how long did it take you to get back to the Ramapo Police Station?

A    I would say five minutes.

Q    And upon arriving back at the Town of Ramapo Police Department, where did you go?

A    I brought him into our interview room in the Detective Bureau.

Q    Was anybody else present in that room at that time?

A    Just Mr. Jean and I initially.

Q    And by the way, prior to this point in time when

1                              L. Youngman-Direct

2     asked the girls what the smell was.  He said that Kyona had

3     said she had urinated either in a box or a small vase -- it

4     was unclear.  I wasn't real sure what it was.  He said a box

5     and a vase -- and when he asked her why she would do that in

6     a box or a vase when the bathroom was so close, she said,

7     "Well, Mendissa did it in her bed also the day before."  He

8     admitted to being very angry about that, but he said he went

9     back downstairs to work into the basement.  He said during

10    that time the girls kept coming downstairs bothering him,

11    asking him questions about the homework, and he was angry

12    about that.  Later in the night he said he went upstairs and

13    he had beaten the girls.

14         Q     Did he say how he beat the girls?

15         A     He said that he had beaten them with a belt.

16         Q     Did he indicate to you anything about the nature

17    of the beating, how many times he had hit them, or the area

18    of the body that he hit?

19         A     He said that he used a brown twisted leather

20    belt.  He said that he hit them 10 to 15 times.  He said he

21    was trying to hit them on the buttocks, but they were moving

22    around at the time.

23         Q     By the way, just for clarifications sake, did he

24    have nicknames for either one of his daughters, Kyona or

25    Mendissa?

1                              L. Youngman-Direct

2        A        I believe he --

3                  MR. GOLDSTEIN:   I'm sorry.   I couldn't

4                  hear the question.

5        Q        Did he have nicknames or use nicknames for

6    either one of his daughters, Kyona or Mendissa?

7        A        Mendissa, he was calling her Mendy; and Kyona,

8    he called her Booby.

9                  THE COURT:   Booby?

10                 THE WITNESS:   Booby, yes.

11       Q        So occasionally in the conversation he would

12   refer to Kyona as Booby or Mendissa as Mendy?

13       A        Mendy, yes.

14       Q        Did he tell you if he saw the girls again

15   anytime after this beating that you referred to?

16       A        Yes.   He said at one point he came upstairs, and

17   I believe he said he saw Booby in the kitchen, and she had

18   asked him a question about homework, and she seemed okay,

19   and that he had gone back downstairs, and he didn't see them

20   until much later in the night.

21       Q        Did he tell you under what circumstances he saw

22   her again or where that was?

23       A        He said it was approximately 30 minutes prior to

24   the ambulance coming to the house, that he was working in a

25   computer room.   He had an office.   He was working on the

1                               L. Youngman–Direct

2     computer, and he said he noticed Booby walking by the door.

3     She seemed like she was unsteady.  He walked out and

4     followed her into the kitchen.  She seemed to be sick.  She

5     was staggering in there, and she said she wasn't feeling

6     well.  She was leaning up against the sink, and he thought

7     that maybe she was not feeling well because she hadn't

8     eaten, so he said he heated some food up in a microwave, and

9     gave her some chicken.  At that point he said she collapsed,

10    and she choked, and she slumped into the sink.

11        Q     Did he tell you what happened or what, if

12    anything, he did after Kyona slumped into the sink area?

13        A     I believe he said he put water on her face.  He

14    picked her up and carried her into his bedroom where Leslie

15    was sleeping.  He brought her in there, and he told Leslie

16    that there was something wrong with Booby, and he didn't

17    know what to do about it.  He said he put alcohol on her

18    face to try to revive her, and he called for an ambulance.

19        Q     Now after having received this statement from

20    Darius Jean or this oral statement from Darius Jean, did you

21    confront him with the fact that you didn't believe the

22    statement?

23        A     Yes.

24        Q     Tell us what, if anything, you said to him.

25        A     We told him that in speaking with the doctor,

L. Youngman-Direct

2  the doctor told us that the body -- that the girl had died

3  several hours before because rigor mortis set in, and rigor

4  mortis takes several hours, and it was not possible for him

5  to have seen the girl walking past his office 30 minutes

6  prior to the ambulance coming.  She had been dead longer

7  than 30 minutes.

8       Q    When you confronted Mr. Jean with that fact,

9  what did he say?

10     A    He kept true to his story that that's what

11  happened.

12     Q    After speaking to him -- how long a period of

13  time did this conversation occur with Mr. Jean up until this

14  point?

15     A    Several hours I would say.

16     Q    And did you ask Mr. Jean if he would be willing

17  to memorialize that statement in some type of written

18  format?

19     A    Yes.

20     Q    And who took that written statement?

21     A    I did.

22     Q    Prior to taking the written statement, was he

23  advised of his rights again?

24     A    Yes.

25     Q    Who did that?

1                          L. Youngman-Direct

2          A      Detective Graham.

3          Q      So just prior to taking this written statement,

4    he was advised for a second time of his Miranda rights?

5          A      Yes.

6          Q      Did he acknowledge his rights and indicate that

7    he wished to speak to you?

8          A      Yes.

9                 MR. MOORE:  I'm going to ask at this

10                time -- actually do both of them for brevity's

11                sake -- this four-page document be marked as

12                People's 10 for I.D. but ask Mr. Goldstein --

13                for purposes of this pretrial hearing, I'm going

14                to attempt to move it into evidence at some

15                point for brevity.  I ask his consent at this

16                point.

17                MR. GOLDSTEIN:  Your Honor, for purposes

18                of this hearing, I have no objection to Exhibit

19                10 going into evidence, as with the second

20                statement, which will be Exhibit 11.

21                THE COURT:  He's only offering 10 right

22                now, and that's the four-page statement, written

23                statement, right?

24                MR. MOORE:  Correct.  That's been referred

25                to as the second statement, the 11:05.

1                           L. Youngman-Direct

2                    THE WITNESS:  Yes.

3                    MR. MOORE:  Thank you.

4          Q       Detective Youngman, after completing or having

5    completed that typewritten statement of Darius Jean, what,

6    if anything, did you do next?

7          A       I interviewed Leslie Nicolas.

8          Q       And where did that take place?

9          A       I spoke to her briefly in our back classroom,

10   and then I spoke to her in another interview room in the

11   Detective Bureau.

12         Q       And do you know approximately how long that took

13   place -- or how long that took to accomplish?

14         A       I would say probably an hour.

15         Q       After completing the statement of Leslie

16   Nicolas, what did you do next?

17         A       I took a written statement from Leslie Nicolas.

18   I would say that was part of the hour I had took.

19         Q       And after completing the written statement,

20   what, if anything, did you do next?

21         A       Mr. Jean had been asking to speak to Leslie.

22   She also was asking to speak to him.  We let them speak.

23         Q       And when you say you let them speak, where was

24   Darius Jean while you were speaking to Leslie Nicolas?

25         A       He was in the interview room.

1                          L. Youngman-Direct

2          Q     You left him in the interview room by himself?

3          A     Yes.

4          Q     Again was he in handcuffs at that point in time?

5          A     No.

6          Q     And when you agreed to allow Leslie Nicolas to

7    speak to him, that conversation took place in that same

8    interview room where he was?

9          A     Yes.

10         Q     And tell us what occurred.

11         A     Detective Graham and I were there, and we said

12   that they could speak to each other.  They were talking in

13   another language.  We kept telling them, "Speak in English.

14   Speak in English," and they kept talking in, I'm assuming,

15   Creole.  I don't know.  And then we just stopped them from

16   talking.

17         Q     Why did you stop it?

18         A     I didn't know what they were talking about.  I

19   didn't know what they were saying to each other.

20         Q     Did that pose some concern for you?

21         A     Yes.

22         Q     Why would that be?

23         A     I didn't know if he was telling her to do

24   something or not do something or the opposite.

25         Q     As a result of specifically Leslie Nicolas's

1                          L. Youngman-Direct

2   failure to comply with your instructions, what, if anything,

3   did you do?

4          A       We ended the conversation.

5          Q       And what happened with Leslie Nicolas?

6          A       She was released and allowed to go.

7          Q       Now prior to Leslie Nicolas going into that room

8   to speak to Darius Jean, did you give her any instructions

9   on what to say?

10         A       No.

11         Q       After Leslie Nicolas was released or left the

12  police station, did you again have occasion to speak with

13  Darius Jean?

14         A       Yes.

15         Q       And could you tell us how and when that took

16  place.

17         A       It was immediately after she left.  I spoke to

18  him for maybe 15 or 20 minutes, and I basically was telling

19  him what the status was.

20         Q       When you say you were telling him what the

21  status was, what specifically did you tell him?

22         A       I told him he was going to be charged with

23  assault for assaulting his daughters, both of them.  At that

24  time we were unsure what the cause of death was, but we were

25  certain that he did beat his daughters sufficiently for that

1                         L. Youngman-Direct

2    charge.

3         Q     And did you challenge his original statement in

4    any regard?

5         A     Yes.  We felt that he was not telling the truth

6    about when he saw his daughter walking in the hallway.

7         Q     Don't tell me what you feel.  Did you tell that

8    to Mr. Jean?

9         A     Yes, we told him that.

10        Q     As a result of that conversation, what, if

11   anything, occurred?

12        A     He admitted that he had found her not in the

13   hallway but in her bed.

14        Q     Explain to me specifically what he told you.

15        A     He told me that he had beaten the girls earlier

16   in the evening and that although he said he did see the one

17   girl an hour later, he checked on the girls in the bedroom

18   many hours after he had given them the beatings, and when he

19   went in there, he said he noticed that the one daughter was

20   sleeping on the top bunk and that Booby looked funny.  He

21   said her eyes were open; that her body was in a weird form

22   is what he said.  He said one leg was over.  And he went in

23   to check on her, and she was not breathing or anything like

24   that.

25        Q     How did this second statement now differ from

1                L. Youngman-Cross

2      there, aren't there?

3         MR. MOORE: Supplemental report should be

4      a three-page one.

5         THE COURT: I have that one.

6         (Defendant's Exhibit A, supplemental

7      statement, was marked for identification.)

8         THE COURT: Okay, Mr. Goldstein.

9         MR. GOLDSTEIN: The witness is taking a

10      look at the report.

11    Q     Do you remember the question, Detective?

12    A     Yes, I do.

13    Q     You can answer.

14    A     Maybe you want to ask me the question again.

15    Q     Sure. After looking at this report, does that

16 refresh your memory as to whether you indicated that Darius

17 Jean wanted to speak to Ms. Nicolas?

18    A     Does it say in the report that?

19    Q     Yes.

20    A     No, it doesn't.

21    Q     Was it memorialized anyplace else by yourself?

22    A     I don't know, to be honest. I will also note

23 that it doesn't say that she asked to speak to him either.

24    Q     That was my next question. Thank you.

25      When Leslie Nicolas went to speak to Darius

1                            L. Youngman-Cross

2    this after the statement was done?

3         A    Yes.

4         Q    In the first statement, the entire four pages,

5    are you telling the Court Mr. Jean did not say to change

6    even one word after it was completed?

7         A    If he did, I would had him initial whatever he

8    wanted changed.

9         Q    But in this four-page statement, it was

10   perfect.  He didn't want to change anything?

11        A    No.

12        Q    And turning to the last two pages, that too was

13   perfect.  He did not want to change anything?

14        A    Once it was done on paper, it did not have to be

15   changed.  We were discussing it as we were talking, as we

16   were doing the interview or the statement.

17        Q    You also conveyed that after the two statements

18   were complete, you had spoken with Mr. Jean again, and then

19   you learned for the first time that Mr. Jean stated words to

20   the effect of that he had put a piece of chicken in the

21   child's mouth to make it appear that she choked, correct?

22        A    No.

23        Q    What did he say?

24        A    You said for the first time that I heard he put

25   a piece of chicken in her mouth.

274

L. Nicolas-Direct

1

2    Q    Was it one or more than one?

3    A    Two.

4    Q    Two of them.  Two of them were together when
5    they asked you to speak to Darius?

6    A    I'm not certain -- yes.  I'm not certain.

7    Q    You're not certain if the two of them were
8    together?

9    A    No.

10    Q    But one of the detectives, one of the plain
11    clothes detectives, said, "Will you speak to Darius"?

12    A    Yes.

13    Q    Did he tell you why he wanted you to speak to
14    Darius?

15    A    They said if there was anything that I wanted to
16    ask Darius, and the statements that he made wasn't making
17    any type of sense.  That's what they told me.

18    Q    They said that the statements that Darius had
19    previously made didn't make much sense?

20    A    Yes.

21    Q    So they wanted you to go in there and speak to
22    him?

23    A    Yes.

24    Q    And what were you supposed to speak to him
25    about?

1                                    L. Nicolas-Direct

2          A      The things that he had said.

3          Q      Did they tell you what he had said?

4          A      Yes.

5          Q      What did they tell you?

6          A      They told me that Darius said that Kyona walked

7    towards the hallway, and she was stumbling into his office,

8    and he said it didn't make any sense because Kyona had

9    passed away awhile ago.

10         Q      So they told that to you?

11         A      Yes.

12         Q      And they told you to go speak to Darius and tell

13   him that?

14         A      Yes.

15         Q      And they wanted you to get the real story of

16   what occurred.   Isn't that what they wanted?

17         A      Yes.

18         Q      And what did you say when they told you that?

19         A      What did I tell them?

20         Q      Yeah.

21         A      I said, "Okay."  I spoke to Darius.

22         Q      For how long did you speak to Darius?

23         A      Two minutes, three minutes.

24         Q      Couple of minutes?

25         A      Yes.

L. Nicolas-Direct

1

2      Q     Where did that take place?

3      A     In a separate room.

4      Q     When you were in that separate room, was it just

5  you and Darius?

6      A     Well, when the police officer brought me to the

7  room, he was there for a minute, and then he left, and then

8  it was just Darius and I.

9      Q     When you say the police officer, is that the

10  plain clothes police officer that told you to go speak to

11  Darius?

12      A     Yes.

13      Q     And is it one or two at this point?

14      A     It was two.

15      Q     So the two of them brought you to the room where

16  Darius was sitting?

17      A     Yes.

18      Q     And they stayed there for about a minute?

19      A     They just brought me to the room, and they left

20  afterwards.

21      Q     So they brought you in the room.  That's the

22  room that has that mirror, correct?

23      A     Yes.

24      Q     They brought you into the room, and after they

25  brought you into the room, closed the door, and you and

1                            L. Nicolas-Direct

2      Darius were alone?

3           A    Yes.

4           Q    And you said you were alone for two or three

5      minutes?

6           A    Yes.

7           Q    And in those two for three minutes, you spoke to

8      each other?

9           A    Yes.

10          Q    Did you speak in English?

11          A    A little bit.  Not much.

12          Q    A little English, mostly Creole?

13          A    Yes.

14          Q    And what did you say to Darius, and what did he

15     say to you in that room?

16          A    I had told him at the time that the police

17     officer said what he said didn't make any sense, and he at

18     the time said -- you know, he was crying -- and he said that

19     Kyona had asthma.  He was repeating that Kyona has asthma.

20          Q    So he repeated to you a number of times that

21     Kyona had asthma?

22          A    Yes.

23          Q    And he was crying?

24          A    Yes.

25          Q    And would you still say he's still in shock in

L. Nicolas-Direct

2   your opinion?

3       A    Yes.

4       Q    Was he handcuffed?

5       A    I don't remember.

6       Q    And even though you told him what -- that the
7   police basically didn't believe his story, he sat there and
8   said that the child had asthma, and he kept crying?  Is that
9   correct?

10      A    Yes.

11      Q    Did you ever tell him to say anything?

12      A    When I spoke to Darius, I had told him, "Well,
13  the police say they want to help you, and they said what you
14  said made no sense," and I told him, you know, he had to
15  tell the truth at the time, and I was like -- at the time I
16  told him, "Well, you know, they said that Kyona passed away,
17  and there was no way that she could have walked into the
18  room," and at the time the police officer said it would have
19  made more sense if he said that he went to check up on
20  Kyona, and I said, "Well, that makes more sense," and I
21  said, "Well, if that's what happened, you should say that's
22  what happened."

23      Q    The police told you it would make more sense if
24  Darius told them he went to check on Kyona in bed and found
25  her the way he found her; isn't that right?

1                              L. Nicolas-Direct

2          A     Yeah.

3          Q     That's what the police told you to tell him,

4    right?

5          A     Yes.

6          Q     And didn't you also tell him, during those two

7    or three minutes that you spoke to him, that if he said he

8    found the child in that fashion, in bed, that the police, in

9    helping him, wouldn't charge him with murder?  Isn't that

10   right?

11         A     Yes.

12         Q     Because if he stuck to his story about finding

13   the child walking out of the room, you told him the police

14   were going to charge him with murder, just as they told

15   you.  Isn't that correct?

16         A     No.  I didn't say that they were going to charge

17   him with murder.

18         Q     But that he would not be charged with murder if

19   he said he found the child in bed?

20         A     Something like that.  I'm not certain.

21               THE COURT:  The answer was, "Something

22               like that," did you say?

23               THE WITNESS:  Yes.

24         Q     Is that when the conversation ended, or was

25   there more?

L. Nicolas-Direct

1

2    Q    How many came in?

3    A    Two of them.

4    Q    And did they say anything to you at that moment?

5    A    I don't remember.

6    Q    But when you spoke to Darius, it was just the

7 two of you in the room?

8    A    Yes.

9    Q    After the conversation with Darius, that's when

10 you indicated you went with the police and gave your half

11 page typewritten statement, correct?

12    A    When -- after they gave me -- after I made the

13 statement, I went to a different room, and then they were

14 asking me more questions.

15    Q    Since seeing Darius in that one room, you didn't

16 see him anymore at Ramapo headquarters that morning, did

17 you?

18    A    No.

19        MR. GOLDSTEIN:  One second, your Honor,

20       please.

21        (Pause)

22        MR. GOLDSTEIN:  One thing that I forgot.

23    Q    Between the time that you were in the house with

24 Mendy and then the time that you drove with Mendy, did you

25 tell Mendy not to say anything at the hospital?

                          L. Nicolas-Cross

1

2   down the hallway at the time he found her, correct?

3       A    Yeah.

4               MR. MOORE:  I have no further questions.

5               THE COURT:  I'd like to call you both up a

6       second, please.

7                   (Bench conference)

8               THE COURT:  There is nothing further.

9       You can step down.

10              MR. GOLDSTEIN:  Sorry, Judge.  Just a

11      couple of follow-up.

12              THE COURT:  I thought you said you had

13      nothing further.  Maybe I misunderstood.  Pardon

14      me.  This will be your redirect.  Of course, it

15      will be limited to cross.

16  REDIRECT EXAMINATION

17  BY MR. GOLDSTEIN:

18      Q    Just so I have it clear through

19  cross-examination, the police asked you not once but a

20  second time for you to speak to Darius in that room at

21  headquarters, right?

22      A    Yes.

23              THE COURT:  I think the question was they

24      asked her did she wish to speak to Darius Jean.

25      She originally said, "No," and then she said,

1                    L. Nicolas-Redirect

2              "Yes," the second time.

3                    Isn't that what you said, Ms. Nicolas?

4              THE WITNESS:  Yes.

5        Q     And it was they that suggested to you that what

6    Darius said made no sense, that what would make more sense

7    is that the child was found in bed not breathing, no pulse,

8    right?

9        A     Yes.

10       Q     And that it would be better to say that story

11   because if he continued with the versions that he had given

12   up to that point, they were going to charge him with murder

13   of the child?

14             MR. MOORE:  Objection.  That's not her

15             answer.

16       A     They didn't say that.

17             THE COURT:  Let see.

18       Q     Did they ever indicate that they were going to

19   charge him with murder?

20       A     No.

21       Q     With anything?

22       A     No.

23             MR. GOLDSTEIN:  Nothing further, Judge.

24             THE COURT:  There's something I want to

25             clarify before you step down.  Just a minute,

1                      Proceedings

2      him that it would make more sense," she said,

3      "if he found her that way, that the police

4      would not charge him with murder."

5          Did you ever tell him that the police

6      would not charge him with murder, or did you say

7      at any time that you believed the police would

8      not charge him with murder if he said that?

9          THE WITNESS:  I told him the police wanted

10     to help him, and we didn't discuss about

11     murder.  I don't remember.

12         THE COURT:  We'll take a short break, and

13     I'll have her read back the testimony to her.

14     Think about it in the meantime.  You can't

15     discuss this testimony with the District

16     Attorney in the meantime.

17         I'll have her read it back.

18         (Pause)

19         (The reporter read the requested

20     testimony.)

21         THE COURT:  This is what my notes say.

22     That's why I wanted to ask her that question.

23     We're back on the record, and the court reporter

24     read back to Ms. Nicolas portions of Mr.

25     Goldstein's direct examination pertaining to

1                    Proceedings

2      what was said between Darius Jean and the

3      witness.

4           Okay.  After hearing that, Ms. Nicolas,

5      could you tell us what you said, to the best of

6      your recollection, to Darius Jean about being

7      charged with murder one way or the other by the

8      police.

9           THE WITNESS:  Maybe I said, "Maybe the

10     police won't charge you with murder," but the

11     police never told me they weren't going to

12     charge him with murder.

13          THE COURT:  Okay.  Thank you.  Did you

14     want to ask her?  You said you wanted the last

15     question read back.

16          MR. GOLDSTEIN:  I couldn't hear the last

17     answer she gave before we broke.

18          THE COURT:  Could you give us the very

19     last answer before we broke?

20          (The reporter read the last answer.)

21          THE COURT:  That was your last.  They

22     never indicated.

23          Anything further, gentlemen?  We don't

24     have to take a break.  Thank you.  You can step

25     down.

- PROCEEDING -

26

1

2  and they speak.  She stays for two or three

3  minutes or so, and she relays that

4  information to Mr. Jean, and do you remember

5  she says Mr. Jean is crying.  He seems to be

6  in shock, but she relays not just the story

7  but the promise of what the police said

8  about we will not charge you with murder if

9  you say this.

10        After that all of a sudden we have a

11  second voluntary statement where Mr. Jean

12  comes to the police.  They ask him do you

13  want to make another statement.  They have

14  sent their agent in.  She is an agent of the

15  police.  She is the police in that room.

16  She is not a friend of Mr. Jean.  She is the

17  police going in telling him what the promise

18  will be and what to say.  She tells him what

19  to say.

20        Now we have this new statement at 2:40

21  in the morning telling a whole different

22  story of all the prior and written

23  statements.

24        In People v. Cologne 406 NY2d 839, in

25  the interrogation of the defendant at the

1                    -PROCEEDING-                    27

2      police station the police encourage the

3      defendant to confess to manslaughter in

4      order to avoid a murder charge.

5           You can't make a promise like that.

6      The police are not allowed to do that,

7      because it encourages that which is not

8      true.  It encourages someone to lie, to

9      escape -- to lie to make an involuntary

10     statement.  I won't be charged with murder

11     if I do this.

12          The courts are replete with statements

13     saying that you can't make a promise like

14     that.

15          The fact that Leslie Nicolas told

16     Mr. Jean to do this is of no moment.  She is

17     the police.  She's the police agent.  And we

18     know that her statement is true versus that

19     of Detective Graham and the other

20     detectives, because how is it that all of a

21     sudden she goes in and tells him what to

22     say, and then for the first time after

23     twelve, thirteen hours of interrogation of

24     conversations of typewritten statements

25     after thirteen hours from 3:30 in the

1                          -PROCEEDING-                          28

2       morning, now it's 2:40 and the next

3       afternoon finally what statement does

4       Mr. Jean give?  He gives a statement that

5       Leslie Nicolas told him to give.

6            If this was a what the heck let him

7       talk.  If this was we're in the doorway and

8       they really didn't speak we would not have

9       this exhibit eleven statement that says the

10      exact thing that Miss Nicolas says the

11      police told her to stay.  It wouldn't have

12      come about.

13           The question is how was this put into

14      Mr. Jean's head.  The story was put into

15      Miss Nicolas' head at the behest of the

16      police and the promise was you wouldn't be

17      charged with murder.

18           For those reasons alone it is clear

19      that the voluntary statement which is on

20      exhibit eleven is an involuntary statement

21      because it's asking for that which Mr. Jean

22      can avoid by a promise that can't be kept

23      and giving him a story to tell which is not

24      true.

25           That's what the courts are always

-PROCEEDING-                              29

1
2     nervous about.  That's why they call it an
3     involuntary statement.  It's involuntary
4     because the confession induced by improper
5     statements and misrepresentations of the
6     police, and Leslie Nicolas is the police in
7     this particular case.  She is the agent of
8     the police.
9              So it's my understanding, your Honor,
10    and it's my argument that as an agent, Miss
11    Nicolas representing the promise and filling
12    in what actually should be said that that
13    last statement, exhibit eleven must be
14    suppressed, and the oral statements that led
15    to exhibit eleven at that very moment must
16    also be suppressed.
17             Prior to that, your Honor, if we just
18    go in order, at this point we have the
19    initial oral statements, and we know that at
20    the time of all of the statements by
21    Mr. Jean -- how did he appear?  Even the
22    police officers say that in the house he
23    appeared distraught, very nervous at the
24    hospital.  When he learned the news that his
25    child had died, he went running like a

1                      -PROCEEDING-                    30

2      crazed man until finally his energy went

3      out, and he just fell on the ground pounding

4      himself on the ground crying, screaming no.

5           When the police finally caught up to

6      him, it's not that he tried to run away, he

7      just ran away from the fact that his child

8      had just been pronounced dead.

9           They had to take him in a limp position

10     in a wheelchair back to headquarters.  They

11     restrained him.  They tied him down to a

12     stretcher, his arms and his legs.  He was

13     given medication by Doctor Silver while in

14     that position.

15          All of that led to the oral statement

16     that he gave.  Did he understand the oral

17     statements?  Did he have a true

18     understanding of waiving his rights on this

19     homicide occasion?  Did he understand each

20     of his rights?  The prosecution will argue

21     well we have the forms and we see his

22     signatures.

23          One of the writings that we see you

24     can't even read.  We were almost joking on

25     that on cross examination what was the state

1                    -PROCEEDING-                    31

2       of Mr. Jean when he wrote.  The police will

3       all say he was fine, he understood.  There

4       was no problem.

5            The medical testimony.  Miss Nicolas'

6       testimony that even as late as twelve hours

7       later he's still in shock, and she's a

8       nurse, and she knows him, in shock, crying

9       still at police headquarters.

10            Does he understand all these rights?

11       Is this a question of him just saying do you

12       understand and someone sitting there and

13       saying sure I understand, I have no problem,

14       I want to waive my rights.

15            This is someone who physically and

16       mentally from the get go, from the very

17       beginning could not understand the

18       circumstances, the rights he had, his

19       Constitutional rights to not speak with the

20       police, to not do anything that they wanted

21       him to do.

22            We want to search your house.  Here is

23       the permission form, sign.  He signs the

24       forms.  We want you to make statements, sign

25       this.  He signs the statements.

- PROCEEDING -                                     32

1
2          He signed the statements not just once
3     but twice indicating he would give up his
4     rights.  He never gave up his rights.  He
5     never understood he was giving up his rights
6     mentally, physically, and medically.
7          Lastly with regard to these statements
8     well not lastly but talk about twisting
9     words.  When we see exhibit ten and eleven
10    the two typewritten statements, and the jury
11    may see these statements, they're going to
12    look at something called voluntary statement
13    typed out very nicely.  Questions and
14    answers throughout and yet we know that is
15    not what occurred here.  Questions did you
16    do something.  When you say "A" for answer
17    you expect that to be the flowing answer of
18    the defendant.
19         Instead we hear from police officer or
20    investigator saying well I would ask him a
21    question, and then we would talk for a
22    while, and then I would write down an
23    answer.  Did you ever lead him?  Did you
24    ever change the words?  No, no, no.  These
25    were all his words.

-PROCEEDING-                                33

1

2          Yet if we look at exhibit 10 which was

3     the statement made at 11:10 in the morning

4     about the third question, what happened.

5     Answer.  Around 8:00 p.m. I gave the girls a

6     spanking.  What happened around 8:00 p.m.?

7     I gave the girls a spanking.  We know that

8     doesn't take five or ten minutes of back and

9     forth conversations.  You type out what

10    happened two words even using one finger.

11    Answer.  I gave the girls a spanking.  That

12    doesn't take long.

13         What did the detective do then?  The

14    next question -- he goes on from spanking.

15    The next question he asks what was the

16    beating for?  The answer was I gave the girl

17    a spanking.  And now the question is what

18    was the beating for, and now it just gets

19    picked up well the beating was for this or

20    that.  That is not what this statement is.

21         This statement exhibit 10 in evidence

22    is not the questions and answers in the

23    conversation between Darius Jean and

24    Detective Youngman.  It's what Detective

25    Youngman wanted to put down.

-PROCEEDING-                    37

1

2    finished.

3        MR. GOLDSTEIN:  The last point is the

4    grand jury statement which we really haven't

5    heard much about but it's been put into

6    evidence, stipulated into evidence.

7        The grand jury testimony came about and

8    because of exhibit eleven which I clearly

9    think has to be suppressed due to police

10   misconduct in this case, but only because of

11   exhibit eleven did the grand jury testimony

12   come about.

13       The grand jury came about to dispel the

14   fact that Darius Jean ever said that he

15   found the children or the child Kyona in bed

16   limp.  It came about because of the exhibit

17   eleven which is an inaccurate, untrue, and

18   involuntary statement, and because of the

19   fruit of the poisonous tree, that's the only

20   reason he even wound up testifying in the

21   grand jury even though there was a hiatus,

22   even though he was represented by different

23   counsel at different times.

24       The impropriety of exhibit eleven is

25   the only thing that led to the grand jury

-PROCEEDING-                    38

1
2      exhibit which is exhibit two in evidence,
3      your Honor.  Thank you.
4          THE COURT:  Again, Mr. Goldstein, it
5      seems that even if you argue that exhibit
6      eleven was the root of the grand jury
7      testimony which was the fruit, I think you
8      are going back to deceive the plan because
9      you have the independent counsel a
10     significant lapse of time for him to address
11     that.  I don't think one is the product of
12     the other.  But okay.  Mr. Moore?
13         MR. MOORE:  I concur to the court's
14     last statement in that regard.
15         What we have -- and I'll rely on the
16     grand jury testimony -- is that the
17     defendant testifying at the grand jury after
18     notice of the preparation of the case giving
19     the opening statement.
20         No place in the opening statement --
21     the second statement was the only cause for
22     him coming.  Did he even address it in his
23     opening statement.  I think that's Mr.
24     Goldstein interpretation of the events but
25     clearly there's nothing said all the way up

8/5/2002 N.Y.L.J. 28, (col. 4)

New York Law Journal
Volume 228, Number 23
© 2002 NLP IP Company


Monday, August 5, 2002


Court Decisions
Second Judicial Department
County Court
Rockland County

Judge Kelly


## PEOPLE V. **DARIUS JEAN**

A combined Huntley/Mapp hearing was held before the Court. The relevant facts adduced are as follows:

On October 12, 2001 at approximately 3:35 a.m., the Ramapo Police were dispatched to 9 Innington Court in Hillcrest regarding a "child not breathing, CPR being administered." P.O. Chris Franklin was the first officer on the scene. When he arrived at the location, he was flagged down by the defendant. The defendant then ushered the officer inside the house.

P.O. Franklin immediately went to the master bedroom. Upon arriving at the bedroom, he observed a young female lying on the bed and an adult female, later identified as Leslie Nicholas, standing at the foot of the bed. The young female on the bed was later identified as Kyona Frederick.

Officer Franklin's initial examination of the young female on the bed revealed that she was not breathing, was not responsive and had no pulse. Officer Franklin then administered one cycle of C.P.R., stopping when the paramedics arrived. During his administration of C.P.R., Officer Franklin noticed that the Ms. Frederick's jaw was unusually stiff.

Officer Franklin also had an opportunity to speak to the defendant inside the house while the paramedics administered to Kyona. The defendant stated to Office Franklin that the victim seemed fine the night before when she went to bed. He also said that was the last time he had seen her conscious.

The defendant also spoke to Officer Sean Lee at the house. The defendant told Officer Lee that he observed the victim stumbling. According to the defendant, the victim said she felt ill and that he tried to feed her. He further stated that the child was not breathing when he put her on the bed. Officer Lee then drove the defendant to Good Samaritan Hospital where Kyona had been removed in an ambulance.

At the hospital, the defendant was informed by doctors that Kyona had expired. Upon receiving the news, the defendant became hysterical and ran screaming from the hospital. The defendant was pursued by Officer Lee who caught up to the defendant when he collapsed in the parking lot. The defendant was however still hysterical and struggling with the officers. Eventually, he was transported back to the emergency room where medical personnel placed him on a gurney and held him in restraints for his protection.

After being called into work, Det. Glen Graham of the Ramapo Police Department arrived at the hospital at approximately 5:00 a.m. Det. Graham was briefed by the officers at the hospital and conferred with Dr. Silva, the emergency room doctor who examined the victim.

At about 6:20 a.m., Detective Graham spoke with the defendant in a curtained off area at the hospital. At the time of the conversation, the defendant was still under restraints. Prior to questioning the defendant, Det. Graham read him his Miranda warnings from a printed form. The defendant acknowledged his rights and agreed to speak with the detective. The defendant then initialed each right and signed the bottom of the form. The defendant then gave an oral account of the events surrounding the victim's death. The defendant also gave the police oral consent to search his house. Following a medical evaluation, the defendant was transported back to the Ramapo Police station, arriving sometime after 7:00 a.m. At approximately 7:42 a.m., the defendant executed a written consent to search his house. Earlier, Leslie Nicholas, after indicating that she co-owned the house,

gave oral consent to search the house. According to Ms. Nicolas, her consent was limited in that she stated that she would consent as long as the defendant also consented.

At 11:05 a.m., the defendant was again interrogated. This time, the interview was conducted by both Det. Graham and Det. Youngman. The defendant was again read his Miranda warnings. Once again, the defendant agreed to speak to the detectives and again he initialed and signed the Miranda form. The defendant then gave another written statement.

After the interview concluded, the detectives spoke to Leslie Nicolas. The detectives told her the substance of the defendant's statements to the police. The detectives further told Ms. Nicolas that they did not believe the defendant's version of events. According to the detectives, in response to repeated requests from Ms. Nicolas, the detectives allowed Leslie Nicholas to speak to the defendant privately.

However, Ms. Nicolas, called by the defense, testified that it was the detectives that suggested that she talk to the defendant. According to Ms. Nicolas the detectives suggested to her that she inform the defendant that they did not believe his story and that they would try to help him if he changed his story.

Ms. Nicholas spoke to the defendant, in creole, for approximately ten minutes. According to Ms. Nicolas, she informed the defendant about the detectives' opinion of his story. Further, she suggested to him that he should tell the truth and that doing so might spare him from a murder charge. According to Ms. Nicolas, the defendant continued to relay the same story to her.

Following that conversation, Ms. Nicholas told the detectives that the defendant wanted to make another statement. At approximately 2:40 p.m., the defendant then gave another written statement to the detectives. This time, the defendant changed his story slightly.

Motion to Suppress Physical Evidence

The defendant's motion to suppress physical evidence is based upon an alleged lack of voluntary consent by a person authorized to give such consent to search the defendant's home. However, the credible evidence adduced at the hearing established that the defendant himself consented to the search of his home and that his consent was voluntary. Further, Leslie Nicolas, a person with at least the apparent authority to consent, also consented to the search of the home.

The People bear the burden of establishing that a consent to search is voluntary. People v. Gonzalez, 88 N.Y.2d 289 (1996); People v. Gonzalez, 39 N.Y.2d 122 (1976). The determination of whether the consent was voluntary must be made in light of the circumstances attendant to the consent. Id. See also People v. Alvaranga, 190 A.D.2d 286 (2nd Dep't 1993); People v. Richards, 119 A.D.2d 597 (2nd Dep't 1986).

Perhaps the most important factor is whether the defendant is in custody at the time of the consent. People v. Gonzalez, 39 N.Y.2d 122 (1976). This factor is not however dispositive. Id. Other factors include: the number of officers present, the defendant's criminal history and background, the cooperation of the defendant prior to the consent and the advisement of the right to refuse to consent. Id.

The Court need not determine if the defendant was legally in custody. However, as custody is a an important factor, the circumstances used in evaluating an accused's custody status are equally relevant here. The first time the defendant consented, he was lying restrained on a hospital bed. However, the restraint was independent of any official government action. Additionally, the circumstances surrounding the interrogation were not so overbearing as to render the consent involuntary. There was a single officer speaking to the defendant in a public area. The defendant was apprised of his Miranda rights. Further, there is no evidence that the defendant was in any way threatened or coerced into giving the consent.

With respect to the other factors, it should be noted that this was not the defendant's first contact with law enforcement. Further, the defendant had been cooperative with police prior to giving his consent. Therefore, based upon the totality of the circumstances, I find that the defendant's consent was voluntary.

This conclusion is supported by the defendant's own sworn testimony before the Grand Jury. The defendant testified before the Grand Jury five days after the victim's death. The defendant was represented by counsel. When asked by the prosecutor, the defendant admitted giving the police voluntary consent to search his home.

Later in the morning of October 12, 2001, the defendant again gave the police consent to search his home. This time, the consent took place during an interview at the police station. Although the

defendant was surely in custody at this time, his consent was nonetheless voluntary. The defendant was read his Miranda warnings and waived his rights. Thereafter, the defendant signed a consent to search form. That form contained an advisement that the defendant could refuse to consent. Even the defendant, in his Grand Jury testimony, agrees that this second consent was also voluntary. Additionally, the consent given by Leslie Nicolas was voluntary. The credible evidence adduced at the hearing established that her consent was voluntarily given and further demonstrated that Ms. Nicolas had apparent and actual authortiy to give consent. See e.g., People v. Gonzalez, 88 N.Y.2d (1996); People v. Lopez, 291 A.D.2d 279 (1st Dep't 2002); People v. Buggs, 140 A.D.2d 617 (2nd Dep't 1988); People v. Richards, 119 A.D.2d 597 (2nd Dep't 1986).
Therefore, the defendant's motion to suppress physical evidence is denied.

Motion to Suppress Statements

The defendant also moves to suppress statements made by him to law enforcement. In all, the People have provided timely notice of their intent to offer seven separate statements.
The first two statements were made by the defendant to Officers Franklin and Lee respectively. They each were made at the defendant's house as the emergency was unfolding. Under the circumstances, they were not custodial. People v. Yukl, 25 N.Y.2d 585 (1969). See also People v. Williamson, 51 N.Y.2d 801 (1980); People v. Davis, 224 A.D.2d 541 (2nd Dep't 1996); People v. McKenzie, 183 A.D.2d 631 (1st Dep't 1992). Accordingly Miranda was unnecessary and the statements are admissible.
The third statement was made at about 6:20 a.m. to Detective Graham who spoke with the defendant in a curtained off area at the hospital. At the time of the conversation, the defendant was under restraints due to his earlier behavior. Prior to questioning the defendant, Det. Graham read him his Miranda warnings from a printed form. The defendant acknowledge his rights and agreed to speak with the detective. The defendant then initialed each right and signed the bottom of the form. The defendant then made his statement to the detective.
Once again the Court need not decide if the defendant was in custody. The defendant was adequately apprised of his Miranda rights prior to making the statement. See generally, People v. Hutchinson, 59 N.Y.2d 923 (1983); People v. Burton, 191 A.D.2d 703 (2nd Dep't 1993). The defendant was advised both orally and in writing regarding his rights prior to the statement. Additionally, the evidence demonstrates that the defendant knowingly and voluntarily waived his rights. People v. Sirno, 76 N.Y.2d 967 (1990); People v. Davis, 55 N.Y.2d 731 (1981). There is no evidence in the record that the defendant either asked for an attorney or invoked his right to silence prior to or during any of the statements. Additionally, there were no factors present that would render the statement involuntary under the totality of the circumstances. People v. Anderson, 42 N.Y.2d 35 (1977); People v. Werner, 725 N.Y.S.2d 681 (2nd Dep't 2001); People v. Johnson, 269 A.D.2d 405 (2nd Dep't 2000).
The fourth statement was also a written statement, this time taken at the Ramapo Police station at approximately 11:05 a.m. The defendant was again read him his Miranda warnings from a printed form. The defendant acknowledged his rights and agreed to speak with the detectives. The defendant then initialed each right and signed the bottom of the form. The defendant then made his statement to the detectives. As discussed above the defendant waived his Miranda rights. Although this additional procedure may have been unnecessary, the defendant was again adequately apprised of his rights and knowingly waived them. Additionally, there were again no factors that would render the statement involuntary.
The fifth statement was a written statement taken at the Ramapo Police station at approximately 2:40 p.m. As detailed above, prior to making this statement the defendant had twice been adequately apprised of his rights and knowingly waived them. The issue regarding that statement is whether the statement was "voluntarily" made.
C.P.L. 60.45(2)(b)(1) provides that a statement is involuntary when it is obtained "by a public servant engaged in law enforcement activity or by a person then acting under his direction or in cooperation with him, by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself." The gist of the defendant's argument is that Leslie Nicolas acted under the direction of or in cooperation with the detectives in speaking to the defendant and making statements to him that created the risk of the defendant falsely incriminating himself.
In order to find that the statement was involuntary, it must be shown both that Leslie Nicolas acted at the direction of or in cooperation with the detectives and that the promises or statements made by

her to the defendant created a substantial risk that the defendant would falsely incriminate himself. C.P.L. 60.45(2)(b)(1).

The credible testimony at the hearing establishes that Ms. Nicolas was acting neither at the direction of nor in cooperation with the police when she spoke to the defendant at the police station. While admittedly informing Ms. Nicolas of their scepticism regarding the defendant's earlier statements, Detectives Graham and Youngman testified that Ms. Nicolas repeatedly requested to speak with the defendant. Further according to the detectives, they neither asked for Ms. Nicolas help nor made a promise of leniency to be conveyed to the defendant.

Ms. Nicolas' relationship was not cultivated for the purpose of eliciting a confession. Further, the detectives did not supervise Ms. Nichols, did not attempt to overhear or record the conversation and did not instruct Ms. Nicolas on what to say. Accordingly, based upon the credible evidence, Ms. Nicolas was not acting as an agent of the police. See People v. Cardona, 41 N.Y.2d 333 (1977); People v. Ray, 65 N.Y.2d 282 (1985), People v. Lewis, 273 A.D.2d 254 (2nd Dep't 2000); People v. Del Duco, 247 A.D.2d 487 (2nd Dep't 1998); People v. Robertson, 149 A.D.2d 442 (2nd Dep't 1989); People v. Kersch, 135 A.D.2d 570 (2nd Dep't 1987).

Even assuming arguendo that Ms. Nicolas did act at the direction of or in cooperation with the police, Ms. Nicolas' remarks to the defendant did not create a substantial likelihood that the defendant would falsely incriminate himself. This is particularly the case because the defendant had already substantially inculpated himself. He had already admitted to having repeatedly hit the victims. According to Ms. Nicolas she told the defendant that the police wanted to "help" him, but they thought his story didn't make sense. She also told him that he should tell the truth. Finally, Ms. Nicolas suggested to the defendant that if he changed his story he may avoid a murder charge.

With respect to the suggestion that the defendant should change his story to avoid a murder charge, according to the detectives, this suggestion was never made to Ms. Nicolas. In fact, Ms. Nicolas herself states that the police did not direct her to relay such information to the defendant. In any event, such a suggestion standing alone would be insufficient to render the defendant's subsequent statement involuntary. People v. Giangrasso, 109 A.D.2d 750 (2nd Dep't 1985). See also, People v. Weisbrot, 124 A.D.2d 762 (2nd Dep't 1986).

Additionally, the suggestion that the police wanted to help him, likewise is insufficient to render the statement involuntary. Id. Finally, Ms. Nicolas' suggestion that the defendant tell the truth obviously did not create a risk that the defendant would falsely incriminate himself. People v. Blandon, 267 A.D.2d 392 (2nd Dep't 1999); People v. Williams, 183 A.D.2d 865 (2nd Dep't 1982).

The sixth statement for which the People provided notice consists of the defendants oral remarks made during the course of his time at the Ramapo Police station. As detailed above, the defendant was twice advised of his Miranda rights. Additionally, the evidence demonstrates that the defendant knowingly and voluntarily waived his rights. There is no evidence in the record that the defendant either asked for an attorney or invoked his right to silence prior to or during the course of his time at the station.

The seventh and final statement noticed by the People is the defendant's testimony before the Grand Jury. The defendant seeks to suppress the defendant's statement on the ground that it is the fruit of illegally obtained evidence, to wit, the defendant's second written statement. As discussed above, each of the defendant's statements was voluntarily made. Even assuming arguendo that the second written statement was involuntarily made, the defendant's Grand Jury testimony would nonetheless be admissible. A defendant's grand jury testimony is attenuated from any preceding taint. People v. Ventiquattro, 138 A.D.2d 925 (4th Dep't 1988); People v. Benson, 114 A.D.2d 506 (2nd Dep't 1985).

Accordingly the defendant's motion to suppress statements is denied.

This Decision shall constitute the Order of the Court.

8/5/2002 NYLJ 28, (col. 4)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

1                          Proceedings

2        defendant has awareness of potential risks

3        involved and has made a knowing choice.

4             The reason I point that out is what I was

5        suggesting to the Court yesterday and wanted to

6        put on the record today is in the course of

7        preparing for this case we spoke to very a

8        significant witness for the prosecution, Dr.

9        Eric Silva, who was the emergency room doctor at

10       Good Samaritan Hospital.

11            THE COURT:  Silver?

12            MR. MOORE:  S-i-l-v-a.

13            THE COURT:  Just so the record will be

14       clear, this was mentioned to me yesterday

15       afternoon when we were doing our calendar, and

16       at some point this was mentioned.  We had a very

17       long calendar yesterday.  We put the matter over

18       until today to address it appropriately, and the

19       parties mentioned this motion was going to be

20       made, and Mr. Moore, you said Dr. Eric Silva?

21            MR. MOORE:  With an "A" at the end, yes.

22            THE COURT:  And Good Samaritan you said?

23            MR. MOORE:  He was emergency room doctor

24       at Good Samaritan Hospital on the morning of

25       October 12th of 2001 when the dead body of Kyona

1                         Proceedings

2          Ortiz is 76 N.Y.2d 652, looks like.  And Scotty,

3          the one that you have; and Wandell Mr. Moore

4          mentioned.

5                    MR. GOLDSTEIN:  I have that.

6                    THE COURT:  The ones you gave me you gave

7          to Mr. Moore also, right?

8                    MR. GOLDSTEIN:  Yes.

9                    THE COURT:  Okay.  All right.

10                   Mr. Goldstein.

11                   MR. GOLDSTEIN:  Thank you, Judge.  First

12         of all, addressing the issues in the order that

13         were given, I just learned that apparently this

14         client has not paid me in full.

15                   THE COURT:  This Dr. --

16                   MR. GOLDSTEIN:  Silva.  Quite frankly, my

17         record-keeping may have been amiss.  I thought

18         he had, but I don't think that's an issue at

19         all.

20                   THE COURT:  I agree.  I think that could

21         be an issue.  I think that can be an issue to

22         some extent.  Federal cases held that is an area

23         that has to be inquired into in a Curcio

24         hearing, which is the federal analog of the

25         Gomberg case, and there was specific cases that

1              Proceedings

2    before the trial, and then if you go on further,

3    your Honor, the very last sentence of that

4    paragraph, "Indeed if anyone's interests were at

5    risk in trial counsel's representation of the

6    defendant, it was that of the witness whose

7    confidential file had been examined."

8         And that's basically what we're talking

9    about here.  You talked about what can be said

10   here.  As I expressed to your Honor yesterday,

11   the matter involving Dr. Silva was a noncriminal

12   offense in New Jersey.

13        THE COURT:  Just tell us about what that

14   was, okay, for the record.  You mentioned it

15   yesterday at side bar.  We had a five-minute

16   conference at the most.  You mentioned there was

17   a matter in New Jersey.  Do you want to

18   elaborate on that?

19        MR. GOLDSTEIN:  Sure.  He was charged with

20   a noncriminal offense in New Jersey, disorderly

21   person's type offense.  The matter was handled

22   by me making one appearance after speaking with

23   the prosecutor, the municipal prosecutor, in the

24   park.  The matter was what we called Section 36

25   closed.  Section thirty-six is a diversion where

Proceedings

1

2    the matter is closed.  Fines were paid, and

3    eventually the case is absolutely dismissed.

4    There is no plea of guilty, there is no criminal

5    record.  There can never be a criminal record,

6    but there is no record of conviction of any

7    type.  And that's when my representation of Dr.

8    Silva concluded.  If there was anything further

9    that occurred on that matter, it would involve a

10   full new retainer agreement.  That's when the

11   matter ended.  Sort of if somebody was sent to

12   probation by the Court and a year later, if

13   there is a violation of probation, if an

14   attorney is retained, he's retained on the new

15   violation of probation.  That's the analogy I'll

16   make on that, your Honor.

17       One thing that Mr. Moore said, and I want

18   to be clear on this, when I spoke to Dr. Silva,

19   he was sitting in my office when I spoke to

20   another person, and that's when he gleaned -- I

21   didn't know at that point -- he gleaned that I

22   was talking about this particular case, and then

23   I asked to speak to him about it, and his

24   response was, "Well is it procedure for me to

25   speak to you?" and my answer to him was what I

28

Proceedings

1

2 here -- do you have that material available to

3 you now?

4          MR. GOLDSTEIN:  Which material?

5          THE COURT:  That you're asking about an in

6 camera presentation.

7          MR. GOLDSTEIN:  I have it up here

8 (indicating).

9          THE COURT:  I can clear the courtroom and

10 take the information with you present, Mr. Jean,

11 so you can hear more about it, and it may be

12 helpful or instrumental to you in making your

13 decision.

14          First of all, do you know for a fact, Mr.

15 Moore, I think you said, that during Dr. Silva

16 did not want to waive the attorney/client

17 privilege with reference to anything he could be

18 cross-examined about with regard to that

19 matter?

20          MR. MOORE:  Indeed he was very adamant.

21          THE COURT:  That's a very serious issue

22 because we now know Dr. Silva does not want your

23 attorney cross-examining him about any of the

24 underlying facts pertaining to that offense, so

25 it's something I want you to consider.  Do you

1                          Proceedings

2       anything else, Mr. Goldstein, that might be

3       helpful factually, either party, for Mr. Jean to

4       consider?

5           MR. MOORE:  I don't believe so.  Just a

6       last note, and I can be wrong on this, and I'll

7       stand corrected if Mr. Goldstein corrects me,

8       but my understanding of the disposition on my

9       own research into New Jersey law is that it's a

10      form of a conditional discharge.  It operates

11      perhaps like New York State's A.C.D. Law would

12      work, which is it's a conditional discharge

13      based upon somebody fulfilling certain

14      requirements.  What those requirements might be,

15      might be community service, might be a fine,

16      might be a lot of things, but it might pend

17      until all those things are concluded and then be

18      dismissed, and my own concern is indeed it may

19      technically still be open.  While Mr. Goldstein

20      says his representation of him is concluded, I'm

21      not sure Mr. Goldstein's representations are in

22      accord with New York State Law on this issue.

23           In other words, if he agreed to handle

24      this matter for Dr. Silva, and it went before

25      the Court, and he made his court appearance, and

Proceedings

1

2     MR. GOLDSTEIN:  Yes.

3     THE COURT:  When you say disorderly

4 conduct --

5     MR. GOLDSTEIN:  Disorderly person.

6     THE COURT:  I know a number of things are

7 covered by that in the New Jersey statute, so I

8 don't know which one he's referring to or what

9 it's about.  That's why I'm asking.

10    MR. GOLDSTEIN:  Dr. Silva came to my

11 office charged with possession of marijuana,

12 under fifty grams.  That's what they call it

13 there.  I think up to fifty grams.  He actually

14 was charged with having, I believe, three

15 marijuana cigarettes on him at LaGuardia -- no,

16 at Newark Airport, where he was taking off for a

17 vacation with his wife for a wedding or

18 something of that sort.

19         Quite frankly, I've been doing this for

20 about twenty-two years now, twenty-three years.

21 Someone who is a doctor, who has no prior

22 criminal record, no prior criminal conduct at

23 all, comes to my office with a disorderly

24 person's offense of that nature, I know that

25 when I go to court and speak to the municipal

1          Proceedings

2  prosecutor, that based on his background and

3  based on everything else, that they are not

4  going to ask for him to plead guilty to that

5  charge.  They're going to allow him the

6  diversion program of Section 36.  I know it.

7  Handled it exactly that way.

8    We went to court on May 23rd in the City

9  of Elizabeth, and on that morning our case was

10  called, and once our case was called, he was put

11  into the program probably within ten seconds

12  from me coming up to the Court.  So it is an

13  extremely minor offense, the equivalent in New

14  York is the unlawful possession of marijuana

15  violation, which your first appearance you're

16  basically entitled to an A.C.D. as long as you

17  have no criminal background.  So his case was

18  extremely minor, and it is not considered a

19  criminal case in the State of New York.

20    That was my representation of him on that

21  matter, and I did in fact discuss, as I said,

22  certain aspects of what he did on the evening of

23  October 12th, I think it is.

24    THE COURT:  That was the day he did the

25  examination?

61

```
 1                      Proceedings

 2          research on it and would suggest to the Court

 3          I'm a bit confused over the applicable standard

 4          that seems to be at both the federal level and

 5          state court that they've adopted a case-by-case

 6          analysis of these types of issues but haven't

 7          established a "bright line" test for a trial

 8          court such as yourself to make a determination.

 9          What I would simply suggest to the Court there

10          is still an issue, after Mr. Jean indicated his

11          desire to keep Mr. Goldstein, as to whether or

12          not this is a type of conflict that is even

13          waivable, and it may be a determination by the

14          Court he can't waive this type of conflict

15          because no matter what is done, the conflict is

16          going to exist and going to affect the way Mr.

17          Goldstein tries this case.

18              I did pull two additional cases, which I

19          have for the Court.  One is Supreme Court case

20          of United States versus Wheat and an additional

21          case, Stewart versus Quelly (phonetic).  I'm

22          handing copies up to the Court.

23              THE COURT:  Does counsel have a copy?

24              MR. GOLDSTEIN:  No.

25              MR. MOORE:  I will provide Mr. Goldstein
```

1                           Proceedings

2          that previously.

3                  My inclination is the defendant has a

4          Sixth Amendment right to counsel of his own

5          choosing.  In balancing that against his right

6          also to have conflict-free representation, it

7          seems that the recent case, the most recent case

8          I read where the issue seems to come up is

9          Supreme Court of the United States, Mickens

10         versus Taylor, and that was decided March 12th

11         of this year, 2002, and in that case they

12         basically held that limitations that affect an

13         attorney's assistance that have no probable

14         effect on the outcome do not establish a Sixth

15         Amendment violation, and they seem to let it go

16         down to what the defendant would have to

17         establish is that a conflict of interest

18         adversely affected counsel's performance.

19                 The defendant is telling us here in open

20         court he's considered all of this and that he

21         doesn't believe this is that type of conflict.

22                 Is that right, Mr. Jean?

23                 THE DEFENDANT:  Yes.

24                 THE COURT:  So any limitations that

25         counsel would have on examining this witness you

1                           Proceedings

2          feel are outweighed by your desire to have Mr.

3          Goldstein as your counsel; right?

4                  THE DEFENDANT:  Yes.

5                  THE COURT:  I'll look at your cases, and

6          if there is anything further, I'll issue a

7          written opinion on it, but right now my

8          inclination is to let the defendant, in view of

9          the fact that the Court has brought the conflict

10         to his attention, the fact that the doctor is

11         not willing to waive the attorney/client

12         privilege and that he's willing to waive the

13         conflict issue, given the limited amount of

14         impact it might have on that physician's

15         credibility in any event, given the nature of

16         the charge, seems to be a very minor charge, it

17         seems the defendant has a potential awareness of

18         the risks involved in his course, and he's

19         knowingly chosen it, and it doesn't seem to me

20         that this would be a significant obstacle in

21         counsel vigorously representing the defendant.

22         I don't think it really even appears as if the

23         potential conflict affects the conduct of the

24         defense at this point, but I will give you a

25         written opinion on it in any event.

7/23/2002 N.Y.L.J. 24, (col. 1)

New York Law Journal
Volume 228, Number 14
© 2002 NLP IP Company

Tuesday, July 23, 2002

Court Decisions
Second Judicial Department
County Court
Rockland County

Judge Kelly

### PEOPLE V. **DARIUS JEAN**

The People moved, in limine, for an order disqualifying defense counsel, Mr. Goldstein. The basis of the motion is Mr. Goldstein's apparent conflict of interest. The defense has opposed the motion. The conflict arises because the defendant's attorney represented a prosecution witness in an unrelated, minor, criminal case. Around the time that Mr. Goldstein undertook representation of the defendant, he met with and was later retained by Dr. Silva, a prosecution witness. According to the People, the doctor would testify regarding his emergency room examination of the deceased. The defendant was apprised of Mr. Goldstein's apparent conflict in open court. The defendant was informed that Mr. Goldstein's cross examination of the doctor would be limited in that he could not inquire into areas covered by the attorney client privilege, as the doctor will not waive the privilege. [FN1] The Court repeatedly emphasized the potential prejudice to the defendant's defense and suggested that the defendant consult with outside counsel to discuss the issues.

The Court then adjourned for one week to allow the defendant to consult with other counsel. Following the adjournment, the defendant informed the court that he had an opportunity to consult with other counsel, but that he wished to have Mr. Goldstein continue to represent him, the conflict not withstanding.

The Court is thus faced with a conflict of competing interests. The Court must weigh the defendant's right to have counsel of his choice and the defendant's right to conflict free representation. [FN2] Clearly, the Sixth Amendment right to counsel includes the right to counsel of the defendant's choosing. Wheat v. U.S., 486 U.S. 153 (1988); U.S. v. Kelly, 870 F.2d 854 (2nd Cir. 1989); U.S. v. Curcio, 694 F.2d 14 (2nd Cir. 1982). See also Kuriansky v. Bed-Stuy Health Care Corp., 135 A.D.2d 225 (2nd Dep't 1988). It is, however, equally clear that the right is not absolute. Id. Competing interests may overcome this presumption of the right to counsel of one's choosing. Id. A defendant's concomitant right to adequate representation is one such competing interest.

In cases where counsel for the defense represents a prosecution witness, the potential conflict may adversely impact the efficacy of counsel's representation and thereby impact the defendant's right to adequate representation. Such a conflict may result in the reversal of a conviction. See, e.g., Mickens v. Taylor, 122 S. Ct. 1237 (2002); People v. Wandell, 75 N.Y.2d 951 (1990); People v. Lyle, 288 A.D.2d 324 (2nd Dep't 2001). A reversal will be mandated when the conflict adversely affected counsel's performance. Id. See also People v. Alicea, 61 N.Y.2d 23 (1983). New York has limited the inquiry in such cases to conflicts involving only "important" prosecution witnesses. People v. Wandell, 75 N.Y.2d 951 (1990); People v. Lyle, 288 A.D.2d 324 (2nd Dep't 2001).

However, when the conflict is brought up prior to trial, the "likelihood and dimensions of nascent conflicts of interests are notoriously hard to predict." Wheat v. U.S., 486 U.S. 153, 162 (1988). When faced with prospective conflicts between counsel and prosecution witnesses, the Court may disqualify counsel. See, People v. Blaylock, 266 A.D.2d 400 (2nd Dep't 1999); People v. King, 248 A.D.2d 639 (2nd Dep't 1999)(counsel represented prosecution witness on related charges); People v. Scotti, 142 A.D.2d 616 (2nd Dep't 1988)(counsel representing drug defendant's supplier who was expected to testify relieved despite defendant's objection). Those decisions, however, do not mandate that counsel be relieved.

In such cases, the Court must be given latitude in balancing the competing rights. Wheat v. U.S., 486

U.S. 153 (1988); U.S. v. Kelly, 870 F.2d 854 (2nd Cir. 1989). The instant case is distinguishable from the cited cases in which counsel was relieved. The prosecution witness is not a co-defendant and was not charged in a related matter.

Additionally, and most importantly, the prospective witness is not an "important" witness. People v. Wandell, 75 N.Y.2d 951 (1990); People v. Lyle, 288 A.D.2d 324 (2nd Dep't 2001). The witness is the doctor who examined the deceased victim at the hospital and pronounced her dead. Additionally, the doctor is likely to testify that he suspected the victim had been abused and that the victim had been deceased for several hours before she was presented at the hospital. Finally, the doctor is expected to testify that he examined the defendant that same day. While it is likely that the witness may have important testimony in some regards, it cannot be said that he is the chief witness or even a critical witness.

Further the conflict of interest is completely unrelated to the instant case. The conflict arises from Mr. Goldstein's representation on a minor charge that was ultimately dismissed. The cross examination of the doctor will therefore not be hampered to any great degree. The privileged communications regarding that minor charge would have had very limited value in attacking the doctor's credibility. In any event, the defense has indicated, as a matter of strategy, that it would not seek to attack the doctor's veracity, even if they were permitted.

Therefore, the conflict is not so great so as to per se disqualify the defendant's counsel. The court must balance the defendant's desire to have Mr. Goldstein represent him and the possibility of the conflict of interest depriving him of effective representation.

In United States of America v. Charles Schwarz, et al, 283 F. 3rd 76 the Court held that while a defendant is generally required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel see Strickland v. Washington, 466 U.S. 688, 687, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), this is not so when counsel is burdened by an actual conflict of interest. Id. At 692, 104 S.Ct. 2052. Prejudice is presumed under such circumstances. See id; United States v. Iorizzo 786 F.2d 52, 58 (2d Cir. 1986). Thus, a defendant claiming he was denied his right to conflict-free counsel based on an actual conflict need not establish a reasonable probability that, but for the conflict or a deficiency in counsel's performance caused by the conflict, the outcome of the trial would have been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance. See Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed. 2d 333 (1980); see also Levy, 25 F. 3d at 152.

An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action. Winkler v. Kean, 7 F.3d 304, 307 (2d Cir. 1993).

The finding of an actual conflict, however, is only the first step in determining whether a defendant must also show that the actual conflict adversely affected his attorney's performance by demonstrating that "a 'lapse in representation' resulted from the conflict." Iorizzo, 786 F.2d at 58 (quoting Cuyler, 446 U.S. at 349, 100 S.Ct. 1708).

A defendant must "demonstrate that some 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " Levy, 25 F.3rd at 157 (quoting Winkler, 7 F.3d at 309) see also Triana v. United States, 205 F.3d 36, 41 (2d Cir. cert. Denied, 531 U.S. 956, 121 S. Ct. 378, 148 L.Ed. 2d 292 (2000).

It does not appear, based upon the allocution, that counsel will be unable to pursue a plausible alternative strategy in this case because of the conflict.

Unlike the situation in Schwarz, supra where the attorney's representation was not only in conflict with his ethical obligation to the PBA as his client, but also with his own substantial self-interest in the $10 million retainer agreement his newly formed firm had with the PBA, the conflict here appears to be a waivable one (United States v. Fulton, 5 F.3d 65) that would not require counsel to forego a plausible alternative strategy. Therefore I find this to be a case where the defendant can waive his right to conflict-free counsel in order to retain the attorney of his choice. United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998)

Further, the defendant effectively waived any conflict of interest. Even assuming arguendo that the conflict involved an "important" witness, the defendant effectively waived the conflict. Much like a trial court's obligation to make a Gomberg inquiry in a case where an attorney represents co-defendant's, courts faced with a conflict such as the one facing this Court should inform the defendant about the conflict and its possible ramifications. Mickens v. Taylor, 122 S. Ct. 1237 (2002); People v. Wandell, 75 N.Y.2d 951 (1990). The Court must then inquire of the defendant to ensure the "defendant has an

awareness of the potential risks involved [in waiving the conflict] and has knowingly chosen" to continue with his current representation.

In this case, the Court has taken great care to explain the nature of the conflict and the potential pitfalls in maintaining his trial counsel. The Court provided the defendant with an adequate opportunity to seek outside legal advice on the issue. The defendant then unequivocally maintained that he wanted Mr. Goldstein to continue to represent him despite any restrictions the conflict of interest would place on his representation. Based on the circumstances, it is clear that the defendant's waiver was knowing and voluntary.

For the foregoing reasons, the Court will allow Mr. Goldstein to continue his representation of the defendant. [FN3] However, as the Court has made abundantly clear, Mr. Goldstein will not be allowed to inquire in privileged matters.

This Decision shall constitute the Order of the Court.

FN1. According to counsel, the inability to cross examine the doctor regarding privileged information will not hamper the defense. According to counsel, as a matter of trial strategy, the defense does not plan to vigorously attack the doctor's credibility.

FN2. The Court need not weigh the People's right to present witnesses without unfair disadvantage, as the Court has already ruled that the defense cannot delve into privileged matters.

FN3. This decision should not be interpreted as a tacit endorsement of counsel's actions in representing conflicting interests. In fact, it appears that such conduct may violate several ethical canons.

7/23/2002 NYLJ 24, (col. 1)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

1                              Proceedings

2              case it's proof beyond a reasonable doubt.

3              What is that?  I said to you in a civil case

4              it's 51 percent.  Proof beyond a reasonable

5              doubt is somewhere on the coninum between 51

6              and 100 percent, and where that is only the

7              juror knows, you make that determination.

8              It's not proof beyond all doubt which would

9              be 100 percent.  You can't get that type of

10             proof in a human affairs.  If the law

11             requires guilt 100 percent every case would

12             be an acquittal.  You can't get that type of

13             proof when dealing with a human being.  The

14             People and the law does have to prove a

15             person's guilt beyond a reasonable doubt.

16             It's higher than 51 percent and something

17             less than 100 percent.  Proof beyond a

18             reasonable doubt that's a constant.  I will

19             explain that in more detail at the end of

20             the case.  Suffice it to say at this time if

21             the juror is convinced that a Defendant's

22             guilt has not been proven beyond a

23             reasonable doubt then a juror could give a

24             reason if called to do so and that reason is

25             based upon the evidence or the lack of

1                         Proceedings

2            evidence, then the Defendant is entitled to

3            an acquittal.  On the other hand if the

4            District Attorney has proved beyond a

5            reasonable doubt, you are entitled to vote

6            for the conviction of the Defendant.  The

7            difference between the criminal and the

8            civil case is the civil case is proved by a

9            mere preponderance.  To mathematize it, it

10           is 51 percent that suffices.  In a criminal

11           case the operative word is greater, it's not

12           a mere preponderance it's proof beyond a

13           reasonable doubt.  Does everybody understand

14           and accept that?

15                Now your job in this case will end when

16           you return a verdict.  If and when you

17           return a verdict on the case if the

18           Defendant is found to be guilty and

19           sentenced, the sentencing is a job

20           exclusively for the Court.  The jurors do

21           not play a role in the sentencing process.

22           You are not to consider a punishment in the

23           verdict.  That is taken from you when you

24           make a determination.  It's up to the Court

25           to impose a sentence.  Just for your

```
1                        Proceedings
2          preliminary the Court spoke to them about
3          beyond a reasonable doubt, and the Court
4          indicated that it sort of did it -- had a
5          mathematically idea where have you to prove
6          51 percent verses 40 for the loss, when the
7          Court started talking about it you indicated
8          beyond a reasonable doubt is somewhere
9          between 51 and 100 percent, and the jury
10         will state that, Your Honor.  I don't think
11         that's the status of the law.  This jury
12         cannot determine if the prosecution, in
13         their minds proves 51 percent or slightly,
14         slightly, slightly more than the 51 percent,
15         that they can find beyond a reasonable doubt
16         has been proven, and that is one reason why
17         courts have stated beyond a reasonable doubt
18         quantifying other than beyond a reasonable
19         doubt and consistently saying that. It's a
20         high standard beyond a reasonable doubt.
21         Finish the sentence it didn't go beyond 100
22         percent.  It has been a high standard in a
23         criminal case, clearly not the 51 or the
24         51.2.
25              THE COURT:  I understand your concern,
```

1                           Proceedings

2          I am addressing it as I go back in there.  I

3          don't think I put it as a 52.  I say

4          somewhere in the confine of 51 and 100

5          percent and that point is the point you

6          determine it.  I did not try to mathematize

7          it.  I am understanding your concerns.

8          We'll address it, we did go on and that's

9          what you are --

10              MR. GOLDSTEIN:  You did say and I ask

11         that under the circumstances this panel be

12         excused.  I don't think that the panel can

13         be rectified for the 51 or the 51.

14              THE COURT:  I understand your

15         objection, thank you, now there is a juror

16         out in that has a problem.  Mr. Hutt, come

17         in? The Court officer said he had extreme

18         hardship.

19              MR. HUTT: I'm David Hutt would this be

20         the side-bar?  I have a severe financial

21         hardship.  I would like to the   ---

22              THE COURT:  What is your hardship?

23              MR. HUTT: I was have an obligation.  I

24         started a smoking cessation program which is

25         on grant.  The grant was supposed to be

1                        Proceedings

2              in the afternoon, you requested a

3              postponement.

4                   MR. HUTT: Regardless of what the reason

5              is?

6                   THE COURT:  Regardless, see you 1:30.

7                   (Whereupon, a lunch recess was taken.)

8                   THE COURT:  It's nice and cool in here,

9              it's 86 in my chambers.  By the way someone

10             expressed some concern to me this morning

11             the fact when I illustrated the burden of

12             proof in a criminal and civil case.  I used

13             an example mathematical.  I am going to

14             hopefully clarify something I said.  In a

15             civil case where a mere preponderance is 51

16             percent is enough and I went onto say in a

17             criminal case is not a mere preponderance

18             but a proof beyond a reasonable doubt and I

19             said it appears somewhere between 51 percent

20             and 100 percent and the purpose is not to

21             suggest that 53 or 58 percent but it was

22             more than 51 percent and something less than

23             100 percent, but the standard being proved

24             is beyond a reasonable doubt.  There was no

25             total quantification for the purpose of

1                                    Proceedings

4

1                          C. Franklin-Direct

2    October 12th of 2001 ?

3         A     Yes, I was.

4         Q     And can you tell us what tour of duty you were

5    working?

6         A     Midnight until 8 a.m.

7         Q     So on Thursday night, midnight, until 8 a.m.

8    Friday morning?

9         A     That's correct.

10        Q     Were you in uniform?

11        A     Yes, I was.

12        Q     Were you riding in a marked patrol vehicle?

13        A     Yes, I was.

14        Q     Do you recall what sector or what area of Ramapo

15   you were patrolling that morning?

16        A     Sector 3; the Monsey area.

17        Q     If I can first direct your attention, sir, to

18   approximately 3:35 a.m. on the morning of October 12, 2001.

19   Can you tell us what, if anything, occurred?

20        A     Received a radio report.

21        Q     What was the dispatch or radio report that you

22   received?

23        A     Respond to a nine-year-old child not breathing,

24   with CPR in progress.

25        Q     Was an address given?

1                          C. Franklin-Direct

2          A      Yes, it was.

3          Q      What was that?

4          A      9 Innington Court.

5          Q      As a result of receiving that radio dispatch,

6     sir, what, if anything, did you do?

7          A      I started to respond to the address.

8          Q      And approximately how long did it take you to

9     get to 9 Innington Court?

10         A      I think less than three minutes.

11         Q      Upon arriving at that address, sir, what, if

12    anything, did you observe, and what, if anything, did you

13    do?

14         A      Upon pulling into the court, I observed a black

15    male on the front lawn area flagging me down, and I

16    proceeded to get out of the patrol vehicle and obtained my

17    medical equipment from the trunk of the car.

18         Q      9 Innington Court, could you describe what's

19    there.  A residence?

20         A      Yes.  Appeared to be a single-family residence,

21    a high ranch.

22         Q      You said there was an individual on the front

23    lawn.  Is that correct?

24         A      Yes, sir.

25         Q      Did you speak with that individual at all?

```
 1                          C. Franklin-Direct

 2        A     Briefly on the front lawn.

 3        Q     What, if anything, did you say and/or what, if

 4   anything, did that person say to you?

 5        A     I asked him where the child was, and he directed

 6   me to the house.

 7        Q     And did you later learn the identity of that

 8   person who was standing on the front lawn?

 9        A     Yes, I did.

10        Q     Who was that, sir?

11        A     Darius Jean.

12        Q     Could you take a look around the courtroom

13   today, Officer Franklin, and tell us if you see that

14   individual in the courtroom present?

15                    MR. GOLDSTEIN:  I would stipulate he will

16              pick Darius Jean.

17                    THE COURT:  Okay.  So stipulated.

18                    From time to time the attorneys may

19              stipulate to something, and when there is a

20              stipulation, it means the parties agree if a

21              witness were called, in the case of a witness or

22              case of a set of facts like we're hearing right

23              now, there needn't be any evidence produced.

24              They are stipulating if a witness were called,

25              they would testify thus and thus or an agreed
```

1                            C. Franklin-Direct

2        A     I proceeded to assess her to see if CPR was

3    necessary.

4        Q     When you say, "I proceeded to assess her," can

5    you tell us what that means or what in fact you did.

6        A     First I checked her -- after seeing if she would

7    respond, I checked her airway to see if there was any type

8    of obstruction, of which there wasn't, checked her breathing

9    to see if she was breathing, which she wasn't, and also

10   checked her pulse, and there was none.

11       Q     Not breathing and no pulse, correct?

12       A     That's correct.

13       Q     What was your purpose of checking her airway?

14       A     Make sure there's no obstruction so in fact if I

15   did administer oxygen, it would take its proper course and

16   not be blocked by anything in her throat.

17       Q     As a result of making those observations or

18   after making those observations, sir, what did you do next?

19       A     I decided that CPR was obviously necessary and

20   provided CPR.

21       Q     Again when you say you started CPR, tell us

22   exactly what it is you did.

23       A     I tilted her head back, pulled her chin down,

24   and noticed that her chin was slightly stiff, and began to

25   place an oxygen mask over her face and administered two, I

1                          C. Franklin-Direct

2     would term, breaths of oxygen through the BVM.

3          Q     Slow you up there.  When you use initials, just

4     tell us what that is, the instrument is.

5          A     It's a mask hooked up to a squeeze bag which

6     assists in administering oxygen instead of doing actual

7     mouth-to-mouth.

8          Q     You said you tilted her head backwards, correct?

9          A     That's correct.

10         Q     And tried to pull her jaw forward?

11         A     That's correct.

12         Q     Open up the airway?

13         A     That's exactly --

14         Q     When you tried to pull her jaw forward, could

15    you explain to us what, if anything, happened.

16         A     It was slightly stiff.  It gave more resistance,

17    more than normal.

18         Q     Then you started CPR?

19         A     Two administrations of oxygen.  Correct.

20         Q     When you say two administrations of oxygen, you

21    squeezed it twice?

22         A     That's correct.

23         Q     What did you do next?

24         A     And then proceeded to give 15 chest

25    compressions.

```
 1                          C. Franklin-Direct

 2    paramedics.

 3         Q     What did you do next, sir, after the paramedics

 4    now took over the course of treatment to the young girl?

 5         A     I had a brief conversation with Leslie Nicolas.

 6         Q     Where did that conversation take place?

 7         A     In the master bedroom doorway area.

 8         Q     And what, if anything, in general were you

 9    asking her?

10         A     If the child had any type of medical history or

11    anything that we should be aware of.

12         Q     Did you at any point later in time see Darius

13    Jean in that area?

14         A     Yes, I did.

15         Q     And can you tell us where and when that occurred

16    and if you had any conversation with Darius Jean.

17         A     He was pacing up and down the hallway along the

18    bedrooms, his hands to his head.  Looked -- repeating,

19    "Please don't die," and looked to be more nervous than

20    upset.

21         Q     Did you have a conversation with him, sir?

22         A     Yes, I did.

23         Q     Can you tell this jury what, if anything, you

24    said to Darius Jean and what, if anything, Darius Jean said

25    to you.
```

1                              C. Franklin-Direct

2        A      Dispatches started to request assistance at Good

3   Samaritan Hospital, and through radio transmissions, which

4   were broken up or staticky, I perceived there was a problem

5   down at the hospital, and I presumed to respond there.

6        Q      You drove to Good Samaritan Hospital?

7        A      Yes, I did.

8        Q      Approximately how long did it take you to get

9   there?

10       A      I would say a minute or two.

11       Q      Upon arriving there, sir, what, if anything, did

12  you observe, or what, if anything, did you do?

13       A      I understood that there was a problem in the

14  rear parking lot, so I proceeded to the rear parking lot,

15  where I observed a couple of officers, as well as Darius

16  Jean, in the rear parking lot.

17       Q      What, if anything, occurred next, sir?

18       A      When I arrived, Darius Jean was already in

19  handcuffs, and they were awaiting a wheelchair to assist him

20  back into the hospital.

21       Q      So what did you do, sir, at that point?

22       A      I stood by and assisted and made sure he was

23  escorted back into the hospital.

24       Q      And after he was brought back into the hospital,

25  sir, what did you do?

1                              C. Franklin-Cross

2    you confirmed that CPR was necessary.  That's when you moved

3    the jaw forward, correct?

4         A     Pulled the jaw down, correct.

5         Q     And the reason you do that is so that you get a

6    clear passage, air passage, to the lungs, correct?

7         A     Yes, sir.

8         Q     Normal CPR training?

9         A     Yes, sir.

10        Q     And when you did that, you then were able to use

11   the air device, and as you indicated to the jury, you were

12   able to squeeze that device two times?

13        A     Yes, sir.

14        Q     When you squeezed that device, you confirmed

15   that the air passage was clear; isn't that right?

16        A     To my knowledge, yes.

17        Q     Because the way you confirm it is you actually

18   can see the lungs fill or the chest rise?

19        A     It appeared -- the chest rise, yes.

20        Q     If there was an obstruction, you would not see

21   that and through your training you would be aware there

22   might be an obstruction?

23        A     Normally.

24        Q     But in this case the lungs filled and chest

25   rose?

```
 1                          C. Franklin-Cross

 2          A      Yes, sir.

 3          Q      And you indicated you did that first at the

 4   doorway to the master bedroom?

 5          A      In that general area.

 6          Q      Did you ask for medical history or anything

 7   about the child?

 8          A      Yes.  I asked if the child had any medical

 9   history.

10          Q      She responded, right?

11          A      Yes, she did.

12          Q      Did you learn the child had a medical history of

13   asthma?

14          A      That's what Ms. Nicolas claimed, yes.

15          Q      Right.  And did you learn that the child had

16   used an inhaler from time to time?

17          A      That's again what she claimed, yes.

18          Q      Did you pass that information on to the

19   paramedics?

20          A      I believe I did.

21          Q      While you were speaking to Leslie Nicolas -- you

22   previously described how Darius Jean appeared out on the

23   grass, the front lawn -- how did Ms. Nicolas appear?

24          A      She was calm.

25          Q      What do you mean by calm?
```

1

2    occurred next?

3        A    I began speaking with Darius Jean and Leslie

4    Nicolas.  I was trying to determine how long the child was

5    down and not breathing.

6        Q    In regard to Darius Jean, what, if anything, did

7    you ask him, and what, if anything, did he tell you about

8    the events of that night?

9        A    I had asked him what had basically happened, and

10   his response to me was that he was sitting in his office

11   doing some work when Kyona had come down the hallway in a

12   dizzy, clumsy-like manner and that he had said that she had

13   stated that she was not feeling well.  He tried to give her

14   some chicken, but she continued to get sicker; that he

15   brought her into the bedroom where Ms. Nicolas was sleeping,

16   advised Ms. Nicolas that the child was not breathing.

17       Q    Did he indicate anything to you about splashing

18   water on her face at one point?

19       A    Yes, he did.

20       Q    Did he say where that occurred?

21       A    I took it to be in the kitchen area.  After he

22   said he had given her some chicken, when that didn't do any

23   good, he splashed some water on her face before he brought

24   her down to the bedroom.

25       Q    Did you ask him any questions about when the

S. Lee-Direct

1

2    last time was he observed her conscious?

3        A    I asked specifically when the last time he knew

4    her to be breathing, and he said that was up to the point he

5    brought her into the bedroom and notified Ms. Nicolas that

6    she was not breathing.

7        Q    Did you ask him about any medical history with

8    Kyona Frederick?

9        A    Yes, and I was advised that she had asthma.

10        Q    After speaking to Darius Jean, what happened

11    next, Officer?

12        A    There came a point in time that Kyona was going

13    to be transported to Good Samaritan Hospital by the

14    ambulance. My sergeant was on the scene, and after

15    conferring with Ms. Nicolas and she had stated that she was

16    unable to drive to the hospital, that I offered Darius Jean

17    a ride to the hospital behind the ambulance.

18        Q    So did there come a point in time where the

19    ambulance with the child Kyona Frederick left 9 Innington

20    Court?

21        A    That's correct.

22        Q    And you followed the ambulance?

23        A    Yes, I did.

24        Q    And in that car was yourself and Darius Jean,

25    correct?

```
1                          S. Lee-Direct
2    cause of death seemed suspicious.
3                  MR. GOLDSTEIN:  Objection, your Honor.
4              Move to strike.
5                  MR. MOORE:  It's what he's saying.
6                  THE COURT:  I'll permit it.  He's saying
7              what he told someone else, not what they told
8              him.
9        Q    After advising Sergeant Lepori of those facts,
10   Officer, what happened next?
11       A    I went back down to the same area I was before,
12   where Darius Jean was in the conference room with Dr. Silva,
13   the emergency room doctor.
14       Q    So upon arriving back at the room now, there was
15   a second person present, Dr. Silva?
16       A    That's correct.
17       Q    Was he the emergency room doctor at Good
18   Samaritan that morning?
19       A    Yes.
20       Q    And what happened next, sir?
21       A    After a conversation with the doctor, Mr. Jean,
22   Darius Jean, became very excited and upset, exited that
23   room, ran out the emergency room doors, and ran south in the
24   parking lot of the hospital.
25       Q    And when that occurred, sir, what did you do?
```

1                          S. Lee-Direct

2        A     I proceeded after him.

3        Q     Tell us what you observed and what, if anything,

4   occurred?

5        A     I observed Mr. Jean running out in the parking

6   lot flailing his arms, yelling and screaming, chased him for

7   approximately a hundred fifty yards, two hundred yards, at

8   which time he collapsed in the parking lot and began to

9   thrash around and bang around, bang his head and his hands

10   and feet on the ground.

11        Q     As a result of that observation, sir, what did

12   you do?

13        A     I came up behind him.  I tried to hold him down,

14   to stop him so he wouldn't hurt himself, tried verbally to

15   calm him down.  Sergeant Lepori arrived at the same time.

16   We were unsuccessful in doing so, and Mr. Jean was placed

17   into handcuffs for his safety.

18        Q     After placing him in handcuffs, what did you do

19   next, Officer?

20        A     We attempted to walk him back to the emergency

21   room.  First we attempted to place him into a patrol car.

22   We were unsuccessful in doing that.  We then attempted to

23   walk him back to the hospital.  We were still unsuccessful.

24   He was very limp.  He was not walking along with us.  Came a

25   point in time somebody approached us with a wheelchair, and

1                              S. Lee-Cross

2         A      Yes, she did.

3         Q      And as a matter of fact, she also told you or

4    you also learned, when you were at Good Samaritan Hospital,

5    that Leslie Nicolas told Dr. Silva that she felt a weak

6    pulse.   Is that correct?

7         A      That's not correct.

8         Q      Did you learn that she told Dr. Silva that she

9    felt a weak pulse?

10        A      No.

11        Q      Did you learn that she spoke to Dr. Silva at the

12   family counseling room?

13        A      Yes.

14        Q      At Good Samaritan Hospital?

15        A      Yes.

16        Q      And Dr. Silva was the emergency room doctor?

17        A      Yes.

18        Q      Darius Jean told you at 9 Innington, when you

19   were speaking to him, that he was in his office working when

20   he saw Kyona come down the hallway in a dizzy state,

21   correct?

22        A      That's correct.

23        Q      Did he tell you about how long before he made

24   the 911 call this was?

25        A      No.

1                              S. Lee-Cross

2         Q     And yet you never saw Mendy or Mendissa come out

3   of her room during that whole time that you were there?

4         A     No, I did not.

5         Q     When you drove Darius to Good Samaritan

6   Hospital, you actually followed the ambulance?

7         A     Yes.

8         Q     And as soon as you arrived at the emergency

9   room, the back portion of Good Samaritan Hospital, the

10  ambulance was pulled up in front of you, correct?

11        A     Correct.

12        Q     And as soon as you arrived, Darius jumped out

13  and ran straight to the ambulance where Kyona was?

14        A     Yes, he did.

15        Q     And he followed them taking Kyona from the

16  ambulance onto the stretcher and into the emergency room?

17        A     Yes.

18        Q     And then after a moment that's when he was told

19  he had to fill out some forms or give some information to

20  the admissions concerning Kyona?

21        A     Yes.

22        Q     While the staff was working on Kyona, there came

23  a point when Darius Jean learned that his daughter had

24  passed; is that correct?

25        A     Yes.

1                              S. Lee-Cross

2          Q      And you were in the hospital at that time,

3    correct?

4          A      Yes.

5          Q      Did you see what Darius's reaction was to that?

6          A      Yes.

7          Q      What was it?

8          A      He became excited.  That's when he ran out of

9    the counseling room and then out of the hospital and south

10   through the parking lot.

11         Q      He was screaming?

12         A      Yes.

13         Q      Crying?

14         A      Yes.

15         Q      And when he ran, he ran and he ran until he

16   collapsed to the ground; is that correct?

17         A      That's correct.

18         Q      And when he collapsed to the ground, that's when

19   he was, as you described, thrashing himself about?

20         A      That's correct.

21         Q      And was crying?

22         A      Yes.

23         Q      And he was thrashing himself about so badly,

24   with his arms, feet, and head hitting the ground, that you

25   and other officers had to control him so he wouldn't even

B. Freson-Direct

1

2          A      Yes.

3          Q      And directing your attention to approximately

4    3:35 a.m. on the morning of October 12th, can you tell us

5    what, if anything, occurred.

6          A      Yes.  My partner around I were at our station.

7    We got a call for a child, nine-year-old, with difficulty

8    breathing.  We left our station, headed to Innington Court.

9          Q      9 Innington Court?

10         A      Yes.

11         Q      How long approximately did it take you to get

12   from your headquarters to 9 Innington Court?

13         A      Maybe four minutes, five minutes.

14         Q      And upon arriving at the house, can you tell us

15   what, if anything, you observed and what, if anything, you

16   did?

17         A      We pulled up at the house.  There was a man

18   standing on the front porch jumping up and down and

19   yelling.  I don't remember what he was saying.  I just

20   remember the voice.

21         Q      Could you describe the male for us?

22         A      Truthfully, a black male.

23         Q      That's all?

24         A      It was dark out.  That wasn't my concern.

25         Q      After making that observation what did you do

1

2    next?

3        A    He led us upstairs, up the stairs in the house,

4    down to the back bedroom, which was on the left-hand side,

5    the master bedroom.

6        Q    Upon arriving in the master bedroom, tell us

7    what you observed?

8        A    I observed one of the police officers doing

9    CPR.  There was a young black child in the bed.

10        Q    Describe the position she was in in the bed?

11        A    She was lying on the right side of the bed, her

12    right, so she's lying there -- it would have been my left

13    looking at her.

14        Q    Was she lying on her back or on her stomach?

15        A    She was lying on her back.  She had her pajamas

16    on, her hair in blue barrettes or something like that.

17    Police Officer was doing CPR.  My partner and I arrived

18    there.  We put her directly onto the floor because you can't

19    do effective CPR without a flat, firm surface.  Put her on

20    the floor.

21        Q    When you say your partner, just so we have a

22    good record, who were you with, or who were you working with

23    that evening?

24        A    Do you want her name?

25        Q    Yes.

1                              B. Freson-Direct

2    night also, so you breathe for her trying to give her body

3    the oxygen it needs.  You do CPR trying to circulate blood

4    and oxygen to all the vital organization.

5                I went to intubate her.  Intubate means to put

6    an artificial airway, a plastic tube, in her mouth down into

7    her lungs so that we can breath more adequately for her.  I

8    went to do that.  Normally I can do that with one hand.  I

9    hold the blade in my left hand, lift up her jaw, and I can

10   see her airway, and then I insert the tube.  I couldn't do

11   that because her jaw was too stiff.  I needed both hands to

12   hold her jaw.  And my lieutenant who showed up on the scene,

13   I had to have him come around and just put the tube in.  I

14   verbally guided it in for him because I needed two hands to

15   open her jaw and to hold it open.

16        Q    Now based upon your medical training, can you

17   make any assessment of the jaw being stiff or why the just

18   would be stiff at that point?

19        A    It was obvious to me why her jaw was stiff.  She

20   had been dead for quite awhile.

21        Q    Is there a term called rigor mortis?

22        A    Yes.

23        Q    And again just based upon your training, could

24   you explain what that is?

25        A    Rigor mortis is when you've been dead for a long

1                            B. Freson-Direct

2    time.  Your body is stiff.  Your joints get stiff.  There is

3    no circulation of anything.

4         Q     And rigor mortis would start from the top of the

5    body and work its way down?

6         A     It would.  That's how we go about doing things.

7    We check the jaw, the head.

8         Q     And in this case you noted you thought the body

9    or the girl had been dead for some period of time because of

10   the stiffness of her jaw, correct?

11        A     Well, that was one of the clues.

12        Q     Did you make any other observations that were

13   consistent with that?

14        A     I did.

15        Q     Can you tell this jury what those were?

16        A     When we went to check her pupils, which is

17   another indication of someone being alive or not, you shine

18   a light into their eyes, and if there is any reaction it,

19   means that there's still brain function.  There was none, no

20   reaction at all.  Her conjunctiva, the tissues here in your

21   eye, ours are all normally red or at least pink.  Hers were

22   this color (indicating).

23        Q     You say "this color."  You're pointing to the

24   table in front of you?

25        A     Yes, this brownish tan putty color.  Her tongue

1                              B. Freson-Direct

2    was the same color.

3          Q      What causes that?

4          A      No circulation of any blood.

5          Q      Do they dry out?

6          A      They were very dry.  Her tongue was dry.  Her

7    eyeballs were dry.  That's another indication.  Mucosa, it

8    was dry.  There is no circulation.  There's nothing

9    happening, no physiologic function.

10         Q      At any point in time did you try to draw blood

11   or prick her finger?

12         A      I did.

13         Q      Can you tell us what, if anything, occurred at

14   that time?

15         A      As I was intubating her, trying to give her an

16   airway, my partner was trying to get an IV.  She couldn't do

17   that.  There was no vasculature, in other words, no blood,

18   nothing going through her body, so we couldn't find a vein,

19   so she attempted an intraosseous IV, whereby we actually

20   screw something into the leg bone, and you can get IV access

21   so we could have put drugs in that way.

22         Q      Let me slow you up so we follow you or we

23   understand you.  You said you couldn't find a vein, correct?

24         A      Yes.

25         Q      When a body is dead, do the veins collapse?

1                           G. Graham-Direct

2          A      I went and spoke with Leslie Nicolas.

3          Q      And where did that take place?

4          A      In the -- I guess you would call it an interview

5     room or greeting room at the emergency room.

6          Q      When you went into that room, was she by herself

7     or with anybody else?

8          A      She was with a young child.

9          Q      Was that Mendissa Jean?

10         A      That's correct.

11         Q      After speaking to Leslie Nicolas, what did you

12    do next?  What was the next thing you did?

13         A      After that I went and I spoke to Mr. Darius

14    Jean.

15         Q      Where did you speak to Mr. Jean, what area of

16    the emergency room?

17         A      In one of the treatment rooms.

18         Q      And describe what you observed when you got to

19    that treatment room.

20         A      Officer Hatch was standing just outside the

21    room, and there is a curtain at the end of the room for

22    privacy, but it was open, and Darius Jean was on a stretcher

23    inside that room, and he had hand restraints on his wrists.

24         Q      Handcuffs or leather hand restraints?

25         A      That would be a leather type, hospital

1                          G. Graham-Direct

2     restraint.

3          Q     And do you know who from the hospital did that,

4     if you know?

5          A     I don't know.

6          Q     Could you describe his demeanor at that time

7     when you entered -- strike that.  There are two things.

8     What time was it when you went to speak to Darius Jean,

9     approximately?

10         A     About after six o'clock.  I believe it was about

11    6:20.

12         Q     Could you describe his demeanor when you arrived

13    to speak to him at 6:20 or so?

14         A     He was quiet and cooperative.

15         Q     Before speaking to Mr. Jean, did you advise him

16    of anything?

17         A     Yes, I did.

18         Q     What is that, sir?

19         A     I gave him his Miranda warning.

20         Q     And how did you do that?

21         A     I read it to him off the standard Town of Ramapo

22    Miranda form.

23         Q     And did he acknowledge to you that he understood

24    his rights and wished to speak to you?

25         A     That's correct.

1                               G. Graham-Direct

2    messed their bed and urinated on the bed and the vase, and

3    he went upstairs and hit them or disciplined them with a

4    belt, a brown twisted leather belt.

5          Q       When you say the girls, did he tell you or did

6    you ask him specifically -- did he tell you that he hit

7    Kyona Frederick with a belt that evening?

8          A       Yes.  He told me he hit both the girls.

9          Q       He also said he also hit Mendissa with a belt

10   that evening, correct?

11         A       That's correct.

12         Q       Did he tell you where Junior and young MC was

13   when this was occurring?

14         A       He says they were doing their music, playing

15   with their music, whatever that means.

16         Q       And did you ask him what happened to the belt or

17   where the belt was?

18         A       Yes, I did.  He said it was on the bed in his

19   bedroom.

20         Q       In the master bedroom?

21         A       That's correct.

22         Q       Did he tell you anything about Leslie Nicolas or

23   when Leslie Nicolas was in the house?

24         A       Yes.  He said she had -- eleven o'clock the

25   previous morning had left the house, gone to the bank, came

1                          G. Graham-Direct

2    back with some money.  They had some type of dispute over

3    money.  She threw the money at him, and then she went to

4    work about noontime.

5         Q     Did he tell you or did you ask him when she

6    returned?

7         A     He said she returned to the house somewhere

8    around eleven o'clock.

9         Q     Sometime around eleven or sometime around ten,

10   sir?

11                    THE COURT:  The witness is looking at

12              something.  Would you indicate what it is.

13                    THE WITNESS:  My notes.

14                    THE COURT:  Okay.

15                    Any witness may look at any document with

16              a view toward refreshing the witness's

17              recollection.  If after looking at the document

18              the witness's recollection is refreshed, then

19              the witness can testify from that witness's

20              recollection as it's been refreshed.  The

21              witness can't just read the document into

22              evidence unless the document is offered in

23              evidence and received first.

24         Q     Does that refresh your recollection, Detective

25   Graham?

1                              G. Graham-Direct

2          A       I can't recall.  I don't have it noted.  I

3     believe it was eleven o'clock.

4          Q       Sir, did you speak to him specifically about --

5     strike that.  What did he tell you happened next?

6          A       He told me that his friends had left the house,

7     that about 3 o'clock in the morning he was in his office, he

8     was doing music, and while he was doing his music, Kyona had

9     walked past in the hallway, walked past the office, and said

10    she wasn't feeling well and continued to the kitchen.  He

11    said he --

12         Q       I'm sorry.  What time did he say this happened?

13         A       He says about three o'clock in the morning.

14         Q       Sometime after 3 a.m. in the morning?

15         A       That's correct.  He followed her to the kitchen,

16    and he asked if she was okay, and she was at the kitchen

17    sink, and he thought maybe she needed something to eat, so

18    he gave her a piece of chicken, put a piece of chicken in

19    her mouth and splashed water in her face, and he says that

20    she collapsed, or he took her from there into the master

21    bedroom Leslie Nicolas was staying and asked for assistance

22    because Kyona had collapsed.

23         Q       Did he tell you what he did, if anything, once

24    he brought the girl into the master bedroom?

25         A       Yes.  He asked her -- asked leslie for

1                              G. Graham-Direct

2    first.  Last line of the page.  Read it to yourself.  Don't

3    read it out loud.  And my question is does that refresh your

4    recollection as to his statements about te asthma attack.

5           A    That's correct.

6           Q    What did he tell you?

7           A    He said he thought she was having an asthma

8    attack.

9           Q    So that's what he stated to you, correct?

10          A    That's correct.

11          Q    Can you take a look a couple of lines up the

12   page as to the time -- you said you weren't sure if it was

13   10 or 11 -- of what time he told you that Leslie Nicolas

14   arrived home.

15          A    Says, "Leslie Nicolas got home sometime after

16   10."

17          Q    So it's ten o'clock, not eleven o'clock; is that

18   correct?

19          A    That's correct.

20                   MR. GOLDSTEIN:  Sometime after 10.

21                   MR. MOORE:  I'll accept that.

22                   THE COURT:  I believe that's what he did

23              say.  Do you want it read back?

24                   MR. MOORE:  No.  That's fine.

25          Q    While you were also speaking to Darius Jean, did

112

G. Graham-Direct

1

2       Q       Is that the acknowledgment of rights form that

3   you used in giving Darius Jean his Miranda at Ramapo Police

4   Headquarters?

5       A       That's correct.

6       Q       What time was that?

7       A       11:05 a.m.

8       Q       And who advised him of his rights at that time?

9       A       I did.

10      Q       How was it that you advised him of his rights?

11      A       I read them to him, and I asked him to read them

12  also and asked him to initial after each right.

13      Q       Did he acknowledge to you that he understood his

14  rights and wished to speak to you again?

15      A       That's correct.

16      Q       And as I asked with the last document, there's a

17  certain portion of that preprinted; is that correct?

18      A       That's correct.

19      Q       And is there handwriting on that form?

20      A       That's correct.

21      Q       And whose handwriting is on the form?

22      A       Again my handwriting is on the top with the date

23  and time and report number, and Darius Jean's name is

24  written in his handwriting along with his initials and his

25  signature at the bottom.

1                           G. Graham-Direct

2    Nicolas.

3         Q      Leslie Nicolas had also arrived at Ramapo Police

4    Station?

5         A      That's correct.

6         Q      And when you said you spoke to her, was it you

7    by yourself or with other officers?

8         A      For a moment it was by myself, and then

9    Detective Youngman came to the room with us.

10        Q      Was a signed statement taken from Leslie Nicolas

11   that morning?

12        A      That's correct.

13        Q      After taking the signed statement from Leslie

14   Nicolas, what happened next, sir?

15        A      After taking the statement from Leslie, she

16   indicated she wanted to talk to Mr. Darius Jean, so after a

17   period of time we agreed to that.

18        Q      When you say after a period of time, did she ask

19   once or more than once?

20        A      Several times.

21        Q      And did you allow her to speak to Darius Jean

22   that morning?

23        A      Yes, we did.

24        Q      Where did that take place?

25        A      That took place in the interview room of the

133

G. Graham-Cross

1

2      A      That's correct.

3      Q      When you spoke to Darius Jean, you not only

4   asked him about what had occurred, you wanted to look in his

5   house, correct?

6      A      That's correct.

7      Q      And when you asked Darius Jean if you, the

8   police, could look in his house, he had no problem with

9   that, correct?

10     A      That's correct.

11     Q      You gave him the permission slip, and he signed

12  the slip, the form?

13     A      That's correct.

14     Q      Was there any reason that he had to sign that

15  form?

16     A      No.

17     Q      Could he have declined to sign that form?

18     A      Yes, he could have.

19     Q      But he gave you permission.

20     A      That's correct.

21     Q      Leslie Nicolas was also asked for permission to

22  search; is that correct?

23     A      That's correct.

24     Q      Who did you ask first?

25     A      I asked him verbally and then went to Leslie,

134

G. Graham-Cross

2  and myself and Detective Dunn asked her.

3     Q    When you went to Leslie Nicolas to ask for
4  permission, did you know at that time that she had been
5  living in the house for a number of years?

6     A    Yes.

7     Q    All of her things were in the house, she's
8  living in the house, she's working and returning, and that's
9  her address, correct?

10     A    That's correct.

11     Q    When you asked her to sign the permission to
12  search.  Did she decline?

13     A    She said that she would give us permission to
14  search the house but that she did not wish to sign anything.

15     Q    In other words, you gave her a written form that
16  would allow you permission, grant you permission to search
17  the house, right?

18     A    That's correct.

19     Q    And the reason you give a written form is to
20  protect yourself, correct?

21     A    That's correct.

22     Q    You have a written form.  Someone signs it
23  giving you permission.  You can now go in the house, right?

24     A    That's correct.

25     Q    If someone gives you an oral statement saying go

1                              G. Graham-Cross

2          Q      Why?

3          A      It was good procedure to keep them separated.

4          Q      Good investigative technique?

5          A      That's correct.

6          Q      But now at this point, even though one or the

7    other or both are asking to speak to each other, you allowed

8    them to speak to each other?

9          A      That's correct.

10         Q      Where were they going to speak to each other?

11         A      Where they did speak to each other, in the

12   interview room.

13                       THE COURT:  Excuse me.  We're going to

14                 have to take our afternoon break.  Actually I

15                 would have to step off the bench for a few

16                 minutes.  A judge has a matter that concerns us

17                 both.  Rather than do that and leave you sitting

18                 here, I'll stop right now, and we'll take the

19                 afternoon break.

20                       I'll just give you the admonitions.

21                 Please don't discuss the case amongst yourselves

22                 or with anyone else.  Avoid any media accounts.

23                 If anyone should attempt to discuss the case

24                 with you, please report to the Court directly.

25                       (Recess)

1                        M. Winters-Direct

2    the scene or her back as you saw it on October 12th of 2001?

3        A    Yes, it does.

4        Q    Thank you, sir.

5             MR. MOORE:  Can I have the lights,

6             please?

7        Q    Detective Winter, after having photographed both

8    the body of Kyona Frederick and Mendissa Jean at Good

9    Samaritan Hospital, what, if anything, did you do next?

10       A    From there I responded over to 9 Innington

11   Court, the residence of the deceased.

12       Q    What, if anything, was your purpose in going to

13   9 Innington Court?

14       A    Upon arrival we wanted to do a search for any

15   pertinent evidence.

16       Q    Did you go there by yourself or with other

17   officers?

18       A    I responded with detectives from the Town of

19   Ramapo as well as a senior detective from the sheriff's

20   department.

21       Q    And while you were there at 9 Innington Court or

22   at that crime scene, who was in charge of that crime scene?

23       A    The Ramapo Town Detectives were in charge at the

24   time I went there.

25       Q    As far as the collection of evidence or

1                             M. Jean-Direct

2    sister, Leslie, and your dad?

3         A    A lady named Oumie.

4         Q    And where did she live in the house?

5         A    In an extra room downstairs.

6         Q    And what grade were you in last year?

7         A    Third.

8         Q    And who is your teacher?

9         A    Ms. Berlin.

10        Q    And what was your favorite subject in third

11   grade?

12        A    Gym.

13        Q    And do you remember what school you went to in

14   New York?

15        A    Summit Park.

16        Q    And did your sister go to the same school as

17   you?

18        A    No.

19        Q    Where did Kyona go?

20        A    Hillcrest.

21        Q    What grade was Kyona in?

22        A    Fourth.

23        Q    Is she older than you?

24        A    Yes.

25        Q    And would Leslie take care of you when you lived

1                              M. Jean-Direct

2          Q      Did you share a room with your sister?

3          A      Yes.

4          Q      What color was your room?

5          A      Pink.

6          Q      And did you have your own bed?

7          A      It was a bunk bed.

8          Q      And who had the top bunk?

9          A      Me.

10         Q      And who had the bottom bunk?

11         A      Booby.

12         Q      Did you start to do your homework that day?

13         A      Yes.

14         Q      And did you show it to anybody?

15         A      Yes.

16         Q      And who did you show it to?

17         A      My dad.

18         Q      And why did you show it to your dad?

19         A      Because I needed help.

20         Q      Do you remember what kind of homework you were

21    doing?

22         A      Math.

23         Q      And what was it about the math homework that you

24    needed help with?

25         A      Rounding off.

1                          M. Jean-Direct

2        Q        And what do you mean by rounding off?   What's

3    that?

4        A        Rounding to the closest number.

5        Q        And so did you show your homework to your dad?

6        A        Yes.

7        Q        And you asked him about rounding off the number?

8        A        Yes.

9        Q        And did your dad help you with that?

10        A        Yes.

11        Q        And did he explain it to you?

12        A        Yes.

13        Q        And after your dad explained it to you, where

14    did you go?

15        A        Back to the room.

16        Q        When you say the room, is that your dad's

17    bedroom?

18        A        Yes.

19        Q        With Leslie?

20        A        Yes.

21        Q        And did you keep doing your homework?

22        A        Yes.

23        Q        And did you show it to anybody after that?

24        A        Yes.

25        Q        And who did you show it to?

1                              M. Jean-Direct

2          A    My dad.

3          Q    And what happened when you showed it to your

4    dad?

5          A    I got it wrong.

6          Q    And what happened when you got it wrong?

7          A    I got in trouble.

8          Q    And what do you mean by you got in trouble?

9          A    He beat me.

10         Q    And where did your dad beat you?

11         A    In his room.

12         Q    And where did you show him the homework?

13         A    In the garage.

14         Q    So after you showed it to him, he came back

15   upstairs?

16         A    Yes.

17         Q    And you said your dad beat you in his room?

18         A    Yes.

19         Q    And did your dad have anything in his hand when

20   he beat you?

21         A    Yes.

22         Q    And what was that?

23         A    A belt.

24         Q    And where did your dad beat you?

25         A    On my back and on my arm.

1                                M. Jean-Direct

2          A    In me and Booby's room.

3          Q    What happened on that time?

4          A    I needed an eraser, and he chased me into the

5    room.

6          Q    He chased you from his room?

7          A    Yes.

8          Q    Into your room that you share with Kyona?

9          A    Yes.

10         Q    And you went there to get an eraser?

11         A    Yes.

12         Q    Where did he hit you in your room?

13         A    The same place.

14         Q    And where is that?

15         A    My back and my arm.

16         Q    And did he hit you with something in your room?

17         A    Yes.

18         Q    What was that?

19         A    A belt.

20         Q    And what were you doing when he was hitting you?

21         A    I was crying.

22         Q    And where was Kyona when he was hitting you in

23   your room?

24         A    She was in the room.

25         Q    And did you go back to finish your homework?

```
 1                          M. Jean-Direct

 2        A     I went to sleep.

 3        Q     Was that in your room?

 4        A     Yes.

 5        Q     And in whose bed?

 6        A     Mine.

 7        Q     And where was Kyona when you went back to your

 8   room to go to sleep?

 9        A     She was --

10        Q     Was she in the room, or was she somewhere else?

11        A     I don't remember.

12        Q     Do you remember where your dad was when you went

13   to your room to go to sleep?

14        A     No.

15        Q     Do you remember hearing anything when you went

16   to sleep, right when you went to sleep?

17        A     No.

18        Q     Do you remember waking up in your room?

19        A     Yes.

20        Q     And was Kyona in your room when you woke up?

21        A     Yes.

22        Q     And was anyone else in the room?

23        A     My dad.

24        Q     And was your dad speaking to Kyona?

25        A     He was beating her.
```

```
1                           M. Jean-Direct

2        Q     And do you know if he was beating her with any

3   object or anything?

4        A     Yes.

5        Q     And what was that?

6        A     A belt and a wire.

7        Q     And what did the belt look like?

8        A     It was brown.

9        Q     And what did the belt look like that you told me

10  your dad hit you with?

11       A     It was brown.

12       Q     Do you know if it was the same belt?

13       A     Yes.

14       Q     And you said he was hitting your sister with a

15  wire?

16       A     Yes.

17       Q     And what did the wire look like?

18       A     It was blue.

19       Q     And did your dad say anything to Kyona before he

20  was hitting her?

21       A     I don't remember.

22       Q     Was Kyona still doing her homework?

23       A     Yes.

24       Q     Was your dad and Kyona speaking about her

25  homework?
```

1                              M. Jean-Direct

2          A      My dad was telling her that the answer was right

3    in front of her.

4          Q      And what was your dad saying about that?

5          A      He said that the answer to the question was

6    right in front of her.

7          Q      Do you remember what type of question it was

8    about that Kyona had to figure out?

9          A      What did they call it when people don't save

10   their money.

11         Q      Did your dad say something to Kyona about what

12   would happen if she didn't get the answer right?

13         A      Yes.

14         Q      What was your dad saying about that?

15         A      He said when he counts to five, if she doesn't

16   have the answer, he'll beat her, and if she screams, he'll

17   do it again.

18         Q      And did your dad count to five?

19         A      Yes.

20         Q      And did Kyona give an answer?

21         A      No.

22         Q      Was Kyona crying?

23         A      Yes.

24         Q      And when your dad was finished counting to five,

25   what did he do?

1                              M. Jean-Direct

2          A      He beat her.

3          Q      And did you see where your dad was hitting

4    Kyona?

5          A      On her back and on her head.

6          Q      And how could you see that from where you were

7    in your bed?

8          A      I peeked over.

9          Q      When you peeked over, did you see if your dad

10   had anything in his hands?

11         A      In his hands he had a belt and a wire.

12         Q      Do you know how he was holding the belt and the

13   wire?

14         A      At the ends.

15         Q      And was he holding the belt and the wire in the

16   same hand?

17         A      Yes.

18         Q      And was he hitting Kyona with the belt and the

19   wire when he had them in the same hand?

20         A      Yes.

21         Q      And where did you see him hit her with those two

22   things?

23         A      On the back and on the head.

24         Q      And when he was hitting Kyona on her head, did

25   you notice anything?

1                          M. Jean-Direct

2          A      The barrette came off.

3          Q      The barrette came off?

4          A      (Nods)

5          Q      When you mean barrette, what are you speaking

6     about?

7          A      A bow.

8          Q      And where was that on Kyona?

9          A      On her hair.

10         Q      And did you see how many times your dad hit

11    Kyona?

12         A      A lot.

13         Q      Was it more than one?

14         A      Yes.

15         Q      Was it more than five?

16         A      Yes.

17         Q      Was it more than ten?

18         A      Yes.

19         Q      Was it around twenty?

20         A      Yes.

21         Q      And when your dad was hitting Kyona, did she say

22    anything?

23         A      She said that she couldn't breathe, she couldn't

24    move, she couldn't write, and she couldn't see.

25         Q      And after Kyona said that what did your dad do?

1                        M. Jean-Direct

2        A    A belt and a wire.

3        Q    Did you see where on Kyona he was hitting her?

4        A    Her back and her head.

5        Q    And did you go back the sleep?

6        A    Yes.

7        Q    And did you wake up again?

8        A    Yes.

9        Q    And did something awake you up?

10       A    I don't know.

11       Q    Did you get out of bed after you woke up?

12       A    Yes.

13       Q    And did you go into another room?

14       A    No.

15       Q    Did you use the bathroom at all that night

16  again?

17       A    Yes.

18       Q    And so you went into the bathroom again?

19       A    Yes.

20       Q    And when you went into the bathroom, was anyone

21  else there?

22       A    Yes.

23       Q    Who was in the bathroom?

24       A    My dad and Booby.

25       Q    And what was your dad doing?

M. Jean-Direct

1

2    A    He was wetting her face.

3    Q    And was he using the sink?

4    A    No, the tub.

5    Q    Was the water running in the tub?

6    A    Yes.

7    Q    And where was Kyona?

8    A    She was in the bathroom.

9    Q    Do you remember if she was wearing any clothes?

10    A    No.

11    Q    You don't remember, or she wasn't wearing any

12  clothes?

13    A    I don't remember.

14    Q    Okay.  And how did Kyona look when your dad had

15  the water running and was putting water on her face?

16    A    Bad.

17    Q    Could you show me how she looked?  Do you

18  remember?

19    A    No.

20    Q    Was she speaking at all?

21    A    No.

22    Q    Was she making any noises?

23    A    No.

24    Q    And you said earlier before that your sister

25  said she couldn't hear, she couldn't write, she couldn't

M. Jean-Cross

1

2      A      In the garage.

3      Q      What was he doing?

4      A      Working on a door.

5      Q      Do you know if he was also fixing Oumie's
6 bathroom?

7      A      Yes.  He was working on a door to go through the
8 garage to the other bathroom.

9      Q      Right.  He was making the apartment downstairs
10 better for Oumie?

11      A      Yes.

12      Q      Now when you went downstairs, you saw your dad.
13 Do you know if it was still light out?

14      A      Yes.

15      Q      And he checked your homework at that time,
16 right?

17      A      Yes.

18      Q      And what happened when he checked your homework?

19      A      I got it wrong.

20      Q      Did he explain to you what was wrong with your
21 homework?

22      A      Yes.

23      Q      Do you want a drink of water?

24      A      (Shakes head)

25      Q      So he explained to you what was wrong with your

1                               M. Jean-Redirect

2    Kyona, if you could see.  Did you ever peek over your bunk

3    bed?

4          A     Yes.

5          Q     Did you see your dad hitting Kyona?

6          A     Yes.

7          Q     Did you see the blue wire hit Kyona's head?

8          A     Yes.

9          Q     Did you see the blue wire hit Kyona's back?

10         A     Yes.

11         Q     And what about the belt?  Did you see the belt

12   hit her head?

13         A     Yes.

14         Q     And did you see the belt hit her back?

15         A     Yes.

16         Q     Is that because you were peeking over?

17         A     Yes.

18         Q     While your dad was hitting Kyona that time, do

19   you know if Leslie was home?

20         A     Yes.

21         Q     How do you know Leslie was home?

22         A     Because she came out of her room.

23         Q     Did she say anything?

24         A     Yes.  She told my dad to stop.

25         Q     And did your dad stop?

313

G. Dunn-Direct

1

2     A     I observed injuries to the back area and to the

3     buttock area.

4     Q     Now, sir, after examining or viewing the body of

5     Kyona Frederick, what did you do next?

6     A     I then went in and spoke with a woman by the

7     name of Leslie Nicolas, who was in a consultation room off

8     the emergency room.

9     Q     And when you went into that consultation room,

10    sir, was Leslie Nicolas by herself or with anyone else?

11    A     There was a young child with her.

12    Q     Did you later learn the identity of the young

13    child?

14    A     Yes, I did.

15    Q     Who was that, sir?

16    A     Mendissa Jean.

17    Q     Now after conversation with Leslie Nicolas, did

18    you also speak with Mendissa Jean?

19    A     Yes, I did.

20    Q     And as a result of those conversations, sir, can

21    you tell us what, if anything, you did?

22    A     I requested that an examination be done of

23    Mendissa Jean for physical condition.

24    Q     By the way, before doing that did you ever speak

25    to Leslie Nicolas about permission to search the house?

1                          F. Murphy-Direct

2    negative, the neck was negative.  On the chest there was

3    redness, on the left upper back.  Also redness on the right

4    upper back, with swelling on the scapular area and

5    interscapular area.

6                    THE COURT:  What's the scapular area?

7                    THE WITNESS:  The wing bone.

8                    THE COURT:  Around the shoulder area.

9                    THE WITNESS:  Yeah, the back.

10   A      (continuing)  There was also swelling and

11   redness on the right upper arm, and there was no limitation

12   of movement.  The pulses were present.  On the lower

13   extremities there were no swelling or contusion marks on the

14   anterior aspect.  There was one-by-two redness on the right

15   thigh, posterior aspect.

16                    THE COURT:  Anterior means?

17                    THE WITNESS:  Anterior means the front.

18                    THE COURT:  Posterior means?

19                    THE WITNESS:  The back.

20                    THE COURT:  Thank you.

21   A      (continuing)  There was a dark discoloration on

22   the left thigh, posterior aspect, but there was no

23   swelling.  The abdomen was negative.  The genitals were also

24   examined.  I didn't see any bruising, no swelling.  The

25   introitus was intact.

1                          E. J. Silva-Direct

2    one of our major trauma and resuscitation base and happened

3    to be an open room at the time, and that has everything in

4    it and ample room for us to do whatever we need to do.

5         Q    Upon the arrival of Kyona Frederick's body, at

6    that time did you conduct an examination or evaluate her

7    condition at Good Samaritan Hospital?

8         A    Yet, I did.

9         Q    Can you tell us what, if anything, you observed

10   or what, if anything, you determined from your examination.

11        A    Well, we found, unfortunately, no signs of

12   life.  Her pupils were fixed and dilated.  There was no

13   spontaneous electrical activity on the cardiac monitor.  The

14   body was somewhat stiff in its presentation, and it was

15   pretty obvious to me at that point that she was dead.

16        Q    As far as -- is there a term dead on arrival

17   used medically?

18        A    Yes, sir, there is.  We make a distinction

19   between bodies that are brought to the emergency room that

20   are dead before they arrive at the emergency room as opposed

21   to those that have some signs of life and die in the

22   emergency room.

23        Q    And which would that be in regard to Kyona

24   Frederick?

25        A    Well, to my mind she was dead on arrival.

1                              E. J. Silva-Direct

2        Q      And do you recall the time that you made that

3   pronouncement that she was dead?

4        A      I believe it was 4:14 in the morning.

5        Q      4:14?

6        A      Yes, sir.

7        Q      Sir, when you first examined the patient, was

8   she lying on her back?

9        A      She was face up, yes, sir.

10       Q      And in this course of this evaluation, did you

11   turn the body or examine the back of her body as well?

12       A      After the pronouncement was made, yes, sir.

13       Q      Can you tell us, upon examining the back area of

14   Kyona Frederick, what, if anything, you observed?

15       A      There appeared to be a number of bruises

16   covering different parts of her back, her buttocks, her

17   lower extremities.  If you want, I can refer to my notes and

18   tell you more specifically where they were, but there

19   appeared basically to be a large number of bruises all over

20   the back of her body.

21                      THE COURT:  Do you want to refer to your

22              notes.  You may, if you would.

23                      THE WITNESS:  Yes, sir.  I appreciate it.

24                      MR. MOORE:  I would ask this be marked --

25              just counting the pages, if I may -- 16-page

E. J. Silva-Direct

1
2        document be marked as People's 50 for
3        identification.
4            (Plaintiff's Exhibit 50, Silva notes, was
5        marked for identification.)
6            COURT OFFICER:  Fifty for I.D.
7   Q   Dr. Silva, you can take a look at that, if you
8 would.  Don't read it out loud.  Just read it to yourself,
9 and tell us whether or not that refreshes your recollection
10 as to the specific injuries that you observed?
11   A   Majority of the wounds were located on the
12 back.  There were probably more than 20 of them.  They were
13 bruises in semicircular fashion, three quarter circular
14 fashion.  There were some additional bruises on the right
15 flank region, and there was a bruise on the right back,
16 which appeared to have a number of these looped lesions in
17 close proximity to each other, possibly suggesting a hand
18 print.
19   Q   I ask you to take a look at People's 8 in
20 evidence and just ask you whether or not you recognize
21 that.
22   A   I'm afraid I do, sir.
23   Q   What, if anything, do you recognize that to be,
24 sir?
25   A   It's a picture of the young lady that I

1                         E. J. Silva-Direct

2    and medications and any factors involved in the situation.

3    Once you explain to somebody -- if you can imagine -- once

4    you tell someone that a family member has just passed away,

5    it's very unclear what kind of helpful information you're

6    going to get from them, so we try to get as much information

7    from them as I can prior to actually giving them the

8    notification.

9         Q    And in this case when you spoke to Darius Jean,

10   did you ask him what happened?

11        A    Yes, sir, I did.

12        Q    Can you tell us -- take a second -- can you tell

13   us what, if anything, he responded to you or what he told

14   you that morning.

15        A    What I was told was that he was working at his

16   computer, that he had noticed that earlier in the evening

17   his child hadn't been feeling particularly well, and that he

18   noticed her walking by the office or whatever the room was

19   where he was working on the computer again while he was

20   there, and this apparently occurred shortly before her

21   arrival in the emergency -- or shortly before their calling

22   the paramedics for assistance.  He thought she wasn't

23   looking well, perhaps a little unsteady on her feet.  His

24   feeling was maybe that she hadn't eaten for awhile and that

25   having a bite to eat might make her feel a little bit

352

E. J. Silva-Direct

1

2       Q       And can you tell us how that was done or what,

3   if anything, occurred when you notified him of the death of

4   Kyona Frederick?

5       A       Well, Mr. Darius was very anxious about what had

6   happened to his daughter, and during my obtaining the

7   information from him, I repeatedly asked him what happened

8   to his little girl.  When I told him that we, the medics,

9   had done everything they had done, and there was nothing

10  further to be done, and unfortunately his daughter had died,

11  he became more upset than he had been prior to that.  He

12  actually went running out of the quiet room and went running

13  out of the emergency department.

14      Q       And if you know, if you personally observed, did

15  you notice police officials following him out of the

16  hospital?

17      A       Police were here with him on the scene, as they

18  often are when any person is brought to the emergency room

19  in a critical fashion, and they were there with us.  They

20  went out to get him, to basically make sure he was okay, and

21  to bring him back into the emergency room so that we could

22  provide whatever other assistance and support he might need.

23      Q       Did there come a point after he left the

24  hospital that he was returned to the hospital?

25      A       Yes, sir.

353

E. J. Silva-Direct

1

2    Q    Who brought him back to the hospital, if you

3    know?

4    A    I'm not --

5    Q    Not asking names.  Just in general.

6    A    I'm going to guess it was Ramapo Police

7    Department.  It was police officers, and I'm not absolutely

8    certain.

9    Q    When Darius Jean was brought back into the

10   emergency room, did you evaluate or examine him at that

11   point in time?

12   A    Yes, sir, I did.

13   Q    Can you tell us what, if anything, that

14   disclosed?

15   A    He was visibly upset.  He initially was

16   reluctant to be there, and given our concerns about his

17   safety and his state of mind at the time, he was placed in

18   restraints for his own protection, as well as the protection

19   of the staff.  Not that he was threatening in any fashion to

20   the staff, but given his state of mind and his degree of

21   being upset, there was always some concern for the safety of

22   the staff as well as for the patient himself.

23   Q    Afraid he might hurt himself?

24   A    Sure.

25   Q    And when you say restraints, can you just

E. J. Silva-Direct

1
2  Let me just -- right.  No evidence of any significant

3  injury, and he had no significant complaints.  Obviously was

4  very upset about the situation.

5        Q    Took two aspirin?

6        A    Tylenol, yes, sir.

7              MR. MOORE:  Thank you, Dr. Silva.  No

8        further.

9              THE COURT:  Mr. Goldstein.

10             MR. GOLDSTEIN:  Yes.  Thank you, Judge.

11  CROSS EXAMINATION

12  BY MR. GOLDSTEIN:

13       Q    Dr. Silva, when you did treat Darius Jean, what

14  was your diagnosis?

15       A    Posttraumatic stress.

16       Q    Traumatic stress being his learning of the death

17  of his daughter?

18       A    Yes, dir.

19       Q    Now, Doctor, you indicated to this injury that

20  when you spoke to the police, and I think even when you

21  spoke to Mr. Jean, you said that you believed the child had

22  been deceased for two to four hours?

23       A    Based on my understanding of the signs that I

24  saw, yes, sir.

25       Q    Did you put that in your report anywhere, in the

1                           E. J. Silva-Cross

2                  place -- the weight of the person, the

3                  temperature of the room, things like that?

4                         THE WITNESS:  I would think the

5                  temperature of the room, the environment that

6                  the body is in, those sort of factors, would

7                  play a role.

8          Q    Temperature of the room, environment, size of

9    the person, and in other words, if you're dealing with a

10   person with a lot of fat, an obese person versus a thin

11   person or a child, those are all factors?

12         A    I would imagine so.  I can't tell you I know a

13   great deal about the details of rigor mortis.  My job is

14   dealing with live people for the most part.

15         Q    Are you aware, though, that rigor mortis on a

16   general basis, rigor mortis obviously effects the muscles?

17   Correct?

18         A    Yes, sir.

19         Q    Does it begin to affect all the muscles at the

20   same time?

21         A    I would imagine so.

22         Q    On how many situs, on human sites, was the body

23   temperature of Kyona Frederick ever taken?

24         A    One.

25         Q    Do you have any idea how long the thermometer

1                        E. J. Silva-Cross

2     with Kyona, with regard to rigor mortis, you did not test

3     her shoulder joints or knee joints or anything of that

4     nature?  That wasn't really your duty at that time?

5          A     Correct.

6                    MR. GOLDSTEIN:  I have nothing further for

7               this witness, your Honor.

8                    THE COURT:  Okay.  Mr. Moore.

9     REDIRECT EXAMINATION

10    BY MR. MOORE:

11         Q     Still your opinion that she died two to four

12    hours before 4:14 a.m.?

13         A     Yes, sir.

14         Q     But you did indicate that you're not a forensic

15    pathologist, correct?

16         A     Correct.

17         Q     Dr. Frederick Zugibe, the Medical Examiner, is a

18    forensic pathologist, correct?

19         A     If you tell me so, yes, sir.  I don't know him.

20    Can't say I know the gentleman.

21         Q     It would be more in the expertise of a forensic

22    pathologist to deal with some of these terms and knowledge;

23    is that correct, sir?

24         A     Yes, sir.

25                    MR. MOORE:  Thank you.  I have nothing

L. Nicolas-Direct

1

2     Q     Were those the pants that Kyona was wearing when

3     you saw her on the bottom bunk bed that day?

4     A     Yes.

5     Q     And would they be considered her house clothes

6     or her play clothes?

7     A     Her play clothes.  Yeah, house clothes.

8     Q     In addition to that pair of pants, you said she

9     was also wearing some type of shirt?

10    A     Yes.

11    Q     Do you remember what the shirt looked like?

12    A     No.

13    Q     Do you remember the color?

14    A     Not really sure, no.

15    Q     But she had that pair of pants and a shirt on,

16    correct?

17    A     Yes.

18    Q     After speaking to her about the room or the room

19    being a mess, what did you do next?

20    A     I -- they had -- they had -- basically the

21    underwears (sic) were filthy, so I gathered their

22    underwears, and I washed it before I went to bed.

23    Q     Where did you wash the underwear?

24    A     In the kids' bathroom.

25    Q     Is that the main bathroom in the hallway in the

1                              L. Nicolas-Direct

2     house?

3          A     Yes.

4          Q     When you went in and washed them, what did you

5     do with the items?

6          A     I hung up the panties on the pole in the

7     bathroom, the shower pole.

8          Q     When you were in that bathroom, were there any

9     clothes on the floor?

10         A     No.

11         Q     People's 48, one more time, those pair of pants

12    are on the bathroom floor; is that correct?

13         A     Excuse me?

14         Q     In the photograph those pants are on the

15    bathroom floor; is that correct?

16         A     Yes.

17         Q     Those pants were not in on the bathroom floor

18    when you went there and washed their underwear; is that

19    correct?

20         A     Yes.

21         Q     There was nothing on the floor?

22         A     Yes, there was nothing on the floor.

23         Q     After washing their underwear and hanging it up,

24    what did you do next?

25         A     I went into the master bedroom, into the

                              L. Nicolas-Direct

1

2    bathroom, and I went in to take a shower at the time.

3         Q    And after taking a shower, what did you do next?

4         A    I went and I laid down on the bed.

5         Q    Were you preparing to go to sleep that night?

6         A    Yes.

7         Q    What happened next?

8         A    Later on I heard Kyona crying.

9         Q    How much later after you first laid down, if you

10   recall, did you hear Kyona crying?

11        A    I don't remember approximately.

12        Q    Upon hearing Kyona cry, what,, if anything,, did

13   you do?

14        A    I went into the kitchen.

15        Q    Upon arriving at the kitchen, what did you see?

16        A    Darius and Kyona.

17        Q    What was Kyona doing at that time in the

18   kitchen?

19        A    She was sitting on the chair in the kitchen

20   table -- I mean --

21        Q    Was she still crying when you got to the

22   kitchen?

23        A    Yes.  Softly, but --

24        Q    What was Darius doing?

25        A    He was standing next to the refrigerator.

1                    L. Nicolas-Direct

2        Q      Did he have anything in his hand at that point

3    in time?

4        A      Yeah.  He had a brown belt.

5        Q      What,, if anything,, did you say to -- strike

6    that.

7               Let me show you what's been marked as People's

8    20 in evidence.  Can you take a look at that photograph.

9    Tell me does that appear to be the belt that Darius had in

10   his hand?

11       A      Yes.

12       Q      What, if anything, did you say to Darius in the

13   kitchen, and what, if anything, did he say to you?

14       A      Well, I told him I wanted to speak to him in the

15   hallway.

16       Q      You called him out of the kitchen?

17       A      Yes.

18       Q      And what did you say?

19       A      I told him, you know, to let Kyona go to sleep

20   because it was late, and he said that she didn't know her

21   homework.  I don't remember, but something like that.

22               MR. GOLDSTEIN:  Sorry, your Honor.  I

23               cannot hear the last.

24               THE COURT:  After she didn't do her

25               homework, you said something else.

1                          L. Nicolas-Direct

2                    Do you want it read bark?

3                    MR. GOLDSTEIN:  Excuse me?

4                    THE COURT:  Read it back.

5                    (The reporter read the last answer.)

6         Q    Did he allow her to go to sleep at that point in

7    time?

8         A    No.

9         Q    After having that conversation with Darius, what

10   did you do?

11        A    I went back into the room.

12        Q    Back into the master bedroom?

13        A    Yeah.

14        Q    What, if anything, did you do at that time?

15        A    I remember -- I went out after -- I think right

16   after that.  I went to get something to eat at that time.

17        Q    Where did you go?

18        A    I went to White Castle's.

19        Q    And how long were you out of the house when

20   you -- strike that.

21                   Did you return to the house after going to White

22   Castle?

23        A    Yes.

24        Q    How long were you out of the house for that

25   period of time that you went to White Castle, approximately?

1                              L. Nicolas-Direct

2          A      Half an hour.

3          Q      And when you arrived home what, if anything, did

4    you do?

5          A      I went up the stairs and then went back to the

6    room.

7          Q      And upon arriving back home, did you speak to

8    Darius or Kyona when you arrived back home from White

9    Castle?

10         A      No.

11         Q      What happened next?

12         A      I went -- actually I went to bed, and I fell --

13   I actually went to bed.

14         Q      Did you fall asleep?

15         A      I didn't think so, no.  I'm not sure.

16         Q      Anything cause you to get out of bed later that

17   evening?

18         A      Yes.

19         Q      What's the next thing that happened?

20         A      I heard Kyona crying again, and then I got up.

21         Q      Let me slow up for a second.  You heard Kyona

22   crying again?

23         A      Yes.

24         Q      Do you know approximately what time that was?

25         A      I don't know.  Maybe one.

L. Nicolas-Direct

1

2      Q      What, if anything, happened at that point in

3   time?  What, if anything, did you observe at that point?

4      A      He was just standing there at that time, and I

5   had asked him you, know to let, Kyona go to sleep and --

6      Q      So you asked him again to let Kyona go to sleep,

7   correct?

8      A      Correct.

9      Q      What, if anything, did he reply to you?

10      A      And he basically replied saying that she was

11   doing her homework all day, and she wasn't getting a

12   particular answer correctly -- correct.

13      Q      This is at one o'clock in the morning?

14      A      Yes.

15      Q      Did you see or talk to it Kyona or Mendissa Jean

16   at that point in time?

17      A      I saw Mendy at that time.

18      Q      Where did you see Mendy?

19      A      She was on the bunk bed, so, you know, she lift

20   up her head when I was speaking to speaking to Darius, and I

21   saw her.

22      Q      After telling Darius to let Kyona go to bed,

23   what happened next?

24      A      He just -- at the time he made smart remark.

25      Q      What did he say?

1                                    L. Nicolas-Direct

2          A      He said basically, "Well, do you want her to be

3     like you?"  Basically what he said.

4          Q      And what did you do next?

5          A      I shut the door, and I went to bed.

6          Q      Now when you went back in the bedroom, did you

7     fall asleep at all?

8          A      Yes.

9          Q      And when was the next time -- was there another

10    time that you got up during the course of the morning hours?

11         A      Yes.

12         Q      Can you tell us what, if anything, occurred?

13         A      Darius, he came into the room with Kyona at that

14    time.

15         Q      Explain to us.  How did he do that, or what

16    happened?

17         A      He basically burst into the room, and he said --

18    he was holding Kyona.

19         Q      He burst into the room, and he was holding

20    Kyona?

21         A      Yes.

22         Q      What did he say?

23         A      He said, "There is something wrong with Kyona,"

24    at the time.

25         Q      And what did he do with Kyona?

1                                                                          441
                              L. Nicolas-Direct
2          A       I had left the room.

3          Q       Why?

4          A       I don't know.  I couldn't look at her.  I just
5    left the room.

6          Q       And where did you go?

7          A       In the hallway.

8          Q       Where did Darius go?

9          A       He was in the room with her.

10         Q       What happened next?

11         A       I just stayed in the hallway.

12         Q       Did there come a point in time when Darius
13   either came out or went back into the room?

14         A       Yes.

15         Q       Did you speak to him at all?

16         A       Yes.

17         Q       Did you ask him what happened?

18         A       I said, "What did you do?"

19         Q       What, if anything, did he say?

20         A       He basically said, "Go and check on Kyona.  Go
21   and check on Kyona."

22         Q       Did he tell you at any point in time that she
23   choked on a piece of chicken?

24                 MR. GOLDSTEIN:  Your Honor, I'm going to
25                 object to the leading.

1                          L. Nicolas-Direct

2                     THE COURT:  Sustained.

3          Q     What, if anything, did he say to you about

4    Kyona's condition?

5          A     He didn't say anything.

6          Q     Just, "Check on Kyona"?

7          A     Yeah.

8                     MR. GOLDSTEIN:  Objection.  Asked and

9                answered.

10                    THE COURT:  Sustained.  That wasn't

11               actually a question, "Just check a Kyona?"

12               Sustained.

13         Q     What happened next?

14         A     I went into the bedroom.

15         Q     What did you do when you entered the bedroom?

16         A     I checked Kyona.

17         Q     And when you say you checked her, what did you

18   do?

19         A     I checked her pulse.

20         Q     And what did you find?

21         A     No pulse.

22         Q     She had no pulse?

23         A     No.

24         Q     Did you check anything else?

25         A     She wasn't breathing at the time.

1                          L. Nicolas-Direct

2      Q      What happened next?

3      A      I told Darius to call 911.

4      Q      Did he do that, if you know?

5      A      Yes.

6      Q      And what happened next?

7      A      I started CPR.

8      Q      And how did you do that?

9      A      I was -- I breathed into her mouth.

10     Q      Let me stop for a second and just backtrack.

11  When you went back into the master bedroom the second time

12  after having been out in the hallway area, was Kyona

13  clothed?

14     A      Yes.

15     Q      And what did she have on her at that point?

16     A      She had a pajama on.

17     Q      Did you put those pajamas on?

18     A      No.

19     Q      You said you started CPR, you were breathing

20  into her mouth.  I'm just trying to get a point of

21  reference.  Correct?

22     A      Yes.

23     Q      What happened next?

24     A      The paramedics came.

25     Q      How long did it take for the paramedics to get

                              L. Nicolas-Direct

1

2   there, approximately?

3         A      Maybe two minutes.  It wasn't a long time.

4         Q      And when the paramedics arrived, what happened?

5         A      They were -- they were working on Kyona.

6         Q      And what did you do while they were working on

7   Kyona?

8         A      I left the room.  I went into the hallway.

9         Q      What happened next?

10        A      There was the police in the living room area.

11               MR. GOLDSTEIN:  I apologize.  Just can't

12               hear.

13               THE WITNESS:  There was the police in the

14               living room area.

15               THE COURT:  She repeated it.  Okay.

16        Q      Did there come a point in time where Kyona's

17   body was removed from the house?

18        A      Yes.

19        Q      What happened.  Tell us what happened.

20        A      Darius left with the paramedics, and then I

21   stayed back with Mendissa, and I went to the kids' room.  I

22   told Mendissa to get dressed.

23        Q      Why did you tell her to get dressed?

24        A      Because I was going to the hospital to see

25   Kyona.

L. Nicolas-Direct

1

2      Q      And how long after they, the ambulance, left did
3   you leave to go to Good Samaritan Hospital?

4      A      Five minutes about.

5      Q      And upon arriving at Good Samaritan Hospital --
6   strike that.  In the car ride to Good Samaritan Hospital,
7   did you speak to Mendissa at all?

8      A      Yes.

9      Q      And what, if anything, did you say to Mendissa,
10   or what, if anything, did Mendissa say to you?

11      A      When I was in the car with Mendissa, Mendissa
12   asked about her sister, and I told her her sister was in the
13   hospital and that I had -- that we're going to go to see
14   her, and at the time I told Mendissa -- not to say anything
15   is what I had told her.

16      Q      You told Mendissa not to say anything about what
17   had happened in the house that night?

18      A      I told her -- I had told her, yes.

19      Q      When you got to the Hospital, what happened?

20      A      I was waiting in the waiting room in the
21   hospital.

22      Q      And was Mendissa waiting with you?

23      A      Yes.

24      Q      What happened?

25      A      I don't know.  That was -- the police were --

1                        L. Nicolas-Direct

2        A      Yes.

3        Q      Please look at 60 in front of you.  Is that

4  agreement defined within the four corners of that document?

5  Did you understand my expression.  I'm sorry.  Did you sign

6  that agreement?

7        A      Yes.

8        Q      Is that your agreement with the District

9  Attorney's Office?

10       A      Yes.

11       Q      And does your signature appear on the bottom of

12  it?

13       A      Yes.

14       Q      Did you read it and confer with your attorney

15  about that document?

16       A      Yes.

17       Q      And after conferring with him did you sign it?

18       A      Yes.

19               MR. MOORE:  I show People's 60 to Mr.

20               Goldstein, and at this time I'll ask People's 60

21               be moved for evidence.

22               MR. GOLDSTEIN:  No objection.

23               THE COURT:  Very good.  In evidence

24               without objection.

25               (People's Exhibit 60, previously marked

1                           L. Nicolas-Cross

2          A      Could mean I woke up from bed.  Doesn't mean I

3     was sleeping.

4          Q      And when you went into the room, into the

5     kitchen, you saw Darius there with Kyona, correct?

6          A      Yes.

7          Q      And he was speaking to her, correct?

8          A      Yes.

9          Q      About the homework?

10         A      Yes.

11         Q      And as you just heard, you told Darius to let

12    Kyona go to sleep, right?

13         A      Yes.

14         Q      But Darius said she hadn't done her homework

15    yet; isn't that right?

16         A      Yes.

17         Q      And with that you went back to your room, to the

18    master bedroom, to go to sleep, right?

19         A      I went, yeah.  I went back, and then I went out

20    that night.

21         Q      So up until that point -- withdrawn.  Darius is

22    in the kitchen.  What time is this now?

23         A      When he was in the kitchen?

24         Q      Uh-huh.  Right before you went back to your

25    bedroom.

1                          L. Nicolas-Cross

2        A      I don't know.

3        Q      Well, you went back to your bedroom, and instead

4    of going to sleep, that's when you decided to go out to get

5    something to eat, right?

6        A      Uh-huh.

7        Q      Do you remember what time that was?

8        A      I don't know.   Around 11.

9        Q      Okay, eleven o'clock.   So you've seen the kids

10   in the room, in different rooms, you've talked to Darius a

11   number of times, and now at eleven o'clock you decide you're

12   going to leave the house and go to White Castle, right?

13       A      Yes.

14       Q      How far away is White Castle?

15       A      About 20 minutes.

16       Q      Twenty minutes to get there, right?

17       A      No, twenty minutes --

18       Q      Where is White Castle?

19       A      About 15 minutes.   It's not far.

20       Q      Where is it?

21       A      It's in Nanuet.

22       Q      Where?

23       A      In Nanuet.

24       Q      Where in Nanuet?

25       A      I don't know the address.

1               L. Nicolas-Cross

2       Q      What road is it on?

3       A      I don't know the address.

4       Q      You don't know the road?

5       A      It's on Route 59.

6       Q      Down toward the Nanuet Mall?

7       A      Yes.

8       Q      So you went from 9 Innington down there?

9       A      Uh-huh.

10      Q      Turned around and came back?

11      A      Uh-huh.

12      Q      And you said you ate in your car; isn't that

13  right?

14      A      Yes.

15      Q      And how long did you say that whole process

16  took?

17      A      I don't know.  Approximately a half hour.

18      Q      So you get back.  It's approximately now, if you

19  left at 11, took half hour or so --

20      A      I don't know.  It was around eleven o'clock, so

21  I don't know if it was eleven o'clock on the dot.  It was

22  around eleven o'clock.

23      Q      Around eleven, and now it took about a half

24  hour, so now it's around 11:30, right?

25      A      I don't know.

1                           L. Nicolas-Cross

2          A      Yes.

3          Q      And as you indicated in one of the last

4     questions that Mr. Moore asked you, Darius looked upset at

5     the time, correct?

6          A      Yes.

7          Q      Now you go back to bed, and this is when you

8     fall asleep again, correct?

9          A      Yes.

10         Q      And that brings us to about 3 a.m., as you said,

11    when you indicated Darius burst into the room carrying

12    Kyona?

13         A      Yes.

14         Q      Now you indicated he was carrying Kyona with his

15    arms in front of him and Kyona across him; is that correct?

16         A      Yes.

17         Q      And you indicated he burst in the room.  What

18    does that mean, burst?

19         A      Excuse me?

20         Q      What does that mean when you say that he burst

21    into the room?

22         A      He came in the room.  Like I said, he burst into

23    the room.

24         Q      Burst into the room, and he laid the child down

25    next to you; is that right?

1                         L. Nicolas-Cross

2        A     Yes.

3        Q     He knows you're an LPN, right?

4        A     Yes.

5        Q     And he's asking you to check the child?

6        A     Yes.

7        Q     But you're crying?

8        A     Yes.

9        Q     And you don't cry for a minute or two minutes or
10   three minutes or four minutes?

11              THE COURT:  Counsel, ask a question.

12       Q     You're crying for ten --

13              THE COURT:  Counsel, you're testifying.

14              Ask a question.

15       Q     Did you cry for 10 minutes out in the hallway?

16       A     About.

17       Q     About, right?

18       A     Yes.

19       Q     You were crying as you were collecting your
20   thoughts; is that correct?

21       A     I was crying because I was wondering what
22   happened.  I asked Darius, "What happened?  What happened?"

23       Q     And he's telling you to check the child?

24       A     Yes.

25       Q     And you said you stayed in the hallway?

1                          L. Nicolas-Cross

2          A      Yes.

3          Q      And you said Darius went with them, right, to

4    Good Samaritan Hospital?   Right?

5          A      Yes.

6          Q      But you stayed home at that time?

7          A      Yes.

8          Q      You stayed home, and when everybody left, you

9    went down to Mendissa room, correct?

10         A      Yes.

11         Q      And when you went down to Mendissa's room, you

12   went down there, and you had to wake her up, didn't you?

13         A      She said she was already up.

14         Q      Did you wake her up or not?

15         A      Yes.   She was laying on the bed, and I said,

16   "Mendy, can you get up to get ready to go to the hospital."

17         Q      She's laying on the bed.   My question is did you

18   wake her up or not.

19         A      Yes.   I told her to get up, but she said she was

20   already up.   That's what she told me.

21         Q      That same statement you gave to the police,,

22   rather you gave to the District Attorney's Office on June

23   14, Page 35.   Do you recall getting this question and giving

24   this answer:

25                          "QUESTION:   And what happens when they

1                              L. Nicolas-Cross

2              take Kyona out of the house?

3                        "ANSWER:  Darius left with Kyona, and I

4              woke up Mendy at that time and told her to get

5              dressed, that we were going to see Kyona in the

6              hospital."

7              Do you recall being asked that question and

8        giving that answer?

9              A     Yes.

10             Q     And on the way to the hospital, you spoke with

11       Mendy, didn't you?

12             A     Yes.

13             Q     You told her not to say anything?

14             A     Yes.

15             Q     You told her that her sister was dead?

16             A     No.  I basically at that time -- I didn't know

17       she was dead, so I said, "We're going to the hospital to

18       check on Kyona."  I didn't know she was dead, so no, I

19       didn't say she was dead.

20             Q     When you got to the hospital, there came a point

21       when you saw Darius, right?

22             A     Yes.

23             Q     Where was he?

24             A     He was on a bed.  They put him on a bed.  He was

25       in restraints.

492

1                              L. Nicolas-Cross

2    remember they came into the room, and then it was Darius and

3    I and the two detectives, and then they were talking to

4    Darius and I.  They were speaking to us.

5          Q      When you were with Darius, how was he in that

6    room?  How was he physically?

7          A      He was crying.

8          Q      Would you still say he was in shock from hearing

9    of the death of his daughter?

10         A      Yes.

11         Q      When you spoke to Darius in that room, did you

12   speak in English or Creole?

13         A      Creole.

14         Q      Did you tell Darius that if he changed his story

15   and told the police that he found Kyona in bed, if he

16   changed his story to that, that the police would not charge

17   him with murder?

18         A      I told Darius that --

19         Q      I'm asking you --

20                THE COURT:  Let her answer.

21                MR. GOLDSTEIN:  I'd like an answer to my

22                question.

23                THE COURT:  She said, "I told Darius

24                that --"  let's hear her answer.

25         Q      You told that, right?

1                                                                      493
                              L. Nicolas-Cross
2            A        I didn't finish.

3                     THE COURT:   Pardon me.   Answer, please.
4            Do you recall the question?

5                     Please don't interrupt her.   You did it
6            twice.

7            A        (continuing)  At the time when I spoke to
8    Darius, I had told Darius that if he -- because he was
9    saying that like Kyona was walking in the hallway to his
10   office, and he basically -- he said that Kyona was walking
11   into the hallway to his office, and the police at that time
12   said that that couldn't be possible because Kyona had passed
13   away, and they said that doesn't make any sense, well, if he
14   said that this happened because that makes more sense than
15   what he said, I told him -- this is what I told Darius.  I
16   said, well, I told him well, if that's what really happened,
17   he should say that's what really happened, and I said,
18   "Maybe they won't charge with you murder."  That's what I
19   told him.

20           Q        Do you recall being asked this series of
21   questions and giving these answers at a hearing that was
22   held in this courthouse on July 8, 2002.

23                    MR. GOLDSTEIN:  Page 70, Judge.

24                    THE COURT:  Go ahead, counsel.

25           Q        Page 70.

1       L. Nicolas-Cross

2    THE COURT:  Counsel, what date are you

3 speaking from?

4    MR. GOLDSTEIN:  Her testimony, your Honor.

5    THE COURT:  I haven't been provided that.

6 If it's here -- it may not be here.  I have the

7 other three transcripts in front of me.  You

8 have a copy, Mr. Moore?  You can follow if there

9 is something.

10  Q Page 70:

11    "QUESTION:  The police told you it would

12 make more sense if Darius told them he went to

13 check on Kyona in bed and found her the way he

14 found her; isn't that right?

15    "ANSWER:  Yeah.

16    "QUESTION:  That's what the police told

17 you to tell him, right?

18    "ANSWER:  Yes.

19    "QUESTION:  And didn't you also tell him,

20 during those two or three minutes that you spoke

21 to him.  That if he said he found the child in

22 that fashion in bed, that the police, in helping

23 him, wouldn't charge him with murder?  Is that

24 right?

25    "ANSWER:  Yes.

L. Nicolas-Cross

1    

2    didn't want to live in the house.

3        Q    Wait a second.  Slow down a second.  You now

4    don't want to sell the house, but you want to rent out the

5    house.  Is that what you are saying?

6        A    Correct.

7        Q    And in your attempt to do that, did you sign a

8    listing agreement?

9        A    No.

10       Q    Who did you sign -- were you the owner?

11            MR. MOORE:  Judge, I'm going to have the

12            same objection.  Seems to me this stuff is

13            barely relevant to any of the facts in the case.

14            MR. GOLDSTEIN:  Your Honor, this goes to

15            motive.

16            THE COURT:  I'll permit some inquire on

17            it.  Items of furniture we don't need, that's

18            not relevant, but I'll permit this.

19       Q    Did you write and sign that you were the owner

20    of the house?

21       A    Did I write and sign?  I signed it.  Said owner,

22    and I did sign because --

23       Q    Because what?

24       A    Because I was paying the mortgage, so --

25       Q    Did you ever go to Darius and say if he wants to

1                              L. Nicolas-Cross

2    rent or sell?

3         A    Because the mortgage needed to be paid.  That's

4    why.  I said the mortgage needed to be paid.

5         Q    Your mortgage?

6         A    Yes, and my mortgage because I was paying the

7    mortgage.  Yes, my mortgage.

8         Q    So if it wasn't paid, would the mortgage company

9    come after you or Darius?

10        A    Like I said, I didn't want -- anyway -- I

11   considered it my home because I was paying most of the

12   mortgage, so yes.

13        Q    So you considered it your home, and you tried to

14   sell it.

15        A    I didn't try to sell it.  I rented it out.

16        Q    You tried to rent it.  By the way, did you rent

17   it?

18        A    I told the lady not to.  I told the lady I

19   didn't want to rent it out because I told the lady I spoke

20   to I didn't want to rent it out.  It's not to put it on, not

21   to place an ad because I decided not to rent out the house.

22   That was not even -- that was two days later.

23        Q    So now two days later after the death of the

24   child, the first thing that you're trying to do is rent it?

25        A    That was a long time before I even tried to rent

L. Nicolas-Cross

2   A    Yes.

3   Q    You were in your car; he was in his car?

4   A    Yes.

5   Q    One in one direction, one in the other, so that
6   the two windows that each of you were driving in the cars
7   were next to each other, right?

8   A    Yes.

9   Q    And you told him you wanted him to take a deal;
10  is that right?

11  A    No.  I told him I think it would be best for him
12  to take the plea.

13  Q    And he kept telling you, "I didn't kill my
14  daughter."  Isn't that correct?

15  A    Yes.

16  Q    And you also told him that you knew he didn't
17  beat his daughter to death; isn't that correct?

18  A    When I spoke to Darius --

19         MR. GOLDSTEIN:  Judge, can you direct the
20         witness?

21         THE COURT:  Let her answer.

22         MR. GOLDSTEIN:  I'm asking the Court to
23         direct the witness.

24         THE COURT:  Counsel, I'm not going to tell
25         you again.  Don't do that again.  Let her answer

1                          L. Nicolas-Cross

2       A     No.

3       Q     He didn't have his earphones on when he was
4   working with his music?

5       A     No.

6       Q     On October 11th/12th of last year, not only were
7   you upset that your relationship with Darius was over, but a
8   new girlfriend was already calling the house.  Is that
9   correct?

10      A     No.  When I spoke to Darius, Darius told me
11  there was nothing going on.  There was a lot of women
12  calling the house.  I said, "Darius, what's going on?" and
13  he said, "Nothing.  These are my friends.  I can't have
14  friends?"

15            I mean we were still together.  I mean we were
16  arguing.  Darius never told me that he had a girlfriend.  He
17  told me that those were his friends, and I was upset that
18  girls were calling the house.  I said, "What's going on?"
19  and he basically said, "Oh, those are just my friends."

20      Q     You didn't believe him that they were just his
21  friends?

22      A     No.

23      Q     You believed they were his girlfriends?

24      A     I believed there was something happening.

25      Q     And in that week where your relationship had

1                        L. Youngman-Direct

2        Q        What, if anything, did he tell you in that

3    regard?

4        A        He told me she had a prior history of asthma,

5    that she had only one serious attack, that she was not being

6    treated for it, but that she had seen a doctor in Nanuet.

7    Dr. Silva I believe the name was.  He said she last saw the

8    doctor in September for a preschool checkup.

9        Q        Dr. Silva or Dr. DeAngelo?

10       A        I'm sorry.  Dr. DeAngelo.

11       Q        Dr. Silva would be the ER doctor?

12       A        Yes.  Dr. DeAngelo was from Clarkstown Pediatric

13   in Nanuet.

14       Q        Did you ask Mr. Jean what, if anything, he had

15   done that day, that day being the date of October 11, 2001,

16   into the morning of October 12th?

17       A        Yes.

18       Q        Can you tell us what, if anything, he told you.

19       A        Yes.  He said for most of the day he was working

20   on a bathroom in a basement apartment he had for a tenant.

21   He said that his daughters came home from school off the

22   bus, they went up into their room, and they were doing their

23   homework.  He said that after a period of time, he went up

24   to check on the girls, and when he went into the room, he

25   smelled what he thought was urine, and he asked the girls

1                          L. Youngman-Direct

2      about this urine.  One of the girls had admitted -- I

3      believe it was Kyona -- that she urinated in a box or a

4      vase, and he asked her why she would do that if the bathroom

5      was so close.  He said that Mendissa had also urinated in

6      the bed the day before.

7           Q      Who told him that?

8           A      Kyona had said that.

9           Q      Did he tell you how he reacted at that?

10          A      He said he was angry at the time, but he went

11     down to the basement and continued working in the basement.

12          Q      Did you ask him anything further about what

13     occurred while he was working in the basement?

14          A      Yes.  He said while he was down there most of

15     the late afternoon, early evening, he said the girls were

16     coming down asking him questions about their homework.  He

17     said he was getting angry that they were bothering him, and

18     he was still angry that the girls had urinated in their

19     room, so he went back upstairs and gave both girls a

20     spanking.

21          Q      How did he describe that spanking to you?

22          A      He said he beat both of the girls with a leather

23     belt, that he had hit them approximately 10 to 15 times

24     each.

25          Q      Did he tell you the area of their bodies that he

1                              L. Youngman-Direct

2    had struck them?

3         A    He said he tried to strike them on the buttocks,

4    but he was holding them by their arm, and they were moving

5    around.

6         Q    What, if anything, did he tell you next?

7         A    He said that he had seen Kyona approximately an

8    hour later up in the kitchen, that she had asked him a

9    question, a homework question.  He helped her with the

10   question, and he went back down into the basement.  He said

11   she appeared fine at that time.  He said after working in

12   the basement, he was up in his office working on the

13   computer when he saw Kyona walking down the hall.  This was

14   much later in the evening, in the early morning hours.

15        Q    Did he tell you how long it was before the

16   paramedics arrived or in relation to when the paramedics

17   arrived?

18        A    He said he didn't know what time it was.  He

19   said it was approximately 30 minutes before the ambulance

20   arrived at the house.

21        Q    Did he tell you what happened at that time when

22   he saw Kyona walking down the hallway?

23        A    He said she was unsteady on her feet.  He said

24   he followed her into the kitchen.  She said she didn't feel

25   well.  He said he walked her over to the sink, put water on

1                                L. Youngman-Direct

2      her face.  And he said he gave her a piece of chicken.  He

3      thought maybe she didn't feel well because she hadn't eaten

4      dinner.  He said she appeared to choke on the chicken, and

5      she slumped into the sink.  He said he picked her up and

6      carried her into his bedroom, where his girlfriend was

7      sleeping.  And told her there was something wrong with

8      Kyona.

9           Q     What did he tell you happened when he brought

10     the girl into the bedroom?

11          A     He said he put alcohol on her face to try to

12     revive her.  He said he thought it would act as a smelling

13     salt type of thing.  He said Leslie did CPR, and he called

14     911.

15          Q     Now, sir, in the course of talking to Darius

16     Jean that morning, did you ask him whether or not he would

17     give you a signed or a written statement in that regard?

18          A     Yes, I did.

19          Q     And prior to giving that written statement, was

20     he advised of anything?

21          A     Yes.  He was advised of his Miranda rights.

22          Q     Who did that?

23          A     Detective Graham.

24          Q     Did he acknowledge that he understood his

25     rights --

L. Youngman-Direct

2    A    Yes.

3    Q    -- and wished to speak to you?

4    A    Yes, he did.

5            MR. MOORE:  Let me ask at this time that a

6        four-page document be marked as People's 62 for

7        identification.

8            (People's Exhibit 62, Jean statement, was

9        marked for identification.)

10           COURT OFFICER:  62 for I.D.

11   Q    Detective Youngman, take a minute and look at

12   that document, and tell us do you recognize that item.

13   A    Yes.

14   Q    And what, if anything, do you recognize that

15   item to be?

16   A    This is a statement I took from Mr. Jean on

17   October 12th.  It's a typewritten statement, question and

18   answer form.

19   Q    Tell us the procedure that you followed in

20   taking the signed statement.

21   A    I fill out the top with the information, his

22   personal information.  I actually type a question, read the

23   question to him, and I have him answer the question, and

24   then I type his answer.

25   Q    Where was this occurring within the detective

559

L. Youngman-Direct

1

2     bureau in Ramapo?

3          A     It was at my desk.

4          Q     What time did you start taking that typewritten

5     statement, sir?

6          A     Time started was 11:10 a.m.

7          Q     How long did it take you to complete the

8     statement?

9          A     Statement was completed at 12:40 p.m.

10         Q     Sir, that is a copy of the statement?

11         A     Yes.

12         Q     Is that a complete and accurate copy of the

13    statement you took from Darius Jean at 11:10 a.m. on October

14    12, 2001?

15         A     Yes.

16         Q     After asking questions and getting answers,

17    what, if anything, did you do next in regard to the

18    statement?

19         A     I read the statement in its entirety to Mr.

20    Jean, including the waivers on the top of the form.  I had

21    him read the statement to himself.  Prior to that I had him

22    read the first couple of lines out loud so I knew that he

23    knew how to read, and then he signed the statement.

24              THE COURT:  When you say the waivers on

25              the top of the form, are you referring to the

L. Youngman-Direct

1

2      A      He signed the statement at 12:55 p.m.

3      Q      So about 15 minutes later after completing the

4      statement?

5      A      Yes.

6      Q      Now, sir, after speaking to Darius Jean or

7      taking the typewritten statement from Darius Jean that

8      morning, what did you do next?

9      A      I believe after that I interviewed his fiance,

10     Leslie Nicolas.

11     Q      And did you take a signed statement from Leslie

12     Nicolas as well?

13     A      Yes, I did.

14     Q      And, sir, after speaking with Leslie Nicolas,

15     what happened next?

16     A      She had been asking to speak to Mr. Jean all

17     day.  She asked again if she could speak to him.

18     Q      Did she tell you why she had to speak to Mr.

19     Jean?

20     A      She said that she had an argument earlier with

21     him in the day, that she had tried to give him money for

22     rent and that he didn't take it.  She wanted to make sure

23     that he had it, that he had picked it up.

24     Q      She said she wanted to make sure he put it in

25     the bank?

574

L. Youngman-Direct

2    A    Yes, for the mortgage.

3    Q    And as a result of her request, did you allow
that to occur, or did you allow Leslie Nicolas to speak to
Darius Jean?

6    A    Yes.

7    Q    Would you tell us how that occurred and what
happened at that time.

9    A    He was in the initial interview room that I
spoke to him in.  I brought her in.  When she first walked
in, he spoke to her.  He actually called out something to
her in Creole.  I don't know what he said.  She answered
something back also in Creole.  I told them to speak
English.  They talked briefly about the money.

I stepped near the doorway.  I was talking to my
partner Detective Graham.  They started talking in Creole
again.  I told them to stop talking in this language.  I
didn't understand what they were talking about.  I asked
them to stop again.  They started talking again in Creole,
and I stopped the conversation.

21    Q    Sir, did you at any time tell Leslie Nicolas to
make the defendant a promise about changing his statement?

23    A    No, I did not.

24    Q    Did you promise the defendant at any time to not
charge him with murder if he would give a second statement?

1                              L. Youngman-Direct

2         Q      I'm going to stop you there for a second.

3    Before you go further did you follow the same procedure as

4    you did with the first statement that the defendant

5    initialled after that warning section in the beginning?

6         A      Yes.

7         Q      And can you see it on that original?

8         A      Yes.

9         Q      And the initial was DJ?

10        A      Yes.

11        Q      So he acknowledged to you again he was giving

12   this statement and that no promises had been made to him to

13   get the statement; is that correct?

14        A      That's correct.

15        Q      One more for the record because I don't know if

16   I did it.   What time does the statement start?

17        A      This statement started at 2:40 p.m.

18             THE COURT:   You asked the start but not

19             the conclusion.

20             MR. MOORE:   That's what I'm trying to pick

21             up.

22             THE COURT:   You did ask the start.

23        Q      Start was 2:40 p.m., and when was the statement

24   concluded, sir?

25        A      The statement was completed at 3:10 p.m.

1                     L. Youngman-Direct

2        "ANSWER:  I don't know what time.  It was

3        about 15 or 20 minutes before the ambulance came

4        for Kyona.

5        "QUESTION:  So what did you do?

6        "ANSWER:  I went into the room.  Mendissa

7        was up on the top bunk sleeping.  She was facing

8        the wall.  Kyona looked kind of weird.  Her eyes

9        were open a little bit.  Her body was crooked.

10       I picked her up and carried her into the

11       kitchen.  I put water on her face.  I took her

12       into my bedroom and put alcohol on her face.  I

13       thought maybe she passed out or had an asthma

14       attack.

15        "Leslie checked for a pulse and told me to

16       call 911.  I called and waited.

17        "QUESTION:  What do you think happened

18       here?

19        "ANSWER:  I think maybe it was an asthma

20       attack.  There was white stuff coming out of her

21       mouth.

22        "QUESTION:  Why did feel you had to lie

23       about Kyona walking down the hallway?

24        "ANSWER:  I feel guilty, of course, but in

25       another way she was fine after.  I thought it

584

1                          L. Youngman-Direct

2    statements.

3        Q      And on the basis of that review, what, if

4    anything, did you do?

5        A      I went back and I spoke to Mr. Jean.

6        Q      And why was that?

7        A      After reading the statements again, I asked him

8    why -- how there was chicken in the girl's mouth when he

9    found her in the bed.  He said that he put the chicken in

10   her mouth after to make it look like she had choked on the

11   chicken.

12       Q      He told you he had put the chicken in her mouth

13   to make it look like she choked?

14       A      Yes.

15              MR. MOORE:  Thank you, Detective

16         Youngman.

17              I have no further questions.

18              THE COURT:  Mr. Goldstein.

19   CROSS EXAMINATION

20   BY MR. GOLDSTEIN:

21       Q      After that second statement you said you went

22   back and you spoke to him about the chicken in her mouth?

23       A      That's correct.

24       Q      And up until this point Mr. Jean had done

25   everything voluntarily with you; is that correct?

1                          L. Youngman-Cross

2          Q      You never presented that to him, did you?

3          A      No.

4          Q      You talked about the fact that after a period of

5     time you interviewed Leslie, correct?

6          A      Yes.

7          Q      And you testified that she asked to speak with

8     Darius Jean, correct?

9          A      Correct.

10          Q      Wasn't it one of the detectives that asked

11     Leslie to speak to Darius Jean?

12          A      No.

13          Q      Did any detective ask Leslie to speak to Darius

14     Jean?

15          A      No.

16          Q      And you said just now that she asked to speak to

17     him because of some money or some mortgage money?

18          A      Yes.

19          Q      Did you put that in any of your reports?

20          A      I don't recall if I did or not.

21          Q      Do you have your reports with you?

22          A      Yes.

23          Q      Could you take a look at them?

24                 (Witness complies)

25          Q      Just for the record I have a three-page

1                           L. Youngman-Cross

2          Q      I'm talking about in your supplemental report,

3     three pages, or the three pages notes, is there anything in

4     there that indicates you allowed Leslie Nicolas to speak to

5     Darius Jean.

6          A      Yes.

7          Q      Could you point that out to me, please.

8                        (Pause)

9          A      Okay.   Well, it's not in the report.

10         Q      It's not in your three-page typed report.   How

11    about in your three pages of notes?

12         A      Yes.

13         Q      In your notes?

14         A      Yes.

15         Q      In your report or your notes did you write down

16    at any point that Leslie spoke to Darius Jean about mortgage

17    money or something to that effect?

18         A      No.

19         Q      And you didn't put it in your typewritten

20    report, did you?

21         A      No.

22         Q      Do you know if anyone else put that in any of

23    their reports at the Ramapo Police Department?

24         A      I don't know.

25         Q      You don't know.   Did you write down that the two

592

1                           L. Youngman-Cross

2   child walk was not correct, that he found the child in bed?

3       A      Correct.

4       Q      Up until that point you had taken a number of

5   oral statements from him, correct?

6       A      Correct.

7       Q      And a written statement?

8       A      Correct.

9       Q      And in none of those statements did he ever say

10  what he said in that last statement, which is now in

11  evidence?

12      A      That's correct.

13      Q      Did Leslie Nicolas tell you that she told Darius

14  Jean that if he admits that he found the child in bed, that

15  he would not be charged with murder?

16      A      Did she tell me that?  No, she did not.

17      Q      Did you tell her to tell him that?

18      A      No, I did not.

19      Q      Did any Ramapo Police Officers tell him that?

20      A      I don't know if they did, but I would guess not.

21             THE COURT:  I think what he said is, "Do

22             you have any knowledge of anyone telling him

23             firsthand?"

24             THE WITNESS:  No, I don't.

25      Q      By the way, when you spoke to Darius Jean in

593

L. Youngman-Cross

2    that room, how did he appear to you?

3        A     He was -- through that whole time?

4        Q     Yes.

5        A     He was upset, naturally.

6        Q     He was upset?

7        A     Yes.

8        Q     Was he crying at all?

9        A     Periodically, yes.

10      Q     Did he appear to be in shock?

11      A     Shock?  I guess you could say shock.

12      Q     What about Leslie Nicolas?  How did she appear

13  when you spoke with her?

14      A     She was upset, of course.

15      Q     Was she calm?

16      A     Was she calm?

17              THE COURT:  Are you asking about one point

18              or throughout?

19              MR. GOLDSTEIN:  Throughout.

20      A     Well, I wouldn't say she was calm, no.

21      Q     When was the first time you spoke with her or

22  saw her?

23      A     I saw her at the hospital, but I didn't speak to

24  her.

25      Q     Let's just back up to the hospital because

F. Zugibe-Direct

A     Yes.  The x-ray of the body, I felt that there
were pneumothoraxes, that means collapses of the lungs, but
I wasn't -- I was quite sure, but not completely, because
it's very difficult in a small child to tell pneumothoraces
sometimes, so I submitted that to the radiologist awaiting
their report.

Following that I proceeded to do the external
description.  What I found on the external, not much of
anything on the front of the body.  Front of the body
appeared okay.  The back of the body was where all of the
findings were.  The entire back was swollen.  In fact as I
recall, the back was somewhat discolored, a sort of a black
and blue effective appearance.

Then I went ahead.  In order make sure what I
was looking at, I made incisions into the back area in
various parts, and I noted that the entire back area was
infiltrated with blood.  Then I went ahead.  The back of the
arms, the triceps areas on both sides, exactly the same,
were also -- had the same discoloration, so I made incisions
there, and they were infiltrated with blood.  Also the
buttock area also infiltrated with blood.  It was quite a
bit of blood lost into the back and into these muscles
there.

Q     Let me slow you up for a second so we

1                              F. Zugibe-Direct

2    understand.

3          A     I'm sorry?

4          Q     Let me stop you for a second and ask you to

5    explain that and do this first.

6          A     Sure.

7          Q     Would you take a look at what's been marked as

8    People's 9 in evidence, and tell us whether or not you

9    recognize that photo.

10         A     Yes.  That's the photograph of the back area of

11   Kyona Frederick.

12         Q     And does that show the injuries that you've been

13   testifying to that you saw in your gross observation?

14         A     Well, the sort of discoloration of the back

15   doesn't show up too well in the photographs, but that shows

16   it much better on the two-by-two's that this photograph was

17   made from there.

18         Q     But that would describe or show in substance the

19   injuries you saw in your gross observation, correct?

20         A     Yes, except for the dissection; except for the

21   cut.

22         Q     I'm going to also show you what's been marked as

23   People's 11 and ask you whether or not you recognize that

24   photo.

25         A     Yes.

1                              F. Zugibe-Direct

2       Q       And what, if anything, is that a photograph of?

3       A       There's a pattern injury on the side of the

4   body, not the front, but the side, which is the axillary

5   area.  The axillary area goes from under your armpit all the

6   way down the side.  There is a loop-type of a pattern.  This

7   is recognized in forensic pathology as a pattern generally

8   made by a wire type of an object.  The loop of a wire that's

9   twisted, turned, and held tightly and hit.  And that's a

10  fresh wound.

11      Q       And, sir, I'll ask a bit more about it later,

12  but was there one or a number of pattern injuries on the

13  body as you saw it?

14      A       Oh, there was many injuries on the back of the

15  body.  I was in the process of describing them.

16      Q       Okay.  I'm sorry.  Let me get you back to the

17  one point where I stopped you at.

18      A       After I made the incision into these areas, the

19  entire area of the back had multiple abrasions of different

20  types, many of them made with the same -- actually with the

21  same type of an instrument because it denudes the skin.

22  What I mean, it actually is almost like sandpaper.  Rubs off

23  those areas.  Many of them were still quite bloody.  In fact

24  the sheet that she came in with was very, very bloody that

25  hit the back part of the body.  There were various

1                              F. Zugibe-Direct

2      configurations, but it was the way that they were hit, and

3      they were made by an object like that piece of wire or some

4      object similar to that.

5          Q      And you indicated that there was blood

6      infiltrating the muscles.  Could you describe what you mean

7      by that?

8          A      The blood infiltration for the beatings.  Blood

9      vessels under the skin were ruptured, and a very significant

10     amount of blood was present throughout the entire back, the

11     muscles of the back of the arm, and in the buttocks area.

12     The buttocks area was infiltrated with blood, too.

13         Q      Sir, what, if anything, did you do next, and

14     what, if any, other findings did you make?

15         A      There was also -- there was also -- there was

16     abrasions on the back of the arm region also, and there was

17     more of those loop patterns that you see there.  This was

18     under the axillary area, but behind the knee, there was some

19     fresh ones there too.

20         Q      Were there also marks and loop-like marks on her

21     arm as well?

22         A      Loop-like patterns similar to the ones shown on

23     the photograph that you showed me.

24         Q      On her arms as well, correct?

25         A      Pardon me?

1                              F. Zugibe-Direct

2       time.  We looked at the lungs, examined the lungs carefully

3       to see if there was any evidence of a mucous plug or

4       anything else that might indicate any type of an acute type

5       of problem occurring in the lungs.

6                      Then after doing the body dissection, we

7       proceeded to the head.  When we opened the scalp.  It was

8       very, very soft, particularly the back of the head region.

9       We brought the scalp back, and all under the entire scalp

10      was what we call encephalohematoma, which means hemorrhage

11      all under the skin of the scalp, greater in the back part of

12      the head than in the front part of the head region.  After

13      opening up the skull, we examined the brain.  The brain was

14      swollen.  In fact there was what they call a consular

15      herniation in the brain, which showed marked swelling

16      because what happens when you get a lot of swelling and

17      there is pressure against the head, lot of pressure against

18      the head, it herniates down into the spinal canal, and we

19      had that beginning.  It was the beginning at that particular

20      time.

21                     And I think that sums it up.

22         Q     Sir, on the basis of your autopsy and

23      evaluation, did you come to an opinion or conclusion as to

24      the cause of death in this case?

25         A     Yes.  The cause ever death was due to multiple

1                              F. Zugibe-Direct

2     soft tissue injuries.  As I mentioned before, soft tissue

3     means the marked hemorrhaging and damage to the musculature,

4     and so forth, all through the back, the lung's soft tissue,

5     the injuries to the lung.  The pneumothoraces was also due

6     to the soft tissue injuries.  And then the head injuries,

7     marked head injuries.  All together, those three items

8     together, was the cause of death.

9          Q     Pneumothoraces in layman's terms, lungs

10    collapse?

11         A     Pardon me?

12         Q     Pneumothoraces in layman's terms means the lungs

13    collapse?

14         A     Pneumothoraces?

15         Q     Yeah.

16         A     Collapse of the lungs.

17         Q     Sir, let me go back to your gross observations

18    as to the body when you -- before you did the dissection.

19    You said you noticed a lot of abraded type injuries on her

20    back area; is that correct?

21         A     Yes.

22                    MR. MOORE:  I'm going to ask this photo be

23                marked as People's 66 for identification.

24                    (People's Exhibit 66, photograph, was

25                marked for identification.)

1                          F. Zugibe-Direct

2          Q      Is that the belt --

3          A      This is it.

4          Q      -- that you see in front of you?

5          A      Uh-huh.

6          Q      It was whole when you saw it, was it not?

7          A      It was whole when I saw it, yes.

8          Q      Did you examine that belt in the course of

9    making your findings?

10         A      Yes.

11         Q      And is that belt or someone having beaten

12   somebody with that leather belt consistent with any of the

13   injuries you found on the body?

14         A      Yes.  I tested it for blood, and it gave a

15   positive reaction for blood, just blood.  Whose blood -- but

16   just blood.  Submitted it to the laboratory.  The police

17   submitted it to the laboratory to have it tested, to see if

18   it was the victim's blood.

19         Q      And, sir, you said that item was consistent with

20   some of the injuries on the body, correct?

21         A      Yes.

22         Q      Did it make the loop-like pattern that you

23   talked about previously?

24         A      Well, the buckle part of it could make some of

25   the injuries that I saw.  I think that the loop-type pattern

1                              F. Zugibe-Direct

2    was made by a wire, not by that.

3         Q      I'm going to show you what's been marked as

4    People's 35 and ask you to open that item too.

5                         (Witness complies)

6         Q      Was that also one of the items that you examined

7    or the police brought to you on that date?

8         A      Yes.

9         Q      And can you tell us what, if any, findings you

10   made in that regard?

11        A      Yes.  I also got positive for blood on it.

12        Q      And is that item consistent with any of the

13   injuries that you found on the body?

14        A      Well, this kind of -- yes.  That kind of an

15   object is the type of a instrument that makes that type of a

16   loop pattern.

17        Q      Can you show us how that would occur?

18        A      Pardon me?

19        Q      Could you show us how that would occur, using

20   that item?

21        A      How it would occur?

22        Q      Yeah.  We talked about loop-like.  If you

23   would --

24        A      Okay.  It's when I double the rope back

25   (indicating), and of course you need a longer part there.

1                          F. Zugibe-Direct

2          Q       Based upon your autopsy could you arrive at an

3     opinion as to the actual time of death?

4          A       Well, the actual time of death is, as I had

5     mentioned, from the time -- go from the time of the beating,

6     from the time of the beating on.  Information that was given

7     that the beating occurred somewhere around one o'clock, so

8     if that occurred at one o'clock, then it would be anywhere

9     from 1:30 to -- let's say it would be anywhere from 1:30 to

10    2:30, somewhere around that time.

11         Q       Now, sir --

12         A       I'll modify that a bit.  Be anywhere from 1:30

13    to almost 3.

14         Q       Now, sir, when you examined the body of Kyona

15    Frederick, is there a term called rigor mortis?

16         A       Yes.

17         Q       And can you explain what that is.

18         A       Yeah.  Rigor mortis is a chemical reaction that

19    occurs in the muscles after death.  There's two components

20    of it.  There are filaments in the muscles called actin and

21    mycin, and actin binds with mycin and is called actomyosin.

22    Well, that occurs in a high oxygen chemical called ATP,

23    adenosine triphosphates.  Breaks off one of the three

24    phosphates on that and uses up all the glycogen that's

25    broken down to sugar.  When all of the glycogen is broken

725

1                              F. Zugibe-Cross

2    positive for blood at the lab, where they have the best

3    facilities, that would confirm with you that the wire in

4    front of you was the wire that was used on Kyona Frederick.

5    Correct?

6         A    Yes.

7         Q    And in fact have you learned that the wire

8    that's sitting in front of you was tested by the lab, first

9    the lab, just like you looked at it?  Correct?

10        A    (Nods)

11        Q    Did you learn that?

12        A    I was told about the blue wire, but they didn't

13   find any blood on the blue wire.

14        Q    You found blood on the blue wire that's in front

15   of you?

16        A    Uh-huh.

17        Q    And you sent it to the lab?

18        A    Yes.

19        Q    And we've stipulated that that exact wire went

20   to the lab.  That's already in evidence.

21        A    All right, fine.

22        Q    The lab personnel testified that he saw no blood

23   on the wire?

24        A    Uh-huh.

25        Q    That he did a crime scope examination on the

726

1                          F. Zugibe-Cross

2    wire and found no blood?

3         A    Uh-huh.

4         Q    And that he continued and did a wet filter paper

5    technique, which you are aware is a technique for testing

6    whether there's blood on an object, correct?

7         A    Right.

8         Q    And again came up absolutely negative, no blood?

9         A    Okay.

10        Q    Knowing that there was now no blood on that

11   wire, you cannot say with a reasonable degree of medical

12   certainty that the wire in front of you was the instrument

13   that was used in this particular case.  Is that correct?

14        A    I can answer that in this manner only.  That

15   wire tested positive for blood regardless of what the

16   laboratory said as far as blood.  Not arguing with them,

17   whether it came from Kyona Frederick or not.  That wire

18   tested for blood.  Whether that wire was the one that did it

19   or not, I can't say.  You're correct in that manner.

20        Q    Well, Doctor, the lab in question never made a

21   decision on that belt, whether the blood came from Kyona

22   Frederick, Mendissa Jean, Darius Jean, myself, yourself.

23   I'm just saying that the lab in question looked at that wire

24   and found no blood.

25                     MR. MOORE:  Objection, Judge.  Is that a

740

F. Zugibe-Cross

1    is attached to the autopsy report.  It's after all of the

2

3    stuff comes in, then the final cause of death is placed

4    here.

5        Q    And you didn't make that change and make it part

6    of your report until January 10th of this year; is that

7    correct?

8        A    This certification here is when -- we certified,

9    this certification was done, when it was requested by the

10   District Attorney's Office, the day they requested the copy

11   of the autopsy report.  It wasn't that the autopsy report

12   wasn't done.

13       Q    Sir, let's get back to pneumothoraces for a

14   moment.  When you did your autopsy of the child --

15       A    Yes.

16       Q    Withdrawn.  A pneumothoraces, that means that

17   there is a puncture of some kind, usually of the lung?

18       A    It means that the lung is collapsed.

19       Q    And isn't that often due to a puncture?

20       A    Yes, either a puncture or blowout.

21       Q    We hear the term as laymen punctured lung.

22       A    Pardon me.

23       Q    As laymen we hear punctured lung.

24       A    That's one cause, punctured lung.

25       Q    Punctured lung, and one cause, would you agree,

1                                    F. Zugibe-Cross

2          Q       Okay, and factors being not just weather

3    conditions or things like that, but also whether you're

4    dealing with an obese person?

5          A       Right.  Obese people generally go in faster.

6    People with fevers go in faster.  Actually a person with

7    this type of beating, I would include the temperature of the

8    body, because of the reaction of the person to the beating,

9    will actually -- the temperature will go up.

10         Q       And rigor mortis can --

11         A       And it will increase the time for rigor mortis

12   to set in.

13         Q       And rigor mortis also would set in earlier on a

14   child; is that correct?

15         A       It sets in earlier on a child, yes.

16         Q       I was just looking at my notes.  When you were

17   testifying, you indicated that you believe the child died

18   within an hour, give or take, a half hour either way?

19         A       Pardon me?

20                 THE COURT:  He said a half hour to an hour

21                 and a half.

22         A       I said an hour, plus or minus a half hour.

23                 THE COURT:  Which is a half hour to hour

24                 and a half, which is 30 to 90 minutes.

25                 THE WITNESS:  Yes.

1                    F. Zugibe-Redirect

2              THE COURT:  You can step down.

3              No further, right?

4              MR. GOLDSTEIN:  No further questions.

5              THE COURT:  You can step down.

6              (Witness excused)

7              THE COURT:  What we'll do is take lunch

8         now.  We'll come back at 2:15.

9              Just give you the admonitions.  Please

10        don't discuss the case amongst yourselves or

11        with anyone else.  Avoid any media accounts.  If

12        anyone should attempt to influence you, please

13        report to the Court directly without discussing

14        it with a fellow juror.  Thank you.

15              (Luncheon recess)

16              THE COURT:  Mr. Moore told me he was going

17        to rest in front of the jury, but rather than

18        have you make your motions then, you said you'd

19        like to make them now when you're breaking at

20        lunch time.

21              MR. GOLDSTEIN:  If I can.

22              THE COURT:  Yeah.

23              MR. GOLDSTEIN:  Your Honor, at this time

24        we move for this Court to dismiss the charges

25        against Mr. Jean.  The People have failed to

1                        Proceedings

2        prove even a prime facia case at this time.

3              More importantly, I'd ask the Court to let

4        me readdress the issue with regard to the

5        depraved indifference motion that I previously

6        brought.  Now that the evidence has been in,

7        it's even more factually clear that this case is

8        distinguishable from the cases that have dealt

9        with depraved indifference in sustaining

10       depraved indifference.  What we have here is a

11       case where there is allegedly, looking at the

12       evidence in the light most favorable to the

13       prosecution, a number of quote, beatings, maybe

14       two or what-have-you, that took place between

15       the 11th and 12th of October.  In the cases

16       where there was sustained depraved indifference,

17       we had cases where beatings of a child took

18       place almost over a week, people shot into a bar

19       where there were a lot of people, and they knew

20       there were people, but I think the case dealing

21       not with beating a child over the course,

22       continuously over the course of five days, if a

23       week, that the Court of Appeals held was

24       depraved indifference.

25              In this case I don't believe depraved

1                           Proceedings

2            indifference factually fits this case.  I still

3            think factually, even in the light favorable to

4            the prosecution, there is some distinguishing

5            between depraved indifference and manslaughter

6            in the first degree.  The People are really

7            proving the same exact set of facts that could

8            fit the same exact set of circumstances, and

9            this case has not gone as far as the cases that

10           the Court of Appeals cited when they sustained

11           depraved indifference, and as the Court knows,

12           there is a tremendous amount of dissent, and

13           Judge Brieant's opinion that came after that

14           indicating that he could not even see a

15           difference between depraved indifference and

16           reckless manslaughter, but that it's factual in

17           nature, and even he could not find a difference.

18                THE COURT:  I think, Mr. Goldstein, we're

19           revisiting something that essentially was

20           revisited before.  I don't see anything that's

21           changed.  The Court is adhering to the decision

22           it issued and points out there had been some

23           unique treatment afforded the child abuse cases

24           to some extent, and I think it fits within that

25           overall pattern.

```
1                        Proceedings
2              Any other motions you'd like to make at
3      this time on the prima facie?
4              MR. GOLDSTEIN:  Not at this time.
5              THE COURT:  Mr. Moore.
6              MR. MOORE:  Rather than go through all the
7      testimony, you've heard all the testimony, I'll
8      rest on the record as to each and every element.
9              THE COURT:  If the jury accepts the
10     People's contention they could make a factual
11     contention and find there is a prime fair case
12     as well, and the Court finds the dispute comes
13     on a question of fact in my opinion, so I will
14     deny that motion.
15             Are you ready to proceed?
16             MR. GOLDSTEIN:  Yes.
17             THE COURT:  Who is your first witness?
18             MR. GOLDSTEIN:  Mr. Cesar.
19             THE COURT:  Hector?
20             MR. GOLDSTEIN:  Herby.
21             I have Rosario material.  It is my own
22     personal notes.  Two-page document of Oumie
23     Camara.  She is not the first witness here.  I
24     do not have Rosario material on that witness.
25             THE COURT:  This is tenants?
```

1                              H. Cesar-Direct

2                          (Witness complies)

3    DIRECT EXAMINATION

4    BY MR. GOLDSTEIN:

5         Q    Mr. Cesar, again where do you live, please?

6         A    I live in Four Merrick Lane, Spring Valley.

7         Q    Spring Valley.  New York?

8         A    Yeah.

9         Q    And do you go to school?

10        A    Yes.  I go to RCC.

11        Q    Rockland Community College?

12        A    Yes.

13        Q    What year are you in?

14        A    That's my second year now.

15        Q    And you're beginning again in September?

16        A    Yes.

17        Q    Do you work at this time?

18        A    Yes.  I work in Shoprite, Pearl River.

19        Q    What do you do there?

20        A    I work as a courtesy clerk.

21        Q    And, sir, do you know Darius Jean?

22        A    Yes, I do.

23        Q    How do you know him?

24        A    I met him like a year ago, and we do music

25    business.

H. Cesar-Direct

1

2  Q    You're in the music business with him?

3  A    Yes.

4  Q    What is that business?

5  A    It's production, TV.  He has TV production, and
6  we try to do hip-hop, and R&B, and all that.

7  Q    You're trying to do music?

8  A    Music, yes.

9  Q    How are you doing with that music?

10  A    We're doing pretty good, but hopefully --

11  Q    When you do your music, where did you do that?

12  A    In his office.

13  Q    That's at his house?

14  A    That's at his house.

15  Q    Do you know his address?

16  A    It's in -- I don't remember the address, but I
17  can get there, though.

18  Q    Is that in Hillcrest?

19  A    Yes, in Hillcrest.  I think the name of the
20  street is Innington or something like that.

21  Q    Innington?

22  A    Yeah.

23  Q    And for how long have you been working with
24  Darius Jean doing music?

25  A    For like less than a year I can say.

H. Cesar-Direct

1

2      Q      In that period of time, which is less than a
3  year, did there come a time -- you said you go to the house,
4  right?

5      A      Yes.

6      Q      Do you know who lives in that house with Darius?

7      A      Yeah, I know who lives in the house.  His two
8  daughters and his girlfriend.

9      Q      Who is his girlfriend?

10     A      Her name is Leslie or something like that.

11     Q      And are you familiar with his two daughters?

12     A      Yeah.  I see them sometimes.

13     Q      Now did there come a time on October 11th of
14  last year, 2001, October 11th, did you go over to his house?

15     A      Yes, I did.

16     Q      And do you know about what time you went to his
17  house?

18     A      If I can recall it, it's probably about 6.
19  After 6, something like that.

20     Q      In the evening?

21     A      Yes, in the evening.

22     Q      When you got to his house, who was in the house?

23     A      Darius was in the house, and Junior; a woman was
24  in his house, was at his house, and his two daughters.

25     Q      You mentioned someone named Junior?

1                        H. Cesar-Direct

2        A    Yeah.

3        Q    Where was Junior?

4        A    He was in the office.

5        Q    When you got to the house, where was Darius?

6        A    I think he was downstairs doing some plumbing

7   stuff.

8        Q    Go ahead.

9        A    And then I ring the doorbell, and he came and

10  told me.

11       Q    You said you went into the house, and you went

12  into his office?

13       A    Yes, his office.

14       Q    Is that where the computer is?

15       A    Yeah, that's where the computer is.

16       Q    Is that where you make your music?

17       A    Yeah, that's the place we do the music.

18       Q    You said you were doing your music with Junior?

19       A    Yes, with Junior.

20       Q    Was Darius doing the music with you at that

21  time?

22       A    No.  He was downstairs in the basement doing

23  some plumbing.

24       Q    You got there, and you started working on the

25  music?

1                           H. Cesar-Direct

2          A      Yes.

3          Q      When you got there, did you see either of his

4    children?

5          A      There is a room down the hallway at his house.

6    That's where the children -- his two daughters were, so they

7    were in the room, and there was another room this side.

8    That's the room that we do the music.

9          Q      That's the office?

10         A      Yeah, that's the office.

11         Q      Did you actually see the two children?

12         A      Yeah.  I saw them, and I wave at them and went

13   inside the office.

14         Q      How long did you stay in the office?

15         A      We stay about from six to, I think -- after six

16   to about nine something, 9:40 or something like that because

17   Junior had to be home by 10.

18         Q      By ten o'clock?

19         A      Yeah, by ten o'clock.

20         Q      When you were in the office, you said you were

21   working on the music?

22         A      Uh-huh.

23         Q      Did there come a time when you had to leave?

24         A      Yes.  I had to go buy some Chinese food.  We got

25   a little bit hungry.

H. Cesar-Direct

1

2    Q    Prior to that do you know if Darius ever left

3    the house?

4    A    Yeah.  I think he did.  He did to buy some stuff

5    from Home Depot or something like that.

6    Q    Do you have any idea as to when he left for Home

7    Depot, what time it was about?

8    A    I can't recall it, but if I was to say, it would

9    be probably seven something.

10   Q    And do you know how long he was gone?

11   A    About half an hour.

12   Q    Did he give you any instructions while you

13   were -- while he was gone?  Did he tell you to do anything?

14   A    Yeah.  He said just watch out for the kids for

15   him; watch the kids for him.

16   Q    When he said that, where were the children?

17   A    They were in their rooms.

18   Q    Doing their homework?

19   A    Yeah, doing their homework.

20   Q    You said Darius was gone for about a half hour?

21   A    Yeah.  Approximately a half hour.

22   Q    When he came back, did you see him?

23   A    Yeah, I saw him.  He's like -- he just opened

24   the door and he told us that he was back home, and he's

25   going to be working on the basement still, so --

H. Cesar-Direct

1

2    Q    You and Junior continued to work?

3    A    Yeah, to do what we was doing.

4    Q    And after awhile you said you left the house; is

5    that right?

6    A    Yes.  After awhile I left to get some Chinese

7    food.

8    Q    How long did it take for you to go get the food

9    and come back?

10    A    I don't know.  About 15 minutes I guess.

11    Q    When you came back with Chinese food, did you

12    start eating immediately?

13    A    No.  Not really.  We had to finish what we were

14    doing, so I just placed the Chinese food inside the kitchen

15    and then went back in the office.

16    Q    And how long did you stay in the office then?

17    A    I don't know.  About an hour.  I don't know.  I

18    don't remember.

19    Q    Did there come a time that you left the office

20    and started eating?

21    A    Yeah.  Before we went home we went to the

22    kitchen to eat the Chinese food that we bought.

23    Q    Who is we?

24    A    Me and Junior.

25    Q    When you were eating, you and Junior, did Darius

H. Cesar-Direct

1
2    come in the kitchen?

3        A    Yes.

4        Q    Did he eat --

5        A    Because we were about to leave and stuff, so --
6    and we were eating the food, so he came up and talked to us.

7        Q    Now while you were eating, did you see either of
8    his children?

9        A    Yeah.  I think one of his girls, one of his
10    daughters.  One came with a book.  I think she had a
11    question.  I don't know, so --

12        Q    Do you know which daughter?

13        A    I think it was Booby.

14        Q    Is Booby Kyona, the older daughter?

15        A    Yeah.

16        Q    You said she asked him some kind of a question?

17        A    Yeah, some kind of question with a book, but I
18    don't know.

19        Q    Do you know about what time that was?

20        A    It was before we left the house.

21        Q    And when you saw Kyona at that time, how did she
22    appear?

23        A    Perfect, like normal.

24        Q    You didn't notice anything unusual?

25        A    No.

1                          H. Cesar-Direct

2          Q      And you said you left the house about 9:40?

3          A      Yeah, about nine -- because Junior had to be

4    home by 10, so that's when we left the house.

5          Q      In all of the time that you were in the house,

6    did the children ever appear unusual at all?

7          A      No.

8          Q      When you were in the house, did you see Leslie

9    at all?

10         A      No.

11         Q      Did there come a time in the house when you

12   learned that Darius had hit the children?

13         A      Well, I think -- if I can remember, I think he

14   was talking about them not doing their homework, so I don't

15   know.  Yeah, I think he said he had to spank one of them,

16   something like that, because she didn't want to do her

17   homework.

18         Q      Where were you when you learned that?

19         A      I think that was when I was in the kitchen, when

20   we was in the kitchen eating the food, and that's when she

21   came, came in the kitchen to ask him the question, so --

22         Q      So you learned that Darius had hit Kyona?

23         A      Yeah, but I didn't pay attention to that because

24   she was fine.

25         Q      But you saw Kyona after that?

1                              O. Camara-Direct

2          A      He's my landlord.

3          Q      You're address is 9 Innington, same as his?

4          A      Yeah.

5          Q      When did you move into 9 Innington?

6          A      May 17 or 18, 2001.

7          Q      May 17, 2001?

8          A      Yes.

9          Q      At that time who did Darius live with?

10         A      With his two kids, Booby and Mendy, and his

11    ex-girlfriend Leslie.

12         Q      Anybody else live in the house?

13         A      No.

14         Q      Where do you live in that house?

15         A      I live downstairs.

16         Q      You have your own apartment downstairs?

17         A      It's a room, yeah.

18         Q      Let's go ahead to October 11, 2001.  Did you

19    work that day?

20         A      I was off that day.

21         Q      What did you do that day?

22         A      I hung out with friends.

23         Q      Did there come a time that you came home to 9

24    Innington?

25         A      Yeah.

1                          O. Camara-Direct

2        Q    Do you know about what time that was?

3        A    It was between 9:30 and ten o'clock.

4        Q    Nine thirty, ten o'clock in the evening?

5        A    At night.

6        Q    And when you got home, did you see anyone when

7   you walked in the house?

8        A    I saw Jerry downstairs.

9        Q    What was he doing?

10       A    He was fixing my shower.

11       Q    When you stay fixing your shower, was he

12   building one for you?

13       A    Yeah.

14       Q    And for how long had he been building that

15   shower for you?

16       A    When I moved in about -- I'm not sure.  About

17   three months.

18       Q    He'd been doing bits and pieces on the shower?

19       A    Yes.

20       Q    Was it getting close to getting finished?

21       A    Yeah.

22       Q    Did he talk to you about the shower?

23       A    When I came home that night, yeah, we spoke

24   about it.

25       Q    And how did he appear?  How did he look?

O. Camara-Direct

A    He looked fine, happy.

Q    Happy.   The shower was almost done?

A    Yeah.

Q    And when you spoke to him, where was that?

A    In the garage.

Q    While you were speaking to him, did you see anybody else in the house?

A    Not when I was downstairs.

Q    Okay.  Now you came home, you spoke to him for a little bit, you said.  Then what did you do?

A    Then I went to my room, changed my clothes, and I went to my bathroom to pick up my stuff to go upstairs to take a shower.

Q    Because you couldn't take a shower downstairs?

A    Right.

Q    You had to use the one that everybody used upstairs?

A    Right.

Q    That's in the main bathroom?

A    Right.

Q    Do you know about what time it was when you went up to take a shower?

A    It was about -- I'm not sure.  Probably 10:15, 10:10.

O. Camara-Direct

2    Q    When you went upstairs to take a shower, did you
3    see Leslie?

4    A    No.

5    Q    Did you see the children?

6    A    Yes, sir.

7    Q    Where did you see them?

8    A    They were in the kitchen, in the table, on the
9    table.

10    Q    What were they doing?

11    A    I believe they were doing homework or something.

12    Q    Did you stop and talk to them at all?

13    A    I say, "Hello," they say, "Hello," yeah.

14    Q    As you say, they were doing some kind of
15    homework in the kitchen?

16    A    Yes, sir.

17    Q    Just the two of them?

18    A    Yes, sir.

19    Q    Nobody else was home when you got home, right?

20    A    I didn't see anybody else.

21    Q    When you went into the bathroom, did you notice
22    anything unusual about the bathroom?

23    A    No.

24    Q    Did you notice any clothes hanging up on the
25    shower bar or anything like that?

1                          O. Camara-Direct

2       A      No.  Not that night.

3       Q      And you said you took a shower?

4       A      Uh-huh.

5       Q      What did you do after that?

6       A      I went back downstairs to my bathroom.

7       Q      And how long did you stay downstairs?

8       A      Probably about 10 minutes talking to Jerry again
9   about the shower.

10      Q      While you were talking to Jerry about the
11  shower, did anyone else come downstairs?

12      A      Booby came downstairs.

13      Q      Booby did?

14      A      (Nods)

15      Q      And for what reason.  Do you know?

16      A      She said she needed help with her homework.

17      Q      And did Jerry help her with her homework there?

18      A      Jerry told her, "I'll be right there," and
19  that's when I went to my room.

20      Q      How did Jerry appear when he spoke to Kyona?

21      A      Normal; fine.

22      Q      How did Kyona appear?

23      A      She seemed fine.

24      Q      After that Kyona went back upstairs?

25      A      I believe so.

1                       O. Camara-Direct

2       Q      And what did you do?

3       A      I went to my room.

4       Q      And what did you do then?

5       A      Put some pajamas on, laid down, and watched TV

6    for awhile.

7       Q      Do you know what you put on, what TV show?

8       A      "Friends."

9       Q      "Friends"?

10      A      Uh-huh.

11      Q      Starts at eleven o'clock, right?

12      A      Right.

13      Q      How long was it from the time that you saw Kyona

14   until you turned on "Friends"?  How much time?

15      A      Probably about a little close to eleven o'clock

16   the last time I saw her.

17      Q      So it was just a few minutes before?

18      A      Before eleven o'clock.

19      Q      And did you go to sleep?

20      A      I watched "Friends," and I went to sleep a

21   little after 11:30.

22      Q      So you watched "Friends," and then you went to

23   sleep?

24      A      (Nods)

25      Q      About 11:30?

O. Camara-Direct

1

2    A    (Nods)

3    Q    While you were asleep, did anything cause you to

4    walk up at all during that night?

5    A    No, until around between 3:30 and four o'clock.

6    Q    And what caused you to wake up?

7    A    I heard footsteps, and I wasn't sure what it

8    was, and I heard Leslie's voice.

9    Q    Were you able to hear what she was saying?

10   A    No.

11   Q    But you heard her voice?

12   A    Yeah.

13   Q    Was she speaking in English or Creole?

14   A    She was speaking Creole, but I don't understand.

15   Q    After you heard that, what happened?

16   A    I didn't pay any attention.  I went back to

17   sleep.

18   Q    The next day did you have a chance to speak with

19   Leslie the next day?  That's October 12th.

20   A    Not that morning.

21   Q    When did you speak with her?

22   A    The next night.  The next day when I came home

23   at night.

24   Q    And what did she say to you at that time?

25              MR. MOORE:  Objection, Judge.

1                         O. Camara-Direct

2                  may find it relevant to something taking place

3                  here.  We will let you hear it, and you decide.

4                      Mr. Goldstein.

5                      MR. GOLDSTEIN:   Thank you.

6     BY MR. GOLDSTEIN:

7          Q     You had a conversation that night, the night

8     that you learned, October 12th.  You had a conversation that

9     night with Leslie Nicolas?

10         A     Right.

11         Q     When you had a conversation with her that very

12    night, did she tell you that you had to leave the house?

13         A     She told me she was going to sell the house and

14    that I had to find another place to stay.

15         Q     Did she also tell you anything about Kyona's

16    health?

17         A     I asked her what happened.  She told me that

18    Jerry gave her a spanking and that she died of a heart

19    attack.

20         Q     Had what?

21         A     She told me Kyona died of a heart attack.

22         Q     Was that a heart attack or asthma attack?

23         A     Asthma attack.  That's what I mean.

24         Q     Are you sure?  I want to be clear.

25         A     Uh-huh.

```
 1                           O. Camara-Direct

 2                   THE COURT:  You're not objecting?

 3                   MR. MOORE:  Suggesting answers to the

 4           witness.

 5                   THE COURT:  Objection.  Leading.

 6           Obviously you heard it.  I can tell you to

 7           disregard it.  The person who calls the witness

 8           is not supposed to ask leading questions.

 9                   Please proceed.

10      Q    She asked you to move out; is that correct?

11      A    Right.

12      Q    During that week before you moved out, you were

13  given a week to stay.  During that week did Leslie have

14  people over at the house at night?

15                   MR. MOORE:  Objection again as to

16           relevance.

17                   THE COURT:  I'll permit it.  The jury will

18           decide whether or not they think that's

19           relevant.

20                   You can answer.

21      A    During that week, yeah.

22      Q    What were they doing during the week?

23      A    Listening to music, you know.

24      Q    Each night?

25      A    The night that I was there, yes.
```

922

1

2                              Jury Charge

3          and when that risk is of such nature and degree

4          that disregard of it constitutes a gross

5          deviation from the standard of conduct that a

6          reasonable person would observe in that

7          situation.  A person also acts recklessly when

8          he creates such a risk but is unaware of that

9          risk solely because of his voluntarily

10         intoxication.  We don't have any testimony of

11         that regard in this case.

12              MR. GOLDSTEIN:  Can we approach for one

13         moment?

14              THE COURT:  Sure.

15              (Bench conference without defendant)

16              THE COURT:  Counsel just said to me -- I'm

17         not sure because I don't recall.  We were moving

18         along rather rapidly -- that I used the word

19         "and" instead of "or."  I don't recall if I did

20         or not, frankly, so I'm going to give you the

21         definition of the term recklessly again.  A

22         person acts recklessly with respect to another

23         person's death when that person engages in

24         conduct which creates a substantial,

25         unjustifiable, and grave risk that another

           person's death will occur and when he or she is

Jury Charge

1
2    unaware of and consciously disregards that risk
3    and when that risk is of such nature and degree
4    that disregard of it constitutes a gross
5    deviation from the standard of conduct that a
6    reasonable person would observe in the
7    situation.  A person also -- I won't even get
8    into the second aspect because there was no
9    testimony pertaining to voluntarily intoxication
10   here.
11               Under our law a crime committed recklessly
12   is generally regarded as less serious and
13   blameworthy than a crime committed
14   intentionally, but when reckless conduct is
15   engaged in under circumstances evincing a
16   depraved indifference to human life, the law
17   regards that conduct as so serious, so
18   egregious, as to be the equivalent of
19   intentional conduct.  Conduct evincing a
20   depraved indifference to human life is more
21   serious and blameworthy than conduct which is
22   merely reckless.  It is conduct which, beyond
23   being reckless, is so wanton, so deficient in
24   moral sense and concern, so devoid of regard for
25   the life of another, as to be equal in

Jury Charge

1

2    MR. MOORE:  Fine.  Thank you, your Honor.

3    THE COURT:  Mr. Goldstein.

4    MR. GOLDSTEIN:  Judge, unbelievable, on

5    that same exact statement under recklessly, when

6    you corrected it to "and," you stated, "And when

7    he is," and then you used unaware as opposed to

8    aware.

9    THE COURT:  No.  I definitely said aware.

10    You might have misheard me.  I definitely said,

11    "aware and consciously disregards that risk"

12    because that's different than when he perceives

13    a risk.  I'll totally stand on what I said

14    because that would have been a biggy.

15    Any requests to charge on what Mr. Moore

16    said?

17    MR. MOORE:  Just that one.

18    THE COURT:  If they want the grand jury

19    exhibit --

20    MR. GOLDSTEIN:  And I think it's 62, which

21    is the 11:10 statement.

22    THE COURT:  11:10 a.m.

23    MR. MOORE:  The earlier statement.

24    THE COURT:  So if they ask for those two,

25    I'll give an instruction, and you'll show me

1                     -M. Lewis/Direct-

2            THE COURT:  I'm sorry.

3            THE COURT:  What did you say?  I can't

4        hear you.

5        A    He love his daughter, he didn't mean

6    her death and then one of the jurors said, "that's

7    why we put second degree, not first degree" and

8    then I thought first degree was accidental and

9    second degree was when you voluntarily kill

10   somebody.

11           Q    When you?

12           A    Voluntarily.

13           THE COURT:  You thought second degree

14       murder was when you voluntarily kill

15       someone?

16                    (Answer Read.)

17           Q    This is what you have to do --

18           THE COURT:  I'll tell you what. Let

19       Robin read it back to her nice and slow and

20       then let her -- you can put a question.

21           A    It was second degree accidental and

22   first degree when you voluntarily kill somebody.

23           Q    Okay. So when you spoke a moment ago,

24   that was a mistake, what you're saying now is

25   correct?

1                          -M. Lewis/Direct-

2            A    Yes.

3            Q    Now, when the jurors told you that--

4    withdrawn. After the juror told you that you --

5    after the juror told you that first degree murder

6    versus second degree murder, is that when you

7    changed?

8            A    That's when I thought that, I said to

9    myself oh, everybody understood that's an accident

10   and I changed.

11           Q    So am I correct that you believed, and

12   the jurors told you that because it was an

13   accident, as you thought it was--

14           THE COURT:  Counsel, that's very

15           leading. Why don't you just have her explain

16           what it is in her own words.

17           Q    You said a moment ago you believed it

18   was an accident?

19           A    Yes.

20           Q    And because you believed it was an

21   accident you believed it was criminally negligent

22   homicide?

23           A    Yes.

24           THE COURT:  Actually she didn't say

25           that. She said second degree first she

1                           -M. Lewis/Direct-

2          thought was accidental, first degree was

3          voluntarily and then she amended that. She

4          didn't use the word criminal negligence.

5                 MR. GOLDSTEIN: I think in the beginning

6          of her testimony.

7                 THE COURT:  In the very beginning she

8          mentions that.

9                 Q    My question to you is, did you -- could

10         you tell the Judge why you changed your thinking

11         from the beginning when you said criminally

12         negligent homicide to voting actually for murder in

13         the second degree? Why did you make that change?

14         What caused you to change?

15                THE COURT:  If anything.

16                Q    If anything?

17                A    Well, it was --

18                THE COURT:  You have to keep your voice

19         up, ma'am.

20                A    It -- I changed because I thought

21         everybody knew by then that was an accident.

22                Q    And did the jurors tell you that murder

23         in the second degree involved an accident?

24                A    No.

25                Q    What led you to believe that murder in

1                          -M. Lewis/Direct-

2    the second degree was an accident?

3          A    Because there was murder first degree

4    and then second degree. I wasn't familiar with all

5    those terms.

6          Q    Who told you the difference between

7    first degree and second degree murder?

8                THE COURT:  If anyone.

9          Q    If anyone?

10         A    After --

11               THE COURT:  You're talking about her

12               deliberations now, not in the courtroom.

13         Q    In deliberations, did anyone tell you

14   that there was a difference between first degree

15   and second degree murder?

16         A    Nobody explain but I understood if it

17   is first degree it got to be something more

18   serious.

19         Q    Okay. Go on, and what is second degree?

20         A    To me some accident that caused

21   somebody to die.

22         Q    Did you write a letter to the Judge at

23   one point?

24         A    Yes.

25         Q    And in that letter did you indicate --

1                        -M. Lewis/Direct-

2                 THE COURT:  Do you want that marked as

3           an exhibit?

4                 MR. GOLDSTEIN:  That's the Court

5           exhibit we had marked.

6                 THE COURT:  For the purpose of the

7           hearing do you want it marked?

8                 MR. GOLDSTEIN: I'll just say it at the

9           moment.

10                THE COURT:  Okay.

11          Q     In that letter, did you write in that

12     letter quote, "one of the jurors said quote, 'that

13     is why we are voting for second degree murder, not

14     first degree, because we know he loved his child

15     and did not want her to die'"?  Did you write that

16     to the Judge?

17          A     Yes.

18          Q     And you indicated that one of the

19     jurors said that to you?

20          A     She said that's why we are voting

21     second degree murder, not first.

22          Q     And what did she say to you, that

23     juror?

24          A     I said to her, "he love his child, he

25     didn't want her to die."

1                        -M. Lewis/Direct-

2              Q    What did she say?

3              A    And she said, "that's why we voting

4    second degree murder and not first", and after

5    that, that she knows he love his daughter.

6                   THE COURT:  Perhaps you can ask about

7                   the identity of that juror, someone next to

8                   her, behind her.

9              Q    You said it was a woman, is that

10   correct?

11             A    Yes.

12             Q    Do you know what number that juror was?

13             A    She was sitting across from me.

14             Q    Across from you at the table in the

15   back?

16             A    Yes.

17             Q    How about out here, do you know about

18   where she was sitting?

19             A    First row.

20             Q    First row?

21             A    Yes.

22             Q    Somewhere in the first row?

23             A    Yes.

24                  THE COURT:  In relation to her where

25                  was she sitting? Maybe she can tell us the

                        -M. Lewis/Direct-

1

2              THE COURT:  You think?

3              THE WITNESS: But I'm not sure.

4              THE COURT:  Okay.

5              THE WITNESS: I think, I'm not sure.

6              THE COURT:  And this is the juror that

7        you said was holding the verdict sheet

8        across the table?

9              THE WITNESS: Yes.

10             THE COURT:  And you recall the juror,

11       you recall that she was holding the verdict

12       sheet, you recall where she was seated but

13       you don't recall whether or not she said

14       that?

15             THE WITNESS: Because we were talking,

16       many things were said and she said, I don't

17       remember exactly, but I think she said it.

18             THE COURT:  Okay.

19             THE WITNESS: But I think she said that

20       but I cannot swear she did, but, you know,

21       in my mind that's why she understood it was

22       he loved his child he didn't want the child

23       to die and that's why we voting number two,

24       not number one.

25             THE COURT:  So you think the reason she

-M. Lewis/Cross-

1

2       Q     So many being specifically six charges

3    that you were considering, correct?

4       A     I guess.

5       Q     Okay. And I can tell from your

6    testimony today or I assume you took your

7    obligation as a juror very seriously, did you not?

8       A     Yes.

9       Q     And what I'm asking you is, those were

10    the votes that you confirmed when you were polled

11    by saying "yes." Are you telling us today you never

12    even voted for manslaughter in the first degree, is

13    that your testimony?

14       A     I don't remember because I don't think

15    it was part of it. I don't think we were allowed to

16    vote on manslaughter.

17       Q     That jury sheet, that verdict sheet in

18    front of you, can you look at where it says

19    manslaughter?

20       A     Yes. I see today.

21       Q     And it's got a check off as guilty,

22    correct?

23       A     Yes, but --

24       Q     Are you saying the foreman of this

25    grand jury put a check on guilty on manslaughter

-M. Lewis/Cross-

2     for a charge you never voted on, is that what

3     you're telling us?

4          A    I wasn't aware we were --

5          Q    If you could, I understand --

6          THE COURT:  Let her finish. "I wasn't

7     aware --

8          A    We were allowed to vote on

9     manslaughter. I wasn't aware of that.

10          Q    What I'm saying is, didn't they go

11    around the room and vote on the charges?  You were

12    saying each person was saying I or yes?

13         A    They said a name, they said everybody

14    okay and people say okay.

15         Q    Okay. And in the course of those

16    deliberations you said yes or voted for charges,

17    correct?

18         A    After the second degree murder was

19    voted I just kept quiet.

20         Q    Okay. You didn't vote on the rest of

21    the charges?

22         A    There were like assault second degree I

23    said "yes", and endangering the welfare of child I

24    said "yes."

25         Q    So you did vote for more than one?

```
 1                      -M. Lewis/Cross-

 2          A      Yes. I said those four.

 3          Q      Okay. Now, in answer to my question,

 4   that verdict sheet that's in front of you is by the

 5   foreman checked off that all twelve jurors voted

 6   yes, guilty for manslaughter in the first degree,

 7   that's what that verdict sheet says, that's what

 8   you said when you were polled?

 9               MR. GOLDSTEIN:  Objection. That is not

10          what the witness said when she was polled.

11               THE COURT:  I'll let her answer the

12          question though.

13          Q      The question, are you saying that the

14   jury foreman checked off guilty on manslaughter in

15   the first degree, a charge you never even voted on?

16          A      Because I wasn't aware.

17          Q      Can you answer my question. Did the

18   grand jury foreman check off guilty on that charge,

19   I'm sorry, the foreman of this jury check off

20   guilty on that charge, manslaughter in the first

21   degree and you never voted yes on it?

22               MR. GOLDSTEIN:  Objection. That is not

23          a proper characteristic at all of what this

24          witness is testifying about.

25               MR. MOORE:  I'd like to know what she's
```

```
 1                        -M. Lewis/Cross-

 2            testifying about.

 3                  THE COURT:  I'll sustain as to form,

 4            Mr. Moore. You can ask her in a simpler

 5            form. Are you saying that a verdict was

 6            returned in your presence that you did not

 7            vote upon?  That's really what you're

 8            asking, whether it was checked off or not is

 9            immaterial. She might say she didn't see the

10            checking actually take place, the mechanical

11            act.

12            A    Yeah.

13            Q    I'm sorry?

14            A    Yes.

15            Q    Yes. So you never voted on manslaughter

16      in the first degree?

17                        (Witness shakes head.)

18                  MR. GOLDSTEIN: Let the record reflect

19            the witness has indicated no, she is not.

20            She shook her head.

21            A    No.

22            Q    No meaning you did not vote?

23            A    No.

24                  THE COURT:  She said no twice.

25                  MR. MOORE:  I guess that's pretty
```

1                          -M. Troy/Direct-

2    Haitian community, spanking, beating, disciplining,

3    whatever word you want to use, is quite frequent

4    and common and she was beaten as a child and she

5    didn't, she defied her father by not marrying a

6    Haitian man because she didn't want her children to

7    be brought up in that culture. We were very

8    surprised that she didn't bring this up earlier,

9    you know.

10           Q     In response to her bringing up these,

11   in addition to her statements, personal statements

12   about her own experience did she address the

13   specific charges?

14           A     Oh, absolutely.

15           Q     And how did she do that and what, if

16   anything, did she say about the charges?

17           A     She kept saying, "I don't think he

18   intended to kill his daughter", and we kept saying,

19   "we all know that but that's not what's here in

20   front of us, that's not what we are deliberating

21   about, that's not the charge, the charge is not

22   anything to do with intent", and she just kept

23   going back to that, "he didn't mean to do it, he

24   didn't mean to do that", and we knew that but

25   that's not what we were talking about.

1                    -M. Troy/Direct-

2    but we were there to discuss his actions directly

3    caused the death of his daughter and she just

4    couldn't get past the word intent and the whole

5    depraved indifference argument, it was very hard

6    for her to understand. We had had it explained

7    again, and we were just trying to make it clear so

8    she would understand, and that was the last hour of

9    deliberations.

10           Q    And when you say you were trying to

11   make it clear, were you explaining to her that

12   intent to kill was not required to be prudent for

13   that charge?

14           A    Absolutely.

15           Q    Did Marie Lewis at any point in time

16   indicate what she thought the defendant was guilty

17   of, if anything?

18           A    She kept saying criminally negligent

19   homicide.

20           Q    And could you tell us how she arrived

21   at that in the sense of what, if any, statements

22   did she make to you to come up with criminal

23   negligence?

24           A    She didn't really have an argument for

25   it. She went from, "he didn't mean to kill her" to

1                              -M. Troy/Cross-

2        the intent to kill?

3              A     Oh sure.

4              Q     Did she ever indicate that Mr. Jean, or

5        that she believed the entire thing was an accident?

6              A     No.

7              Q     Did she ever indicate that Mr. Jean

8        loved his child?

9              A     Yes.

10             Q     When Ms. Jean (sic) became the soul

11       holdout --

12                   MR. MOORE:  Ms. Lewis.

13             Q     When Ms. Lewis became the soul holdout,

14       how many people were speaking to her to try to

15       convince her?

16             A     In turns probably everybody in the

17       room.

18             Q     Okay. And did they ask her for her

19       opinion at that point why she was not changing her

20       vote?

21             A     Yes.

22             Q     And what did she say?

23             A     She was very emotional. She said a lot

24       of things, but basically was she felt that Darius

25       did not mean to kill his daughter. She gave us some

1                              -M. Troy/Cross-

2       personal background, some personal history, and as

3       irrelevant as that might be related to the case, it

4       helped us understand why she was feeling the way

5       she was, but a lot of us also said, you know, to

6       kind of counterbalance that, you know, your father

7       is not on trial, none of these things are directly

8       related to what we have before us, essentially.

9              Q     But during the entire deliberations you

10      don't recall anyone ever saying anything concerning

11      any of the charges that criminal negligence is for

12      car cases or for accident cases?

13             A     No. I really don't recall that being

14      said.

15             Q     Did anyone ever say to Ms. Lewis right

16      before the very last vote, we understand what

17      you're talking, we know we know what you're talking

18      about, but that's why we're voting for murder in

19      the second degree rather than murder in the first

20      degree?

21             A     Yeah. We brought that up. The charges

22      were what they were.

23             Q     Do you know who would have said that?

24             A     That would have been me.

25             Q     That would be you. Okay. Could you tell

11/26/2002 N.Y.L.J. 21, (col. 4)

New York Law Journal
Volume 228
Copyright 2002 NLP IP Company -- American Lawyer Media. All rights reserved

Tuesday, November 26, 2002

Doi

County Court

DECISION OF INTEREST

PEOPLE V. **DARIUS JEAN**

Rockland County

Judge Kelly

Pursuant to a prior order of the Court, a hearing was conducted on the defendant's motion to set aside the verdict.

Findings of Fact

On August 19, 2002, following a jury trial, a verdict was rendered convicting the defendant of Murder in the Second Degree under count one of the indictment, Manslaughter in the First Degree under count two of the indictment, and two counts of Assault as well two counts of Endangering the Welfare of a child. Under count one, the defendant was convicted of the crime of Murder in the Second Degree in that the defendant under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct that created a grave risk of death to Kyona Frederick and thereby caused her death. The conviction of Manslaughter in the First Degree under count two was based upon the theory that the defendant intended to cause physical injury to Kyona Frederick, a person less than eleven years old, and thereby caused her death.

On September 23, 2002 the Court received a letter from Juror Number Eight, Maria Lewis. The letter stated that she voted for Murder in the Second Degree, but believed that it was similar to accidental death. She related that juror number two, Marianne Troy, told her that they were voting for Murder in the Second Degree and not in the First Degree because they knew the defendant loved his child and did not want her to die. The Court received Mrs. Lewis's letter and sent a copy of that letter to defense counsel. Counsel brought the instant motion to set aside the verdict and in support thereof submitted a draft affidavit and a completed affidavit, neither of which were signed by Ms. Lewis, who had gone to counsel's office to discuss the matter with him.

At the hearing, Ms. Lewis testified that she thought the defendant was guilty of Criminal Negligence. She said she thought what took place was an accident, she believed that he loved his daughter and did not intend to kill her.

Ms. Lewis stated that she was of Haitian origin and that English was not her first language. However, in response to some questions from the Court she stated that she is a chemist by profession and had a college degree and that all of her classes were taught in English. Further, she stated that she has been speaking English since she came to this country thirty years ago.

According to Ms. Lewis, there were multiple votes cast during deliberations. She stated she believed the defendant was guilty of Criminal Negligence not Murder in the Second Degree since she thought it was an accident. She said she voted not guilty for Murder in the Second Degree on the first two ballots. She testified that initially several other jurors also voted not guilty on Murder in the Second Degree as they thought it was Manslaughter. At that point, the jury requested, and was recharged on the definition of Murder in the Second Degree. The jury also requested that the testimony of Mendissa Jean, the stepsister of Kyona Frederick who witnessed the beating, be read back.

Following the Court's recharge on the applicable legal definitions and the testimony of Mendissa Jean, all of the jurors, except for Ms. Lewis, were prepared to render a verdict of guilty of Murder in the Second Degree. Ms. Lewis maintains that although she had not actively participated in prior discussions, she explained to the other jurors that she was voting "not guilty" with respect to Murder in the Second Degree because she felt that the defendant loved his children.

At that point, Ms. Lewis states that juror number two stated to her in response, "That's why we're voting Murder in the Second degree and Not Murder in the First Degree.'[1] She stated that Juror Number Two told her that the reason they were voting for Murder in the Second Degree and not Murder in the First Degree is that Murder in the First Degree would have required an intentional killing.

According to Ms. Lewis, at that point she felt that the other jurors realized it was an accident and she agreed to vote "guilty" with respect to Murder in the Second Degree as charged in the first count. Ms. Lewis' change in her stance made the jury unanimous in its decision to convict the defendant of Murder in the Second Degree. Ms. Lewis maintains that, but for juror number two's comment, she would have maintained her "not guilty" vote with respect to Murder in the Second Degree.

Ms. Lewis also voted guilty with respect to counts three through six. One of those counts, Assault in the Second Degree, required a finding of intent to cause physical injury as well. However, Ms. Lewis states that she does not even remember voting on the second count charging Manslaughter in the First Degree. Following the rendering of the verdict in open court, the jury was polled at defense counsel's request. When polled, Ms. Lewis affirmed the jury's verdict in all respects.

The People called Mr. Thomas McCaffrey who was the foreman of the jury. He testified that numerous votes were taken by the jury before the final verdict was rendered. He stated that Ms. Lewis only voted for Murder in the Second Degree after extensive deliberations and numerous votes by the jury. Even then, her vote came only after there was additional testimony and evidence supplied to the jurors at their request. Specifically he stated that she decided to vote guilty with respect to Murder in the Second Degree following the read back of the testimony of Mendissa Jean and after the jury had requested a clarification from the Court on the applicable law.

Mr. McCaffrey further testified that Ms. Lewis stated in the jury room that she had been beaten by her father in Haiti and Canada and that in Haiti, nothing would happen to a person who physically disciplines his child. He stated the other jurors told her that we are in America and had to follow American Law.

He said that the jurors did agree with her that the defendant did not intend to kill his daughter, but they felt that he did, under circumstances evincing a depraved indifference to life, recklessly caused her death. He said the other jurors told Ms. Lewis they realized that the defendant did not have an intent to kill Kyona, but noted that an intentional killing was not the People's theory of prosecution in the charge of Murder in the Second Degree.

Mr. McCaffrey stated that when the final vote was taken, he asked the jurors who wanted to vote guilty for Murder in the Second Degree to raise their hands. According to Mr. McCaffrey, Ms. Lewis eventually joined, albeit reluctantly, in voting guilty with respect to Murder in the Second Degree. When the final vote was taken inside the jury room, all of the jurors, including Ms. Lewis, raised their hands indicating accordance with the verdict. This process was repeated for each count including Manslaughter in the First Degree.

The People also called Marianne Troy, Juror Number Two, whom Ms. Lewis alluded to in her letter and testimony. She also stated that a number of votes were taken before the jury arrived at the unanimous verdict and that initially, she too voted not guilty on the count of Murder in the Second Degree. She stated that it was only after further instructions and clarifications on the law were furnished by the court and the testimony of Mendissa Jean was read back that both she and Ms. Lewis changed their vote.

She also stated that Ms. Lewis related that administering discipline to children is very common in the Haitian Community and that she had been beaten as a child. She said she told Ms. Lewis that Ms. Lewis' father was not on trial here and that although her personal experience was illuminating, it was not directly relevant to the issues in this case.

She also stated that Ms. Lewis expressed an opinion that the defendant did not intend to kill his daughter. Ms. Troy said that she concurred with her in that sentiment. She stated that it was after Mendissa Jean's testimony was read back that Ms. Lewis eventually changed her mind and voted guilty on the count of Murder in the Second Degree.

She stated that she never told Ms. Lewis that criminal negligence was reserved only for car accidents and never heard her say that what took place was the result of an accident. She said she told Ms.

Lewis that the People's theory was not that the defendant intentionally killed his daughter, but that he caused her death through reckless conduct made under circumstances evincing depraved indifference to human life. Ms. Troy explained that the jurors spent about an hour and a half explaining the point that intent was not an element of Murder in the Second Degree as charged in the indictment. Ms. Troy explained that, in an effort to illustrate that point, she did explain to Ms. Lewis that they were voting guilty for Murder in the Second Degree because, unlike Murder in the First Degree, intent was not an element.

Application of Law

As a general rule, a jury verdict may not be impeached by an examination of the deliberative process of the jury. People v. Maragh, 94 N.Y.2d 569 (2000); People v. Smalls, 112 A.D.2d 173 (2nd Dep't 1985). In fact, it was with great reluctance that the Court granted the hearing, as the system of trial by jury is much better served if the discussions in the jury room remain sacrosanct. However, as previously noted, the instant situation presented a unique factual scenario that warranted at least a limited examination of the jury's deliberations. People v. Testa, 61 N.Y.2d 1008, 1009 (1984). C.P.L. §330.30(2) provides in pertinent part that a defendant may move to set aside the verdict on the ground of "improper conduct by a juror ... which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict." C.P.L. §330.30(2). The determination of improper influence must be evaluated on a case by case basis to determine the likelihood of prejudice to the defendant. People v. Testa, 61 N.Y.2d 1008 (1984). The facts in each case must be examined to determine the "'likelihood that prejudice be engendered.'" People v. Maragh, 94 N.Y.2d 569, 573 (2000)(quoting People v. Brown, 48 N.Y.2d 388).
The gravamen of the defendant's claim is that Ms. Lewis capitulated to pressure applied to her by other jurors. Particularly, Ms. Lewis claims that juror number two's misinterpretation of the law regarding Murder in the Second Degree caused her to accede to the other jurors.
The Court must be mindful to differentiate between improper juror influence and typical deliberations involving the application of everyday experiences. Id. at 574. In this case, it is clear that there was no improper influences. Rather, it seems apparent that the comment by juror number two was not an interjection of unique outside knowledge, but rather a discussion of the application of the facts to the law. Such debate is precisely what is designed to occur during deliberations.
The common theme running through cases examining improper juror influence is that the tenor of juror deliberations will not be used to impeach the verdict. See, e.g., People v. Maragh, 94 N.Y.2d 569 (2000); People v. Anderson, 249 A.D.2d 405 (2nd Dep't 1998); People v. McKenzie, 173 A.D.2d 493 (2nd Dep't 1991); People v. Lehrman; 155 A.D.2d 693 (2nd Dep't 1989); People v. Scales, 121 A.D.2d 578 (2nd Dep't 1986). All of the points raised by the defendant deal with the deliberative process. Counsel has failed to advance any position other than an attack on the deliberative process. Even assuming that juror number two did provide a misinterpretation of the law, that alone is insufficient to justify setting aside the verdict. People v. Sanchez, 64 A.D.2d 677 (2nd Dep't 1978). Further, the "legal instruction" provided by juror number two is not inconsistent with applicable legal standards.
Ms. Troy explained to Ms. Lewis that they were voting guilty with respect to Murder in the Second Degree because unlike Murder in the First Degree, intent to kill is not an element. While it is true that Ms. Troy misapplied the nomenclature, the substance of what she said was accurate and relevant. Based upon the reservations voiced by Ms. Lewis, it was appropriate to draw the distinction between intentional murder and depraved indifference murder.
It is true that the distinction involves two separate subdivisions of Murder in the Second Degree, rather than between Murder in the First Degree and Murder in the Second Degree. However, Ms. Troy's error was inconsequential. It was the substance of her argument that rang true. It cannot be said that Ms. Lewis was deceived or mislead. The minor misstatement by Ms. Troy could not have mislead any juror, let alone one as intelligent as Ms. Lewis presented herself to be.
Additionally, any misstatement by Ms. Troy was obviously precipitated by her lack of legal expertise. Therefore, it must be differentiated from instances of a juror's outside expertise being introduced into deliberations.
Further, nothing in Ms. Lewis' testimony suggests that she was pressured by the other jurors. Certainly, no valid argument can be made that she was subjected to pressure sufficient to cause even the slightest risk of prejudice to the defendant. People v. Liguori, 149 A.D.2d 624 (2nd Dep't 1989). See also People v. Anderson, 249 A.D.2d 405 (2nd Dep't 1998); People v. McKenzie, 173 A.D.2d 493

(2nd Dep't 1991); People v. Scales, 121 A.D.2d 578 (2nd Dep't 1986). Ms. Lewis' testimony contained no reference to hostility or acrimony during the deliberations.

In sum, it appears that the deliberations were conducted in a thoughtful and civil manner. While Ms. Lewis was obviously hesitant to convict, nothing that occurred during the trial or deliberations justifies overturning a properly rendered verdict. Ms. Lewis had opportunities to change her mind after the final vote taken in the jury room. However, at no time prior to being polled did she express her change of heart. Her subsequent change of heart is an insufficient cause for overturning the verdict. People v. Bellamy, 158 A.D.2d 525 (2nd Dep't 1990). See also People v. Horney, 124 Misc.2d 22, 26 (Sup. Ct., N.Y. Co. 1984).

The finality of a jury verdict will not be disturbed simply because a juror had a change of heart. People v. Horne, 112 A.D. 2d 841; People v. Smalls, 112 A.D. 2d 173. In People v. Liguori, 149 A.D. 2d 624, 625, the court stated that "Although another deliberating juror stated that he voted guilty only because he capitulated to the pressure placed on him by the other jurors', a jury verdict may not be impeached by statements going to the tenor of the jury's deliberations. People v. Maddox, 139 A.D. 2d 597, lv. denied 72 N.Y. 2d 862. In People v. Sanchez, 64 A.D. 2d 677, the court also rejected a claim by a juror that she relied on assertions by other jurors that there had to be a guilty verdict stating that her testimony merely established that she was persuaded by the interpretation of the law given by more voluble and articulate jurors in the sanctity of the jury room.

This is not a case where the jury has been improperly influenced by matters going beyond the scope of the trial evidence Parker v. Gladden, 385 U.S. 363 or where the jurors themselves became unsworn witnesses against the accused. People v. DeLuci, 20 N.Y. 2d 275.

It appears this is a case of juror afterthought. People v. Lavender, 117 A.D. 2d 253 and I find that the defendant has failed to demonstrate either alleged misconduct or that his right to a fair trial was impaired.

This Decision shall constitute the Order of the Court.

FN[1] Ms. Lewis testified that juror #2 said other things to her, but she could could not be certain about what was said.

11/26/2002 NYLJ 21, (col. 4)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

*To be Argued by:*
HARVARD HOLLENBERG, ESQ.
*(Time Requested: 15 Minutes)*

# New York Supreme Court
## Appellate Division – Second Department

——◆❶◆——

**Docket Nos.:**
**2003-00251**
**2004-00848**

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent.*

– against –

DARIUS JEAN,

*Defendant-Appellant.*

## AMENDED BRIEF FOR DEFENDANT-APPELLANT

HARVARD HOLLENBERG, ESQ.
*Attorney for Defendant-Appellant*
320 East 22nd Street, Suite 2K
New York, New York 10010
(212) 995-9313

Rockland County Clerk's Indictment No. 321/01

STATEMENT PURSUANT TO CPLR 5531

# New York Supreme Court

## Appellate Division – Second Department

————◆❙❙◆————

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent,*

– against –

DARIUS JEAN,

*Defendant-Appellant.*

1.    The indictment number of the case in the court below is 321/01.

2.    The full names of the original parties are as set forth above. There have been no changes.

3.    The action was commenced in the County Court, Rockland County.

4.    The action was commenced on or about October 17, 2001.

5.    The nature of the action involves Penal Law violations.

6.    The appeal is from an Order of the Honorable William A. Kelly.

7.    This appeal is on the original record.

# TABLE OF CONTENTS

**Page**

**FOREWORD**                                           1

**INTRODUCTION**                                       1

**ISSUES RAISED**                                      2

**FACTS**                                              3

**PROCEDURE**                                          3

**POINT ONE**                                          5

THE TRIAL COURT ERRED BY FAILING TO EXCLUDE ALL
PURPORTED WAIVERS AND STATEMENTS MADE BY THE
DEFENDANT, WHEN HE WAS IN FOUR POINT [TOTAL] RESTRAINTS,
AS WELL AS ALL HIS SUBSEQUENT STATEMENTS, INCLUDING HIS
TESTIMONY BEFORE THE GRAND JURY. THE TRIAL COURT ALSO
ERRED IN FAILING TO EXCLUDE ALL EVIDENCE SEIZED
PURSUANT TO THE DEFENDANT'S COERCED
GRANT OF PERMISSION TO SEARCH HIS HOUSE

**POINT TWO**                                          12

THE JURY'S PROFOUND CONFUSION, WHICH LED TO THEIR
COMPROMISE VERDICT, MANDATES REVERSAL

**POINT THREE**                                        19

MR. GOLDSTEIN PROVIDED INEFFECTIVE COUNSEL TO MR. JEAN
PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO
THE U.S. CONSTITUTION, AS WELL AS SECTION SIX OF ARTICLE
ONE OF THE NEW YORK STATE CONSTITUTION

**POINT FOUR**                                                     21

DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO
COUNSEL BECAUSE COUNSEL NEITHER PREPARED NOR MOUNTED
ANY DEFENSE RELATING TO ALLEGATIONS OF ABUSING
MENDISSA JEAN; MOREOVER, HIS INEPT CROSS-EXAMINATION OF
MENDISSA JEAN TAINTED THE DEFENSE RELATING TO KYONA

**POINT FIVE**                                                     26

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO
THE ENTRY OF CONTRADICTORY VERDICTS, VERDICTS
RENDERED ATHWART THE TRIAL JUDGE'S INSTRUCTIONS; SUCH
VERDICTS VIOLATE DEFENDANT'S RIGHT TO A FAIR TRIAL,
BECAUSE THEY ARE REPUGNANT AND INCONSISTENT;
THEY ARE THE PRODUCT OF JURY COMPROMISE,
AND THEY DO NOT REFLECT THE INTENTION OF THE JURORS

**POINT SIX**                                                      29

TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO
CHALLENGE THE CONSTITUTIONALITY OF NEW YORK'S
"DEPRAVED INDIFFERENCE" MURDER STATUTE AS APPLIED

**POINT SEVEN**                                                    33

THE REFUSAL OF THE TRIAL COURT TO DISQUALIFY DEFENSE
COUNSEL, DESPITE COUNSEL'S ACTUAL CONFLICT OF INTEREST
IN SIMULTANEOUSLY REPRESENTING A KEY PROSECUTION
WITNESS IN A CRIMINAL MATTER, DEPRIVED MR. JEAN OF
MEANINGFUL REPRESENTATION

**POINT EIGHT**                                                    40

DEFENSE COUNSEL'S CROSS-EXAMINATION OF THE MEDICAL
EXAMINER WAS INEFFECTIVE, AMONG OTHER REASONS,
BECAUSE IT WAS INATTENTIVE

ii

**POINT NINE**                                                                41

DEFENSE COUNSEL'S SUMMATION WAS INEFFECTUAL:
IT REFLECTED DEFENSE COUNSEL'S OMISSIONS AT TRIAL;
IT REINFORCED THE PROSECUTION'S CASE,
AND COUNSEL FAILED TO REQUEST THAT THE JURY
CONSIDER LESSER INCLUDED OFFENSES

**POINT TEN**                                                                 46

MR. GOLDSTEIN'S FAILURE TO OBJECT TO THE PROSECUTION'S
PREJUDICIAL MISSTATEMENT IN SUMMATION, OF MENDISSA
JEAN'S TESTIMONY, CONSTITUTED REVERSIBLE ERROR

**CONCLUSION**                                                               48

# FOREWORD

Defendant's appeal was perfected on February 17, 2004. Upon review, the District Attorney discovered that in addition to the more than 2100 transcript pages filed and served, the transcript pages affecting the issue of the District Attorney's motion to disqualify defense counsel on the ground that defense counsel had an actual conflict of interest in representing a key witness for the State, needed to be added. The District Attorney graciously caused such pages to be transcribed and provided a copy to the undersigned. Upon consent of the District Attorney and leave of this Court, an Amended Brief is herewith provided, reflecting, at Point Seven, the pertinent case law and considerations.

# INTRODUCTION

This is a case involving the tragic death of Kyona Frederick, the nine-year old stepdaughter of the Defendant, Darius Jean. In disregard of the Defendant's Fourth, Fifth, and Sixth Amendment rights (as well as their counterparts in the New York State Bill of Rights), the Defendant was the subject of coerced waivers of Miranda warnings, a coerced consent to search his home, the introduction of evidence before the Grand Jury and at trial that was inadmissible as "fruit of the poisonous tree." Moreover, at trial, defense counsel labored under an actual conflict of interest; he failed to defend Mr. Jean, in any meaningful way, and he often reinforced the prosecution's case.

1

## ISSUES RAISED

1. Did the circumstances surrounding the Defendant's alleged waiver of his Miranda rights and his supposed consent to search his home comprise a series of violations of his fundamental rights, pursuant to the Fourth and Fifth Amendments to the United States Constitution, made applicable to the states by the Fourteenth Amendment, and his rights pursuant to Sections 6 and 12 of the New York State Constitution Bill of Rights?  The answer is "yes."

2. Was the jury so confused as to render the verdicts of Murder in the Second Degree and Manslaughter in the First Degree constitutionally invalid as misguided, i.e., the result of misleading instructions by the trial court, including an impermissibly mathematical judicial declaration of "proof beyond a reasonable doubt" defined as 51 percent +, coupled with irresponsible jury deliberations pitting First Degree Murder (which was not charged) with unintentional homicide? Yes, the jury was hopelessly confused.  Were those verdicts repugnant, as defined by law? Again, the answer is "yes."

3. Should defense counsel have been disqualified because he was also representing a key prosecution witness?  The answer is "yes."

4. Was the performance of defense counsel so inadequate as to have deprived the Defendant of his federally protected Sixth Amendment rights, and his rights pursuant to Section 6 of the New York State Constitution?  The Defendant answers "yes."

2

# FACTS

On or about October 11th and 12th, 2001, Kyona Frederick was rushed to Good Samaritan hospital. Her condition at the time she was transported was very much an issue at trial, most notable for the absence of any attempt by defense counsel to demonstrate that the Defendant believed that at the time he called EMS, Kyona was still alive. Kyona expired during the early a.m. hours of October 12th.

# PROCEDURE

On or about November 21, 2002, after a trial at which he was represented by David I. Goldstein, Esq., according to a Notice of Appeal prepared by Mr. Goldstein and dated November 24, 2002, Mr. Jean was found guilty of Murder in the Second Degree, in violation of Penal Law Section 125.25.02, in connection with Kyona's death; Manslaughter in the First Degree, in violation of Penal Law Section 125.20(4), also in connection with Kyona's death; Assault in the Second Degree, in violation of Penal Law Section 120.05(2), in connection with his alleged treatment of his daughter, Mendissa Jean; Assault in the Third Degree, in violation of Penal Law Section 120.00.02, also in connection with his alleged treatment of his daughter, Mendissa Jean, and two counts of Endangering the Welfare of a Child, in violation of Penal Law Section 260.10.01, relating to both Kyona and Mendissa.

Mr. Jean was originally sentenced to a term of from twenty-five years to life on the murder charge; to a term of from eight and one-third to twenty-five years on the manslaughter charge; to a term of seven years on the third degree assault; to a

3

term of one year on the second degree assault, and to terms of one year each on the charges of endangering the welfare of a child, all sentences to run concurrently.

On or about March 12, 2003, the trial court re-sentenced Mr. Jean, as above, but substituted a definite sentence of twenty years on the manslaughter charge. Upon the latter occasion, the Court denied Mr. Jean's application to dismiss the murder charge, on the ground that the jury impermissibly found Mr. Jean guilty of both murder and the lesser-included offense of manslaughter; hence the murder conviction, which is the greater, cannot stand, as set forth in the self- executing provision of CPL 300.50(4).

Successor counsel commenced a proceeding pursuant to CPL Section 440.10(1)h), on or about June 25, 2003, setting forth the basis for vacating all applicable orders, verdicts and judgments, on the grounds that Mr. Jean had been unconstitutionally deprived of his right to counsel, at trial. On or about August 18, 2003, without a hearing, the trial court denied the application. Of eight specific alleged defalcations, the trial court declared that six were so ascertainable from the record, that the motion could not be granted in lieu of an appeal. As to the other specifications, supported by Affidavits, the trial court determined that they were insufficient to create a basis for a successful claim on Sixth Amendment grounds. On or about December 3, 2003, The Honorable David S. Ritter, an Associate Justice of this Court, denied Defendant's application for leave to appeal. Since it is the long-standing policy of this Court to evaluate deficiencies in the conduct of defense counsel, in their entirety, Defendant respectfully refers the Court to those two grounds, denied upon their merits, in contemplation of reversal.

4

**To Wit:** Defense counsel never explained the plea-bargaining process to the Defendant nor did he actually engage in good-faith plea bargaining. Too, Defense counsel failed to present available witnesses at trial who could have testified in mitigation of the circumstances of the alleged occurrence.

## POINT ONE

### THE TRIAL COURT ERRED BY FAILING TO EXCLUDE ALL PURPORTED WAIVERS AND STATEMENTS MADE BY THE DEFENDANT, WHEN HE WAS IN FOUR POINT [TOTAL] RESTRAINTS, AS WELL AS ALL HIS SUBSEQUENT STATEMENTS, INCLUDING HIS TESTIMONY BEFORE THE GRAND JURY. THE TRIAL COURT ALSO ERRED IN FAILING TO EXCLUDE ALL EVIDENCE SEIZED PURSUANT TO THE DEFENDANT'S COERCED GRANT OF PERMISSION TO SEARCH HIS HOUSE

For purposes of analyzing the "exclusionary rule," the Defendant was initially questioned, so as to commence the prosecution of this case, by Ramapo Detective Glenn Graham, on October 12, 2001, at 6:20 a.m. at Good Samaritan Hospital, while the Defendant was in restraints, after he had become uncontrollably hysterical and had indicated, by hitting his head on the pavement, that he was dangerously suicidal. (Tr. 7/1/2002, p. 113, 1. 24 to p. 114, 1. 12.; p. 115, 1. 19 to p. 116 1.19) At no point, then or thereafter, was the Defendant ever apprised, explicitly and distinctly, that he had a right to refuse to sign a waiver of his Fourth and Fifth Amendment rights. As discussed, infra, where a Defendant is physically restrained, he may not be questioned or asked to forego his Fourth and Fifth Amendment rights, simply by seeking to know whether he is willing to sign a waiver. Subsequent to his release from restraints, he must be told, in so many words, that he has an absolute right: (i) to refuse to sign any such waiver, and (ii)

5

refuse to be questioned orally. Under the same circumstances, Mr. Jean was asked to consent search his home. (Tr. p. 123., 1. 8 to 20)

In these regards, the trial court's Decision following a combined Huntley/Mapp hearing, which declared that it was the hospital that had restrained Mr. Jean; therefore, the police were free to seek waivers of his Fourth And Fifth Amendment rights as though he were not in restraints, is a sophistic argument - moreover, it is an argument against the adoption of the Fourth and Fifth Amendments. The mischief such a holding could provoke would be incalculable. "But your honor, it was the King's men who placed the stones upon his chest; we law enforcement officers merely questioned him." Accord, *People v. Law*, 273 A.D.2d 897, 710 N.Y.S.2d 223 (4th Dept. 2000).

The testimony of Detective Graham continued, to the effect that Detective Graham must have understood that the initial waivers could be found constitutionally defective, because at 11:00 am, the same morning, at the police station, Detective Graham told the Defendant, "we have to do this again," and caused Mr. Jean to iterate the first purported waivers. (Tr. p. 126, 1. 15 to p. 127, 1. 13) Mr. Jean was still in such condition of confusion and distress that in executing the second purported waiver of his Miranda rights, his writing was not the bold, assertive writing of a healthy, 29-year-old man, but the "sketchy" writing of a person plainly not yet come to his senses. (Tr. p. 129, 1. 7 to p. 130, 1. 18) Detective Graham never inquired as to whether Mr. Jean might have been sedated or otherwise medicated. (Tr. p. 130, 1. 19 to p. 131, 1. 2) Finding the Defendant as upset at the police station as he had been at the hospital, Detective Youngman then

6

the Defendant's statement, with Detective Graham still hovering on the scene. (Tr. p. 131, 1. 24 to p. 133, 1. 20) During the entire period of questioning, the Defendant was incontrovertibly in custody, as had been for more than seven (7) hours. ('Tr. p. 137, 1. 23 to p. 138, 1. 3)

The police then employed the services of the Defendant's ex-girl friend to evoke a story from Mr. Jean different from that contained in his signed statement. Detectives Graham and Youngman informed Ms. Leslie Nicolas of their perception of the Defendant's statement and shared with her the view that they did not believe it. (Tr. 134, 1. 12 to 135, 1. 4) Ms. Nicolas was the Defendant's ex-girl friend. By October 11th and 12th, Mr. Jean had a devoted new girl friend, Sarah Rosenberg, as attested by her Affidavit submitted in conjunction with the CPL 440.10(1)(h) motion previously made herein. Thus, Ms. Nicolas' had every motive in acting as the police agent provocateur. It is not for lack of truth that the observation has been made that "hell hath no fury like a woman scorned." As a result of Ms. Nicolas' importuning, Mr. Jean changed his story. (Tr. p. 142, 1. 10 to p. 148, 1. 25)

With her own agenda rampant, Ms. Nicolas, herself, testified that she did, indeed, persuade the Defendant to change his story, at the importuning of the police. (Tr. p. 277, 1. 14 to p. 279, 1. 23) At that time, Mr. Jean was plainly in a state of shock; weeping profusely, he was susceptible to almost any suggestion. (Tr. p. 280, 1. 2 to 14) The Defendant's second statement was given after more than eight-and-a-half (81/2) hours in custody. It was Ms. Nicolas, as agent of the police, who obtained a second story from Mr. Jean. (Tr. p. 296, 1. 5 to 13)

7

first to the search of Mr. Jean's home for the express purpose of locating

seizing evidence, Fourth Amendment jurisprudence could not be more clear:

well-settled that a warrantless entry into a person's home is presumptively

reasonable, and violative of the Fourth Amendment unless there is an exigent

circumstance." *United States v. Isiofia*, F. Supp. 2d , 2003 WL 21018853 *4

N.Y. May 5, 2003).

According to the Court,

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms. "The right of the people to be secure in their ...houses ...shall not be violated."

****

In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. The exigent circumstances where it is reasonable for the government to enter a home without a warrant include the imminent destruction of evidence or the imminent endangerment of another person.

****

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of primary evidence, or that is acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.

*4 (citations and internal quotation marks omitted.)

It could hardly be argued that any exigent circumstances precluded the

police from obtaining a properly executed warrant to search Mr. Jean's home.

8

... as in the case of Mr. Isiofia, the government cannot prove, as they ... a preponderance of the evidence, that permission was given voluntarily. ... was in the hospital, deeply traumatized, emotionally incontinent and still ... Under those circumstances he was asked to waive his rights and hard ... first clearly invalid waiver, while he was still in the hospital, he was ... consent to the search of his home. Mr. Jean was never explicitly advised ... to refuse the waiver of his Miranda rights nor to refuse the search. ... presumptively under the influence: of alcohol, as in the case of Mr. ... Jean's emotional distress was even greater. Indeed, if the hospital ... accurate that Mr. Jean was not sedated, then his emotional state was all ... liable for such omission.

... trial, Dr. Eric Silva testified for the state as an expert witness. Dr. Silva ... emergency room physician who caused Mr. Jean to be placed in restraints; ... diagnosed Mr. Jean as suffering from post traumatic stress disorder. (Tr. ... to p. 356, 1. 6) And according to the state, at the time of the ... induced waivers of his rights, his condition was that of suffering ... post traumatic stress disorder. On the other hand, just like Mr. Isiofia, ... was in [more complete, i.e. four point] restraints. That constitutes a ... factor in determining that every subsequent statement made by Mr. Jean, as ... every item seized from his home and used to educe testimony, from bed ... the blue cord, should have been suppressed, as "fruits of the poisonous ... *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). ... *United States v. Long Huang You*, 198 F.Supp.2d 393 (S.D.N.Y. 2002).

9

... as in the case of Mr. Isiofia, the government cannot prove, as they ... preponderance of the evidence, that permission was given voluntarily. ... was in the hospital, deeply traumatized, emotionally incontinent and still ... Under those circumstances he was asked to waive his rights and hard ... first clearly invalid waiver, while he was still in the hospital, he was ... consent to the search of his home. Mr. Jean was never explicitly advised ... to refuse the waiver of his Miranda rights nor to refuse the search. ... not presumptively under the influence: of alcohol, as in the case of Mr. ... Mr. Jean's emotional distress was even greater. Indeed, if the hospital ... accurate that Mr. Jean was not sedated, then his emotional state was all ... labile for such omission.

... trial, Dr. Eric Silva testified for the state as an expert witness. Dr. Silva ... emergency room physician who caused Mr. Jean to be placed in restraints; ... diagnosed Mr. Jean as suffering from post traumatic stress disorder. (Tr. ... 9 to p. 356, 1. 6) And according to the state, at the time of the ... induced waivers of his rights, his condition was that of suffering ... post traumatic stress disorder. On the other hand, just like Mr. Isiofia, ... was in [more complete, i.e. four point] restraints. That constitutes a ... factor in determining that every subsequent statement made by Mr. Jean, as ... every item seized from his home and used to educe testimony, from bed ... to the blue cord, should have been suppressed, as "fruits of the poisonous ... Id. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). ... also, *United States v. Long Huang You*, 198 F.Supp.2d 393 (S.D.N.Y. 2002).

9

A well researched presentation the factors to be considered to determine whether true consent has been granted to the state to enter upon and search a suspect's home was set forth by the federal district court, in *United States v. Orozco*, 1990 WL 118287 *6 (E.D.N.Y. 1990). These include whether the defendant knew he had a right to refuse consent; Mr. Jean was never explicitly told he had the right to refuse. In addition, the factors relating to the defendant's loss of liberty include whether he was subject to "subtly coercive" police questioning; whether he was in restraints; whether he was being forcibly detained and whether he was being questioned in a "station house" atmosphere. In Mr. Jean's case, he was not only placed in a coercive setting, that setting combined the restrictive presence of the hospital staff, who restrained him, and the police officers who caused him to sign a waiver of his Miranda, rights, another determining factor. Most poignantly, Mr. Jean was in a "possibly vulnerable state," which, by itself, would undercut the voluntariness of the alleged consent. Id.

The situation regarding his former girlfriend is of no constitutional avail to the state, for two reasons: she was not acting toward him as a "concerned relative;" rather, at all times relevant herein, she was acting as an agent of the police and was in a "hostile position" toward the Defendant. Thus, both the statement she provoked and her alleged consent cannot be used against the Defendant. *People v. Green*, 134 Misc.2d 227, 510 N.Y.S.2d 420 (Sup. Ct. Queens Co. 1986). In addition, she was said to have granted her consent orally, but she refused to sign the consent form. (Tr. 8/12/2002, p. 135) Since the government must prove the

10

voluntariness of her consent, by a preponderance of the evidence, United States v. Isiofia, supra, that contradiction does not get them even halfway toward meeting their burden. Indeed, the state did not even establish by proofs that Ms. Nicolas had any right to grant consent, which, unlike a warrant, would in any event, have lacked the specificity required to bypass the Fourth Amendment. *People v. Gonzalez*, 88 N.Y.2d 289, 644 N.Y.S.2d 673, 667 N.E.2d 323 (1996); *People v. Coston*, 271 A.D.2d 694, 706 N.Y.S.2d 732 (2d Dept. 2000), leave to appeal denied, 95 N.Y.2d 833, 713 N.Y.S.2d 140, 735 N.E.2d 420; on reconsideration, 95 N.Y.2d 962, 722 N.Y.S.2d 479, 745 N.E.2d 399 (2000).

The illegitimacy of the search consent, in violation of Defendant's Fourth Amendment rights, is organically tied to the unconstitutionally procured waivers of his Fifth and Fourteenth Amendment right not to incriminate himself (and state Constitution analogues). None of the subsequent statements could be, constitutionally, described as new or a validation of the truth of the earlier statements, because they amounted only to reiteration, not ratification. The constitutional fault adhering to the coerced search of his home does not "attenuate" these later statements because these statements were, ipso facto, derived from the unlawful search and seizure at his home; i.e., they were "fruits of the poisonous tree." *Mincey v. Arizona*, supra. See *People v. Ripic*, 182 A.D.2d 226, 587 N.Y.S.2d 776 (3d Dept. 1992); appeal granted, 80 N.Y.2d 978, 591 N.Y.S.2d 147, 605 N.E.2d 883, appeal dismissed, 81 N.Y.2d 776, 594 N.Y.S.2d 712, 610 N.E.2d 385, reargument denied, 81 N.Y.2d 954, 597 N.Y.S.2d 940, 81 N.Y.2d 954, 597 N.Y.S.2d 940 (1993).

This applies to Mr. Jean's Grand Jury testimony with great force, because he would never have testified had he not been unconstitutionally placed in the position of feeling that he had waived his rights, when he had not effectively done so. That Grand Jury testimony should have been thrown out as part and parcel of the doctrine of the fruits of the poisonous tree. See *People v. DeMartino*, 71 A.D.2d 477, 422 N.Y.S.2d 949 (1st Dept. 1979), leave to appeal denied, 49 N.Y.2d 892, 427 N.Y.S.2d 1030, 405 N.E.2d 240 (1980). In any event, it is the government which bears the burden of proving that the Grand Jury testimony was not the product of unlawfully obtained statements and evidence, which they did not and cannot do. *Harrison v. United States*, 392 U.S. 219, 224-225, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

Moreover, the trial court should have precluded the submission of the voluntariness issue to the jury: the trial court should have excluded all of the evidence gained from the coercion of Mr. Jean's alleged consents. See *People v. Conklin*, 145 A.D.2d 20, 537 N.Y.S.2d 695 (4th Dept. 1989), appeal denied, 74 N.Y. 738, 545 N.Y.S.2d 112, 543 N.E.2d 755 (1989); *United States v. Eggers*, 21 F.Supp.2d 261 (S.D.N.Y. 1998).


## POINT TWO

### THE JURY'S PROFOUND CONFUSION, WHICH LED TO THEIR COMPROMISE VERDICT, MANDATES REVERSAL

The trial court planted the seed of confusion, during jury selection, when he unconstitutionally instructed the entire panel that proof beyond a reasonable doubt amounts to proof beyond fifty-one (51%) percent. The trial court opined, as

follows:

> When somebody is suing in a criminal case, it's proof beyond a reasonable doubt. What is that? I said to you in a civil case it's 51%. Proof beyond a reasonable doubt is somewhere on the continuum between 51 and 100 percent, and where that is only the juror knows, you make that determination. It's not proof beyond all doubt which would be 100 percent. You can't get that type of proof in human affairs. If the law requires guilt 100 percent every case would be an acquittal. You can't get that type of proof when dealing with a human being. The People and the law does have to prove a person's guilt beyond a reasonable doubt.

> <u>It's higher than 51 percent and something less than 100 percent.</u>

> *******

> To mathemetize it, it is 51 percent that suffices.

> In a criminal case the operative word is greater, it's not a mere preponderance, it's proof beyond a reasonable doubt. Does everybody understand and accept that?

(Tr. 8/5/02, p. 51, 1. 25 to p. 53, 1. 14) (emphasis added.)

> Defense counsel then objected, out of the hearing of the jury:

> I don't think that's the status of the law. This jury cannot determine if the prosecution, in their minds proves 51 percent or slightly, slightly more than 51 percent that they can find beyond a reasonable doubt has been proven, and that is one reason courts have stated beyond a reasonable doubt quantifying other than beyond a reasonable doubt and consistently saying that. It's a high standard, beyond a reasonable doubt. Finish the sentence it didn't go beyond 100 percent. It has been a high standard in a criminal case, clearly not the 51 or the 51.2.

(Tr. p. 62, 1. 10 to 24.)

> The judge responded by reinforcing the false concept.

> THE COURT: I understand your concern, I am addressing it as I go back in there. I don't think I put it as a 52. I say somewhere in the confine of 51 and 100 percent and that point is the point you determine it. I did not try to mathemetize it. I am understanding your concerns. We'll address it...

> MR. GOLDSTEIN: ....I don't think that the panel can be rectified for the 51 or the 51.

13

(Tr. p. 62, 1. 25 to p. 63, 1. 13)

The court acknowledged the objection; however, instead of correcting the

error, after a lunch recess, the court compounded it.

> By the way someone expressed some concern to me this morning the fact
> when I illustrated the burden of proof in a criminal and civil case. I used an
> example mathematical. I am going to hopefully clarify something I said. In a
> civil case where a mere preponderance is 51 percent is enough and I went
> on to say in a criminal case is not a mere preponderance but a proof beyond
> a reasonable doubt and I said it appears somewhere between 51 per cent and
> 100 percent and the purpose is not to suggest that 53 or 58 percent but it
> was more than 51 percent and something less than 100 percent, but the
> standard being proved is beyond a reasonable doubt.

(Tr. p. 65, 1. 9 to 24) (emphasis added.)

Whatever the judge said thereafter, he never explicitly stated that he had

misspoken by quantifying reasonable doubt as greater than 51 percent. The fact

that the jury disobeyed the judge's later instructions and found the Defendant

guilty of both Second Degree Murder (unintentional) and First Degree

Manslaughter (intentional) is strong proof that they believed, as the judge had told

them, that the District Attorney had proved his case beyond a reasonable doubt,

reckoning, however, upwards from only from 51 percent.

The impermissibility of falsely stating the constitutional standard of proof

beyond a reasonable doubt was revisited by the Second Circuit Court of Appeals

in *Gaines v. Kelly*, 202 F.3d 598, 604 (2d Cir. 2000):

> The close link between the reasonable doubt standard and the
> accuracy of the jury's verdict was highlighted by the Supreme Court's
> decision in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124
> L.Ed.2d 182 (1993).                              *******
> [N.B. Sullivan cites to Cage v. Louisiana, 498 U.S. 39, 41, 11 S.Ct. 328,
> 112 L.Ed.2d 339 (1990), which held that a jury must not be misled into
> thinking that "substantial doubt" is needed to warrant an acquittal. Hence,

14

allowing a jury to believe that doubt stretching from 51 percent to 100 percent is the same as proof beyond a reasonable doubt is impermissible a fortiori.]

*******

There [in Sullivan] it was held that a constitutional defect in a jury instruction defining reasonable doubt can never constitute harmless error, but rather requires automatic reversal of a conviction.

According to the appeals court, a misdescription of the burden of proof vitiates all the jury's findings, because it leaves the reviewing court to speculate what a properly instructed or guided jury would have done in the same circumstance. Further, quoting from an earlier Supreme Court decision, the Second Circuit pointed out that "a person accused of a crime ...would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case," quoting from *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Where District Court Judge Jack B. Weinstein attempted to quantify reasonable doubt, the Second Circuit reversed. Judge Weinstein had defined beyond a reasonable doubt as 95 percent+ probability; clear and convincing, 70 percent+ probability; and preponderance, 50 percent+ probability. *United States v. Shonubi*, 103 F.3d 1085, 1092 [FN 3] (2d Cir. 1997). It is such a well-settled principle that reasonable doubt cannot be quantified, let alone between fifty-one and a hundred, that such an assertion is universally recognized to run the risk of a grave miscarriage of justice. *Commonwealth v. Sullivan*, 20 Mass. App. Ct. 802, 485 N.E.2d 1198 (1985), which, according to *Sullivan v. Louisiana*, supra, requires reversal.

15

Five minutes after the jury rendered its verdicts against the Defendant, one of the jurors, Marie Lewis, sought to contact the judge to explain that her vote, as juror number 7, did not express her intentions, which had been overwhelmed by misleading information from the jury foreman and other jurors. Ms. Lewis had intended to hold out for a "not guilty" verdict on the Second Degree Murder charge. Not: able to contact the judge (Tr. p. 59, passim), Ms. Lewis explained the situation to defense counsel. Counsel moved to set aside the verdicts and a hearing was held on the motion on October 31, 2002 and November 7, 2002.

The juror related that during the deliberation one of the jurors explained to her that if they came to the conclusion that Mr. Jean had intended Kyona's death, they could find him guilty of First Degree Murder, but if they thought it was an accident, they should find him guilty of Second Degree Murder. (Tr. p. 7, 1. 5 to p. 10, 1. 21) (Tr. p. 68, 1. 19 to 1. 24) First Degree Murder was never an option. charged by the trial court.

The same testimony, in other words, continued.  Ms. Lewis testified that Kyona's death had to have been an accident because she felt sure, and so did the juror who misguided her, that Mr. Jean loved his child and did not intend to kill her. (Tr. p. 11, 1. 11 to p. 12, 1. 5) Ms. Lewis first language was French, not English. (Tr. p. 25, 1. 12 to 1. 14; p. 118, 1. 10 to 119, 1. 3) Adding to Ms. Lewis' confusion was that she never was offered the verdict: sheet to actually read. (Tr. p. 84, 1. 14 to 1. 25)

Ms. Lewis could not attest to how the First Degree Manslaughter verdict was reached; only that she did not cast that specific vote. (Tr. p. 85 1. 9 to p. 88, 1.

16

24) It is clear that Ms. Lewis could not understand the difference between Second Degree Murder and First Degree Manslaughter because although the judge charged the elements of each, he never said they were mutually exclusive; that is why re-reading the charges made no impact (See Tr. p. 104, 1. 14 to p. 106, 1. 25; p. 109, 1. 4 to 1. 7 ["No, but if you commit murder, you have to want that person dead. If you don't want that person to be dead this is not murder."])

Juror Marianne Troy corroborated Ms. Lewis' testimony, regarding the intensity of the jury's repeatedly stated consensus that the death of Kyona was unintentional. (Tr. p. 158, 1. 17 to 1. 25) Ms. Troy also agreed that Ms. Lewis wished to vote for criminally negligent homicide. (Tr. p. 160, 1. 18 to 19) Ms. Troy also agreed that it: was she (possibly among others) who represented that the jury's choice was Second Degree Murder by way of contrast to First Degree Murder. (Tr. p. 169, 1. 15 to p. 170, 1. 18) Most tellingly, the Court opined that First Degree Manslaughter is not an intentional crime. (Tr. p. 171, 1. 8 to 1. 11) (See discussion of why "depraved indifference murder" was constitutionally vague, as applied, elsewhere in this brief.)

There are essentially two arguments regarding the extraordinary degree of jury confusion detailed in the post conviction hearing. The fact that Ms. Lewis was misled, however unintentionally, as to a charge not before the jury, caused prejudice to the Defendant's case. See *People v. Brown*, 48 N.Y.2d 388, 423 N.Y.S.2d 461, 399 N.E.2d 51 (1979). The critical point is that the jury was considering a count not charged, e.g., First Degree Murder.

Equally serious was the total confusion of the jury over the definition of

"depraved indifference" Second Degree Murder as contrasted with other counts in the indictment relating to Kyona. As previously demonstrated, the confusion began with the judge's instruction that proof beyond a reasonable doubt lies within a spectrum of probability ranging from 51 percent to one hundred percent. During two days of hearings, not one of the three jurors testified that the jury ever considered whether the prosecution had proved any of the elements of any, of the alleged crimes beyond a reasonable doubt. Once it is recognized that the jurors thought they only needed slightly more than a preponderance of the evidence to convict, the return of repugnant verdicts is readily explained.

The jury was insistent that at no level did they believe that the Defendant intended to harm Kyona and thus cause her death; nevertheless, they returned guilty verdicts on both First Degree Manslaughter and Second Degree Murder. Indeed, the judge's comment during the post-trial hearing that the jury had no intentional count to consider indicated a failure to appreciate intentional element required for proof beyond a reasonable doubt on the First Degree Manslaughter charge.

"Depraved indifference" murder is founded upon lack of intent, and First Degree Manslaughter, implicates intent. See *People v. Robinson*, 145 A.D. 2d 184 (4th Dept. 1989), affirmed, 75 N.Y.2d 879 (1990) ("because the jury found defendant guilty of both intentional and reckless homicide, it is impossible to determine what if anything the jury decided on the issue of defendant's mental state at the time of the offense," 145 A.D.2d at 186). A defendant cannot be guilty of both reckless and intentional crimes; where such verdicts are returned, the

18

Defendant must be granted a new trial. *People v. Helliger*, 96 N.Y.2d 462 (2001) ; People v. Gallagher, 69 N.Y.2d 525 (1987). A Defendant cannot be guilty of both intentionally and recklessly causing a person's death; such verdicts are "repugnant." CPL Section 300.30, subd. 5, *People v. Horning*, 263 A.D.2d 955 (4th Dept. 1999), leave to appeal denied, 94 N.Y.2d 824 (1999); *People v. Rogers*, 166 A.D.2d 23 (1st Dept. 1991). At the very least, such verdicts implicate profound jury confusion and impermissible jury compromise [again, harking back to the 51 percent instruction, which invited such compromise]. *People v. Pyne*, 223 A.D.2d 910, 636 N.Y.S.2d 491 (3d Dept. 1996).

Compromise verdicts must, as a matter of law, be reversed. *People v. Fermin*, 235 A.D.2d 328 (1st Dept. 1997). A jury's mistaken impression of the law, attested even after the return of the verdicts, must result in reversal. *People v. Addison*, 259 A.D.2d 410 (1st Dept. 1999) .

## POINT THREE

### MR. GOLDSTEIN PROVIDED INEFFECTIVE COUNSEL TO MR. JEAN PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, AS WELL AS SECTION SIX OF ARTICLE ONE OF THE NEW YORK STATE CONSTITUTION

The Sixth Amendment to the United States Constitution states, in relevant part,

> In all criminal prosecutions, the accused shall enjoy the right ...to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S.C.A. Annotated, Constitution, Amendment VI. The Sixth Amendment has been declared applicable to the states via the due process and equal protection

19

Defendant must be granted a new trial. *People v. Helliger*, 96 N.Y.2d 462 (2001) ; People v. Gallagher, 69 N.Y.2d 525 (1987). A Defendant cannot be guilty of both intentionally and recklessly causing a person's death; such verdicts are "repugnant." CPL Section 300.30, subd. 5, *People v. Horning*, 263 A.D.2d 955 (4th Dept. 1999), leave to appeal denied, 94 N.Y.2d 824 (1999); *People v. Rogers*, 166 A.D.2d 23 (1st Dept. 1991). At the very least, such verdicts implicate profound jury confusion and impermissible jury compromise [again, harking back to the 51 percent instruction, which invited such compromise]. *People v. Pyne*, 223 A.D.2d 910, 636 N.Y.S.2d 491 (3d Dept. 1996).

Compromise verdicts must, as a matter of law, be reversed. *People v. Fermin*, 235 A.D.2d 328 (1st Dept. 1997). A jury's mistaken impression of the law, attested even after the return of the verdicts, must result in reversal. *People v. Addison*, 259 A.D.2d 410 (1st Dept. 1999) .


## POINT THREE

### MR. GOLDSTEIN PROVIDED INEFFECTIVE COUNSEL TO MR. JEAN PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, AS WELL AS SECTION SIX OF ARTICLE ONE OF THE NEW YORK STATE CONSTITUTION

The Sixth Amendment to the United States Constitution states, in relevant part,

> In all criminal prosecutions, the accused shall enjoy the right ...to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S.C.A. Annotated, Constitution, Amendment VI. The Sixth Amendment has been declared applicable to the states via the due process and equal protection

19

provisions of the Fourteenth Amendment. Cf. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, n. 14, 25 L.Ed.2d 763 (1970).

The New York State Constitution sets forth, in relevant part,

> In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him.

New York State Constitution, Article I-Bill of Rights, Section 6.

The right to counsel entails the right to effective counsel; a violation of that federal right is governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

As explained by the United States Supreme Court, in *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 1511-512, 146 L.Ed.2d 389 (2000),

> To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of reasonableness. To establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (Internal quotation marks omitted.)

The Court cautioned that there are situations in which a presumption of prejudice arises from a finding of ineffectual assistance. According to the Court, the failure of counsel to present mitigating evidence [as occured in the instant case] was just such a situation.

To establish a violation of the defendant's rights under the State Constitution, a standard is applied that is clearly different from the federal standard, because there is not the same emphasis on the outcome.

> A defendant is not guaranteed a perfect trial, but is entitled to a fair trial. Thus, to prevail on a claim of ineffective counsel, a defendant must

20

demonstrate that he or she was deprived of a fair trial because he or she did not receive meaningful representation; mere disagreement with strategies and tactics will not suffice. Meaningful representation includes a prejudice component which focuses on the fairness of the process as a whole rather than any particular impact on the outcome of the case.

*People v. Brown*, 300 A.D.2d 314, 315, 752 N.Y.S.2d 347, 348 (2nd Dept. 2002).

## POINT FOUR

### DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO COUNSEL BECAUSE COUNSEL NEITHER PREPARED NOR MOUNTED ANY DEFENSE RELATING TO ALLEGATIONS OF ABUSING MENDISSA JEAN; MOREOVER, HIS INEPT CROSS-EXAMINATION OF MENDISSA JEAN TAINTED THE DEFENSE RELATING TO KYONA

Three counts of the within indictment related to allegations of abuse of Mendissa Jean. These included Assault in the Second Degree (Sec. 120.05(2) of the Penal Law); Assault in the Third Degree (Sec. 120.00(2) of the Penal Law), and Endangering the Welfare of a Child (Sec. 260.10(1) of the Penal Law). At no time relevant herein did counsel consult with one or more experts relating to these charges. Where the decision not to investigate the possibility of calling an expert defense witness in Mendissa's case involved no strategy that advanced the interests of Mr. Jean, the Court should find that Mr. Jean was ineffectively represented. *Sparman v. Edwards*, 26 F.Supp.2d 450, 470 (E.D.N.Y. 1997), affirmed, 154 F.3d 51 (2d Cir. 1998) ; *Spencer v. Donnelly*, supra. See *Eze v. Senkowski*, NYLJ March 5, 2003, at p. 21, col. 2-5 (2d Cir. Feb. 12, 2003). At no time did counsel present witnesses on behalf of the Defendant. Indeed, at no time relevant herein did counsel effectively cross- examine Mendissa Jean or present rebuttal testimony, nor did he address the indictment counts, in any way at trial; moreover, he never asked the jury to find the Defendant "not guilty' of these

charges. Such inaction calls for reversal. *People v. Brown*, 300 A.D.2d 314, 752 N.Y.S.2d 347 (2d Dept. 2002).

As demonstrated by counsel's letter to the undersigned, submitted in support of the motion made below to vacate the Defendant's convictions, counsel seemed to have lost his way and come to the conclusion that the Defendant was charged with the deaths of both children, and as a result, counsel thought that he did not have to make a separate and distinct defense of the charges relating to Mendissa Jean. Such addlement on the part of defense counsel warrants reversal. See Matter of *Bruce B.*, 111 A.D.2d 754, 490 N.Y.S.2d 246 (2nd Dept. 1985). See also, *People ex rel. Pulko v. Murphy*, 244 A.D. 382, 280 N.Y.S. (3d Dept. 1935). Moreover, the time of Kyona's death was crucial, because if Mr. Jean called 911 believing (correctly or incorrectly, but sincerely) that her life might still be saved, that fact could well have created reasonable doubt respecting a possible acquittal or a verdict of a lesser offense. A video tape of Mendissa's testimony prepared for presentation to the Grand Jury, and viewed by the undersigned, contains the following perfectly audible colloquy:

Mendissa reports that she was awakened in the middle of the night and Kyona was not in their room. "My Dad was telling my Mom my sister couldn't breathe, and she was passing out, and to do CPR."

What did your Mom say?

She told him to call the ambulance.

Do you know where your sister was then?

In their room.

22

And how do you know that?

<u>Because I heard her in their room.</u>

Mr. Goldstein never raised this critical point, either in his questioning of Mendissa or at any other point in the trial. That omission is strong, categorical evidence of inadequate representation. *Spencer v. Donnelly*, 193 F.Supp.2d 718, 732 (W.D.N.Y. 2002).

In addition, Mr. Golkdstein not only reinforced Mendissa's testimony regarding the number of times Kyona had been spanked, he actually added to its effectiveness. Consider the following colloquy between the prosecutor and Mendissa and then Mr. Goldstein and Mendissa.

<u>Prosecutor</u>: And did you see how many times your Dad hit Kyona?

A lot.

Q. Was it more than one?

A. Yes.

Q. Was it more than five?

A. Yes.

Q. Was it more than ten?

A. Yes.

Q. Was it around twenty?

A. Yes.

(Tr. p. 259, 1. 10-20)

<u>Mr. Goldstein</u>: It was more than once, right?

Yes.

23

More than five?

Yes.

More than ten?

Yes.

More than twenty?

Yes.

More than thirty?

I don't know.

Okay. But more than twenty, right?

Yes.

(Tr. 300, 1. 17 to p. 301, 1. 5)

Except for the labels, could anyone tell which was the prosecuting attorney and which was the attorney for the defense? Indeed, all the prosecutor succeeded in establishing was "around twenty," whereas Mr. Goldstein went further and established that it was "more than twenty." This went beyond ineffective representation. Mr. Goldstein's cross-examination of Mendissa was downright incompetent. *Spencer v. Donnelly*, supra.

There is no strategy that could account for such conduct on the part of defense counsel. Defense counsel could either have omitted to cross-examine Mendissa or he could have cross-examined her meaningfully, but not a combination of both which resulted in an ineffectual performance; moreover, Mr. Goldstein's <u>reinforcement</u> of the above-referenced portion of Mendissa's testimony went truly beyond the professional standard expected of a supposedly

24

seasoned trial lawyer. *Quartararo v. Fogg*, 679 F. Supp. 212, 246 (E.D. N.Y. 1988), affirmed, 849 F.2d 1467 (2d Cir. 1988).

Most important of all, a defense could have been mounted respecting the charges relating to Mendissa, as evidenced, inter alia, by counsel's statement at sentencing (Tr. 11/21/2002 p. 22, 1. 14 to p. 24, 1. 23) that he had interviewed Mendissa's teachers and physicians, who were prepared to testify as to her health and her performance at school. That information was available to defense counsel at trial. He did nothing to present such evidence at trial, as part of either case, in chief, or pursuant to his choice to cross-examine Mendissa, when she took the stand. The failure to investigate the possibility of calling an expert witness coupled with the failure to call available fact witnesses mandates reversal. *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001). The pace at which defense counsel barreled through the trial; the summation (if one can call it that), and the sentencing demonstrated that he made no reasoned judgments and prepared no strategy whatever due to his unwillingness to do the work necessary even to have made a perfunctory defense; therefore, the convictions relating to Mendissa Jean should, as a matter of law, be reversed. Id.

As discussed, infra, the definition of "depraved indifference" murder, although facially constitutional, is beset with criticism, because of the indistinctness of its parameters. Where a defendant's conviction on that count is based upon a totality of the facts and circumstances, which would also validate convictions on lesser-included charges, such as Second Degree Manslaughter and Criminally Negligent Homicide, the reversal of this Defendant's convictions

relating to Mendissa Jean must perforce transmute into the dismissal of the convictions relating to Kyona.

The issue is not one of conceding guilt on any ground, but only that a finding of guilt relating to the gravest charge pertaining to Kyona cannot be separated from the finding of guilt on the charges relating to Mendissa Jean. Stated otherwise, it is impossible to tell whether a reasonable jury would have found the Defendant not guilty on the "depraved indifference" count, but rather, might have found him guilty of Second Degree Manslaughter or Criminally Negligent Homicide, if they had any reason not to believe that he had also abused Mendissa Jean.

The "spillover" effect which taints all of the convictions stems from the fact that where the jury concludes that a defendant is guilty on charges relating to one child, they are "primed" to find him guilty as to the other; therefore, both sets of convictions must be reversed. *Lindstat v. Keane*, 239 F.3d 191, 205-206 (2d Cir. 2001).

## POINT FIVE

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE ENTRY OF CONTRADICTORY VERDICTS, VERDICTS RENDERED ATHWART THE TRIAL JUDGE'S INSTRUCTIONS; SUCH VERDICTS VIOLATE DEFENDANT'S RIGHT TO A FAIR TRIAL, BECAUSE THEY ARE REPUGNANT AND INCONSISTENT; THEY ARE THE PRODUCT OF JURY COMPROMISE, AND THEY DO NOT REFLECT THE INTENTION OF THE JURORS

The jury violated the trial court's instruction that they find the Defendant guilty of First Degree Manslaughter only after acquitting him of Second Degree Murder; they found him guilty of both. There are only two possibilities. The

26

likeliest is that the verdicts are repugnant, because the intention element needed to be proved in connection with the second verdict is constitutionally inconsistent with the unintentional nature of the first. See *Sellan v. Kuhlman*, 63 F.Supp.2d 262, 265-266 (E.D.N.Y. 1999). In such cases, infra, neither verdict can stand; indeed, none of the verdicts can withstand constitutional scrutiny. The more remote possibility is that the two verdicts are consistent, in which case the statute mandates dismissal of the first.

As previously set forth, the jury, inter alia, found the Defendant guilty of both Second Degree ("depraved indifference") Murder, which is founded upon lack of intent, and First Degree Manslaughter, which implicates intent. See *People v. Robinson*, 145 A.D. 2d 184 (4th Dept. 1989) , affirmed, 75 N.Y. 2d 879 (1990) ("because the jury found defendant guilty of both intentional and reckless homicide, it is impossible to determine what if anything the jury decided on the issue of defendant's mental state at the time of the offense," 145 A.D.2d at 186). A Defendant cannot be guilty of both reckless and intentional crimes; where such verdicts are returned, the Defendant must be granted a new trial. *People v. Helliger*, 96 N.Y.2d 462 (2001); *People v. Gallagher*, 69 N.Y.2d 525 (1987). A Defendant cannot be guilty of both intentionally and recklessly causing a person's death; such verdicts are "repugnant." CPL Section 300.30, subd. 5, *People v. Horning*, 263 A.D.2d 955 (4th Dept. 1999), leave to appeal denied, 94 N.Y.2d 824 (1999); *People v. Rogers*, 166 A.D.2d 23 (1st Dept. 1991).

The lesser included offense under "depraved indifference murder" is not first degree manslaughter but second degree manslaughter. *People v. Hartman,*

27

___A.D.2d___, 772 N.Y.S.2d 396 (3d Dept. 2004). Only where a defendant is accurately tried for first degree murder, not "depraved indifference murder," can the jury find, instead, that the defendant is guilty of first degree manslaughter, which is intentional. *People v. Gonzalez*, —N.Y.2d—, 2004 WL 578448 (March 25, 2004).

Failure of counsel to raise the issue of repugnant verdicts is itself an independent constitutional claim which must be redressed on appeal. *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *People v. Demott*, 185 A.D.2d 718, 587 N.Y.S.2d 558 (4th Dept. 1992).

Further, the trial court conducted a hearing occasioned by the complaint of one juror that she had been improperly guided toward acquiescence in compromise verdicts. Compromise verdicts must, as a matter of law, be reversed. *People v. Fermin*, 235 A.D.2d 328 (1st Dept. 1997). A jury's mistaken impression of the law, attested even after the return of the verdicts, must result in reversal. *People v. Addison*, 259 A.D.2d 410 (1st Dept. 1999) .

Critical to understanding the jury's confusion is the well-settled precept that "depraved indifference" homicide is so grave an accusation that the degree of culpability alleged is virtually the same as that for intentional Second Degree Murder, not in the least because the punishment is the same. *People v. Sanchez*, 98 N.Y.2d 373, 384 (2002). But intention is not an element of "depraved indifference" homicide; therefore, the jury's comparison of first and second degree murder amounted to their deliberation over a straw man argument, supra. The jury must acquit the Defendant of the greater charge of murder before returning a guilty

28

verdict on the lesser charge of manslaughter. CPL 300.50(4), *People v. Helliger*, supra, 96 N.Y.2d at 467. Failure to do so dictates reversal; moreover, double jeopardy principles preclude retrial on the greater offense. Id. As shown by the record on re-sentencing, successor counsel's application to dismiss the Second Degree murder conviction, pursuant to CPL 300.50(4), was denied. [Tr. 3/12/03, pp. 7-8]

A further reason for the jury's confusion - also fatally not objected to by counsel - was the failure of the judge to explain, in so many words, that the two mental states required to be found in order to return a verdict of "depraved indifference" murder and First Degree manslaughter are "contradictory." *People v. Harrison*, 85 N.Y.2d 891, 893 (1995). See *People v. Gonzalez*, supra. That omission compounded the sense of lack of direction on the part of the jury; therefore, reversal must be granted on that basis, alone. Id.

## POINT SIX

### TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO CHALLENGE THE CONSTITUTIONALITY OF NEW YORK'S "DEPRAVED INDIFFERENCE" MURDER STATUTE AS APPLIED

Although trial counsel challenged New York's "depraved indifference" murder statute as unconstitutionally vague prior to the trial, his duties did not end there, particularly because the verdicts for "depraved indifference" murder and First Degree Manslaughter are repugnant, supra. Indeed, the ruling against the Defendant, at that time, was a virtually foregone conclusion. *People v. Sanchez*, 98 N.Y.2d 373, 748 N.Y.S.2d 312, 777 N.E.2d 204 (2002). It was incumbent upon counsel to challenge the constitutionality of the "depraved indifference" murder

29

statute, as applied, after the trial. The law regarding the timing of a constitutional

challenge to a criminal statute, as applied, was recently and cogently reviewed by

Judge Casey, who is handling the Gotti trial. —F.Supp.2d— , 2004 WL 32858

(S.D.N.Y. Jan. 6, 2004) .

According to the court,

> Moving Defendants must challenge the New York depraved
> indifference statute as it applies to the facts of this case, rather
> than on its face. See *Chapman v. United States*, 500 U.S. 453,
> 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (noting that
> vagueness challenges to statutes not implicating First
> Amendment rights must be applied as to facts of case) (citing
> *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 46
> L.Ed.2d 228 (1975)). Arguments that a statute is
> unconstitutionally vague as applied to the facts of the case
> necessarily must be made after those facts emerge. See *United
> States v. Bastian*, 112 F.Supp.2d 378, 380 (S.D.N.Y. 2000).
> The *Bastian* court rejected an as-applied challenge on
> vagueness grounds to a federal firearms statute made in a pre-
> trial motion to dismiss. Id. The court there stated, "Heeding the
> Supreme Court's admonition that a vagueness challenge to a
> statute may only be examined in light of the facts of the case at
> hand, this Court cannot conduct a proper examination of the
> application of ... [the statute] on the basis of the indictment
> alone." Similarly, the only facts before this Court are those
> presented by the indictment, which are insufficient to carry out
> the required fact-intensive analysis. Thus, the Court denies the
> motion to dismiss the charges against Fappiano for the murder
> of Parasole on the ground that it is prematurely made.

2004 WL 32858 at *6.

Criminal statutes that fail to delineate the range of forbidden conduct with

particularity are unconstitutionally vague. The deprivation of liberty entailed has

been described as the absence of "fair warning ...in language that the common

world will understand, of what the law intends to do if a certain line is passed. To

make the warning fair, so far as possible the line should be clear." *United States v.*

*Lanier*, 520 U.S. 259, 265, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting from

*McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931)

(Holmes, J.)).

In Lanier, Justice Souter analyzed "a fair warning" as absent under three

circumstances,

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second... the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

520 U.S. at 266 (Internal cites and quotation marks omitted; emphasis supplied.)

A criminal statute that admits of different constructions is too uncertain to

be consistent with due process of law. "Penal statutes prohibiting the doing of

certain things, and providing a punishment for their violation, should not admit of

such a double meaning that the citizen may act upon the one conception of its

requirements and the courts upon another." *Connally v. General Const. Co.*, 269

U.S. 385, 393, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (quoting from *United States v.*

*Capital Traction Co.*, 34 App. D.C. 592, 19 Ann. Cas. 68 (1910)).

Such "double meaning" occurred in the case at bar. The jury plainly found

that the conduct of the Defendant was both intentional and unintentional. It is

beyond any comprehensible concept of due process to hold that a jury could find

the Defendant guilty of "depraved murder," which is unintentional - as explicitly

contrasted by them with First Degree Murder, which is intentional; then, believing

31

as they said they did, that the conduct was unintentional, find him guilty of First

Degree Manslaughter, which is intentional.  Where this learned appellate Court

cannot fathom which of these positions was the correct one, the case must be

reversed.  *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 100 L.Ed.2d 384

(1988):

> with respect to findings of guilt on criminal charges, the Court consistently
> has followed the rule that the jury's verdict must be set aside if it could be
> supported on one ground but not on another, and the reviewing court was
> uncertain which of the two grounds was relied upon by the jury in reaching
> the verdict.

In this case, the jury was plainly confused and vague as to the meaning of

the "depraved indifference" statute and misapplied it to the Defendant. They

believed erroneously that Second Degree Murder was to be distinguished from

First Degree Murder, which was not charged, and after finding Second Degree

Murder, pursuant to the statute, they disobeyed the judge's instructions and also

found the Defendant guilty of First Degree Manslaughter (or was it the other way

around?).  Since it impossible for the reviewing court to know the true intention of

the jury, the "depraved indifference" statute was here unconstitutionally vague, as

applied.

The failure of the defense attorney to raise this constitutional point before

the jury was discharged is one more important feature of his inadequate

performance, a performance that in this particular, as well, goes to the heart of the

denial of Defendant's state and federally protected constitutional right to counsel.

32

## POINT SEVEN

## THE REFUSAL OF THE TRIAL COURT TO DISQUALIFY DEFENSE COUNSEL, DESPITE COUNSEL'S ACTUAL CONFLICT OF INTEREST IN SIMULTANEOUSLY REPRESENTING A KEY PROSECUTION WITNESS IN A CRIMINAL MATTER, DEPRIVED MR. JEAN OF MEANINGFUL REPRESENTATION

On June 20, 2002, the trial court held a hearing to determine the motion of the District Attorney to disqualify retained defense counsel, David Goldstein, Esq., on the ground that in another quasi-criminal matter, counsel was representing an "important," "very significant witness for the prosecution." ([June 20, 2002; June 27,2002] Tr. p. 3, l. 21; p. 4, l. 7-8) The witness was Dr. Eric Silva, the emergency room physician at Good Samaritan Hospital, who had pronounced Kyona's death. Dr. Silva had not yet paid Mr. Goldstein's fee, at the date of the hearing. (Tr. p. 5, l. 14-21) Mr. Goldstein had agreed to represent Dr. Silva, and did represent Dr. Silva while Mr. Goldstein was already representing Mr. Jean. (Tr. p. 6, l. 11-14; p. 7, l. 6-10)

Based upon his review of the ethics and the case law, the District Attorney presented the issue of whether Mr. Goldstein could continue to represent Mr. Jean, even if Mr. Jean were to express a waiver of the conflict. A principal reason was that Dr. Silva might well not waive attorney-client privilege, so as to leave Mr. Goldstein free to rigorously cross-examine Dr. Silva at Mr. Jean's trial. (Tr. p. 8, l. 15 through 9, l. 6) According to the "perplexed" District Attorney:

> The brief scenario I would suggest to the Court and the problem that exists here is Mr. Goldstein owes a legal obligation to both Darius Jean and to Dr. Silva. If Dr. Silva is called at this trial, there will be an issue of whether or not Dr. Silva is cross-examined and what material is used to cross-examine him and if any of that material violates attorney/client

33

> privilege that Mr. Goldstein owes to Dr. Silva. If he doesn't go into that material and if instead he decides, "I'm not going to use that material," the question is has he fulfilled his full oath and obligation to Darius Jean to vigorously defend this case. Seems to me it's a bit of a Hobson's choice if he's going to step in the middle protecting one client's interest and probably violating the other client's interest...

(Tr. p. 12, l. 5-22)

Mr. Goldstein refused to acquiesce in his own disqualification, citing among other reasons, that if Dr. Silva failed to pay him, and Mr. Goldstein sued Dr. Silva, which was not an issue ripe for consideration, Dr. Silva would be deemed to have waived client confidentiality. (Tr. p. 15, l. 6-13) It is truly remarkable that Mr. Goldstein argued to preserve his as yet unpaid representation of Dr. Silva while also representing Mr. Jean.

In closed session, Mr. Goldstein revealed that Dr. Silva had been arrested at Newark Airport and charged with possession of marijuana in an amount less than fifty (50) grams. According to Mr. Goldstein, the relevant New Jersey statute appears to be Chapter 36A of Part 5 of Subtitle 2 of Title 2C of the New Jersey Code of Criminal Justice. The District Attorney compared the New Jersey provision to the adjournment-in-contemplation-of-dismissal process available under New York law. The District Attorney also compared the outcome to that pertaining to a disorderly conduct charge. (Tr. p. 30, l. 8-22) Mr. Goldstein referred to the charge as "disorderly person." (Tr. p. 37, l. 3-24)

However, under the New Jersey statutory scheme chosen by Dr. Silva, supervisory treatment is mandatory. The statutory scheme commences with Section 2C:35-10(a)(4) of Chapter 35 of Part 5 of Subtitle 2 of Title 2C of New

34

Jersey Statutes Annotated. Possession of less than fifty (50) grams of marijuana constitutes the offense of being a "disorderly person." A defendant charged under that statute may plead to the charge; pay the penalty, and have his record expunged. *State v. Dylag*, 267 N.J. Super. 348, 631 A.2d 588 (Super. Ct. Law Div. 1993) On the other hand, pursuant to Chapter 36A, *supra,* upon the consent of the District Attorney, the Defendant may receive diversionary treatment under supervision. Indeed, Mr. Goldstein stated that Dr. Silva had been placed under such supervisory treatment. (Tr. p. 38, l. 5-12) Mr. Goldstein apparently did not seek Dr. Silva's unsupervised release.

In New York State, Penal Law Sections 221.05 and Criminal Procedure Law Section 170.56 pertain. Under New York law, possession of a small quantity of marijuana constitutes a violation punishable by a fine of up to one hundred dollars. Where the matter is adjourned in contemplation of dismissal, pursuant to CPL 170.56(2), a judge has the discretion either to require or not to require supervisory treatment. Moreover, in New York, especially where supervision seems in apropos, the charge may be reduced to one of disorderly conduct. See, *e.g.*, *People v. Peralta*, 2003 WL 21174608 (App. Term, 1st Dept., April 29, 2003).

The court told Mr. Jean that if Mr. Goldstein chose to cross-examine Dr. Silva, the matter involving the doctor's supervised treatment for marijuana use could not be brought up (Tr. p. 39, l. 19 through p. 40, l. 20), because Dr. Silva was "adamant" that his arrest and required treatment remain confidential. (Tr. p. 28, l. 14-25) The court granted Mr. Jean time to make a decision and to consult with a different attorney. The trial court did *not*, however, underline{appoint} an attorney to

explain to Mr. Jean the full ramifications of the waiver of the acknowledged conflict. Thus, even after a week of reflection by the Defendant, who agreed to go forward with Mr. Goldstein's representation, the District Attorney urged that Mr. Jean could not waive the conflict. (Tr. p. 61, l. 9-17)

The court opined that a defense attorney's conflict over representing a client at trial, where he was still representing a prosecution witness, could be waived where the conflict has "no probable effect on the outcome." (Tr. p. 64, l. 13-15) This view of the requirements of the Sixth Amendment is topsy-turvy: where as here, the conflict is actual, not potential, the client cannot waive the right to conflict-free representation; the issue is not any inferred impact upon the outcome of the trial but the impact upon the integrity of the judicial process, itself. *United States v. DiPietro*, —F.Supp.2d—, 2004 WL 613073*5 (S.D.N.Y. March 29, 2004).

The Sixth Amendment (and its co-relative New York State constitutional provision) guarantees criminal defendants the right to effective assistance of counsel. The Sixth Amendment further guarantees that this counsel will be free of conflict. *United States v. Schwartz*, 283 F.3d 76, 90 (2d Cir. 2002). See *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Although a defendant is generally required to demonstrate prejudice to prevail on a claim of ineffective counsel, under habeas corpus jurisprudence, set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), prejudice is presumed when counsel is burdened by an actual conflict of interest. This presumption is fairly rigid *Id.* At

692, 104 S.Ct. At 2067. The defendant need not show that the conflict affected the outcome of the trial, but only that counsel avoided an otherwise plausible defense strategy or an attack on the prosecution's case. See *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994). Conflict-free rigorous cross-examination is the hallmark of adequate representation, because the precept is founded in ethics, as well as constitutional and case law. *Louth v. Wiegand*, 167 A.D.2d 850 (4th Dept. 1990). That conflict can emanate *either* from the attorney's unconscious use of his relationship with the other client to discredit that client as a witness *or* the attorney's refraining from seizing an opportunity to discredit the client for fear of giving the appearance of impropriety. *Emle Industries, Inc. v. Patentex, Inc.*, 478 F. 2d 562, 571 (2d Cir. 1973).

Despite a clear finding of actual, rather than potential, conflict, the trial court's decision, allowing Mr. Goldstein to proceed with Mr. Jean's defense, assured Mr. Jean that he could rely heavily upon Mr. Goldstein's "strategy," alternative to a devastating cross-examination of Dr. Silva. However, no such strategy eventuated. Mr. Goldstein presented no witnesses, expert or otherwise, on behalf of Mr. Jean. Mr. Goldstein's cross-examinations of both Dr. Silva and of the Medical Examiner offered the jury no basis for perceiving in their testimonies any unreliability or any contradictions specifically relating to any of the counts of the indictment.

For example, one critical question involved the time of Kyona's death. Dr. Silva's testimony provided a basis for the Medical Examiner's report as to this issue. Clearly, if Mr. Jean had called 911 believing that Kyona was still alive, that

would have gone a long way toward disproving his alleged depraved indifference

to her death. Weakening the impact of the testimony of either physician was truly

the only strategy Mr. Goldstein had left, after determining not to present his own

expert witness.

As illuminated by the decision in *United States of America v. Massino*, 303

F.Supp.2d 258 (E.D.N.Y. 2003), where defense counsel seeks to represent a

defendant in a criminal case, after having represented a key government witness,

any suggested alternative strategy argument becomes inherently unreliable.

> Because of Savitt's prior representation of CW, he cannot
> ethically cross-examine CW without his consent. According to
> the court in *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir.
> 1995), "when a defense attorney cross-examines a former client
> who is a witness against the defendant, a conflict of interest
> may exist; absent a waiver from the former client, the attorney
> cannot inquire into the privileged matter." To avoid obtaining
> such a waiver, Massino asserts that Savitt would not cross-
> examine CW. This might mean that Savitt would pursue a
> particular defense strategy because of his loyalty to a witness
> testifying against his client. "An attorney who is prevented
> from pursuing a strategy or tactic because of the canons of
> ethics, is hardly an objective judge of whether that strategy is
> sound trial practice. Counsel's inability to make such a conflict
> -free decision is itself a lapse in representation." *United States
> v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995). The court in
> *Malpiedi* suggests that such "lapse in representation" is enough
> to establish prejudice when a conflict becomes actual. *Id*.

303 F.Supp.2d at 262-263 (emphasis added).

Moreover, Mr. Jean simply lacked the capacity to make so momentous a

decision, and leaving it to him to find another attorney to advise him, in and of

itself must strongly have suggested to him that the advice of another attorney

would not have differed materially from that of Mr. Goldstein. The advice,

without an offer to appoint another attorney for such limited purpose, must have

been read as saying, "go find another attorney, if you want to, and see if his or her advice differs from that of Mr. Goldstein." Even if such advice had been sought and another attorney had agreed with Mr. Goldstein's position, in such instances, especially where impeachment of a witness is crucial to the defense, the Defendant would have been constitutionally precluded from exercising an option to allow a conflicted attorney to proceed. *United States v. Schwartz, supra*, 283 F.3d at 82. See *People v. Wandell*, 75 N.Y.2d 951, 952-953, 554 N.E.2d 1274, 1275, 555 N.Y.S.2d 686, 687 (1990).

There are times when defense counsel must be free to consider asking questions on cross-examination which a layman (including a defendant) might shrink from as distasteful. *United States v. Oberoi*, 331 F.3d 44, 51 (2d Cir. 2003). The fact that the witness has a history of illicit drug use or that such drug use might have impaired his observations at the time in question and his clarity of mind at trial can be potent and legitimate bases for cross-examination. *People v. Fernandez*, 304 A.D.2d 504, 758 N.Y.S.2d 329 (1st Dept. 2003). Compare, *People v. Perez*, 70 N.Y.2d 773, 515 N.E.2d 901, 521 N.Y.S.2d 215 (1987). It is not up to defense counsel to discard an approach favorable to his client in order to collect a double fee. DR 5-105(A), (B) and C) [22 NYCRR Section 1200.24(A), (B) and (C)].

In view of the overwhelming ethical, jurisprudential and constitutional body of law discussed herein, if Mr. Goldstein lacked the required discretion to withdraw from the case, as urged by the District Attorney, the trial court should have removed him.

## POINT EIGHT

## DEFENSE COUNSEL'S CROSS-EXAMINATION OF THE MEDICAL EXAMINER WAS INEFFECTIVE, AMONG OTHER REASONS, BECAUSE IT WAS INATTENTIVE

Dr. Frederick Zugibe testified for the prosecution in his capacity as the Rockland County Medical Examiner. Dr. Zugibe, himself, underscored the importance of Dr. Silva's report in that his own calculations were based, in part on the record. (Tr. pp. 711-712)

At first, Dr. Zugibe testified that Kyona' death had occurred anywhere between 1:30 to almost 3:00 o'clock a.m. Indeed, he actually corrected himself and moved his estimate from what he had said earlier, 2:30 a.m., forward to 3:00 a.m. (Tr. pp. 709, 1. 4-13)

Upon prompting by the District attorney, Dr. Zugibe then complaisantly adjusted his estimate of the time of death back to 2:00 a.m., not in pursuit of the truth but in aid of the prosecution's pursuit of a conviction. (Tr. p. 712, 1. 16-17) Mr. Goldstein never challenged this discrepancy. (See Tr. p. 709, 1. 4-13) Since Dr. Zugibe also testified that rigor mortis can occur in as little as one hour (Tr. p. 710, 1. 7-17), Mr. Goldstein had ample opportunity to zero in on the variability of Dr. Zugibe's time-of-death opinions. The omission to do so was not only ineffectual on cross-examination, it also was to lead to a confusing and inaccurate portrait of Dr. Zugibe's testimony during the summation for the defense.

On information and belief, Mr. Goldstein never researched the background of Dr. Zugibe (except for obtaining his resume) or his prior performances in court, including the greater percentage of occasions where his testimony was used to

convict defendants as contrasted with the smaller percentage of occasions where his testimony was used to exculpate defendants. Moreover, Mr. Goldstein never confronted or engaged Dr. Zugibe through the use of learned articles, texts or treatises. In light of Mr. Goldstein's failure to present expert testimony for the defense, his failure to advert to such printed authorities left Dr. Zugibe's testimony largely uncontradicted.

As in the case of his absent cross-examination of Mendissa Jean, Mr. Goldstein's cross-examination of Dr. Zugibe served only to reinforce the latter's assertions. "Inadequate preparation" coupled with "perfunctory cross-examination" which does not even address the issue of credibility, so crucial here as to Dr. Zugibe's inconsistencies regarding the time of Kyona's death, cannot be justified in terms of any "conceivable forensic stratagem," and requires a vacatur of the verdicts herein. See *Matter of Jamie TT*, 191 A.D.2d 132, 599 N.Y.S.2d 892 (3d Dept. 1993). Accord,, 26 F.Supp. 2d 450 (E.D.N.Y. 1997), affirmed, 154 F.3d 51 (2d Cir. 1998) (to be constitutionally effective, defense counsel may need to go beyond consulting only one expert, and he must vigorously cross-examine the prosecution's expert). In the absence of calling a defense expert witness, vigorous cross-examination of the prosecution's expert becomes absolutely vital. Cf. *People v. Diaz*, 131 A.D.2d 775, 776, 517 N.Y.S.2d 66, 67 (2d Dept. 1987).

## POINT NINE

### DEFENSE COUNSEL'S SUMMATION WAS INEFFECTUAL: IT REFLECTED DEFENSE COUNSEL'S OMISSIONS AT TRIAL; IT REINFORCED THE PROSECUTION'S CASE, AND COUNSEL FAILED TO REQUEST THAT THE JURY CONSIDER LESSER INCLUDED OFFENSES

41

A defendant in a criminal case has a constitutional right to an effective summation, which includes reviewing the evidence, focusing the jury on the critical issues and pointing out weaknesses in the prosecution's case. *People v. Worthy*, 112 A.D.2d 454, 492 N.Y.S.2d 423 (2d Dept. 1985).

Mr. Goldstein's summation accomplished nothing so much as to reinforce the prosecution's case. One of the statements characteristic of the effeteness of the defense was made in review of the testimony of Officer Chris Franklin, regarding CPR attempts to revive Kyona. Mr. Goldstein said, "[n]o one is going to be acquitted, no one is going to be found not guilty, based on that little scenario." (Tr. p. 823, l. 13-15)  Mr. Goldstein thus deprived the jury of the option of considering whether reasonable doubt might lie in an implied lack of due care on the part of the rescue workers.

Mr. Goldstein's review of Dr. Zugibe's testimony describes not a single connection between the inconsistencies in that testimony and reasonable doubt as to the charges against Mr. Jean. For example, Mr. Goldstein said, "He [Dr. Zugibe] told the Grand Jury, what you could have told the Grand Jury, the child died by soft-tissue injury and blunt trauma." (Tr. p. 830, l. 16-19). In other words, defense counsel is telling the jury, in scientific jargon, no less, that Kyona was beaten to death.

Over the course of three pages of the defense summation transcript, Mr. Goldstein discusses the fact that although at trial Dr. Zugibe related Kyona's death to a pneumothorax, that was not what Dr. Zugibe had told the Grand Jury. (Tr. p. 830-833) Without learned texts, articles, and treatises to contradict Dr. Zugibe,

42

and in the absence of an expert defense witness, Mr. Goldstein had no way to persuade the jury that this discrepancy was of any significance; indeed, he never even asserted that the two examples of Dr. Zugibe's statements were in any way relevant to reasonable doubt concerning the charges against Mr. Jean.

Further, Mr. Goldstein bollixed the issue regarding the time of death. Mr. Goldstein said that Dr. Zugibe had put the time of death at 2:30 a.m. (Tr. p. 837, 1. 16-17) As discussed supra, sua sponte, Dr. Zugibe at first moved the time of death from 2:30 a.m. to 3:00 a.m. Then upon the prompting of the District Attorney, he moved the time back to 2:00 a.m. Having failed to cross-examine Dr. Zugibe over the variability of his time-of-death opinions, Mr. Goldstein was not able to tie that discrepancy to the issue of reasonable doubt regarding the "depraved indifference" allegation. A summation that omits the necessary points to be made and their connection to the defendant's guilt or innocence constitutes inadequate counseling of constitutional dimensions. *Quartararo v. Fogg*, 679 F.Supp. 212, 248 (E.D.N.Y. 1988), affirmed, 849 F.2d 1467 (2d Cir. 1988).

In his letter to the undersigned, supra, Mr. Goldstein responded to the following question: if the Court was certain to charge that Mr. Jean could be convicted of Second Degree Manslaughter or Criminally Negligent Homicide, why had Mr. Goldstein had not drawn those options to the attention of the jury, nay pleaded with the jury to consider those options, in his summation?

Mr. Goldstein's response was that Mr. Jean maintained that Kyona's death had been caused by another, and only shortly before the conclusion of the trial did Mr. Jean permit a defense to be articulated of Second Degree Manslaughter. By

43

way of explaining the omission, Mr. Goldstein argued that he could not very well ask the jury to reach a verdict for which he had not prepared them.

Mr. Goldstein's explanation revives the "potted plant" theory of legal representation. One of the duties of defense counsel is to advise the client of the strengths and weaknesses of the prosecution's case. Once the putative defense medical expert declined to testify, the urgency of establishing the jury's ability to consider lesser-included offenses became imperative.

Mr. Goldstein's argument in this regard also does not stand to reason. If Mr. Goldstein knew that the Court was likely to charge lesser included offenses, why would not that simple fact have persuaded Mr. Jean to allow preparation for that option; in addition to which, given the judge's charge on these counts, why could Mr. Goldstein not have prepared for them without Mr. Jean's explicit approval? In this regard, the Court is respectfully referred to: Abraham Abramovsky, "Re-Evaluating Depraved Indifference Under New York Law," NYLJ, June 24, 2003, p. 3, col. 1, in which the Fordham Law Professor and director of the law school's International Criminal Law Center reengages the principle that the legal distinction between "depraved indifference murder" and Second Degree Manslaughter is ephemeral. Considering the wide disparity in sentencing between the two offenses, and considering that the Court was actually to empower the jury to return a verdict of Second Degree Manslaughter, the failure of defense counsel to ask the jury to consider that and other lesser included offense is inexcusable on any grounds.

Indeed, it is well-settled law that a pro forma statement that the defendant is

not guilty coupled with the failure to ask the jury to consider lesser-included offenses amounts to depriving the defendant of effective counsel. *People v. Morales*, 118 A.D.2d 814, 815 500 N.Y.S.2d 170, 172 (2d Dept. 1986).

As discussed, supra, Mr. Goldstein's failure to attempt to impeach Mendissa's testimony rendered his summary of the perceived defects in that testimony of no moment to the jury, since they were instructed that counsels' statements by way of summation were not evidence. Plus the fact that there were avenues of impeachment which would not have served to reinforce the prosecution's message that she and Kyona had been beaten. Mendissa had previously testified for the Grand Jury that she heard Kyona alive at the time Ms. Nicolas told Mr. Jean to dial 911, tending to create doubt as to the time of death, sufficient to have resulted either in acquittal or a verdict of a far lesser degree of culpability than depraved indifference to Kyona's life. Too, Mendissa's biological mother, Ruth Frederick was seen in the courtroom attempting to coach Mendissa. Had Mr. Goldstein pointed that out, there would at least have been some basis for arguing that her testimony had been "scripted." See *Quartararo v. Fogg*, supra. In his apparent haste to wade quickly through his summation, Mr. Goldstein also misstated to the jury the definition of "depraved indifference murder" by asserting the following:

"He is not guilty of recklessly causing what he believes to be serious physical injury." (Tr. p. 857, 1. 8-10) How better to underscore rather than deny "depraved indifference" than by telling the jury that Mr. Jean did not believe he had caused serious injury, when the child was dead?

45

Could Mr. Goldstein's reinforcement of the prosecution's case have gotten even worse? Mr. Goldstein not only virtually admitted Mr. Jean's guilt, he thoroughly foreclosed any possibility that the jury might return a verdict of Second Degree Manslaughter or Criminally Negligent Homicide when he averred: "Even if you accept the prosecution's theory, put everything aside and accept that this child was beaten between one o'clock and three o'clock in the morning, beaten to death, even that alone will not allow you to return a verdict of [guilty]. (Tr. p. 853, 1. 11-18) (Emphasis added.)

Why not?

A defense counsel who emphasizes "the brutal nature of the crime" in his summation has deprived the defendant of his constitutional right to representation. *Quartararo v. Fogg*, supra. See also, *Williams v. Taylor*, 529 U.S. 362, 369, 120 S. Ct. 1495, 1500, 146 L.Ed.2d 389 (2000) (counsel has a duty to mitigate, not exaggerate, the prosecution's case). According to the federal trial court,

> Because no aspect of counsel's advocacy could be more important than the opportunity to marshal the evidence for each side before submission of the case to judgment, and because for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt,[counsel's] summation deprived petitioner of the effective assistance of counsel.

*Quarteraro v. Fogg*, supra. See *People v. Mary Wilson*, 133 A.D.2d 179, 518 N.Y.S.2d 690 (2d Dept. 1987), passim.

### POINT TEN

### MR. GOLDSTEIN'S FAILURE TO OBJECT TO THE PROSECUTION'S PREJUDICIAL MISSTATEMENT IN SUMMATION, OF MENDISSA JEAN'S TESTIMONY, CONSTITUTED REVERSIBLE ERROR

In summation, the prosecution described Mr. Jean's alleged depravity by

46

alluding to a purported fact not in evidence, to wit: that according to Mendissa, Mr. Jean had taken Kyona's lifeless body into the bathroom to bathe her. (Tr. p. 870-871) The only testimony given by Mendissa was that she had seen Mr. Jean with Kyona in the bathroom splashing water on Kyona's face. There was no testimony that Kyona was either in the bathtub or had expired at the time. (Tr. p. 262, 1. 15 to p. 263, 1. 19)  What the District Attorney then did was to interpolate other testimony by Mendissa, making it seem as though Mendissa had witnessed something in the bathroom, which she had not. (Tr. p. 263, 1. 24 to p. 264, 1. 21)

Mr. Goldstein objected to none of this. It is well-settled law that a prosecutor's comments upon summation can so infect a trial with unfairness as to make the resulting conviction a denial of due process: this is especially true where the prosecutor manipulates or misstates the evidence. *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (citations omitted). In light of the District Attorney's explicit use of this tactic to validate a jury finding of "depraved indifference" murder, Mr. Goldstein's failure to challenge the colossal prejudice to Mr. Jean's receiving a fair trial could not be rationalized as legitimate defense strategy. Id. at 295-296.

As the federal Court of Appeals had opined earlier in the same decision, when addressing the prosecution's tactic, "the advocacy shown in the record at hand has no place in the administration of justice and should neither be permitted nor rewarded." Id. at 294-295 (citation omitted). The prosecutor's willful statement, in summation, describing events he knew to be false, in itself warrants reversal. *People v. Rose*, 307 A.D.2d 270, 761 N.Y.S.2d 686 (2d Dept. 2003).

47

## CONCLUSION

For all of the above reasons, the convictions herein of the Defendant, Darius

Jean, should be reversed.

Dated: New York, New York
      May 4, 2004

Harvard Hollenberg, Esq.,
Attorney for Defendant-
Appellant, Darius Jean

48

# APPELLATE DIVISION – SECOND DEPARTMENT
## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to 22 NYCRR Section 670.10.3(f) that the foregoing brief was prepared on a computer using WordPerfect 10.

*Type.*  A proportionally spaced typeface was used, as follows:

      Name of typeface: Times New Roman
      Point size:  14
      Line spacing:  Double

*Word Count.*  The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 13,381 words.

Dated: New York, New York
      May 4, 2004

ATTORNEY NAME:

Harvard Hollenberg, Esq.

Attorney for Defendant-
Appellant, Darius Jean
320 East 22nd Street, Ste. #2K
New York, New York 10010
(212) 995-9313

*To be argued by:*
Stephanie A. Small
15 minutes

# SUPREME COURT OF THE STATE OF NEW YORK
## APPELLATE DIVISION: SECOND DEPARTMENT

------------------------------------------

### THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

### DARIUS JEAN,

Defendant-Appellant.

------------------------------------------

Rockland County Ind. No. 2001-321
App. Div. Doc. No. 2003-00251

-------------------------------------------------------------------------

### BRIEF FOR RESPONDENT

Respectfully Submitted,

MICHAEL E. BONGIORNO
District Attorney
Rockland County
Attorney for Respondent
1 South Main Street, Suite 500
New City, New York 10956
(845) 638-5001

ANN C. SULLIVAN
STEPHANIE A. SMALL
Senior Assistant District Attorneys
 *Of Counsel*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

THE EVIDENCE AT THE SUPPRESSION HEARING ................................. 3

   The People's Case ................................................................................. 3
   The Defense Case ................................................................................. 9
   The Court's Decision ........................................................................... 12

THE EVIDENCE AT TRIAL ....................................................................... 15

   The People's Case ............................................................................... 15
   The Defense Case ............................................................................... 27

POINT I ...................................................................................................... 29

   THE HEARING COURT PROPERLY DENIED
   DEFENDANT'S MOTION TO SUPPRESS ........................................... 29

     A.  Statements ................................................................................ 30
     B. Consent to Search ..................................................................... 37
       i.  Consent to Search by Defendant ......................................... 38
       ii. Consent to Search by Nicolas ............................................. 40

POINT II ..................................................................................................... 43

   DEFENDANT RECEIVED VERY EFFECTIVE
   ASSISTANCE FROM HIS TRIAL ATTORNEY ................................... 43

POINT III .................................................................................................... 61

   THE JURY'S VERDICT CONVICTING
   DEFENDANT OF SECOND DEGREE MURDER
   AND FIRST DEGREE MANSLAUGHTER IN A
   MULTI-COUNT INDICTMENT WAS SOUND ...................................... 61

     A. The Jury's Verdict Was Sound ................................................... 62
     B. The "Depraved Indifference" Murder Statute is Constitutional ........... 66
     C. The Court's "Reasonable Doubt" Charge Was Proper .......................... 68

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
——————————————————————x

THE PEOPLE OF THE STATE OF NEW YORK,

                                        Respondent,

         - against -

DARIUS JEAN,

                                        Defendant-Appellant.
——————————————————————x

## BRIEF FOR RESPONDENT

## INTRODUCTION

Defendant Darius Jean appeals from a judgment of the Rockland County Court (Kelly, J.) rendered March 12, 2003. By that judgment, defendant was convicted, after a jury trial, of Murder in the Second Degree (Penal Law §125.25(2)), Manslaughter in the First Degree (Penal Law §125.20(4)), Assault in the Second Degree (Penal Law §120.05(2)), Assault in the Third Degree (Penal Law §120.00(2)), and two counts of Endangering the Welfare of a Child (Penal Law §260.10(1)). The court sentenced defendant to an indeterminate term of from twenty-five years to life on the second degree murder charge, to run concurrently with a determinate term of twenty years on the first degree manslaughter charge, a determinate term of seven years on the second degree assault charge and a determinate term of one year each on the remaining charges of misdemeanor

assault and endangering the welfare of a child.[1]  Defendant is presently serving that sentence.

Defendant's conviction arose from the beating death of his nine-year-old step-daughter, Kyona Fredericks, and the beating of his eight-year-old biological daughter, Mendissa Jean, causing her physical injury.  These incidents occurred on October 11 and 12, 2001, at the family home located at 9 Innington Court in Hillcrest, New York.  Using a braided leather belt and an amplifier cord, defendant repeatedly struck Kyona and Mendissa in order to "discipline" them.  His fatal beating of Kyona caused her to suffer from internal bleeding and a collapsed lung.

On or about October 23, 2001, by Indictment No. 2001-321, a Rockland County grand jury charged defendant with one count of Murder in the Second Degree (Penal Law §125.25(2)), Manslaughter in the First Degree (Penal Law §125.20(4)), Assault in the Second Degree (Penal Law §120.05(2)), and Assault in the Third Degree (Penal Law §120.00(2)), and two counts of Endangering the Welfare of a Child (Penal Law §260.10(1)).  Defendant moved for various relief, including suppression of statements defendant gave to police, as well as suppression of evidence police recovered from defendant's house.  By Decision

---

[1] The court initially sentenced defendant to an indeterminate term of eight and one-third to twenty-five years on the first degree manslaughter charge which was an improper sentence. As such, the court resentenced defendant on the manslaughter charge to a determinate term of twenty years.  Parenthetical references preceded by "S" refer to the minutes of the sentencing proceedings conducted on November 21, 2002.  Parenthetical references preceded by "R" refer to the resentence proceedings conducted on March 12, 2003.

and Order dated February 19, 2002, the Honorable William A. Kelly granted a hearing on the matter. On July 1, 2002, a <u>Huntley</u> and <u>Mapp</u> hearing commenced. On July 30, 2002, Justice Kelly issued a fourteen-page written decision denying defendant's motion to suppress in its entirety. On August 5, 2002, an eight-day jury trial commenced before Justice Kelly. On August 19, 2002, the jury found defendant guilty of all counts in the indictment. On November 19, 2002 and March 12, 2003, the court sentenced defendant as noted above.[2]

On appeal, defendant claims that the hearing court improperly denied his motion to suppress his statements to police, as well as the physical evidence recovered from his house. Defendant further argues that the court's charge on reasonable doubt confused the jury; that the jury's verdict is repugnant; and that he received ineffective assistance of counsel.

## THE EVIDENCE AT THE SUPPRESSION HEARING

### The People's Case

On October 12, 2001 at approximately 3:35 a.m., POLICE OFFICER CHRIS FRANKLIN of the Town of Ramapo Police Department, responded to defendant's home at 9 Innington Court in Hillcrest, New York after receiving a radio call regarding a nine-year old who was not breathing. (Franklin: H1:4-5, 15;

---

[2] <u>See</u>, Fn. 1, <u>supra</u>.

Lee: H1:27, 40).[3] As the first police officer to arrive, Police Officer Franklin encountered defendant, who was standing on the front lawn of the house flagging the officer down. (Franklin: H1:6, 15). Defendant advised him that the child was in the master bedroom and, after retrieving some medical equipment from his police car, Police Officer Franklin entered the house to attend to the child. (Franklin: H1:6-7, 15). Defendant followed him inside. (Franklin: H1:7).

Upon entering the bedroom, Police Officer Franklin observed Kyona Fredericks lying on the bed and Leslie Nicolas standing at the foot of the bed. (Franklin: H1:7, 15). Police Officer Franklin began to perform CPR on the child. (Franklin: H1:8, 9, 17). He checked her pulse and airway and then, when he opened her jaw, he noticed it was "unusually stiff." (Franklin: H1:8, 17). When the paramedics arrived shortly thereafter and attended to Kyona, Police Officer Franklin spoke to both Nicolas and defendant. (Franklin: H1:10-11, 21, 23). Town of Ramapo POLICE OFFICER SEAN LEE arrived at the home minutes later and assisted Police Officer Franklin with the investigation. (Franklin: H1:11; Lee: H1:27, 29). Nicolas advised Police Officer Lee that she was asleep in bed when defendant brought Kyona into her room; that defendant told her that Kyona was not breathing; that she told defendant to call 911 and that she started to perform

---

[3] Parenthetical references preceded by "H1" are to the minutes of the pre-trial hearing conducted on July 1, July 2, July 8, and July 9, 2002 and "H2" are to the minutes of the pre-trial hearing conducted on July 15, 2002 before the Honorable William A. Kelly.

CPR on Kyona prior to the arrival of the police. (Lee: H1:29). Defendant confirmed Nicolas' account but added that prior to carrying Kyona into the bedroom, he was working in his office when he saw Kyona walking clumsily in the hallway. According to defendant, Kyona told him she was not feeling well so he tried to feed her some chicken. When she would not eat, he splashed water on her face but she only got more sick, and, by the time he carried her to the bedroom, she was not breathing. (Lee: H1:29-30).

After several minutes, the paramedics placed Kyona into the ambulance and brought her to Good Samaritan Hospital. (Franklin: H1:12; Lee: H1:31). Since defendant was not permitted to accompany Kyona into the ambulance, Police Officer Lee followed in his police car with defendant. (Lee: H1:31, 48). At the hospital, defendant jumped out of the car and ran to the ambulance. (Lee: H1:32, 49). Kyona was taken to the trauma room, while Police Officer Lee assisted defendant with hospital admittance procedures. (Lee: H1:32-33). Eventually, defendant was escorted to a family consultation room. (Lee: H1:34, 49).

In the meantime, Police Officer Lee spoke with a nurse, who advised him that Kyona was dead, that there were signs of abuse, and that he should contact a detective for further investigation. (Lee: H1:35). When the emergency room physician, Dr. Silva, advised defendant that Kyona was dead, defendant rushed from the hospital, ran into the parking lot, and collapsed. (Lee: H1:35-37, 50-51).

Police Officer Lee attempted to calm defendant, but defendant continued to thrash about, bang his head on the pavement, flail his arms and kick, as he repeatedly yelled "no." (Lee: H1:37-38, 51). With the assistance of other law enforcement and hospital personnel, defendant was handcuffed, placed in a wheelchair and returned to the emergency room, where he was attended to by hospital staff members. (Lee: H1:38-39, 51).

Shortly after 5:00 a.m. that same morning, DETECTIVE GLENN GRAHAM of the Town of Ramapo Police Department arrived at Good Samaritan Hospital to investigate possible child abuse against Kyona. (Graham: H1:65). After speaking with Town of Ramapo Lt. Holmes and Police Officer Lee, Detective Graham learned from Dr. Silva that Kyona had been dead for several hours before she arrived at the hospital. (Graham: H1:65, 108-109). Pointing to blood and wounds on her back, Dr. Silva told Detective Graham that it took two to three hours from the time of Kyona's death for her body to become stiff. (Graham: H1:67, 69). Kyona's stepmother, Leslie Nicolas, told Detective Graham that defendant carried Kyona into her bedroom where she slept at approximately 3:00 a.m., and told her that Kyona was not breathing. (Graham: H1:69).

At about 6:23 a.m., Detective Graham met with defendant, who was lying in a hospital bed in restraints, and administered _Miranda_ rights to him. (Graham: H1:70-71, 72, 77, H2:116, 117: People's Exhibit 4: _Miranda_ form). Defendant told

6

Detective Graham he understood his rights and was willing to speak to him. (Graham: H1:73, H2:117-119). Defendant said that on October 11, 2001, he and some friends were home listening to music. (Graham: H1:78). His daughters, Kyona and Mendissa, had arrived home from school at around 3:00 p.m. and began their homework. (Graham: H1:79). At approximately 8:00 p.m., defendant discovered that either Kyona or Mendissa accidentally urinated in their room. To punish them, defendant told Detective Graham that he hit each of them with a brown braided leather belt. (Graham: H1:79). Defendant recounted that at about 3:00 a.m., he came upon Kyona in the hallway, who told him she was not feeling well, and immediately passed out. (Graham: H1:80). Defendant saw that Kyona was not breathing and splashed some water and alcohol on her face to revive her. Eventually, defendant carried Kyona to his wife's room. (Graham: H1:81). Defendant consented to the search of his home, and even told the detective where he could locate the brown leather belt. (Graham: H1:82, 97, H2:123; People's Exhibit 8: Consent to Search Form). Nicolas also consented to a search of their home. (Graham: H1:82, 83, H2:121, 122).

At approximately 6:30 a.m., DETECTIVE LEE YOUNGMAN of the Town of Ramapo Police Department, arrived at the hospital. (Youngman: H2:155). After he spoke to defendant, defendant agreed to accompany him to the police station. (Youngman: H2:156). Defendant was not handcuffed. (Youngman:

H2:157). There, Detectives Youngman and Graham spoke to defendant for "several hours." (Graham: H1:89; Youngman: H2:158). Defendant essentially reiterated what he told Detective Graham about Kyona's demise. (Youngman: H2:158). Detective Graham then advised defendant of his <u>Miranda</u> rights for the second time, and defendant's statement was reduced to writing. (Graham: H1:90, 92; People's Exhibit 7: <u>Miranda</u> form; People's Exhibit 10: defendant's first written statement). Although Detective Graham confronted defendant with Dr. Silva's belief that Kyona had been dead for "several hours" before she arrived at the hospital, defendant "stuck to his story." (Youngman: H2: 164).

Detectives then spoke to Nicolas at the police station and took a written statement from her. (Graham: H1:99; Youngman: H2:172). Afterwards, they permitted defendant and Nicolas to meet. (Graham: H1:100, H2:134, 147; Youngman: H2:172). Detectives never instructed Nicolas about what to say to defendant. (Graham: H1:104; Youngman: H2:174). Detectives soon ended their conversation because they conversed primarily in Creole, and the detectives could not understand their conversation. (Graham: H1:103; Youngman: H2:173). Nicolas advised the detectives that defendant wanted to speak to them again before she left the police station. (Graham: H1:104; Youngman: H2:174).

During the second interview with defendant, defendant admitted he found Kyona unconscious in her bed hours after he beat her. (Youngman: H2:175).

Defendant described how Kyona "looked funny" because she was not breathing, her eyes were open, and her body was in a "weird form." (Youngman: H2:175). Defendant admitted he never saw Kyona walking in the hallway, and explained he made that up because he was upset. (Youngman: H2:176). Defendant's admissions were reduced to writing by Detective Youngman. (Youngman: H2:177; People's Exhibit 11: defendant's second written statement). After defendant acknowledged the accuracy of his second written statement, he admitted to detectives that he placed a piece of chicken in Kyona's mouth after she was dead to make it look like she choked. (Youngman: H1:178-181).[4]

## The Defense Case

On October 11, 2001, at approximately 10:00 p.m., defendant's fiancée, LESLIE NICOLAS, arrived home from work.[5] (Nicolas: H2:211, 217, 229). She lived at 9 Innington Court in Hillcrest, New York with defendant, his two children, Kyona and Mendissa, as well as Oumie, a tenant. (Nicolas: H2:213). When Nicolas arrived home that night, she visited with Mendissa sitting in the kitchen and spoke with Kyona in the girls' bedroom doing her homework. (Nicolas: H2:218-219, 228, 229). Seeing that the bedroom was messy, Nicolas picked up their dirty underwear off the floor, washed them in the girls' bathroom and hung

---

[4] The People also introduced into evidence, with defendant's consent, a Stipulation of Gina Nowicki, the Rockland County Grand Jury stenographer, as well as defendant's Grand Jury testimony. (Proceedings: H1:60-61; People's Exhibit 2).

9

them to dry. (Nicolas: H2:228-230).  Afterwards, she went to the master bedroom, showered, and watched television in bed. (Nicolas: H2:230, 232).

At approximately 11:00 p.m., Nicolas heard Kyona crying in the kitchen and summoned defendant to the hallway.  (Nicolas: H2:234, 236).  Defendant, who was holding a brown belt, explained that he was upset because Kyona was not answering her homework questions correctly.  (Nicolas: H2:237-239).  Nicolas urged defendant to let Kyona go to sleep. (Nicolas: H2:237).

While defendant and Kyona were still in the kitchen, Nicolas left the house for some food. (Nicolas: H2:239). When she returned approximately a half hour later, defendant was in the girls' room behind the closed door. (Nicolas: H2:241, 242).  Nicolas went to sleep. (Nicolas: H2:242).  At around 1:00 a.m., Nicolas awoke to the sounds of Kyona's cries. (Nicolas: H2:244, 245, 249).  She walked into the hallway, saw the girls' bedroom door wide open and saw Mendissa smile and wave to her from the top bunk. (Nicolas: H2:246, 247, 249).  From the doorway, Nicolas again urged defendant to let Kyona sleep. (Nicolas: H2:247). Defendant, however, advised Nicolas that Kyona was still getting her homework wrong and snapped, "Well, do you want Kyona to be like you?"  (Nicolas: H2:248).  With that, Nicolas returned to her room. (Nicolas: H2:248).

---

[5] Gary Lipton, Esq. represented Leslie Nicolas and was present when Nicolas testified at the pre-trial hearing. (Proceedings: H2:211).

At approximately 3:00 a.m., while Nicolas was sleeping, defendant burst into Nicolas' bedroom carrying Kyona's naked body in his arms, and placed her on the bed. (Nicolas: H2:251, 254, 259). When defendant told Nicolas something was wrong with Kyona, she ran from the room, and stayed in the hallway and cried for several minutes. (Nicolas: H2:251, 252). At defendant's urgent pleas, she returned to the bedroom but saw that Kyona was not breathing and could not find her pulse. (Nicolas: H2:256). Defendant called 911, as Nicolas directed him to do, while she started to perform CPR on Kyona. (Nicolas: H2:256, 257, 259). She continued her attempts to resuscitate Kyona until the paramedics arrived and took over. (Nicolas: H2:258).

About ten minutes later, paramedics took Kyona to the hospital. (Nicolas: H2:264, 266). Defendant left at the same time. (Nicolas: H2:266). Nicolas was unsure whether Kyona was dead, but nevertheless instructed Mendissa not to talk about what happened that night. (Nicolas: H2:267, 282, 283). It was not until Nicolas arrived at the hospital later that morning and saw defendant, who was restrained to a gurney, that she knew that Kyona died. (Nicolas: H2:266, 267, 269).

At the hospital, and later, at the Town of Ramapo police station, Nicolas spoke with some detectives and ultimately signed a written statement. (Nicolas: H2:271, 272). At the request of the detectives for her "to get the real story," Nicolas agreed to speak with defendant. (Nicolas: H2:273-275, 288). They spoke

together for several minutes, mostly in Creole. (Nicolas: H2:277, 288).  She told

defendant, as requested by detectives, that defendant's story did not make sense,

that he should tell the truth, and that if he told the detectives that he went to check

on Kyona, they would not charge him with murder.  (Nicolas: H2:275, 277, 278-

279, 288, 291, 294).

## The Court's Decision

In a fourteen-page written decision dated July 26, 2002, Justice Kelly denied

defendant's motion to suppress the physical evidence and statements.  The hearing

court credited the testimony of the People's witnesses, and made factual findings

consistent with that evidence. (Decision at 1-5).  Specifically, the hearing court

found that Police Officers Chris Franklin and Sean Lee arrived at defendant's home

in Hillcrest, New York in response to a radio call regarding a "child not breathing,

CPR being administered." (Decision at 1).  The hearing court found that upon their

arrival at the home, both police officers spoke with defendant and Nicolas about the

events that transpired. (Decision at 2).  The hearing court found that, at the hospital,

after defendant discovered that Kyona "expired," defendant became hysterical

requiring that defendant be placed in hospital restraints.  Once  defendant calmed

down, he spoke to Detective Graham after being advised of his Miranda rights and

"gave an oral account of the events surrounding the victim's death" as well as "oral

consent to search his home." (Decision at 3).

The hearing court also found that defendant gave additional statements to detectives at the Ramapo police station, both oral and written, was again advised of his Miranda rights, and signed a written consent to search his house. (Decision at 3-4). The hearing court found that Nicolas gave oral consent to search the house, so long as defendant also consented. (Decision at 3-4). The hearing court found that detectives also spoke with Nicolas, advised her that they did not believe defendant's version of events and allowed Nicolas to speak with defendant. (Decision at 4). Furthermore, the hearing court considered the testimony of Nicolas, who was called by the defense, who claimed that "the detectives suggested to her that she inform the defendant that they did not believe his story and that they would try to help him if he changed his story." (Decision at 4). The hearing court found that after Nicolas spoke with defendant, she advised them that defendant wanted to make another statement and the detectives spoke with defendant again and gave another written statement. (Decision at 5).

Based on those facts, the hearing court concluded that "the credible evidence adduced at the hearing established that the defendant himself consented to the search of his home and that his consent was voluntary." (Decision at 5). The court found that defendant's confinement to his hospital bed did not render him in "custody" because it was "independent of any official government action" and "the circumstances surrounding the interrogation were not so overbearing as to render the

consent involuntary." (Decision at 6). The hearing court found that its conclusion that defendant's consent was voluntary "is supported by the defendant's own sworn testimony before the Grand Jury" in which defendant admitted that he consented to the search of his home. (Decision at 7). The hearing court also held that Nicolas, too, consented to the search of the home and had the apparent authority to give such consent. (Decision at 5, 7).

With respect to the statements defendant gave to police, the hearing court concluded that all seven statements noticed by the People were admissible. (Decision at 8-14). According to the hearing court, the first two statements defendant gave to Police Officers Franklin and Lee "were made at the defendant's house as the emergency was unfolding" and therefore, were not custodial. (Decision at 8). Defendant's third statement -- to Detective Graham at the hospital -- was made after Detective Graham advised defendant of his rights and defendant agreed to speak with him. (Decision at 8-9). Similarly, the hearing court concluded that the two written statements defendant made at the Ramapo police station, as well as his oral remarks, were made after defendant was advised of his Miranda rights and "after defendant knowingly and voluntarily waived his rights." (Decision at 9, 10, 13). The hearing court rejected defendant's argument that Nicolas acted as an agent of the police since the hearing court found that "Ms. Nicolas' relationship was not cultivated for the purpose of eliciting a confession"

nor did the detectives supervise Ms. Nicolas, attempt to overhear or record the conversation or instruct her on what to say. (Decision at 11).

Lastly, the hearing court found that defendant's grand jury testimony is admissible at trial, even assuming that defendant's second written statement was involuntarily made, since "[a] defendant's grand jury testimony is attenuated from any preceding taint." (Decision at 13-14).

## THE EVIDENCE AT TRIAL

### The People's Case

On the morning of October 11, 2001, LESLIE NICOLAS put eight-year old MENDISSA JEAN and her step-sister, nine-year old Kyona Fredericks, onto the school bus, as she does every school day.[6] (Nicolas: T5:423). Nicolas, who was defendant's girlfriend, lived with him at 9 Innington Court in Hillcrest, New York for approximately five years. (MENDISSA JEAN:T5:244; Nicolas:T5:419-421). At around 12:30 p.m. that same afternoon, Nicolas left the house to go to her new telemarketing job. (Nicolas:T5:422, 423). Defendant was unemployed. (Nicolas:T5:423). That day, he intended to complete the installation of a shower stall in the basement apartment. (Nicolas:T5:424).

---

[6] Parentthetical references preceded by "T1" are to the minutes of the trial conducted on August 5, 2002 before Justice Kelly; "T2" to the trial minutes of August 8, 2002; "T3" and "T4" to the trial minutes of August 9, 2002, morning and afternoon sessions, respectively; and "T5" to the trial minutes of August 12, 13, 15, 16 and 19, 2002.

When the girls returned home from school, defendant worked in the garage. (Jean:T5:247, 283). The girls kissed defendant "hello" and continued upstairs to do their homework. (Jean:T5:247, 278). Kyona worked in the girls' bedroom, while Mendissa worked in the master bedroom. (Jean:T5:247, 279). Since she was having some trouble with rounding off numbers, Mendissa asked defendant for help. (Jean:T5:248). Once defendant explained to her what to do, Mendissa returned to the master bedroom to work. (Jean:T5:249, 283). When she finished, and showed defendant her homework, defendant scolded Mendissa because her answers were incorrect and whipped and hit her repeatedly on the back and arm with a belt. (Jean:T5:249, 250, 251, 285, 286). As Mendissa cried, defendant shouted, "I already explained this to you." (Jean:T5:251). When Mendissa later asked defendant for an eraser, defendant whipped Mendissa again on her back and arm with the belt. (Jean:T5:252). Afterwards, Mendissa worked late into the night to finish her homework. (Jean:T5:253). When she was finished, she cleaned her room and then, at around 11:00 p.m., ate some dinner that Nicolas prepared. (Jean:T5:253, 289, 293; Nicolas:T5:426).

While Mendissa ate her dinner in the kitchen, Nicolas arrived home from work, and was surprised to see that Mendissa was not yet in bed. (Jean:T5:254; Nicolas:T5:427, 428). Nicolas soon realized that Kyona was also still awake in her room doing her homework. (Nicolas:T5:429). Since Kyona still needed to finish

16

her homework, and had been unable to clean her room that night, Nicolas went to see her. (Nicolas:T5:429). She picked up some dirty clothes on the girls' bedroom floor, and washed them. (Nicolas:T5:431, 432). Afterwards, she retired to the master bedroom where she showered and laid in bed. (Nicolas:T5:433). Later that night, when she heard Kyona crying, she went to see what was wrong. (Nicolas:T5:433).

Nicolas found Kyona and defendant in the kitchen. (Nicolas:T5:433). Defendant was holding a brown belt. (Nicolas:T5:433-434). Out of earshot, Nicolas urged defendant to let Kyona sleep. (Nicolas:T5:434). Defendant adamantly refused because Kyona "didn't know her homework." (Nicolas:T5:434). Frustrated that defendant ignored her plea to let Kyona go to bed, Nicolas left the house. (Nicolas:T5:435). She returned approximately a half-hour later, proceeded to her room and went to sleep. (Nicolas:T5:435-436).

Meanwhile, in the girls' bedroom, Mendissa eventually fell asleep in the top bunk of the bed. She awoke to the sounds of defendant striking Kyona with the belt and a piece of blue wire. (Jean:T5:255-256, 297, 299). Apparently, Kyona still had not finished her homework since Mendissa heard defendant say, "the answer is right in front of you." (Jean:T5:257). Hinting at the correct answer, defendant told Kyona that if she did not give the correct response by his count to five, he would beat her again. (Jean:T5:257). When Kyona did not answer, defendant beat her

17

on the head and back as Mendissa listened to her step-sister's screams. (T5:257). As she leaned over the top bunk, Mendissa saw that one of defendant's strikes to Kyona's head caused her blue barrette to fly off. (T5:259).

After the nearly twenty blows that Mendissa counted, she heard Kyona say to defendant that she could not breathe, move, write or see. (Jean:T5:259, 300). Defendant ignored Kyona, and continued to beat her until Kyona had to use the bathroom. (Jean:T5:260). Mendissa saw that defendant took her into the bathroom twice during that night – the first time so she could use toilet and the second time to "bathe" her. (Jean:T5:260, 262-263). When she the bathtub water running and saw defendant splashing water on Kyona's Mendissa went to sleep. (Jean:T5:264, 302).

At approximately 1:00 a.m., Nicolas heard Kyona crying again. (Nicolas:T5:436). Standing in the doorway to the master bedroom, she saw defendant in the girls' room. (Nicolas:T5:436-437). Again, she pleaded with defendant to let Kyona go to sleep but defendant gave the same response that she was not answering her homework right." (Nicolas:T5:438). Defendant then snapped, "Do you want her [Kyona] to be like you?" (Nicolas:T5:439). Nicolas gave up trying to reason with defendant and went back to sleep. (Nicolas:T5:439). Defendant continued to beat Kyona long into the night. (Jean:T5:260).

A couple of hours later, Nicolas was startled awake when defendant burst into her bedroom carrying Kyona, placed her naked body on the bed and shouted, "something is wrong with Kyona." (Nicolas:T5:439, 440). Nicolas became so upset when she saw Kyona unconscious that she left the room crying. (Nicolas:T5:441). Defendant insisted that Nicolas check on Kyona but when she could not find her pulse and realized that Kyona was not breathing, she yelled to defendant to call 911, and immediately began CPR. (Nicolas:T5:441-443).

Moments later, POLICE OFFICER CHRIS FRANKLIN of the Town of Ramapo Police Department arrived at the house. (Franklin:T5:4: Nicolas:T5:444). Defendant, who was standing on the front lawn waiving his arms, directed Police Officer Franklin to the master bedroom. (Franklin:T5:5, 6). Once inside, Police Officer Franklin checked Kyona for a pulse and to see if she was breathing. (Franklin:T5:9). Unable to find her pulse, he tilted Kyona's head back, but saw that Kyona's jaw was already stiff. (Franklin:T5:10). As Police Officer Franklin began CPR, defendant, who appeared more nervous than upset, paced in the hallway saying, "please don't die." (Franklin:T5:12).

After administering one set of compressions, the paramedics arrived to assist Kyona. (Franklin:T5:11; BARBARA FRESON:T5:64-65). POLICE OFFICER SEAN LEE, of the Town of Ramapo Police Department, soon arrived and while the paramedics attended to Kyona, Police Officers Franklin and Lee spoke with

defendant and Nicolas about whether Kyona had any prior medical problems that would help explain her current condition. (Franklin:T5:13; Lee:T5:34). Defendant explained that he was working in his office when he saw Kyona walking clumsily in the hallway, and was not feeling well. (Lee:T5:34). Defendant told police he brought Kyona into the kitchen and tried to feed her some chicken. He splashed some water on her face, and brought Kyona, who was still breathing, to Nicolas for help. (Franklin:T5:13; Lee:T5:34-35). Defendant further advised the officers that Kyona had a history of asthma. (Lee:T5:35).

Meanwhile, the two paramedics, Barbara Freson and her partner Janet Capone, worked on Kyona's lifeless body for approximately twenty minutes before taking her to Good Samaritan Hospital. (Freson:T5:72). According to Freson, Kyona had been dead "for quite a while" because her jaw was stiff and Freson needed the use of both hands to pry it open. (Freson:T5:67, 68). Freson also saw that Kyona had no blood circulation, that her tongue and eyes were dry and her tongue was a "brownish tan putty" color. (Freson:T5:68-69). On the way to the hospital, Freson and Capone continued their attempts to revive Kyona but were unsuccessful. (Freson:T5:72, 74). Police Officer Lee and defendant followed in Lee's patrol car. (Lee:T5:35).

At Good Samaritan Hospital, defendant jumped out of the police car and ran to the ambulance. (Lee:T5:35, 57). Police Officer Lee, however, directed

defendant to stay away from the medical personnel so that they could attend to Kyona. (Lee:T5:36). Once Kyona was brought into the emergency department trauma room, DR. ERIC J. SILVA, the on-duty emergency room physician, examined Kyona and found her to have "no signs of life." (Silva:T5:342). Dr. Silva, who concluded that Kyona was "dead on arrival," pronounced her dead at 4:14 a.m. (Silva:T5:342, 343). A subsequent examination of Kyona's body revealed that she had more than 20 injuries on her back consisting of semi-circular bruises and "looped lesions." (Silva:T5:343-344). Due to his observations, Dr. Silva notified the Office of the Medical Examiner that Kyona's death was "highly suspicious," that "child abuse was a factor" and opined that Kyona had been dead "somewhere between two to four hours prior to her arrival in the emergency room." (Silva:T5:346, 348-349). Meanwhile, Police Officer Lee assisted defendant with checking Kyona into the hospital. (Lee:T5:36-37).

After pronouncing Kyona's death, Dr. Silva met with defendant. (Silva:T5:349). First, Dr. Silva obtained a medical history of Kyona. (Silva:T5:349). Defendant reiterated to Dr. Silva what he had previously told Police Officers Franklin and Lee about the evening – that he saw Kyona in the hallway, that Kyona was not feeling well, and that he felt she needed a bite to eat to make her feel better. (Silva:T5:350). Dr. Silva then advised defendant that Kyona was dead. (Silva:T5:351). Upon hearing about her death, defendant ran out

of the hospital into the parking lot. (Lee:T5:39; Silva:T5:352). He ran -- flailing his arms and yelling -- until he collapsed. (Lee:T5:40). On the ground, defendant banged his head, arms and feet on the pavement and did not stop until several police officers placed him in handcuffs. (Franklin:T5:15; Lee:T5:40). Defendant was then placed in a wheelchair and returned to the hospital emergency room for observation. (Franklin:T5:15; Lee:T5:40).

Because Dr. Silva suspected that Kyona had been abused, DETECTIVES GLENN GRAHAM, GREG DUNN AND LEE YOUNGMAN of the Town of Ramapo Police Department Detective Bureau, responded to the hospital to further investigate child abuse allegations. (Graham:T5:92; Dunn:T5:312; Youngman:T5:550). At about 6:20 a.m., Detective Graham, interviewed defendant, who had been placed on a stretcher with leather hospital restraints around his wrists. (Graham:T5:97-98). After Detective Graham advised defendant of his Miranda rights, defendant agreed to speak about what happened that day and evening and admitted to Detective Graham that he typically disciplined the girls using a brown, twisted leather belt. (Graham:T5:98-100; 104-105). Defendant even told Detective Graham the exact location of the belt and then consented to a search of his house so that the police could recover the belt.[7] (Graham:T5:104,

---

[7] DETECTIVE MATTHEW WINTERS of the Rockland County Bureau of Criminal Identification, along with several members of the Town of Ramapo Police Department, conducted a search of defendant's home at 9 Innington Court. (Winters:T5:178). Detective

109). Defendant similarly told Detective Graham how he saw Kyona in the hallway, fed her some chicken, splashed water and alcohol on her face, and then carried Kyona to the master bedroom to ask Nicolas for help. (Graham:T5:106). According to defendant, he "thought Kyona was having an asthma attack." (Graham:T5:108).

As part of their investigation, Detective Dunn spoke with Nicolas, as well as Mendissa, when the two arrived at the hospital later that morning. (Dunn:T5:313). His conversation with Nicolas resulted in her giving the police permission to search the house at 9 Innington Court. (Dunn:T5:314). After his conversation with Mendissa, Detective Dunn arranged for an emergency room physician to examine her. (Dunn:T5:316). DR. FE MURPHY conducted a complete physical on Mendissa and found her to be in "acute distress." (Murphy:T5:332, 333). He observed swelling and redness, especially on her right arm, and concluded that her injuries were consistent with her being struck by a leather belt. (Murphy:T5:334, 336).

Detective Youngman spoke with defendant several minutes later. (Youngman:T5:552). Defendant's wrists were no longer in restraints.

---

Winters photographed various rooms of the house and collected numerous pieces of evidence, including the brown, twisted leather belt (People's Exhibit No. 34), the blue amplifier cord (People's Exhibit No. 35), blood-stained sheets and a satin blanket from Kyona's bed (People's Exhibit Nos. 37 and 38), and homework pages from the girls' bedroom (People's Exhibit No. 36). Detective Winters also responded to Good Samaritan Hospital and took photographs of the bruising on both Kyona's and Mendissa's bodies. (People's Exhibit Nos. 8-15).

(Youngman:T5:552). Defendant agreed to accompany Detective Youngman to the police department for further questioning. (Youngman:T5:552). Police Officer Lee drove Detective Youngman and defendant to the police station where Detectives Youngman and Graham interviewed defendant. (Lee:T5:43; Graham:T5:110; Youngman:T5:552). After discussing his family background, as well as Kyona's medical history, defendant repeated his story to the detectives about how he disciplined the girls that evening because he was angry that they urinated in their room and that they continued to answer their homework assignment incorrectly. (Graham:T5:110; Youngman:T5:553, 554). Defendant admitted that he spanked both Kyona and Mendissa, between ten to fifteen times each, with the brown leather belt. (Youngman:T5:555). Defendant further explained, as he did earlier, that he saw Kyona in the hallway in the early morning while he worked in his office. (Graham:T5:110; Youngman:T5:556). He explained that she was unsteady on her feet so he brought her into the kitchen where he splashed water on her face and tried to feed her some chicken. (Youngman:T5:557). According to defendant, Kyona choked on the chicken and then slumped over into the kitchen sink. (Youngman:T5:557). Defendant then carried Kyona into the master bedroom where he told Nicolas something was wrong with Kyona and asked her for help. (Youngman:T5:557). Nicolas directed defendant to call 911 while she administered CPR to Kyona. (Youngman:T5:557). Defendant's version of events

were taken down in written form after defendant acknowledged that he understood his Miranda rights as Detective Graham explained them to him. (Graham:T5:111, 112; Youngman:T5: 557-558; People's Exhibit 62: defendant's first written statement).[8]

Detectives Youngman and Graham then interviewed Nicolas at the police station. (Graham:T5:116; Youngman:T5:573).  After she completed a written statement, detectives allowed her to speak with defendant in the interview room at her request. (Graham:T5:117; Youngman:T5:573, 574).  At no time did Detective Youngman ask Nicolas to speak with defendant or tell Nicolas what to say to defendant. (Youngman:T5:574). Since Nicolas and defendant spoke to each other primarily in Creole, the detectives were unable to understand their conversation and abruptly ended it. (Graham:T5:118; Youngman:T5:574). Before Nicolas left the station, she advised the detectives that defendant wished to speak to them again. (Graham:T5:118).

During this second interview, Detective Youngman advised defendant that, although they did not believe defendant intentionally killed Kyona, they did not believe his story that he saw Kyona walking in the hallway. (Youngman:T5:575). Defendant thereafter admitted that he found Kyona in her bed and that she "looked

---

[8] At trial, the People called GINA NOWICKI, the court reporter who transcribed the minutes of the Rockland County Grand Jury pertaining to People v. Darius Jean, and read defendant's Grand Jury testimony into the record. (Nowicki: T5:620-676).  Defendant's testimony at the

kind of weird." (Youngman:T5:575; People's Exhibit 63: defendant's second written statement). Detective Youngman then took a second written statement from defendant, which essentially reiterated defendant's prior version of events, but included defendant's recent admission. (Graham:T5:119; Youngman:T5:575; People's Exhibit 63). When Detective Youngman confronted defendant a third time about why defendant put the chicken in Kyona's mouth, defendant replied, "I put it there to look like she choked." (Youngman:T5:584).

On October 21, 2001, several days after Kyona's death, DR. FREDERICK ZUGIBE, Chief Medical Examiner for Rockland County, conducted an autopsy on Kyona's body. (Zugibe:T5:690). The autopsy revealed that Kyona sustained multiple abrasions to her back causing her back to become swollen, discolored, and infiltrated with blood. (Zugibe:T5:693). Upon examining the belt and cord recovered from defendant's home,[9] Dr. Zugibe concluded that those items were consistent with the pattern and loop-type abrasions found on Kyona's back. (Zugibe:T5:704, 705). In Dr. Zugibe's expert opinion, Kyona died as a result of blunt force trauma which caused hemorrhages and pneumothoraxes. (Zugibe:T5:715-716). He estimated her time of death between 1:30 a.m. and 3:00

---

Grand Jury essentially mirrored defendant's version of events as set forth in People's Exhibit 62; defendant's first written statement).
[9] RUSSELL GETTIG, a forensic scientist with the New York State Police Crime Lab, concluded that the blood on defendant's belt, Kyona's homework pages, and her satin blanket and sheet matched her DNA profile.

a.m. and stated that a beating of this severity could have effected Kyona's eyesight, as well as her ability to write, and breathe. (Zugibe:T5:707-708, 709).

## The Defense Case

On October 11, 2001, at approximately 6:00 p.m., HERBY CESAR arrived at defendant's home on Innington Court in Hillcrest, New York. (Cesar:T5:769). He and defendant had been producing music together for about one year and they generally worked out of defendant's home office. (Cesar:T5:767-768). When he arrived that night, Junior, another person involved in defendant's music business, was already there. (Cesar:T5:770). Defendant remained downstairs in the basement working on a plumbing project. (Cesar:T5:770). On his way to the office, Cesar waved to Kyona and Mendissa, who were in their room. (Cesar:T5:771). At around 7:00 p.m., defendant asked Cesar and Junior to watch the girls, who remained in their room doing their homework, to allow him to go to the Home Depot store. (Cesar:T5:772). Defendant returned home about thirty minutes later. (Cesar:T5:772).

For the rest of the night, Cesar and Junior worked in defendant's office, playing loud music and making beats until around 9:00 p.m. (Cesar:T5:771, 773). At one point, Cesar left to pick up some Chinese food, but he and Junior did not eat it until just before they left. (Cesar:T5:771, 773). While they were eating their Chinese food in the kitchen talking to defendant, Kyona, who looked perfectly

fine, entered the kitchen with a book. (Cesar:T5:774). After she left the kitchen, defendant told Cesar and Junior that he had spanked one of his girls because she was not correctly answering her homework assignment. (Cesar:T5:775). During the time that Cesar was at defendant's house, he never saw Leslie Nicolas, defendant's girlfriend, nor did he notice anything unusual about the girls. (Cesar:T5:774, 775).

Between 9:30 p.m. and 10:00 p.m. and shortly after Cesar and Junior left defendant's house, defendant's downstairs tenant, OUMIE CAMARA, arrived home to find defendant working on the shower in her bathroom. (Cesar:T5:771, 774; Camara:T5:786, 787). She had a brief conversation with defendant about his progress, and after she changed her clothes, went upstairs, saw Kyona and Mendissa sitting at the kitchen table doing their homework, and then took a shower in the girls' bathroom. (Camara:T5:787-789). When she returned downstairs, she had another conversation with defendant about his progress on her shower. (Camara:T5:790). During their conversation, Kyona, who seemed fine, came downstairs and asked defendant to help her with her homework. (Camara:T5:790). Camara then retired to her bedroom where she changed into her pajamas and watched the television show "Friends" at 11:00 p.m. (Camara:T5:791). She fell asleep after the program ended. (Camara:T5:791). Sometime between 3:30 a.m.

and 4:00 a.m., Camara woke up when she heard Nicolas' voice and footsteps upstairs but soon fell back asleep. (Camara:T5:792).

That morning, Camera spoke to the police and found out that Kyona had died. (Camara:T5:806-807). She gave a statement to the police at the Ramapo police station. (Camara:T5:807). Later that night back at the house at 9 Innington Court, she spoke with Nicolas. (Camara:T5:792). Nicolas advised her that she was selling the house and that Camara needed to find another place to live. (Camara:T5:796, 797). During that week, Nicolas removed all of the contents from the house and, by the end of the week, Camara moved out. (Camara:T5:798, 805).

## POINT I

### THE HEARING COURT PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS (Answering Defendant's Amended Brief, Point I at 5-12).

On appeal, defendant claims that the hearing court erred when it failed to grant his motion to suppress the evidence recovered from defendant's house and defendant's statements.[10] In particular, he maintains that the statement defendant gave to Detective Graham at the hospital, "while the Defendant was in restraints, after he had become uncontrollably hysterical and had indicated ... that he was

---

[10] Defendant does not appear to dispute on appeal the admissibility of the first two oral statements he made to Police Officers Chris Franklin and Sean Lee at 9 Innington Court when the police officers first responded to the 911 call. As such, the People do not address the

dangerously suicidal," was in violation of his Fourth and Fifth Amendment rights since he was never told that he had a right to refuse to sign a waiver of those rights. (Defendant's Amended Brief at 5). Defendant also maintains that his consent to search the house, which was obtained by Detective Graham at the same time, and all evidence and subsequent statements obtained as a result, including defendant's grand jury testimony, are "fruits of the poisonous tree." (Defendant's Amended Brief at 9, 11). Defendants claims are wholly meritless.

A. Statements

Turning first to the statement defendant made at the hospital at approximately 6:20 a.m. to Detective Graham, the hearing record clearly supports the trial court's conclusion that the statement was admissible. Not only was defendant not "in custody" at the time the statement was made, Detective Graham nevertheless advised defendant of his Miranda rights prior to speaking with him.

To determine whether defendant was "in custody," the court must not assess what the defendant thought, but rather "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position. (Citations omitted)." People v. Yukl, 25 N.Y.2d 585, 589 (1969). The test is an objective one.

---

admissibility of those statements on appeal and maintain that such statements were lawfully obtained.

Applied here, the evidence adduced at the hearing clearly establishes that defendant was not in police custody. Detective Graham spoke with defendant one-on-one while defendant sat on a hospital bed in an examining room while Police Officer Hatch stood outside the room. (Graham: H1:70). Although the record reflects that defendant wore leather hospital restraints around his wrists, (Graham: H1:71), defendant was restrained by medical devices for medical purposes. See, People v. Webster, 248 A.D.2d 738 (2d Dept. 1998); People v. Ripic, 182 A.D.2d 226, 231-232 (3d Dept. 1992). Aside from the hospital restraints, "there is nothing in the record . . . to indicate that defendant was restrained of [his] freedom of movement by the police to the degree associated with a formal arrest." People v. Ripic, 182 A.D.2d at 232. In fact, the hearing court correctly concluded that "the restraint [of defendant] was independent of any official government action." (See. Decision and Order dated July 26, 2002 at 6). Moreover, the facts reveal that defendant was in a non-coercive, non police-dominated atmosphere and that it was defendant's own medical condition that rendered him "immobile." See, People v. Webster, 248 A.D.2d at 738; People v. Ripic, 182 A.D.2d at 231.

Defendant's argument that defendant was "in custody" is nevertheless rendered moot by the fact that Detective Graham, prior to speaking with him, advised defendant of his Miranda rights. The testimony elicited at the hearing established that Detective Graham, using a pre-printed form, verbally administered

the Miranda warnings to defendant.    (Graham: H1:71, 77).    After defendant indicated that he understood his rights, he placed his initials next to each of the rights that Detective Graham read to him and then signed the Acknowledgement of Rights form.    (Graham: H1:72-73: People's Exhibit No. 4).    Defendant then waived his rights and agreed to speak with Detective Graham. (Graham: H1:73).

Notwithstanding the overwhelming evidence, defendant contends that, since he was "uncontrollably hysterical" and "dangerously suicidal," he could not have voluntarily waived his Miranda rights. (Defendant's Amended Brief at 5). Contrary to defendant's contention, there is no evidence in the hearing record to support his conclusion that his emotional state interfered with his ability to understand and subsequently waive his constitutional rights.    Although understandably upset over the death of his step-daughter, the testimony of Detective Graham established that defendant, by the time Detective Graham spoke with him, was alert and coherent, fully understood his rights and chose to waive them. See, People v. Bongiorno, 243 A.D.2d 719 (2d Dept. 1997).  In addition, the record is also void of any evidence that defendant "objected to the presence of and questioning by the [detective], that defendant refused to answer, or that defendant requested that the [detective] leave." People v. Ripic, 182 A.D.2d at 231.  See also, People v. Sirmons, 239 A.D.2d 446 (2d Dept. 1997).

With respect to the first written statement defendant made to Detectives Youngman and Graham at the Town of Ramapo Police Department at approximately 11:05 a.m., defendant contends that he was "still in such condition of confusion and distress" or "a person [who had] plainly not yet come to his senses" that he was unable to voluntarily waive his <u>Miranda</u> rights. (Defendant's Amended Brief at 6). Defendant is again mistaken. The evidence at the hearing unequivocally established that defendant, after Detective Graham verbally advised him of his rights for the second time and in the same manner as he had done at the hospital, <u>i.e.</u>, using a pre-printed form, waived his rights and signed an Acknowledgement of Rights form indicating that he understood his rights and agreed to speak with the detectives. (Graham: H1:92, 94; Youngman: H2:158, 165-168; People's Exhibit No. 7).

Clearly, the evidence presented at the suppression hearing proved that defendant was questioned by Detective Graham only after <u>Miranda</u> warnings had been administered to him. <u>See, People v. Rose</u>, 187 A.D.2d 617 (2d Dept. 1992). And, as the hearing court found, "defendant was again adequately apprised of his rights and knowingly waived them." (<u>See</u>, Decision and Order dated July 26, 2002 at 10). Since "great weight must be accorded to the determination of the hearing court...having seen and heard the witnesses, it's determination should not be

disturbed." People v. Horn, 196 A.D.2d 886 (2d Dept.), app. den., 82 N.Y.2d 850 (1993).

Defendant also attacks the voluntariness of the second written statement he gave to Detectives Youngman and Graham at the Ramapo Police Department on the ground that Leslie Nicolas, whom defendant refers to as his ex-girlfriend,[11] "was not acting toward him as a 'concerned relative;' [but] rather . . . she was acting as an agent of the police and was in a 'hostile position' toward the Defendant." (Defendant's Amended Brief at 10). In other words, defendant contends that Nicolas, having her own agenda, "persuaded the Defendant to change his story, at the importuning of the police." (See, Defendant's Amended Brief at 7). Defendant's contention, however, simply has no merit.

To determine whether Nicolas acted as an agent of the police, as defendant contends, "[t]he test is whether the private individual's conduct became 'so pervaded by governmental involvement that it [lost] its character as such and invoke[d] the full panoply of constitutional protections.'" (Citations omitted). People v. Lewis, 273 A.D.2d 254 (2d Dept. 2000). See also, People v. Jemmott, 144 A.D.2d 694, 695 (2d Dept. 1988). In making such a determination, the court must look at whether the individual's action in speaking with defendant was

---

[11] Defendant's reference to his "devoted new girlfriend, Sarah Fastenberg, is of no consequence as her Affidavit submitted in support of defendant's C.P.L. §440.10 motion is not part of the record pertaining to this appeal.

instigated, supervised, encouraged or solicited by the police. See, People v. Lewis, 273 A.D.2d at 255 (Mother of victim was not acting as agent of police where, although mother spoke to detective prior to speaking with defendant, defendant telephoned her and she was neither instigated nor supervised by police in speaking with defendant); People v. Hales, 272 A.D.2d 984 (4th Dept. 2000) (Mother of sixteen-year-old defendant was not acting as agent of police where mother yelled at defendant to tell the truth and defendant then agreed to give second statement); People v. Jemmott, 144 A.D.2d 694 (Father of defendant was not acting as agent of police where it was defendant who requested to speak with his father and the police officers only complied by arranging for the meeting); People v. Del Duco, 247 A.D.2d 487 (2d Dept. 1998) (Stepfather of defendant was not acting as agent of police where hearing evidence established that stepfather voluntarily spoke to the police and the police neither encouraged, instructed, nor directed stepfather to pick up defendant). Undoubtedly, where there is no basis to support a finding that an individual acted as an agent of the police and defendant is unable to point to any testimony to establish that the individual's actions were instigated or supervised by the police, the court will not find that that individual acted as an agent of the police. See, People v. Galloway, 138 A.D.2d 735 (2d Dept. 1988).

Applied here, and as the court properly concluded, "[t]he credible testimony at the hearing establishe[d] that Ms. Nicolas was acting neither at the direction of

nor in cooperation with the police when she spoke to the defendant at the police station." (See, Decision and Order dated July 26, 2002 at 11). The facts adduced at the hearing established that Nicolas requested to speak with defendant, just as defendant requested to speak with Nicolas and the detectives merely arranged for the two to speak with each other. Although the detectives shared their skepticism with Nicolas regarding defendant's version of events, at no time did the detectives tell Nicolas what to say, record their conversation, request that Nicolas wear a wire or even supervise their conversation. Cf., People v. Eberle, 265 A.D.2d 881 (4[th] Dept. 1999). In fact, the detectives testified at the hearing that, during their conversation, Nicolas and defendant spoke mostly in Creole, which the detectives were unable to understand. (Graham: H1:103; Youngman: H2:173).

Moreover, the fact that Nicolas told defendant to tell the truth and may have mentioned to defendant that if he cooperated he would not be charged with murder is of no moment. Neither remark "create[d] a substantial risk that the defendant might falsely incriminate himself." People v. Giangrasso, 109 A.D.2d 750 (2d Dept. 1985); People v. Blandon, 267 A.D.2d 392 (2d Dept. 1999). See also, Decision and Order dated July 26, 2002 at 12-13.

The fact that defendant gave a second written statement to Detectives Youngman and Graham, after Nicolas spoke to defendant, does not render defendant's statement involuntary. As previously stated, defendant has not

36

established that Nicolas acted as an agent of the police. Furthermore, prior to giving his second written statement, defendant was again advised of his <u>Miranda</u> warnings. <u>See</u>, <u>People v. Hales</u>, 272 A.D.2d 984.

Since the People established that defendant's statements to the detectives were voluntarily made, defendant's contention that his "Grand Jury testimony should have been thrown out" is equally unavailing. (Defendant's Amended Brief at 12). First, defendant has not established that defendant's grand jury testimony was tainted by any illegal police activity. <u>See</u>, <u>People v. Benson</u>, 114 A.D.2d 506, 507 (2d Dept. 1985), <u>app. denied</u>, 67 N.Y.2d 649 (1986). Second, defendant was not compelled to testify before the Grand Jury, as the defendant in <u>People v. DeMartino</u>. Here, defendant voluntarily testified before the grand jury only after he signed a waiver of immunity, which was fully explained to him, and only after defendant was given the opportunity to confer with his attorney. <u>People v. Benson</u>, 114 A.D.2d at 507. <u>Cf.</u>, <u>People v. Ventiquattro</u>, 138 A.D.2d 925 (4th Dept. 1988).

B. Consent to Search

Similar to the argument defendant raises with respect to the voluntariness of his statements, defendant raises an identical argument with respect to the voluntariness of his consent to search his house. (Defendant's Amended Brief at 8-11). Specifically, defendant claims that due to his emotional and physical state while in the hospital, as well as the fact that the detectives never advised defendant

of his right to refuse, defendant's consent to search his house was involuntary. (Defendant's Amended Brief at 9). Defendant also argues that the consent by "his former girlfriend, [i.e., Nicolas], is of no constitutional avail" since she was acting as an agent of the police and since she refused to sign the consent form. (Defendant's Amended Brief at 10). Both of these arguments are baseless.

### i. Consent to Search by Defendant

While is it well-settled that the People have a "heavy" burden to prove voluntariness, whether a consent to search is voluntary is a question of fact, which must be determined from the totality of the circumstances. See, People v. Gonzalez, 39 N.Y.2d 122, 128 (1976); People v. Zimmerman, 101 A.D.2d 294, 295 (2d Dept. 1984). The courts will consider several factors in determining whether a consent to search was voluntary, including the form of the consent, the custody status of the defendant, the techniques used by the police to obtain consent, and the background of the defendant. People v. Gonzalez, 39 N.Y.2d at 128. "No one circumstance is determinative of the voluntariness of consent." Id.

An analysis of the factors to determine voluntariness as applied to the facts of the instant matter clearly demonstrates that defendant voluntarily consented to the search of his home. At the hospital, when Detective Graham obtained defendant's verbal consent to search, defendant was not in custody. Aside from that, defendant had just admitted to Detective Graham that he had used a brown

leather belt to discipline the girls and explained to Detective Graham where in the house the belt could be located. In other words, defendant volunteered the belt's location to Detective Graham and then told Detective Graham that the police had his permission to search the house. Later that same day, defendant signed a Consent to Search form at the Ramapo Police station to confirm his prior verbal consent. See, People v. Rose, 187 A.D.2d 617 (2d Dept. 1992)

Defendant's reliance on the fact that the detectives failed to advise defendant of his right to refuse to consent is misplaced. (See, Defendant's Amended Brief at 10). First of all, the failure to advise defendant of his right to refuse is only one of the several factors the court can consider to determine the voluntariness of the consent. Here, although defendant was not advised of his right to refuse to consent, the evidence at the hearing did establish that defendant was not in custody and that defendant was advised of his Miranda warnings prior to giving his consent. The mere fact that Detective Graham, nor any other law enforcement official, failed to advise defendant that he could refuse to consent to the search does not, in and of itself, negate the voluntariness of defendant's consent. People v. Auxilly, 173 A.D.2d 627 (2d Dept. 1991); People v. Zimmerman, 101 A.D.2d 294. Defendant's argument also falls short based on the fact that prior to signing the written Consent to Search form, defendant was in fact advised of his right to refuse to consent.

In concluding that defendant voluntarily consented to the search of his home, the court also recognized that "this was not defendant's first contact with law enforcement [and] . . . that defendant had been cooperative with police prior to giving his consent." (See, Decision and Order dated July 26, 2002 at 7). In addition, the court also noted that defendant admitted to the Grand Jury that both his verbal and written consent were voluntarily given. (See, Decision and Order dated July 26, 2002 at 7).

Based on the totality of the circumstances, and based on the fact that the People must establish consent by "clear and positive" evidence, the record supports the hearing court's determination that defendant voluntarily consented to the search.

### ii. Consent to Search by Nicolas

In view of the fact that defendant voluntarily consented to the search of his home, it is immaterial whether the police also obtained consent to search the house from Nicolas. Assuming, however, that defendant's consent was not voluntarily given, defendant's claim -- that Nicolas's consent was "of no constitutional avail" because she was acting as a vengeful woman set on retaliating against defendant and as an agent of the police – is equally unavailing.

It is well-established that a police officer is authorized to effect a warrantless entry into a home if the officer obtains voluntary consent to enter the premises. In

40

addition, a search conducted pursuant to the voluntary consent of a party possessing the requisite authority and control over the premises is lawful. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 (1973). Consent can be either oral, in writing, or conveyed by the conduct of the consenting party. People v. Valenzuela, __Misc.2d__, N.Y.L.J. 5/16/96 (Sup. Ct. Bx. Cty. 1996). The prosecution bears the burden to prove consent was lawfully obtained. The hearing court should consider the "totality of circumstances" to determine whether consent is given voluntarily or the product of either express or implied coercion by the police. See, People v. Leidinger, 196 A.D.2d 688 (1st Dept.), app. den., 82 N.Y.2d 851 (1993).

More to the point, the right of a third party to consent to police entry is recognized where he or she has the "requisite degree of control" over the premises. People v. Mantilla, 220 A.D.2d 691 (2d Dept. 1995), app. den., 88 N.Y.2d 850 (1996). Thus, New York courts have found that a defendant's fiancée or girlfriend has authority to consent to the search of premises she shares with the defendant. People v. Cosme, 48 N.Y.2d 286 (1979); People v. Melo, 98 A.D.2d 754 (2d Dept. 1983); People v. Lopez, 291 A.D.2d 279 (1st Dept. 2002).

Applied here, it is abundantly plain that Nicolas had the authority to consent to the search of the house. At the hearing, Nicolas testified that she lived at 9 Innington Court with defendant for the past five years and that she and defendant

had been engaged to be married for four of those years. (Nicolas: H211, H213). Without more, it is clear that Nicolas had both "apparent and actual authority to give consent" to search the house. (See, Decision and Order dated July 26, 2002 at 7-8). See also, People v. Melo, supra; People v. Lopez, supra..

Defendant nonetheless assails the hearing court's determination on the ground that Nicolas' consent was not voluntary because it was motivated by her hostility toward defendant. Nicolas' reason for consenting to the search, however, is not relevant in determining whether her consent was voluntary. In other words, Nicolas' motivation is simply not a factor. In addition, the fact that Nicolas refused to sign the Consent to Search form does not vitiate the voluntariness of her consent, as defendant argues. As stated, Nicolas' reasons for not wanting to sign the form does not negate her freely given verbal consent to search the house.

Interestingly, defendant does not present any reason to show that the hearing court should not have credited the testimony of the police officers. Since "great weight must be accorded to the determination of the hearing court...having seen and heard the witnesses, it's determination should not be disturbed." People v. Horn, 196 A.D.2d 886 (2d Dept.), app. den., 82 N.Y.2d 850 (1993).

*   *   *

In sum, since the record supports the conclusion that defendant's statements to police were voluntarily made and that both defendant and Nicolas consented to the search of the house, the court's ruling should be affirmed.

## POINT II

### DEFENDANT RECEIVED VERY EFFECTIVE ASSISTANCE FROM HIS TRIAL ATTORNEY (Answering Defendant's Amended Brief, Points III – X at 19-47).

On appeal, defendant argues that he received ineffective assistance of counsel in violation of his state and federal constitutional rights. Specifically, defendant points out several examples in which he received ineffective assistance of counsel:  defense counsel's failure to effectively cross-examine Mendissa Jean and Dr. Frederick Zugibe, the medical examiner (Defendant's Amended Brief at 21, 40); his failure to consult with defense experts and to present a defense (Defendant's Amended Brief at 21); his failure to object to the "contradictory" verdicts (Defendant's Amended Brief at 26); his failure to challenge the constitutionality of the depraved indifference murder statute as applied to defendant (Defendant's Amended Brief at 29); his failure to consent to his own disqualification (Defendant's Amended Brief at 33); his failure to deliver an effective closing argument (Defendant's Amended Brief at 41); and his failure to

object to the prosecutor's closing argument (Defendant's Amended Brief at 46).[12]

A review of the record reveals that nothing could be further from the truth.

Defendant actually received very effective assistance of counsel from an

experienced defense attorney whose efforts on his behalf afforded him a fair trial,

and whose performance, without doubt, meets constitutional requirements.

To establish an ineffective assistance of counsel claim, defendant must show

that his attorney failed to provide "meaningful representation" under all the

circumstances. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984);

People v. Benevento, 91 N.Y.2d 708 (1998); People v. Henry, 95 N.Y.2d 563 (2000).

In other words, the constitutional requirement of effective assistance of counsel will

be satisfied "so long as the evidence, the law and the circumstances of a particular

case, viewed in the totality and as of the time of the representation, reveal that the

attorney provided meaningful representation." People v. Satterfield, 66 N.Y.2d 796,

798-99 (1985); People v. Baldi, 54 N.Y.2d 137, 147 (1981). The standard to be

applied is an objective one. People v. Benevento, 91 N.Y.2d at 712, and "cannot be

fixed with yardstick precision" but must instead be measured against the "unique

circumstances in each case." People v. Baldi, 54 N.Y.2d 137, 146 (1981). Even if

defendant proves that his attorney failed to provide "meaningful representation,"

---

[12] Defendant raised these identical issues in a post-judgment motion he filed pursuant to CPL
Section 440.10. By Order dated August 18, 2003, Justice Kelly denied defendant's motion in its
entirety on both procedural and substantive grounds. The court concluded that sufficient facts

defendant must also establish that "the attorney's conduct constituted 'egregious and prejudicial error' such that defendant did not receive a fair trial." People v. Benevento, 91 N.Y.2d at 713, citing, People v. Flores, 84 N.Y.2d 184, 188-189 (1994). More specifically, "the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case." Id. at 714. See also, People v. Stultz, 2 N.Y.3d 277 (2004). "The Constitution guarantees the accused a fair trial, not necessarily a perfect one. (Citations omitted)." People v. Benevento, 91 N.Y.2d at 712.

Applied here, it is plain that the record of counsel's performance before, during and after the trial provides a sound basis for rejecting defendant's ineffective assistance claim. Although the attorney who tried the case was not his original attorney, David Goldstein, defendant's retained trial attorney, zealously represented his client. Expressing dissatisfaction with the omnibus motion submitted by defendant's prior counsel, Goldstein requested a new motion schedule to submit his own motion papers. His motion sought various relief, including a demand for additional discovery, a dismissal of the indictment, and suppression of defendant's statements and physical evidence. Goldstein also demanded Brady material and moved to preclude the prosecution from using at trial evidence of prior convictions and prior bad acts pursuant to People v.

_____

appeared on the record to permit adequate review on direct appeal, and that each of defendant's

Sandoval, 34 N.Y.2d 371 (1974). His motion resulted in the court's granting of a Huntley/Mapp hearing, as well as a Sandoval hearing.

During the pre-trial hearings, moreover, Goldstein extensively cross-examined the People's witnesses, interposed objections, and called defense witness. At the Sandoval hearing, not only did defense counsel successfully oppose the prosecutor's request to inquire about defendant's previous conviction in Florida for burglary in the event defendant were to testify, (Proceedings: H2:313), defense counsel also vehemently opposed the People's Ventimiglia motion to introduce evidence of prior events in which defendant beat or "disciplined" his daughters. (Proceedings: H2:8-10). Defense counsel made cogent, articulate arguments to prevent the admission of such evidence for which the court obviously credited since it denied the People's motion. See, People v. Laviolette, 307 A.D.2d 541 (3d Dept. 2003).

Goldstein's zealous advocacy was apparent at all stages of the proceedings as counsel, up to and during the trial, continuously raised issues regarding the admissibility of evidence. Goldstein moved in limine to preclude the admissibility of certain photographs of defendant's daughters on the ground that the jury would be unable to distinguish the "old injuries" from the injuries the girls' sustained on October 11 and 12, 2001. (Proceedings: H2:15-16). Prior to jury selection,

---

claims lack merit.

Goldstein moved to preclude the testimony of the People's blood expert on the ground that this witness would be unable to conclusively state that the blood found on the belt resulted from the October 11-12 beatings, as opposed to a prior incident. (Proceedings: T1:4).

In addition to filing a new omnibus motion, Goldstein sought, by order to show cause, a reduction of the second degree murder charge to second degree manslaughter on the ground that the depraved indifference murder statute is unconstitutionally vague. He also requested a hearing to determine whether the police or the prosecution in any way influenced the testimony of eight-year old Mendissa Jean.

Counsel's meaningful representation of defendant continued into the trial proceedings. Goldstein took an active role in jury selection and raised several challenges for cause to remove members of the jury panel, including a Batson claim. (Proceedings: T1:151; T2:53; T2:167; T2:172; T3:60; T3:77). See, People v. Wagner, 104 A.D.2d 457 (2d Dept. 1984). During the trial, counsel gave an opening statement, made assorted objections and thoroughly cross-examined the People's witnesses to point out any weaknesses in the prosecution's case. After the prosecution rested, defense counsel moved to dismiss the charges. presented his own defense by calling two witnesses, and delivered a persuasive summation.

Nor did defense counsel's zealous representation of defendant end when the jury announced its guilty verdict. Defense counsel moved to set aside the verdict, (Proceedings: T5:974), and at sentencing, urged the court to "exercise its discretion" and impose a sentence other than the maximum terms recommended by the People.  (Sentence: S22-31).  Even after sentence was imposed, defense counsel moved for a hearing based on allegations of jury misconduct.  His motion led to a two-day hearing on the issue. Even at sentencing, the court commended defense counsel for his "zealous advocacy" on defendant's behalf.  (Sentence: S:38).  All told, it is evident that defendant received constitutionally "meaningful representation" at all stages of the proceedings.

Defendant nevertheless argues that he was denied the ineffective assistance of counsel based on several instances where Goldstein's performance fell below the level of "meaningful representation." (Defendant's Brief at 21-47).  Taken individually or viewed in totality and as of the time of the representation, defendant's ineffective assistance of counsel claim must fail.

Defendant's first contention -- that trial counsel failed to present a defense and conducted an "inept" cross-examination of Mendissa Jean – is wholly unsupported by the record. (Defendant's Amended Brief at 21).  In fact, defense counsel's strategy to weaken the prosecution's case was to call Herbie Cesar and Oumie Camera to highlight inconsistencies that were elicited through the People's

witnesses, to corroborate defendant's statements to police that Kyona "appeared fine" the evening of October 11, 2001, and to raise an issue of whether Leslie Nicolas had a self-serving motive to assist the police in their investigation of defendant.    With respect to counsel's cross-examination of Mendissa Jean, although counsel may have elicited damaging testimony, that does not, in and of itself, rise to the level of "downright incompetence" as defendant contends. (Defendant's Amended Brief at 24).  Rather, defense counsel had before him an eight-year-old girl who had been beaten by her father.  Without wanting to come across too strong but obviously finding it necessary to cross-examine her to some extent, defense counsel asked pointed, tactical questions of this very vulnerable witness.  In that regard, Goldstein's inquiry into the number of times defendant struck the girls was intended to minimize, rather than emphasize, the prosecution's case.  The fact that defendant now disagrees with the manner and method of her cross-examination is insufficient to establish that counsel was ineffective.  See, People v. Benevento, 91 N.Y.2d 708 (1998); People v. Flores, 84 N.Y.2d 184 (1994).

This argument equally applies to defendant's contention that defense counsel failed to effectively cross-examine Dr. Zugibe, the medical examiner. (Defendant's Amended Brief at 40).  Specifically, defendant claims that defense counsel was inadequately prepared because he failed to research the doctor's

background or present his own defense expert. Defendant also characterizes Goldstein's cross-examination of Dr. Zugibe as "perfunctory," (Defendant's Amended Brief at 41), because Goldstein failed to impeach the doctor either by using the doctor's own changed testimony regarding the time of death or by using articles, texts or treatises for that purpose. (See, Defendant's Amended Brief at 40-41).

A review of counsel's cross-examination of Dr. Zugibe, however, proves that defendant is simply incorrect. Counsel's cross-examination of Dr. Zugibe demonstrates his thorough preparation, and that knew what areas to cover with this witness. For example, Goldstein not only established that the cable wire (admitted into evidence as People's Exhibit 35) was not necessarily the weapon that defendant used to beat his daughters on October 11 and 12, 2001, (T5:726, 730), but he also shifted the blame to the police officers and paramedics who, he suggested, administered negligent care to Kyona. On cross-examination, Dr. Zugibe conceded that some of the techniques they administered were improperly performed. (T5:750-754). Dr. Zugibe even admitted on cross-examination that he failed to include certain findings in his report such as the finding of blood on the cord and the location of the blood on the belt, failed to photograph the blood he allegedly found on the cable wire (although the forensics lab found none), and failed to perform certain additional tests, in addition to an x-ray that could have

confirmed his finding that Kyona died from a pneumothorax, i.e., a collapse of the lung. Viewing counsel's cross-examination in its entirety, counsel obviously studied the medical concepts relating to Kyona's cause of death so that he could appropriately question Dr. Zugibe about the procedures he followed and the conclusions he reached.

Defendant's next contention that counsel failed to deliver an effective closing argument is similarly baseless. There can be no dispute that defendant has both a constitutional and statutory right to an effective summation. See, People v. Marcelin, 23 A.D.2d 368, 371 (2d Dept. 1965), app. den., 74 N.Y.2d 743 (1989); People v. Jackson, 166 A.D.2d 356 (1st Dept. 1990); People v. Bacalocostantis, 111 A.D.2d 991 (3d Dept. 1985). However, a closing argument will not be ineffective just because defendant, with the clarity of hindsight, may have worded it differently. Rather, the effectiveness of counsel's closing argument must be viewed based on counsel's performance in its entirety, People v. Vanterpool, 143 A.D.2d 282 (2d Dept. 1988), and, in the instant matter, defense counsel's performance exceeded the standard of "meaningful representation."

Were this Court to review the substance of counsel's closing argument, it is clear that defense counsel did exactly what he was supposed to do, i.e., he commented upon every pertinent matter of fact that bore upon questions the jury had to decide. See, People v. Ashwal, 39 N.Y.2d 105 (1976). Contrary to

51

defendant's contention that counsel's summation "only reinforced the People's case" and "emphasized the brutal nature of the crime," counsel delivered an articulate, logical and well-argued summation.    For example, Goldstein commented upon the lack of evidence, questioned the credibility of the People's witnesses -- especially that of Mendissa Jean, Dr. Frederick Zugibe, and the police -- and offered alternate theories as to the cause of Kyona's death.  Goldstein also suggested that the police officers and/or paramedics caused Kyona's death due to the excessive number of compressions that were administered to her in a short period of time.  (Defense Summation: T5:833).    Goldstein urged the jury to consider Leslie Nicolas as the murderer since her behavior throughout the evening was suspect and since she clearly had a motive to blame defendant for her actions. (Defense Summation: T5:849, 854-856). Faced with the evidence that defendant admitted to disciplining his daughters, as well as the credible scientific and forensic evidence, defense counsel's strategy that the People's evidence was legally insufficient was a plausible one.  In view of his effective advocacy, this Court should "not second-guess whether that strategy 'was the best trial strategy, or even a good one, so long as defendant was afforded meaningful representation." People v. Jackson, 277 A.D.2d 915 (4th Dept. 2000), quoting, People v. Satterfield, 66 N.Y.2d at 799-800.  See also, People v. Johnson, 273 A.D.2d 495 (3d Dept. 2000).

Still, defendant identifies several instances during the trial in which counsel failed to raise assorted objections. (Defendant's Amended Brief at 26, 29, 46). Defendant claims that Goldstein: failed to object during the People's closing argument when the prosecutor "alluded to facts not in evidence" regarding Mendissa's testimony. He also faults Goldstein for failing to object to the "contradictory verdicts," and to challenge the constitutionality of the depraved indifference murder statute. None of defendant's claims have merit.

A prosecutor, like any other advocate, is entitled to broad leeway in framing his points. People v. Galloway, 54 N.Y.2d 396, 399 (1981); People v. D'Alessandro, 184 A.D.2d 114, 119 (1st Dept. 1992). And, his summation must be examined in relation to defendant's summation, as he is entitled to respond to defendant's arguments. People v. Halm, 81 N.Y.2d 819, 821 (1993); People v. Marks, 6 N.Y.2d 67, cert. denied, 362 U.S. 912 (1960); People v. Devonish, 159 A.D.2d 320, 321 (1st Dept. 1990). Under these standards, the prosecutor's comments were entirely proper and the fact that defense counsel failed to object to them is of no moment.

After the prosecutor reminded the jury of the testimony of Leslie Nicolas, who washed the girls' dirty underwear in the bathroom sink late that night and hung them on the shower bar to dry, and the testimony of Oumie Camera, a defense witness, who saw the underwear hanging up in the bathroom the next day, the prosecutor said:

> When you put together the testimony of Mendissa Jean,
> Leslie Nicolas, the police, there's an obvious reason.

> Kyona Fredericks died in those clothing, and it is only after she's dead and after [defendant] finds her dead – and let's talk about how depraved this is – that he takes that young girl into the bathroom, takes off those pants, and puts her in the bathtub. How do you know that? Mendissa Jean tells you that. It is after the beating occurred. And what did Leslie Nicolas tell you when [defendant] brings her into that room? He brings her in stark naked and dead.

(People's Summation: T5:870-871).    By these remarks, defendant argues that the prosecutor alluded to facts not in evidence.   (Defendant's Amended Brief at 47).

However, in context, it is evident that the prosecutor was merely extrapolating various bits of testimony from different witnesses about what each observed and did in the bathroom.   From those comparisons, he urged the jury to fit these pieces together in the context of the People's proof of defendant's guilt.   Contrary to defendant's contention, the People merely urged the jury to draw a logical inference from the evidence presented which constituted fair comment on that evidence. People v. Liang, 208 A.D.2d 401 (1st Dept. 1994); People v. Chavez, 207 A.D.2d 705 (1st Dept. 1994), citing, People v. Revell, 172 A.D.2d 356 (1st Dept. 1991).

Similarly, defense counsel's failure to object at the close of the trial to the "contradictory verdicts" and to renew his challenge to the constitutionality of the depraved indifference murder statute as applied to him does not render his representation constitutionally deficient. (Defendant's Amended Brief at 26, 29). As discussed in Point I, supra, the jury's verdict finding defendant guilty of both second degree murder and first degree manslaughter is not inconsistent or repugnant. In

54

addition, the trial court had already ruled on the issue regarding the constitutionality of the depraved indifference murder statute as a result of defense counsel's show cause order. As the issue had previously been preserved for appellate review, there was no need for defense counsel to raise the issue again after the jury announced its verdict.

Indeed, at the resentencing hearing, defendant's new counsel attempted to raise the issue again.[13] (R: 6-7). The court, noting that the issue was "the subject of an extensive motion by . . . predecessor counsel [Goldstein]," denied the application since it's previous ruling on the issue was "the law of the case." (Resentence: R7). As such, there was no reason for defense counsel to challenge the constitutionality of the statute at the conclusion of the trial and his failure to do so did not deprive defendant of "meaningful representation." Given the record on appeal, there is no evidence to support defendant's contention that defense counsel's failure to raise these objections were anything but "tactical trial decisions." People v. Taylor, 1 N.Y.3d 174, 177 (2003), quoting, People v. Ryan, 90 N.Y.2d 822, 823-824 (1997).

Defendant's remaining claim is that the trial court's refusal to disqualify Goldstein due to a conflict of interest was improper. (Defendant's Amended Brief at 33). According to defendant, trial counsel's earlier representation of the People's witness, Dr. Eric Silva -- the emergency room physician who pronounced

---

[13] Defendant's appellate counsel, Harvard Hollenberg. Esq.. appeared at the re-sentencing

Kyona's death and was therefore a main prosecution witness -- on an unrelated marijuana possession charge in New Jersey, presented an actual conflict of interest existed that hindered counsel's ability to effectively cross-examine Dr. Silva. (Defendant's Amended Brief at 33). Defendant's claim is unavailing.

It is well-settled that a defendant has the right to counsel of his choice. Wheat v. U.S., 486 U.S. 153, 108 S.Ct. 1692 (1988). That right, however, is not absolute since the right to the effective assistance of counsel includes "representation that is reasonably competent, conflict-free and single-mindedly devoted to the client's best interests. (citations omitted)." People v. Harris, 99 N.Y.2d 202, 209 (2002). To prevail on an ineffective assistance of counsel claim on the ground that defense counsel's representation was not free of conflict, defendant must establish the existence of the conflict and that the conflict affected his counsel's performance. Id. at 210. Even where a conflict is shown to exist, defendant may waive his right to conflict-free counsel so long as the court is "satisfied that the defendant 'has an awareness of the potential risks involved in that course and has knowingly chosen it.' (Citations omitted)." People v. Wandell, 75 N.Y.2d 951, 952 (1990); see also, People v. Corona, 173 A.D.2d 484 (2d Dept. 1991); People v. Griffin, 249 A.D.2d 244 (1st Dept. 1998).

---

hearing.

In this case, the court conducted a full evidentiary hearing on the issue before it and correctly determined that Goldstein could continue to represent defendant. Although there is no dispute that an actual conflict of interest existed based upon Mr. Goldstein's prior representation[14] of Dr. Silva on an unrelated matter in New Jersey and that Mr. Goldstein's prior representation of Dr. Silva would impact the scope of his cross-examination of that witness, it was nevertheless entirely proper for the court to deny the People's motion to disqualify Goldstein.

Defendant's primary argument, however, is based on the fact that since Dr. Silva would not waive the attorney-client privilege, Mr. Goldstein would be prohibited from cross-examining Dr. Silva at trial about his arrest for possession of marijuana. (C:28).[15] Defendant argues that this information regarding a witness' history of illicit drug use or that such drug use might have impaired his observations at the time in question "can be [a] potent and legitimate bases [sic] for cross-examination" and his failure to utilize such information denied the defendant

---

[14] In his brief, defendant erroneously characterizes the representation as being "simultaneous." (Defendant's Amended Brief at 33), whereas, according to Mr. Goldstein, he no longer represented Dr. Silva as the matter had been resolved. During the hearing, Mr. Goldstein advised the court that "[t]he matter was handled by me making one appearance after speaking with . . . the municipal prosecutor. . . . The matter was what we called Section 36 . . . [which] is a diversion where the matter is closed. Fines were paid, and eventually the case is absolutely dismissed. . . . And that's when my representation of Dr. Silva concluded." (C:18-19).

[15] Parenthetical references preceded by "C" (Conflict) are to the minutes of the hearing to determine whether Mr. Goldstein should be disqualified which were conducted on June 20, 2002 and June 27, 2002 before the Honorable William A. Kelly.

the effective assistance of counsel.    (Defendant's Amended Brief at 39).

Defendant, however, misses the point since Mr. Goldstein's decision not to cross-

examine Dr. Silva about this matter was purely a tactical one and should not be

second-guessed.    Although defendant contends that Mr. Goldstein's "strategy"

never materialized and obviously assails Mr. Goldstein's performance based on an

unsuccessful strategy, it cannot be said that Mr. Goldstein's strategy was an

implausible one. On the contrary, Mr. Goldstein had a valid reason for not wanting

to cross-examine Dr. Silva about this "extremely minor charge" since it did not

"fit[] into [their] methodology of defending this case" nor did they want to offend

the jury by attacking the witness on such minor issues. (C:22-23).   According to

Mr. Goldstein, that would have been the "wrong approach" and probably would

have hurt, rather than helped, the defense. (C:23).

Notwithstanding the fact that defendant established that an actual conflict

existed and that the conflict would impact counsel's performance to the limited

extent that it would restrict the scope of his cross-examination of Dr. Silva,

defendant nevertheless waived his right to conflict-free representation.  During an

extensive colloquy on the issue, wherein both the prosecutor, defense counsel,

defendant and the court actively participated, the court inquired of defendant as to

whether he understood the nature of the conflict and his constitutional right to

conflict-free representation.  In response to the court's inquiry, defendant stated

that he understood the nature of the proceedings, (C:24), and advised the court that he and his attorney had had several prior conversations pertaining to the issue. (C:23, 24). Not only did the court ask general questions of defendant regarding his awareness of the conflict, the court also asked whether defendant understood the potential risks associated with Mr. Goldstein's continued representation of him. (C:28, 39-40, 43-44). In discussing the fact that Dr. Silva refused to waive his attorney-client privilege, the court explained:

> That's a very serious issue because we now know Dr. Silva does not want your attorney cross-examining him about any of the underlying facts pertaining to that offense, so it's something I want you to consider. Do you understand that?

(C:28-29). Defendant replied that he understood. (C:29). Clearly, the court fully explored with defendant how the conflict might undermine the effectiveness of his counsel. In an attempt to ensure that defendant fully considered all of the factors and ramifications of his decision to keep Mr. Goldstein as his attorney, the court adjourned the case for one week to give defendant an opportunity to consult with an independent attorney. (C:32, 33-34, 44, 55). The following week, defendant advised the court that he wanted Mr. Goldstein to remain on his case. (C:60).

With apparent disregard to the hearing record, defendant nevertheless argues that defendant's decision to "keep" Mr. Goldstein was not knowingly and intelligently made due to the court's failure to "appoint an attorney to explain to

Mr. Jean the full ramifications of the waiver of the acknowledged conflict." (Defendant's Amended Brief at 35-36). Specifically, defendant claims that "Mr. Jean simply lacked the capacity to make so momentous a decision" and the court's suggestion that he consult another attorney, rather than appoint one, "must strongly have suggested to him that the advice of another attorney would not have differed materially from that of Mr. Goldstein." (Defendant's Amended Brief at 38). Considering the fact that defendant has an extensive education which includes a high school degree and eight years of college, which the court elicited during the hearing, (C:42), defendant's argument is absurd. As the court indicated, defendant certainly had "the ability to make a decision and [was] able to digest and assimilate this information." (C:42). And, as the defendant readily admitted, defendant understood everything that took place during the hearing. (C:42). Significant, too, is the fact that on the date scheduled for the trial to commence, approximately one month after the hearings took place, defendant again reiterated his desire to have Mr. Goldstein continue to represent him. (Proceedings: T1:3). Based on this record, it is clear that defendant made a knowing, intelligent and voluntary waiver of his right to conflict-free counsel after a detailed discussion and inquiry by the court and his claim that he was denied the effective assistance of counsel, under these circumstances, must fail.

*                    *                    *

In sum, defendant received ample and effective assistance of counsel both prior to, during and after trial. If any conduct of defendant's counsel might now with hindsight be questioned, it is still very clear that no failing on counsel's part in any way prejudiced defendant or denied him of a fair trial. For these reasons, defendant's conviction must be affirmed.

## POINT III

### THE JURY'S VERDICT CONVICTING DEFENDANT OF SECOND DEGREE MURDER AND FIRST DEGREE MANSLAUGHTER IN A MULTI-COUNT INDICTMENT WAS SOUND
#### (Answering Defendant's Brief, Point II at 12)

In a multiple-count indictment, defendant was indicted for, inter alia, second degree "depraved indifference" murder (Penal Law Sec. 125.25(2)) and first degree manslaughter (Penal Law Sec. 125.20(4)) arising out of the death of his stepdaughter, Kyona Fredericks. After a jury trial, he was convicted of both of those counts, as well as the remaining counts set forth in the indictment.

On appeal, defendant claims that the verdict -- finding defendant guilty of both second degree murder and first degree manslaughter -- is inconsistent. (Defendant's Amended Brief at 12). Specifically, defendant argues that the verdict is "repugnant" since "[a] Defendant cannot be guilty of both intentionally and recklessly causing a person's death." (Defendant's Amended Brief at 19). Defendant also argues that the inconsistent verdict resulted from the "jury's

profound confusion" due to the court's improper preliminary instruction to the jury panel regarding "reasonable doubt." (Defendant's Amended Brief at 18). Defendant's claims are uniformly without merit.

## A.  The Jury's Verdict Was Sound

Turning first to defendant's claim that the jury's verdict was "repugnant" since the jury found defendant guilty of both reckless and intentional crimes. (Defendant's Amended Brief at 17-18), defendant's claim is unfounded.  To begin, the jury's verdict finding defendant guilty of both second degree murder and first degree manslaughter is not "repugnant" or "inconsistent."    A  verdict  is "repugnant" or "inconsistent" when a jury, with regard to identical underlying circumstances, convicts a defendant of one offense, while acquitting him of another offense whose elements are necessarily included in the offense for which he has been convicted."  People v. Jones, 126 A.D.2d 401, 402 (1st Dept. 1987), citing, People v. Tucker, 55 N.Y.2d 1 (1981).  In the instant matter, defendant was found guilty of all counts in the indictment and therefore was simply not convicted of one offense whose elements are included in another offense for which he was acquitted.

Furthermore, defendant has failed to preserve his claim in which he attacks e verdict for review by this court.  After the jury returned its verdict, the trial 'rt asked defendant if he wanted to make any motions.  (Proceedings: T5:973).

Defendant then moved to "review the motions that [h]e had stated earlier to set aside the verdict" but failed to set forth any specific objection to the verdict at that time.  (Proceedings: T5:974).  The trial court denied defendant's motion on the ground that "it was a question of fact on all these counts for the jury to resolve, and they did that."  (Proceedings: T5:974).

Although defendant did, in fact, move to set aside the verdict, defendant did not articulate the basis for the relief sought.  (Proceedings: T_:974).  And, once the jury was discharged, "it was no longer possible to remedy the defect, if any, by resubmission to the jury for reconsideration of its verdict."  People v. Satloff, 56 N.Y.2d 745, 746 (1982); see also, People v. Suarez, 99 A.D.2d 473 (2d Dept. 1984).  Due to defendant's failure to timely raise his repugnancy claim, if any such claim existed, it is waived.  See, People v. Alfaro, 66 N.Y.2d 985 (1985); People v. Aponte, 194 A.D.2d 315, 316 (1st Dept. 1993); People v. Harris, 128 A.D.2d 432 (1st Dept. 1987); People v. Johnson, 121 A.D.2d 397, 398 (2d Dept. 1986); People v. James, 112 A.D.2d 380, 381 (2d Dept. 1985).  As defendant failed to preserve his challenge to the verdict, defendant's appeal must be denied.

Should this Court find that defendant has preserved his attack on the verdict, it would nevertheless find it meritless.  Although it is well-settled that "a person cannot act both intentionally and recklessly with respect to the same result," People v. Gonzalez, 1 N.Y.3d 464, 468 (2004), the fact that defendant was convicted of

both Murder in the Second Degree (P.L. §125.25(2)) and Manslaughter in the First Degree (P.L. §125.20(4)) does not violate that rule.[16]  Contrary to defendant's contention that defendant was found guilty of both intentionally and recklessly causing a person's death, a careful reading of the statutes establishes that defendant was only found guilty of recklessly causing the death of Kyona Fredericks.

Pursuant to Penal Law Section 125.25(2), "[a] person is guilty of murder in the second degree when: (2) Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." The distinction between depraved indifference murder and intentional murder lies in the fact that depraved indifference murder "results not from a specific, conscious intent to cause death, but from an indifference to or disregard of the risks attending defendant's conduct." People v. Gonzalez, 1 N.Y.3d at 226.  In other words, the defendant who is unconcerned with the consequences of his actions evinces a depraved indifference to human life, such as in the case of a defendant who repeatedly beat a young child over a period of several days causing the child's death. See, People v. Poplis, 30 N.Y.2d 85 (1972).

---

[16] While the Court of Appeals has repeatedly overturned verdicts where a defendant was found guilty of both the intentional and reckless murder of the same person, those cases are inapplicable to the within matter.

On the other hand, "[a] person is guilty of manslaughter in the first degree when: (4) being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person." Penal Law Section 125.20(4). Under this statute, a defendant acts with an intent to cause physical injury to a child, but his reckless conduct results in the death of that child.

Due to the overwhelming evidence at trial, the jury's verdict finding defendant guilty of second degree "depraved indifference" murder and first degree manslaughter was entirely appropriate.[17] The evidence at trial established that defendant, over a two-day period, repeatedly beat his eight-year-old step-daughter, Kyona Fredericks, with a braided leather belt and a blue amplifier cord resulting in her death. Even after Kyona told defendant that she could no longer breathe, move, write, or see, defendant continued to beat her. It was not until hours later, at approximately 3:00 a.m. that defendant realized that something was wrong with Kyona and sought medical attention for her. Unfortunately, defendant's efforts were too late as, according to both the emergency room physician and the medical examiner, Kyona had already been dead for approximately one hour.

---

[17] As defendant does not challenge the legal sufficiency of the evidence at trial, the People will not address that issue in great detail.

Undoubtedly, the People proved that defendant was guilty of second degree murder and first degree manslaughter.

Defendant nonetheless insists, based on the evidence adduced at the post-conviction hearing, that the jury should not have convicted defendant of first degree manslaughter since the jury did not believe "that the Defendant intended to harm Kyona and thus cause her death."[18]  (Defendant's Amended Brief at 18). Defendant, however, misstates the testimony adduced at the hearing since Marie Lewis, Juror No. 2, repeatedly stated how "defendant loved his child and didn't mean to kill her." (Lewis: P6, 11, 22, 43, 103-104, 116; McCaffery: P135; Troy: P158).[19]  Based on the jury's verdict finding defendant guilty of Manslaughter in the First Degree and Assault in the Second Degree, both of which require an intent to cause physical injury, it is clear that the jurors believed that defendant intended to harm his daughters when he beat them.

B.  The "Depraved Indifference" Murder Statute is Constitutional

Defendant's attack on the verdict does not end there as defendant also challenges the constitutionality of the "depraved indifference" murder statute as applied to defendant.   (Defendant's Amended Brief at 17, 29).  At the outset, defendant claims that "[c]riminal statutes that fail to delineate the range of

---

[18] A more detailed discussion of the evidence adduced at the post-conviction hearing is set forth in Subsection D, infra.

[19] Parenthetical references preceded by "P" are to the minutes of the post-conviction hearing

forbidden conduct with particularity are unconstitutionally vague." (Defendant's Amended Brief at 30). Defendant then reverts to his argument that since the jury found defendant guilty of both intentional and unintentional conduct, the jury "was plainly confused as to the meaning of the 'depraved indifference' statute and misapplied it to the Defendant" in violation of his due process rights. (Defendant's Amended Brief at 31-32). Defendant's claim is wholly without merit.

To begin, the Court of Appeals has previously held that the "depraved mind" second degree murder statute is not unconstitutionally vague "since the type and level of risks to be avoided by the actor are specifically delineated." People v. Cole, 85 N.Y.2d 990 (1995), citing, People v. Gomez, 65 N.Y.2d 9 (1985). See also, People v. Johnson, 87 N.Y.2d 357 (1996). Taking defendant's argument a step further, there is nothing in the record to support his claim that the depraved indifference murder statute was unconstitutionally vague as applied to defendant or to support his contention that "it is impossible for the reviewing court to know the true intention of the jury." (Defendant's Amended Brief at 32). On the contrary, the evidence presented at trial established that this defendant recklessly caused the death of Kyona while acting under "circumstances evincing a depraved indifference to human life." P.L. §125.24(4). More specifically, the facts adduced at trial proved that defendant caused the death of Kyona through an excessive

---

conducted on October 31, 2002 and November 7, 2002 before the Honorable William A. Kelly.

physical beating.  Additionally, "the true intention of the jury" was ascertained at the post-conviction hearing when the three testifying jurors indicated that they understood the difference between intentional and reckless murder and found defendant guilty of reckless murder because of their belief that defendant did not intend to kill Kyona.  As it was entirely appropriate for the jury to find defendant guilty of both Murder in the Second Degree and Manslaughter in the First Degree, there is no reason in law or justice for setting aside defendant's conviction.

## C.  The Court's "Reasonable Doubt" Charge Was Proper

In further support of his claim that the jury's verdict was "repugnant," defendant argues that the inconsistent verdict resulted from the "jury's profound confusion . . . [leading] to their compromise verdict."  (Defendant's Amended Brief at 12).  According to defendant, the court "planted the seed of confusion" at the commencement of jury selection when, during the court's preliminary instructions to the entire jury panel, the court defined "reasonable doubt" by quantifying it.  (Defendant's Amended Brief at 12-15).  Contrary to defendant's contention, the court's "reasonable doubt" charge, when viewed in its entirety and in context, was entirely proper and defendant provides a misleading and incomplete account of precisely what occurred during trial.

At the commencement of trial and just prior jury selection, the court provided preliminary instructions to the jury panel.  Included in the court's

instruction was a brief explanation regarding how the defendant is presumed

innocent and how the People have the burden to prove defendant's guilt beyond a

reasonable doubt. (Proceedings: T1:50). To illustrate the People's burden of proof,

the court compared the burden of proof in a civil case with the burden of proof in a

criminal case:

> It's [a] little bit different then what the applicable
> standard of proof is in a civil case and some of you have
> sat on civil cases. The people are not required to prove –
> parties are not required to prove their case beyond a
> reasonable doubt as the People are in a criminal case. In
> order for a party to prevail in a civil case it's sufficient if
> one of the parties prove – the operative burden of proof
> would be proof by a mere preponderance. If one of the
> parties have proved, as opposed to the criminal case, that
> party wins to the mathematical percent of 51 percent or
> the creditability of evidence as opposed to 49 percent,
> that's the only burden you have to meet. When somebody
> is suing in a criminal case it's proof beyond a reasonable
> doubt. What is that? I said to you in a civil case it's 51
> percent. Proof beyond a reasonable doubt is somewhere
> on the coninum [sic] between 51 and 100 percent. You
> can't get that type of proof in human affairs. If the law
> requires guilt 100 percent every case would be an
> acquittal. You can't get that type of proof when dealing
> with a human being. The People and the law does have to
> prove a person's guilt beyond a reasonable doubt. It's
> higher than 51 percent and something less than 100
> percent. Proof beyond a reasonable doubt that's a
> constant.

(Proceedings: T1:51-52). The court then described when it would be appropriate

for the jury to acquit defendant, or find him guilty, and again illustrated his point

by comparing the standards of proof in a civil and criminal case:

> The difference between the criminal and the civil case is the civil case is proved by a mere preponderance. To mathematize it, it is 51 percent that suffices. In a criminal case the operative word is greater, it's not a mere preponderance it's proof beyond a reasonable doubt. Does everybody understand that?

(Proceedings: T1:53). After the court concluded its preliminary instructions to the jury panel, defense counsel objected to the court's use of a mathematical equation to define "reasonable doubt" as being "somewhere . . . between 51 and 100 percent." (Proceedings: T1:62). The court, indicating that it "underst[oo]d [defendant's] concern," addressed the jury again:

> . . . By the way someone expressed some concern to me this morning the fact that when I illustrated the burden of proof in a criminal and civil case. I used an example mathematical. I am going to hopefully clarify something I said. In a civil case where a mere preponderance is 51 percent is enough and I went on to say in a criminal case is not a mere preponderance but a proof beyond a reasonable doubt and I said it appears somewhere between 51 percent and 100 percent and the purpose is not to suggest that 53 or 58 percent but it was more than 51 percent and something less than 100 percent, but the standard being proved is beyond a reasonable doubt. There was no total quantification for the purpose of indicating a number, but to merely indicate it was a greater standard of proof in a criminal case but something less than mathematical certainty.

(Proceedings: T1:65-66). Defense counsel did not object to the court's amended instruction and jury selection continued. (Proceedings: T1:66).

During the court's charge to the jury at the conclusion of the trial, Justice Kelly gave a more detailed definition of the People's burden of proof. To begin, Justice Kelly defined what was meant by "reasonable doubt." First, he explained that a "reasonable doubt is "a doubt arising from the evidence or lack of evidence in the case," "a doubt as reasonable men and woman may entertain after a careful and honest review and consideration of all the evidence in the case." (Proceedings: T5:903-904). He also explained that a "reasonable doubt" is not an "imaginary, unsubstantial doubt" nor is it proof "beyond all doubt or any doubt or to a mathematical certainty." (Proceedings: T5:904). Finally, the court instructed the jury that:

> The proof must be sufficient to satisfy you and your fellow jurors consciences so that you believe that the defendant committed the crimes charged and/or crime charged and that no other reasonable conclusion is possible. The doctrine of reasonable doubt applies not only on the whole case but also as to each and every material element necessary to constitute each crime charged. As I explained to you, I will break it down into the elements. If you have a reasonable doubt on any material element of the crime or crimes charged, the defendant is entitled to the benefit of that doubt and consequently to acquittal of that crime or crimes. It is your duty to weigh and analyze the evidence, and in so doing if you find something in the evidence or a failure of the evidence which causes you to have a reasonable doubt as to the guilt of the defendant, it is your duty to give the defendant the benefit of that doubt and acquit him on that crime or crimes. On the other hand, if you do not have a reasonable doubt, conversely it is your duty to convict the defendant of that crime or crimes.

(Proceedings: T5:903-905).[20]

Taken out of context by only citing to a very small portion of the charge, as defendant does in his brief, it is certainly possible to find error in the court's preliminary instruction defining "reasonable doubt." When viewed in their entirety, however, the court's "reasonable doubt" charges provided to the jury during the entire trial process correctly stated the definition of "reasonable doubt." "[E]ven if the purported error actually occurred [in the court's preliminary instruction], it could not have misled the jury given the correct statement of the reasonable doubt standard in the remainder of the preliminary charge, as well in the final charge." People v. Valdes, 283 A.D.2d 187 (1st Dept. 2001). Since the court's final charge to the jury, read just prior to the commencement of their deliberations, was adequate, compare, People v. Malloy, 55 N.Y.2d 296 (1982), "any prejudice that arose from the initial instruction was obviated." People v. Simon, 224 A.D.2d 458, 459 (2d Dept. 1996).

Furthermore, there is no reason to believe that the trial jury applied anything other than the correct standard of proof. (See, Defendant's Amended Brief at 14-15). In determining whether a "reasonable doubt" instruction violates the constitutional standard, the court must look to "'whether there is a reasonable

---

[20] The court's instruction to the jury was patterned on the Criminal Jury Instructions. See, CJI Section 6.20.

likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.E.2d 385 (1991), quoting, Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198; see also, People v. Paris, 229 A.D.2d 926 (4th Dept.), app. denied, 88 N.Y.2d 1070 (1996).  Applied here, the challenged instruction was given to the jury panel at the commencement of jury selection.  Two weeks later, at the conclusion of the trial, the court charged the jury and defendant does not challenge the adequacy of that instruction. Due to the passage of time between the challenged instruction and the final instruction, it is not reasonably likely that the jury applied the challenged instruction they heard at the beginning of the trial, before they were even sworn in as jurors, as opposed to the instruction they heard prior to commencing their deliberations.

### D.  The Evidence Adduced at the Post-Conviction Hearing Established That the Jury's Deliberations Were Proper

Lastly, in an attempt to further bolster his claim that the verdict was "repugnant" and the jury was "profoundly confused" by the court's charge on "reasonable doubt," defendant heavily relies on the testimony of Juror No. 7, Marie Lewis, who testified on defendant's behalf at a post-conviction hearing, which the court granted in response to defendant's motion to set aside the verdict on the ground of juror misconduct. (Defendant's Amended Brief at 16-18). Ms. Lewis testified that she was misled into thinking that, by finding defendant guilty of

second degree murder, all the jurors agreed that Kyona's death was an accident. as Ms. Lewis maintained until she changed her vote. Specifically, defendant attempts to impeach the jury verdict on the ground that "the jury was considering a count not charged, e.g., First Degree Murder." (Defendant's Amended Brief at 17). According to defendant, the evidence adduced at the hearing -- the explanation given by Juror No. 2, Marianne Troy, to Ms. Lewis regarding the distinction between intentional (first degree) and depraved indifference (second degree) murder – establishes that the jury considered a count not in the indictment.

The evidence presented at the post-conviction hearing was elicited through the testimony of three witnesses – Ms. Lewis, Thomas McCaffrey, the jury foreman, and Marianne Troy, Juror No. 2. Both McCaffrey and Troy testified on behalf of the prosecution. According to Ms. Lewis, although she agreed with the verdict in open court when the jury was polled, she returned to the courtroom immediately after the court discharged the jury in an attempt to speak with the judge because she was "unhappy" with the verdict. (Lewis: P:3, 4, 57-59, 83, 91, 98). She felt that she was misled by the other jurors into changing her vote since, based on the discussions during deliberations, it was her understanding that by finding defendant guilty of Murder in the Second Degree, the jurors concluded that Kyona's death was an accident.[21] (Lewis: P:7, 8, 9, 10, 60, 66, 69). However, by

---

[21] Ms. Lewis repeatedly testified that during deliberations, she told the jurors it was her belief

the time she returned to the courtroom, the judge had already left for the day. (Lewis: P:59). Over the next several days, Ms. Lewis continued to mull over the verdict and became very upset and was unable to sleep. (Lewis: P:48, 53). She tried to speak to her family and friends but they told her to "stay out of it" and "forget about it." (Lewis: P:53, 60). Needing a "sympathetic ear," she contacted defendant's attorney. (Lewis: P:60). Defense counsel advised her to write a letter to the judge, and she complied. (Lewis: P:32, 61). She then met with defense counsel on several more occasions at which time they reviewed an affidavit, drafted by defense counsel, for her to sign. (Lewis: P:32, 34, 39, After numerous revisions of the affidavit so that it was written in "her words," Ms. Lewis nevertheless declined to sign it. (Lewis: P:35, 37, 39, 41; Defendant's Exhibits B and C).

To further explain what occurred during deliberations, the prosecution called McCaffrey and Troy to the witness stand. According to them, the jury spent a lot of time explaining to Ms. Lewis that the element of "intent" was not required to find defendant guilty of second degree murder. (McCaffrey: P135; Troy: P:158). In fact, both jurors testified that during deliberations, Ms. Lewis revealed that she was of Haitian decent and explained that spanking was common in the Haitian

---

that defendant "loved his daughter and didn't want her to die" and that "he didn't intend to kill her." (Lewis: P:6, 22, 62, 70101). She claimed that the jurors never explained to her that "intent" was not an element of second degree murder. (Lewis: P:102).

community and that she, too, had been beaten in that manner. (McCaffrey: P:132; Troy: P:158). After extensive discussions in an attempt to persuade Ms. Lewis to change her vote, Ms. Lewis eventually voted "guilty" on the second degree murder count. (McCaffrey: P:137-138; Troy: P:163).

Contrary to defendant's contention, there is nothing in the record to indicate that the jurors deliberated in an improper manner. In addition, defendant's reliance on Ms. Lewis' testimony is misplaced and defendant's argument is compounded by the fact that defendant mischaracterizes the hearing testimony as defendant has not established that "Ms. Lewis was misled, however unintentionally, as to a charge not before the jury." (Defendant's Amended Brief at 17). The problem with defendant's argument is that it presupposes the existence of improper jury conduct during their deliberations.

"Generally, a jury verdict may not be impeached by proof of the tenor of its deliberations, but it may be upon a showing of improper influence." People v. Brown, 48 N.Y.2d 388, 393 (1979). See also, People v. Anderson, 249 A.D.2d 405 (2d Dept.), app. denied, 92 N.Y.2d 877 (1988); C.P.L. Section 330.30(2). Whether improper jury conduct occurred must be examined on a case-by-case basis "to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered. [Citations omitted]." People v. Testa, 61 N.Y.2d 1008, 1009 (1984). However, "not every misstep by a juror rises

to the inherently prejudicial level at which reversal is required automatically." People v. Brown, 48 N.Y.2d at 394. For example, in cases where jurors felt coerced or pressured to vote guilty, the courts held that the defendants failed to raise an issue of improper influence but merely sought "to impeach the verdict by delving into the tenor of the jury's deliberative process." People v. Anderson, 249 A.D.2d 405. See also, People v. Goode, 270 A.D.2d 144 (2d Dept.); People v. Brown, 307 A.D.2d 645 (3d Dept.); People v. Perez, 199 A.D.2d 225 (1st Dept. 1993), app. denied, 83 N.Y.2d 875 (1994).

Applied here, it is clear that Ms. Lewis' feeling of being misled is not a proper basis for impeaching the verdict. First of all, what occurred in the jury room was entirely appropriate and undoubtedly the essence of the deliberative process. As the court (Kelly, J.) so aptly explained:

> In this case, it is clear that there was no improper influences. Rather, it seems apparent that the comment by juror number two was not an interjection of unique outside knowledge, but rather a discussion of the application of the facts to the law. Such debate is precisely what is designed to occur during deliberations.

(Decision and Order dated November 14, 2002 at 9).

The uncontradicted testimony at the hearing established that the jurors, after several votes, had not yet come to a unanimous verdict with respect to the second degree murder count. Since Ms. Lewis eventually expressed to the jurors her reason for continuing to vote "not guilty" – that she did not feel defendant intended

to kill his step-daughter -- it was not inappropriate for another juror to try to explain to Ms. Lewis the difference between intentional murder and depraved indifference murder. Although that other juror (Troy), who lacked any legal education, may have been mistaken when she referred to intentional murder as First Degree Murder, her reference to that charge was purely illustrative. Other than Ms. Troy's reference to First Degree Murder as a way to explain the distinction between intentional and reckless murder, the record is devoid of any evidence to establish that the jurors even remotely considered finding defendant guilty of First Degree Murder.

Second, defendant's argument is invalidated by the fact that Ms. Lewis confirmed upon the polling of the jury in open court that she agreed with the verdict announced by the jury foreman. See, People v. Goode, 270 A.D.2d 144 (In light of juror's confirmation that it was her verdict upon polling the jury, juror's post-trial statements that she was "coerced" by other juror were not a proper basis for impeaching verdict). It was not until after the court discharged the jury and the judge had already gone home for the evening that Ms. Lewis had her own misgivings about the outcome. At no time in the jury room, after her vote was taken on the second degree murder charge, or in open court after the polling of all twelve jurors, did Ms. Lewis have a "change of heart." Her "change of heart" is nothing more than juror afterthought, which is an insufficient cause for overturning

the verdict.  <u>See</u>, <u>People v. Bellamy</u>, 158 A.D.2d 525 (2d Dept.); <u>People v. Lehrman</u>, 155 A.D.2d 693 (2d Dept. 1989).

         *                  *                  *

As the jury's verdict convicting defendant of second degree murder and first degree manslaughter is consistent and not the product of improper conduct by either the court or the jury, defendant's conviction should be affirmed.

## **CONCLUSION**

The judgment of conviction should be affirmed.

Respectfully submitted,

MICHAEL E. BONGIORNO
District Attorney
Rockland County

ANN C. SULLIVAN
STEPHANIE A. SMALL
Senior Assistant District Attorneys
Of Counsel

July 2004

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
————————————————————————————x

THE PEOPLE OF THE STATE OF NEW YORK,

               Respondent,

      - against -

DARIUS JEAN,

               Defendant-Appellant.

————————————————————————————x

**CERTIFICATION
OF COMPLIANCE**

App.Div. Doc. No.
2003-00251

Ind.No.2001-321

     I certify that this brief complies with 22 NYCRR §670.10.3[f], in that I used the word processor software Microsoft Word 98 to prepare this brief, in Times New Roman typeface, 14 point font size, and double-spaced. I further certify that I conducted a word count and, excluding the Table of Contents and the citations to the transcripts in sections of the brief entitled "The Evidence at the Suppression Hearing" and "The Evidence at Trial," I received a total of 18,315 words.

Dated: New City, New York
      July 16, 2004

                      *Stephanie A. Small*
                      Stephanie A. Small
                      Senior Assistant District Attorney
                      Of Counsel

13 A.D.3d 466, 786 N.Y.S.2d 564, 2004 N.Y. Slip Op. 09311

**Briefs and Other Related Documents**

**View New York Official Reports version**
Supreme Court, Appellate Division, Second Department, New York.
The PEOPLE, etc., respondent,
v.
**Darius JEAN,** appellant.
Dec. 13, 2004.

**Background:** Defendant was convicted in the County Court, Rockland County, Kelly, J., of murder in the second degree, manslaughter in the first degree, assault, and endangering the welfare of a child. Defendant appealed.

**Holdings:** The Supreme Court, Appellate Division, held that:
(1) defendant was not in custody for *Miranda* purposes during questioning at hospital, and
(2) defendant's girlfriend was acting as agent to police when she spoke to defendant before he signed written statement.

Affirmed.

West Headnotes

[1] KeyCite Notes 

110 Criminal Law
   110XXIV Review
     110XXIV(O) Questions of Fact and Findings
       110k1158 In General
         110k1158(4) k. Reception of Evidence. Most Cited Cases

The factual findings and credibility determinations of the trial court following a suppression hearing are entitled to great deference on appeal, and will not be disturbed unless clearly unsupported by the record.

[2] KeyCite Notes 

110 Criminal Law
   110XVII Evidence
     110XVII(M) Declarations
       110k411 Declarations by Accused
         110k412.2 Right to Counsel; Caution
           110k412.2(2) k. Accusatory Stage of Proceedings; Custody. Most Cited Cases

Defendant was not in custody for *Miranda* purposes during questioning at hospital, even though defendant was placed in restraints by hospital personnel, where evidence showed that defendant was restrained for his own safety, and not for purpose of police interrogation. U.S.C.A. Const.Amend. 5.

[3] KeyCite Notes 

☞110 Criminal Law
   ☞110XVII Evidence
      ☞110XVII(M) Declarations
         ☞110k411 Declarations by Accused
            ☞110k412.1 Voluntary Character of Statement
               ☞110k412.1(2) k. Statements While in Custody; Persons to Whom  Made. Most Cited
Cases

Defendant's girlfriend was not acting as agent to police when she spoke to defendant before he signed written statement, and thus defendant's constitutional privilege against compelled self-incrimination was not implicated by their conversation; there was no evidence demonstrating that girlfriend was acting at instigation or under supervision of police. U.S.C.A. Const.Amend. 5.
**565 Harvard Hollenberg, New York, N.Y., for appellant.
Michael E. Bongiorno, District Attorney, New City, N.Y. (Ann C. Sullivan, Stephanie A. Small, and Argino Kosmetatos of counsel), for respondent.

HOWARD MILLER, J.P., GLORIA GOLDSTEIN, STEPHEN G. CRANE, and PETER B. SKELOS, JJ.

*466 Appeal by the defendant from (1) a judgment of the County Court, Rockland County (Kelly, J.), rendered November 21, 2002, convicting him of murder in the second degree, manslaughter in the first degree, assault in the second degree, assault in the third degree, and endangering the welfare of a child (two counts), upon a jury verdict, and imposing sentence, and (2) a resentence of the same court imposed March 12, 2003, resentencing him on the count of manslaughter in the first degree. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement authorities.
ORDERED that the judgment and resentence are affirmed.

[1] [2]          Contrary to the defendant's contention, the County Court properly denied that branch of his omnibus motion which was to suppress his statements to law enforcement authorities. Viewing the totality of the circumstances (see *People v. Casassa,* 49 N.Y.2d 668, 681, 427 N.Y.S.2d 769, 404 N.E.2d 1310, cert. denied 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 50; *People v. Anderson,* 42 N.Y.2d 35, 38, 396 N.Y.S.2d 625, 364 N.E.2d 1318), a reasonable person in the *467 defendant's position, innocent of any criminal wrongdoing, would not have believed that he was in police custody before receiving *Miranda* warnings (see *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; *People v. Yukl,* 25 N.Y.2d 585, 589, 307 N.Y.S.2d 857, 256 N.E.2d 172, cert. denied 400 U.S. 851, 91 S.Ct. 78, 27 L.Ed.2d 89). The factual findings and credibility determinations of the County Court following the suppression hearing are entitled to great deference on appeal, and will not be disturbed unless clearly unsupported by the record (see *People v. Prochilo,* 41 N.Y.2d 759, 761, 395 N.Y.S.2d 635, 363 N.E.2d 1380; *People v. Leggio,* 305 A.D.2d 518, 519, 761 N.Y.S.2d 74). The evidence at the hearing established that the defendant was placed in restraints by hospital personnel for his own safety, and not for the purpose of a police interrogation (see *People v. Ripic,* 182 A.D.2d 226, 235, 587 N.Y.S.2d 776). In any event, the police detective did not question the defendant about the crime until after he advised the defendant of his constitutional rights and obtained a voluntary written waiver from **566 the defendant (see *Miranda v. Arizona, supra;* *People v. Lovette,* 212 A.D.2d 639, 640, 622 N.Y.S.2d 588; *People v. Rose,* 187 A.D.2d 617, 589 N.Y.S.2d 931). By that time, the defendant had calmed down and gave coherent answers to the detective's questions in an effort to exculpate himself (see *People v. Bongiorno,* 243 A.D.2d 719, 663 N.Y.S.2d 861; *People v. Womble,* 161 A.D.2d 679, 555 N.Y.S.2d 452; cf. *People v. Turkenich,* 137 A.D.2d 363, 529 N.Y.S.2d 385). The evidence was also sufficient to establish that the defendant willingly accompanied the police to the precinct where he again voluntarily waived his *Miranda* rights (see *Miranda v. Arizona, supra*) before making a further statement (see *People v. Leggio, supra;* see also *People v. Diaz,* 84 N.Y.2d 839, 616 N.Y.S.2d 900, 640 N.E.2d 1134).

[3]          Furthermore, the County Court correctly found that the defendant's girlfriend was not acting as an agent of the police when she spoke to the defendant before he signed a second written statement (see *People v. Ray,* 65 N.Y.2d 282, 286, 491 N.Y.S.2d 283, 480 N.E.2d 1065). There is no

evidence to demonstrate that she was acting at the instigation or under the supervision of the police (*see People v. Lewis,* 273 A.D.2d 254, 255, 709 N.Y.S.2d 572; *People v. Del Duco,* 247 A.D.2d 487, 488, 668 N.Y.S.2d 704; *People v. Jemmott,* 144 A.D.2d 694, 695, 535 N.Y.S.2d 84; *People v. Galloway,* 138 A.D.2d 735, 737, 526 N.Y.S.2d 549; *cf.* *People v. Eberle,* 265 A.D.2d 881, 882-883, 697 N.Y.S.2d 218).

The physical evidence was properly admitted because the defendant voluntarily consented to a search of his residence (*see People v. Rose, supra; People v. Auxilly,* 173 A.D.2d 627, 628, 570 N.Y.S.2d 212; *People v. Zimmerman,* 101 A.D.2d 294, 297, 475 N.Y.S.2d 127), as did his girlfriend (*see People v. Cosme,* 48 N.Y.2d 286, 291-293, 422 N.Y.S.2d 652, 397 N.E.2d 1319; *People v. Lopez,* 291 A.D.2d 279, 738 N.Y.S.2d 308; *People v. Melo,* 98 A.D.2d 754, 755, 469 N.Y.S.2d 465).

***468** The defendant's claim that the jury verdict was inconsistent (*see* CPL 300.30[5] ) is unpreserved for appellate review (*see People v. Alfaro,* 66 N.Y.2d 985, 987, 499 N.Y.S.2d 378, 489 N.E.2d 1280; *People v. Skeeters,* 180 A.D.2d 834, 580 N.Y.S.2d 451). In any event, the verdict was not inconsistent (*see* Penal Law §§ 125.20[4], 125.25[2]; *People v. Trappier,* 87 N.Y.2d 55, 58-59, 637 N.Y.S.2d 352, 660 N.E.2d 1131; *People v. Taylor,* 169 A.D.2d 743, 744-745, 564 N.Y.S.2d 484; *People v. Rivera,* 59 A.D.2d 675, 398 N.Y.S.2d 538 [Silverman, J., concurring]; *see also People v. Payne,* 3 N.Y.3d 266, 786 N.Y.S.2d 116, 819 N.E.2d 634; *People v. Poplis,* 30 N.Y.2d 85, 330 N.Y.S.2d 365, 281 N.E.2d 167; *cf. People v. Gonzalez,* 1 N.Y.3d 464, 468, 775 N.Y.S.2d 224, 807 N.E.2d 273; *People v. Gallagher,* 69 N.Y.2d 525, 529-530, 516 N.Y.S.2d 174, 508 N.E.2d 909; *People v. Robinson,* 145 A.D.2d 184, 185, 538 N.Y.S.2d 122, *affd.* 75 N.Y.2d 879, 554 N.Y.S.2d 473, 553 N.E.2d 1021).

Any prejudice to the defendant resulting from the County Court's improper pretrial instruction was obviated by the final charge given to the jury at the trial (*see People v. Valdes,* 283 A.D.2d 187, 726 N.Y.S.2d 8; *People v. Simon,* 224 A.D.2d 458, 459, 638 N.Y.S.2d 113).

The defendant's trial attorney provided meaningful representation (*see People v. Harris,* 99 N.Y.2d 202, 210, 753 N.Y.S.2d 437, 783 N.E.2d 502; *People v. Benevento,* 91 N.Y.2d 708, 714, 674 N.Y.S.2d 629, 697 N.E.2d 584; *People v. Baldi,* 54 N.Y.2d 137, 146-147, 444 N.Y.S.2d 893, 429 N.E.2d 400; *People v. Corona,* 173 A.D.2d 484, 485, 570 N.Y.S.2d 105; *cf.* ***567** *People v. Wandell,* 75 N.Y.2d 951, 952, 555 N.Y.S.2d 686, 554 N.E.2d 1274).

The defendant's remaining contentions are without merit.

N.Y.A.D. 2 Dept.,2004.

People v. Jean

13 A.D.3d 466, 786 N.Y.S.2d 564, 2004 N.Y. Slip Op. 09311

## Briefs and Other Related Documents  (Back to top)

- 2004 WL 3253048 (Appellate Brief) Amended Brief for Defendant-Appellant (May. 04, 2004)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**HARVARD HOLLENBERG**
**Attorney at Law**
**320 East 22nd Street, Suite #2K**
**New York, New York 10010**
**Telephone: (212) 995-9313**

January 18, 2005

The Honorable Judith S. Kaye
Chief Judge
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207

RE: *People v. Darius Jean*
    Appellate Division, Second Department
    Docket Numbers: 2003-00251; 2004-00848
    Rockland County Clerk's Indictment No. 321/01

<u>Oral Argument Requested</u>

Dear Judge Kaye:

New York State criminal court judges should not instruct prospective jurors in a murder case that proof beyond a reasonable doubt "appears somewhere between 51 percent and 100 percent." That is one of the reasons the Defendant in the above-referenced matter is seeking leave of the Court of Appeals to appeal a unanimous decision of the Appellate Division, sub silentio, to the contrary.

Reversal is sought of the appellate decision affirming Mr. Jean's multiple convictions, headed by a conviction for "depraved indifference murder," for which he was sentenced to a term of imprisonment of from 25-years-to-life. The aforementioned instruction is all the guidance the jury had while it reviewed evidence and listened to testimony.

Such an instruction would have presented a serious constitutional violation undermining Mr. Jean's right to a fair trial had it been said even once. In this case, the trial judge said it four times, twice in the morning, and then after an objection by counsel, out of the hearing of the panel, and after a leisurely lunch, twice more in the afternoon. During the entire course of jury selection and trial, the judge never recanted.

In light of the Second Department's decision, leave to appeal is also being sought to restate the principle, through reversal, that all of the courts of this state are

bound by decisions of the United States Supreme Court interpreting due process of law.   The Supreme Court has unquestionably held that allowing a jury to infer that it might find a person guilty of a crime upon a standard consistent with a civil case determination, i.e., by a preponderance of the evidence, mandates automatic reversal, per se.  *In re Winship*, 397 U.S. 358, 363 (1970).

Ordinarily, such a serious constitutional error might be argued in the abstract. Not here.  The upshot of Rockland County Judge Kelly's misstatement of the law was that contrary to his charge to the jury that they return a homicide verdict in the alternative, the jury found the Defendant guilty of both unintentional murder and First Degree Manslaughter, which is intentional.  While Defendant also seeks to argue that the verdicts were inconsistent, *infra*, even if they were deemed somehow to be constitutionally consistent, the fact that the jury disobeyed the charge and entered verdicts for both offenses means that they could well have determined each verdict by a lesser standard than proof beyond a reasonable doubt.   Thus, there is no issue of sufficiency of evidence because if Mr. Jean's trial was infected by constitutional error, then the presumption of innocence was never overcome.  Appellate courts are not supposed to be left to speculate whether properly instructed, the jury might have perceived deficiencies in the case for the top charges and found Mr. Jean guilty, if at all, of lesser included offenses, such as Second Degree Manslaughter or Negligent Homicide.

While the final charge followed pattern jury instructions, the Appellate Division's notion that what the Justices concede to have been improper earlier instructions were thereby obviated is not supported by the cases they cited.  *People v. Valdes*, 283 A.D.2d 187 (1st Dept. 2001) held that the word "not" was a typo.  *People v. Simon*, 224 A.D. 458 (2d Dept. 1996) held that the word "reasonable" was a simple case of the judge mis speaking.   Neither judge purposely and memorably told the jury four times, including twice after an objection by counsel, that they might substitute a civil preponderance standard as coterminous with proof beyond a reasonable doubt.

The likelihood that the jury would view 51 per cent as a standard against which to measure evidence as it came in so prejudiced the Defendant that reversal is mandatory on the basis of error.  *People v. Johnson*, —A.D.3d—, 783 N.Y.S.2d 5 (1st Dept. 2004).  See *People v. Townsend*, 67 N.Y.2d 815, 817 (1986).  Moreover, the 51% standard invited "premature deliberation," mandating reversal.  *People v. Davis*, —A.D.3d—, 783 N.Y.S.2d 850 (2d Dept. 2004).  Accord, *Collins v. State of Nevada*, 111 Nev. 56, 58, 888 P.2d 926, 927 (1995) (although the trial court gave an adequate charge to the jury after the trial, "it appears that the jury heard evidence throughout the entire trial under the mistaken impression that proof beyond a reasonable doubt is only "a little stronger than a preponderance of the evidence" and "almost equal to clear and convincing," as declared by the judge during voir dire; thus reversal was necessary); *Commonwealth v. Bonds*, 424 Mass. 698, 703, 677 N.E.2d 1131, 1134 (1997), (a probability of guilt, even a strong one cannot be the basis for a finding of proof beyond a reasonable doubt); *Commonwealth v. Sullivan*, 20 Mass. App. Ct. 802, 482 N.E.2d 1198 (1985) (instruction that proof beyond a reasonable doubt exceeds 50%

constituted reversible error).

It should have been well-settled, by now, that the Fifth and Sixth Amendments to the federal Constitution prohibit a jury in a criminal case from finding that the Defendant was "*probably* guilty." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (emphasis in original) (Scalia, J. for a unanimous Court). One cannot imagine how much clearer the point could be made than in Chief Justice Rehnquist's concurring opinion. "Where the jury views the evidence from the lens of a defective reasonable-doubt instruction, there can be *no* factual findings made by the jury beyond a reasonable doubt in which an appellate court can ground its harmless error analysis." 508 U.S. at 283 (emphasis in original). That is why announcing a defective reasonable-doubt standard always requires reversal.

*Cage v. Louisiana*, 498 U.S. 39 (1990) had previously held that neither "grave" nor "substantial" doubt are required to acquit. Mr. Jean's jury was told that they could have doubts stretching backward from 100 percent to 51 percent and still convict. Such latitude is unconstitutional, *a fortiori*. *Gaines v. Kelly*, 202 F.3d 598, 609-610 (2d Cir. 1990).

In recent years, the New York State Court of Appeals has held that no person may be convicted of both intentionally and recklessly committing the same act. This point was extensively briefed to the Appellate Division. These few thoughts, then, are proffered solely for purposes of clarification.

This Court has explained that where the ultimate result, death, has occurred, intent to harm is inconsistent with lack of intent to cause death. *People v. Trappier*, 87 N.Y.2d 55 (1995); *People v. Rogers*, 166 A.D.2d 23 (1st Dept. 1991). It is the duty of the jury to distinguish between the two alleged states of mind. *People v. Hartman*, 4 A.D.3d 22 (3d Dept. 2004); *People v. Horning*, 263 A.D.2d 955 (4th Dept. 1999), leave to appeal denied, 94 N.Y.2d 824 (1999). Case law requires that the judge charge the jury not to reach the issue of First Degree Manslaughter unless they first acquitted the Defendant of Second Degree Murder. *People v. Helliger*, 96 N.Y.2d 462 (2001).

The mental states contemplated by "depraved indifference" murder and First Degree Manslaughter are contradictory. *People v. Harrison*, 85 N.Y.2d 891 (1995). Since the jury inferred the opposite, reversal is required. *Id*.

To the extent that Penal Law section 125.20(4) attempts to fuse the two concepts, this Court, having decided that the Legislature could not have intended that a person be convicted of both intentional and unintentional acts should read the statute as proscribing intentional rather than reckless homicide, particularly in light of the other provisions of the statute. Statutes, Section 98 (b), *People v. Kates*, 77 A.D.2d 417 (4th Dept. 1980) (a statutory construction which results in the nullification of one part of the statute by another is not permissible); Section 111, *People v. Brooks*, 34 N.Y.2d 475,

3

478 (..."it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary, but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning"); *People v. Cruz*, 291 A.D.2d 1, 10 (1st Dept. 2002); *People v. Allison*, 117 Misc. 463, 465 (Sup. Ct. N.Y. Co. 1983).

The Defendant respectfully maintains the validity of all of the POINTS made to the Appellate Division, including, particularly, the violation of the Defendant's Fourth and Fifth Amendment rights, which should have rendered much of the evidence inadmissible. However, the question of ineffective counsel requires the marshaling of several items. As supported by affidavits, the record, and case citations, below, trial counsel provided ineffective representation depriving Mr. Jean of his constitutional right to counsel and its coordinates, his right to produce witnesses on his own behalf and to effectively confront and cross-examine witnesses against him.

- In a separate criminal matter, trial counsel was representing an expert witness called by the prosecution in this very case, at the same time he was representing Mr. Jean. Counsel's advice to Mr. Jean that his case would not be prejudiced if counsel failed to rigorously cross-examine the expert was tainted by counsel's expectation that he would (and did) receive more than eighty thousand ($80,000.00) dollars from the Defendant, his family and his friends. Under such circumstances, the Defendant is precluded from waiving the conflict. Compare, *People v. Pochly Jean-Baptiste*, New York Law Journal, August 2, 2004, p. 20, col. 4 (Rockland County Court, Kelly, J.).

- Defendant was indicted and found guilty of three crimes relating to a second daughter. Counsel made no defense whatsoever to these charges. Counsel failed to call fact witnesses who could have mitigated these charges. Counsel called no expert witnesses to refute the abuse charges. Counsel's cross examinations were not only ineffectual, they hurt the Defendant's case. *Spencer v. Donnelly*, 193 F.Supp.2d 718 (W.D.N.Y. 2002). The mishandling of the second daughter's case created spillover so as to taint the murder case, because where the jury is given no reason to disbelieve or even question charges relating to one child, they are "primed" to find the Defendant guilty of a crime relating to a second child. *Lindstat v. Keane*, 239 F.3d 191, 205-206 (2d Cir. 2001).

- Defense counsel failed to call character witnesses who were ready and willing to demonstrate to the jury that the charges against the Defendant were both generally and particularly out of character. Thus, the only picture of the Defendant the jury had was entirely circumscribed by the allegations.

- Defense counsel failed to discuss plea bargaining with Mr. Jean, nor did

counsel engage in good faith negotiations regarding a plea bargain with the District Attorney.

- Defense counsel's summation reinforced the prosecution's case; moreover, he failed to ask the jury to consider lesser included charges. To quote one modern day philosopher, "the most you can get out of life is what you ask for."  Counsel did not even ask the jury to consider lesser included charges, such as Manslaughter in the Second Degree and Negligent Homicide.

- Defense counsel failed to object to the inconsistency of the verdicts for Murder in the Second Degree and Manslaughter in the First Degree.

- Defense counsel failed to object to a highly prejudicial prosecutorial summation allegation that was not true.

- Defense counsel's cross-examination of the Medical Examiner failed to catch him in major inconsistencies as to time of death.

It has been said that "hard cases make bad law."  Per contra, Aristotle wrote that justice is reason without passion – or what's an appellate system for?


Respectfully submitted,

/s/

Harvard Hollenberg

cc.  Hon. Michael Bongiorno ✓

Mr. Darius Jean

cc's. without attachments, including the Appellate Division decision from which leave to appeal is being sought; the respective briefs of the Defendant and the District Attorney; all of the submissions of the parties in connection with Defendant's motion before the trial court, pursuant to CPL 440.10(1)(h).

**HARVARD HOLLENBERG**
Attorney at Law
320 East 22nd Street, Suite #2K
New York, New York 10010
Telephone: (212) 995-9313

February 8, 2005

The Honorable Judith S. Kaye
Chief Judge
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207

Re:   *People v. Darius Jean*
      Appellate Division,
      Second Department
      Docket Numbers: 2003-00251;
      2004-00848
      Rockland County Clerk's
      Indictment No: 321/01

Dear Judge Kaye:

I am writing in follow up to my letter dated January 18, 2005, with submissions, on behalf of the Defendant, Darius Jean, in the above-referenced matters, seeking leave to appeal his criminal convictions. In response to my letter, the Clerk of the Court allowed that I might supplement the contents of my letter, with particular reference to the appealability to the Court of Appeals of the issues Defendant seeks to raise.

Statutory authority for this appeal emanates, inter alia, from Section 470.35 of the Criminal Procedure Law. This Court has the authority to review all questions of law laid before the Appellate Division, whether or not taken up by that Appellate Division. *Practice Commentary*, Prof. Peter Preiser, McKinney's Book 11A, 1994, pp. 717-718. Further, the Court of Appeals has authority to review issues decided against the Defendant by the trial court that reflect its abuse of discretion. *Id.*; *People v. LaFontaine*, 92 N.Y.2d 470 (1998).

Previously, I presented for this Court's consideration the trial judge's instruction to potential jurors that "proof beyond a reasonable doubt" is a flexible standard ranging from 51% to 100%. That issue was couched in terms of its "improper" impact upon the jury's deliberation of guilt or innocence and the



entailed virtual preclusion not only of acquittal, but also of lesser-included counts of Second Degree Manslaughter and Criminally Negligent Homicide.

However, the standard of "proof beyond a reasonable doubt" was also brought into play when the trial court similarly placed before the jury the issue of whether Mr. Jean's statements to the police and his Grand Jury testimony had been voluntary, and whether the search of his house and the seizure of items therein had been lawful. As previously discussed, during the course of observing the introduction of evidence relating to these issues, the jury would likely have been evaluating its weight, along with the credibility of witnesses, in terms of preponderance, not proof beyond a reasonable doubt. See *People v. Hinds*, 13 A.D.3d 554 (2d Dept. 2004); thus, the Appellate Division had nothing reliable before it except the opportunity to second-guess the jury, which it is not supposed to do, *id*. Issues of weight and credibility are to be determined by the jury, not by the Second Department, because the Appellate Division must view the evidence in the light most favorable to the prosecution. The jury, however, is under no such constraint. See *People v. Rapley*, 292 A.D.2d 469 (2d Dept. 2002). There is no telling how the jury would have ruled; what questions they might have asked, and what distinctions they ought to have drawn, had they been properly instructed from the outset.

Upon assuming this case, I moved the trial court for a vacatur of judgments, pursuant to CPL 440.10(1)(h). A critical issue involved the constitutional inadequacy of trial counsel. Trial counsel never informed the Defendant of the role of plea-bargaining in his case; he never weighed the strengths and weaknesses of the case nor the pros and cons of a plea bargain with the Defendant, and he never negotiated a possible plea bargain in good faith with the District Attorney. Such defalcations amount to a deprivation of effective counsel of constitutional dimension. *Boria v. Keane*, 90 F.3d 36 (2d Cir. 1996). See *Mask v. McGinnis*, 233 F.3d 132 (2d Cir. 2000).

In support of these contentions, the Defendant submitted two sworn affidavits, one from the Defendant and one from his girl friend, who admittedly attended every discussion had between the Defendant and trial counsel. There was no hearing and trial counsel submitted no affidavit or sworn affirmation. The trial court found that Mr. Jean and his girl friend had to be lying, without hearing either one of them. Even in the civil court system maintained by many European countries, where taking testimony under oath is a rarity, I would have had the right at least to ask the court to place the trial attorney under oath, on the Continent, a request usually granted. Apparently, no such procedure pertains in Rockland County.

Second, the inadequacy of trial counsel was also demonstrated by his failure to call character witnesses on the Defendant's behalf. Two affidavits were submitted by potential witnesses, who were ready, willing and able to testify at trial on Mr. Jean's behalf. As argued in the Memorandum of Law accompanying

2

the motion to vacate, it is critical to every defense, but especially a defense relating to "depraved indifference" murder, that the jury be able to learn something more of the Defendant's life than is reflected by a heap of accusations. That is because the line between Second Degree Murder and Second Degree Manslaughter is so thin as to be tipped potentially by any good thing that can be said about a Defendant. Even the trial judge agreed that such testimony would have been helpful. As to the argument that such character witnesses would have been subject to cross-examination, it has long since been settled law that there are limits beyond which such cross-examination may not stray. *United States v. Morgan*, 554 F.2d 31 (2d Cir. 1977).

For the above reasons, in these two regards, the decision of the trial court to deny vacatur was an abuse of discretion.

Moreover, when reviewing the issue of the adequacy of counsel, an appeal to the Appellate Division searches the entire record. That the Appellate Division in this case chose to overlook **all** of trial counsel's omissions is an insult to justice, itself. *Boria v. Keane, supra*.

Respectfully submitted,

/s/

Harvard Hollenberg
Attorney for Defendant, Darius Jean

cc.   Hon. Michael E. Bongiorno   ✓

Mr. Darius Jean

3

HARVARD HOLLENBERG

ATTORNEY AT LAW

320 EAST TWENTY-SECOND STREET, SUITE 2K

NEW YORK, NEW YORK 10010

TELEPHONE (212) 995-9313

April 22, 2005

The Honorable Judith S. Kaye
Chief Judge
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207

RE:   *People v. Darius Jean*
Appellate Division, Second Department
Docket Nos.: 2003-00251; 2004-00848
Rockland County Ind. No. 321/01

Dear Judge Kaye:

Request for leave to appeal the Appellate Division's Decision and Order, dated December 13, 2004, affirming the convictions of Mr. Darius Jean, in the above-referenced case, was made by me pursuant to a letter to this Court, dated January 18, 2005 (with attachments), and a follow-up letter, dated February 8, 2005.

Mr. Jean then moved to reargue the Appellate Division's decision. It was my understanding that said request for leave to appeal to the Court of Appeals would be held in abeyance pending the Appellate Division's decision on the motion to reargue. In a Decision and Order, dated April 14, 2005, the Appellate Division denied the motion. A copy of that Decision and Order is enclosed.

Therefore, it is respectfully requested that my previous request for leave to appeal to the Court of Appeals the Appellate Division's December 13, 2004 Decision and Order be reinstated to active consideration.

Respectfully submitted,

Harvard Hollenberg

cc.   Mr. Darius Jean
Hon. Michael E. Bongiorno

5 N.Y.3d 807, 836 N.E.2d 1159, 803 N.Y.S.2d 36 (Table)
**View New York Official Reports version**

(The decision of the Court of Appeals of New York is referenced in the New York Supplement and
North Eastern Reporter in a table captioned 'Applications for Leave to Appeal - Criminal'.)

Court of Appeals of New York
People
v.
**Darius Jean**
August 29, 2005


Kaye, C.J.

2d Dept.: 13 A.D.3d 466, 786 N.Y.S.2d 564 (Rockland)
Denied.
N.Y. 2005.
People v. Jean
5 N.Y.3d 807, 836 N.E.2d 1159, 803 N.Y.S.2d 36 (Table)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK

        – against –

DARIUS JEAN,

                          Defendant.

------------------------------------------X

Case Nos.
2003–00251
2004–00848

**AFFIRMATION
IN SUPPORT
OF MOTION
FOR WRIT
OF ERROR
<u>CORAM NOBIS</u>**

    **ABRAHAM ABRAMOVSKY,** an attorney admitted to practice in the courts of the State of New York, affirms under penalty of perjury pursuant to CPLR § 2106 that the following is true and correct to the extent of his knowledge:

    1.   I am the attorney for the defendant in the above captioned matter and as such am fully familiar with the facts and circumstances thereof.  I make this Affirmation in support of the instant motion for an Order granting a writ of error coram nobis on the ground of ineffective assistance of appellate counsel.  The sources for the allegations of fact made herein include conversations with my client, review of the case file and review of other pertinent documents.

<u>**STATEMENT OF FACTS**</u>

    2.   The charges in the instant case arise from defendant Darius Jean's alleged beating of his stepdaughter Kyona Fredericks and natural daughter Mendissa Jean.  It was alleged that on October

–1–

11, 2001,[1] defendant beat both children with a belt and/or lamp cord for failing to complete their homework correctly. Subsequently, when it was discovered that Kyona was not breathing, defendant and his girlfriend Leslie Nicolas rushed the girls to the hospital, where Kyona was pronounced dead and Mendissa treated for physical injuries.

3.    When defendant learned that Kyona was dead, he became so distraught and hysterical that he had to be placed in four-point restraints due to the risk of suicide.  While held in these restraints, he was questioned by detectives.  At the urging of the detectives, Ms. Nicolas whas sent into to the room to speak to the defendant and elicited further statements from him.

4.    On October 23, 2001, an indictment was lodged against defendant charging him with depraved indifference murder, manslaughter in the first degree, assault in the first and second degrees, and two counts of endangering the welfare of a child. Defendant moved pretrial to suppress the statements he made while in restraints and the statements made under interrogation by Ms. Nicolas, as well as the fruits of a search that resulted directly from those statements.  His motion was denied after a hearing, and the case proceeded to trial on August 5, 2002.

5.    During its initial charge, the trial court instructed the

---

[1] It was alleged at trial that the beating continued into the early morning hours of October 12, but the testimony as to the time the beating began and ended was inconclusive.

jury that reasonable doubt was "higher than 51 percent and something less than 100 percent... to mathematize it, it is 51 percent that suffices." (T.51-53).[2] Following a lunch recess, the court further instructed the jury that "proof beyond a reasonable doubt... appears somewhere between 51 percent and 100 percent." (T.65). The trial court did not give any curative instruction despite being requested to do so by defense counsel.

6.    The People's case was then presented and, after the prosecution rested, defense counsel moved to dismiss on the ground that the evidence was not legally sufficient to establish depraved indifference murder:

> MR. GOLDSTEIN: Your Honor, at this time we move for this Court to dismiss the charges against Mr. Jean. The People have failed to prove even a prima facie case at this time...
>
> Now that the evidence has been in, it's even more factually clear that this case is distinguishable from the cases that have dealt with depraved indifference in sustaining depraved indifference. What we have here is a case where there is allegedly, looking at the evidence in the light most favorable to the prosecution, a number of quote, beatings, maybe two or what have you, that took place between the 11th and 12th of October. In the cases where there was sustained depraved indifference, we had cases where beatings of a child took place almost over a week... beating a child over the course, continuously over the course of five days, if a week, that the Court of Appeals held was depraved indifference.

---

[2] Copies of relevant pages of the trial transcript are annexed as Exhibit A.

In this case I don't believe depraved
indifference factually fits this case.  I
still think factually, even in the light
favorable to the prosecution, there is some
distinguishing [sic] between depraved
indifference and manslaughter in the first
degree.  The People are really proving the
same exact set of facts that could fit the
same exact set of circumstances, and this case
has not gone as far as the cases that the
Court of Appeals cited when they sustained
depraved indifference, and as the Court knows,
there is a tremendous amount of dissent, and
Judge Brieant's opinion that came after that
indicating that he could not even see a
differnce between depraved indifference and
reckless manslaughter,[3] but that it's factual
in nature, and even he could not find a
difference.

(T.762-64).  The trial court denied this motion.  (T.764).

7.    At the conclusion of evidence and summations, the trial

court gave its charge to the jury.  Although the court did not

repeat its "51 percent" instruction on reasonable doubt, it never

recanted that instruction or informed the jury that it had

misspoken.  Moreover, the court compounded the error during its

charge on depraved indifference murder, when it instructed the jury

that "[a] person acts recklessly with respect to another person's

death when that person... creates a substantial, unjustifiable and

grave risk that another person's death will occur and when he or

she is **unaware of** and consciously disregards that risk."  (T.922-

---

[3] The reference to "Judge Brieant's opinion" was clearly a
reference to <u>Jones v. Keane</u>,   N.Y.L.J., Jun. 7, 2002, p.25
(S.D.N.Y.), in which former Chief Judge Charles L. Brieant found
that the New York depraved indifference murder statute, as then
interpreted by the Court of Appeals, was unconstitutionally vague.

23) (emphasis added).

    8.  Defendant's trial counsel objected to this instruction but the court refused to correct its charge:

> MR. GOLDSTEIN: Judge, unbelievable, on that same exact statement under recklessly, when you corrected to "and," you stated "And when he is," and then you used unaware as opposed to aware.

> THE COURT: No. I definitely said aware. I definitely said, "aware and consciously disregards the risk" because that's different then when he perceives a risk. I'll totally stand on what I said because **_that would have been a biggy_**.

(T.952) (emphasis added). In other words, although the court acknowledged that the erroneous charge (which clearly appears on the face of the settled transcript) "would have been a biggy," it denied giving that instruction and refused to instruct the jurors correctly. On August 19, 2002, under the influence of these erroneous and misleading instructions, the jury convicted defendant on all counts.

    9.  On September 23, 2002, after defendant was convicted but before he was sentenced, the court received a letter from trial juror Marie Lewis. In the letter, Ms. Lewis stated that she had voted for depraved indifference murder under pressure from the other jurors because she "believed it was similar to accidental death." Thereafter, defendant moved pursuant to CPL § 330.30 to set aside the verdict based on juror confusion. A hearing was held on this motion, following which the trial court issued a written

decision concluding that Ms. Lewis had experienced "juror afterthought" rather than being confused during deliberations. The County Court then proceeded, on November 21, 2002, to enter judgment pursuant to the jury verdict and sentence defendant to a term of 25 years to life.

10. Defendant, represented by Harvard Hollenberg, Esq., appealed his conviction and sentence to this Court. On May 4, 2004, Mr. Hollenberg filed a ten-point brief in support of the appeal.[4] Eight of those points alleged that defendant's trial counsel was ineffective in various ways. The other two points argued that the trial court erroneously declined to suppress defendant's statements at the hospital, and that the verdict resulted from impermissible jury confusion compounded by erroneous instructions. However, despite the fact that defendant's trial counsel had made a detailed motion to dismiss the depraved indifference murder charge, Mr. Hollenberg did not argue that the evidence was insufficient to sustain a murder conviction. Moreover, although Mr. Hollenberg raised the "51 percent" instruction in his juror confusion point, he failed to mention the "unaware of the risk" instruction.

11. Defendant's direct appeal was argued before this Court on November 15, 2004. On December 13, 2004, this Court issued a decision affirming defendant Jean's conviction. See People v.

---

[4] A copy of the appellate brief is annexed as Exhibit B.

-6-

Jean, 13 A.D.3d 466 (2d Dept. 2004).  This Court did not reach the issue of sufficiency because it was not directly raised in defendant's brief.[5]  Furthermore, with respect to the juror confusion issue, this Court found that "[a]ny prejudice to the defendant resulting from the County Court's improper pretrial instruction was obviated by the final charge given to the jury at the trial."  Id. at 468.  Obviously, this Court's conclusion that the final charge "obviated" the prejudice would have been seen in a different light had Mr. Hollenberg highlighted the fundamental errors in that charge.

12.  Defendant sought leave to appeal to the Court of Appeals on all issues raised in the brief.  The Court of Appeals denied leave on June 24, 2005, and a motion for reconsideration was subsequently denied on August 29, 2005.

13.  On or about June 12, 2006, defendant filed a *pro se* motion for writ of error coram nobis before this Court.  In July 2006, before the motion was decided, defendant retained the undersigned as counsel and withdrew the motion without prejudice in

---

[5] Mr. Hollenberg argued in Point VI of the brief that the depraved indifference murder statute, as interpreted under the doctrine of People v. Register, 60 N.Y.2d 270 (1983), was unconstitutionally vague.  In addition, Mr. Hollenberg argued in Point II that the evidence suggested an accidental death and that defendant "could not be guilty of intentionally and recklessly causing a person's death."  Plaintiff contends that these arguments sufficiently preserved the issue for subsequent habeas review.  However, because no direct sufficiency point was raised in the brief, this Court did not consider the sufficiency of the evidence in its December 13, 2004 decision.

order to provide counsel with an opportunity to review the record. Subsequently, the undersigned determined that a CPL § 440.10 motion should be litigated first, and filed such a motion in the Rockland County Court seeking relief on various grounds.  That motion was denied on October 23, 2006, and this Court denied leave to appeal on February 13, 2007.

14.  Accordingly, defendant now moves this Court for a writ of error coram nobis on the ground that defendant received ineffective assistance of appellate counsel.  As set forth in detail below, defendant's counsel was ineffective for (1) not raising the "unaware of the risk" instruction either as a separate point on appeal or as part of the jury confusion point, and (2) not arguing that the evidence at trial was insufficient to sustain a conviction of depraved indifference murder.

### **STANDARD OF REVIEW**

15.  A defendant in a criminal case has a Sixth Amendment right to effective assistance of counsel on his direct appeal.  <u>See Jones v. Barnes</u>, 463 U.S. 745, 754 (1983); <u>see also</u> <u>People v. Turner</u>, 5 N.Y.3d 476 (2006).  This requires that appellate counsel provide "meaningful representation" to the defendant that "reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument."  <u>People v. Stultz</u>, 2 N.Y.3d 277, 285 (2004).  If a defendant's appellate counsel is ineffective, he may obtain relief by filing a motion for

writ of error coram nobis in the Department of the Appellate Division to which his appeal was taken. <u>Id.</u>; <u>see also</u> <u>People v. Bowen</u>, 234 A.D.2d 161 (1st Dept. 1996); <u>People v. Rutter</u>, 202 A.D.2d 123 (1st Dept. 1994).

16. A defendant is entitled to a writ of error coram nobis if "significant issues [exist] which *may have merit* and were not raised by appellate counsel on direct appeal." <u>People v. Smith</u>, 21 A.D.3d 599 (3d Dept. 2005) (emphasis added); <u>see also</u> <u>People v. Nuness</u>, 266 A.D.2d 934 (4th Dept. 1999) (same). "[I]t is well-settled that the unexplained failure of counsel to raise issues which, if raised, would have rendered a reversal or modification likely, constitutes a sufficient ground upon which to predicate a finding of ineffective assistance of appellate counsel." <u>People v. Rutter</u>, 202 A.D.2d 123, 131 (1st Dept. 1994); <u>see also</u> <u>People v. Hacker</u>, 162 A.D.2d 815 (3d Dept. 1990) (granting writ of error coram nobis where his brief on appeal did not argue issues that "may have merit and should have been raised by appellate counsel").

17. Moreover, a writ of error coram nobis is an available remedy even where appellate counsel "raised and competently argued other claims... on direct appeal," as long as a potentially meritorious claim was omitted. <u>Bowen</u>, 234 A.D.2d at 162. It should be noted that an attorney may be found constitutionally ineffective, *even within a context of overall zealousness and competence*, where he fails to make a single critical argument or

motion.  For instance, in <u>People v. Wallace</u>, 187 A.D.2d 998 (4th
Dept. 1992), the court held that the defendant received ineffective
assistance of counsel when his attorney failed to object to
improper identification testimony and to improper bolstering of the
identification witness.  The court held that, "[b]ecause the issue
of identification was critical," the defense attorney's failure to
raise meritorious challenges to flawed identification testimony
constituted ineffective assistance.  <u>Id.</u> at 198-99.  Similarly,
in <u>People v. Hollins</u>, 221 A.D.2d 863 (3d Dept. 1995), the Appellate
Division, Third Department found ineffective assistance where the
defendant's attorney, *inter alia*, failed to make meritorious
objections to the introduction of physical evidence that was key to
the prosecution's case and which led to the conviction of the
defendant.

18.  In the instant case, appellate counsel raised and argued
ten points in his brief on direct appeal.  The majority of these
points, however, were predicated upon ineffective assistance of
trial counsel and raised issues of marginal merit.  In contrast,
Mr. Hollenberg *failed* to raise two issues that were both preserved
and meritorious: the "unaware of the risk" instruction and the
sufficiency of the evidence of depraved indifference murder.  Under
the authorities set forth above, his failure to raise these issues
constitutes ineffective assistance of counsel despite the fact that
he did raise and litigate other points on appeal.

-10-

**POINT I**

**APPELLATE COUNSEL SHOULD HAVE ARGUED, EITHER AS A SEPARATE POINT OR AS PART OF THE JUROR CONFUSION POINT, THAT THE "UNAWARE OF THE RISK" INSTRUCTION WAS REVERSIBLE ERROR**

19.  First, Mr. Hollenberg should have argued that the trial court committed reversible error in instructing the jury that it could find defendant guilty of depraved indifference murder if he was "unaware of the risk" created by his conduct.  This error was clearly preserved by trial counsel and was not cured by the trial court.  Indeed, even though the trial judge acknowledged that such an instruction "would have been a biggy," he insisted that he had given no such charge and refused to correct the record.  The transcript of the trial belies the trial judge's contention, so the error – which was indeed a "biggy" – was left uncorrected to influence the trial jury's deliberations.

20.  This erroneous instruction, standing alone, would have been sufficient to constitute reversible error.  It is well settled that recklessness is a "higher [and] more culpable" mental state than negligence, and that awareness of the risk is the very crux of the distinction between the two.  People v. Montanez, 41 N.Y.2d 53, 56 (1976); see also People v. Roe, 74 N.Y.2d 20, 27 n.7 (1989) (awareness of the risk is "essential" to proving recklessness).  Consequently, by charging the jury that defendant could be convicted of depraved indifference murder despite being "unaware of the risk," the court reduced the *mens rea* of the crime from

–11–

recklessness to criminal negligence.  The court thus relieved the prosecution of having to prove an element of the offense charged – i.e., the culpable mental state of recklessness – and thereby impermissibly reduced the burden of proof and caused reversible error.  See People v. Kennedy, 242 A.D.2d 876 (1st Dept. 1997).  Moreover, the judge flatly refused to correct the erroneous charge after it was brought to his attention, thus violating his obligation to make the law meaningful to the jury and instruct the jurors correctly.  See, e.g., People v. Peterson, 233 A.D.2d 533 (2d Dept. 1996).  Thus, had Mr. Hollenberg argued this point on appeal, he could and would have won reversal for his client.

21.  Moreover, Mr. Hollenberg could have made an even stronger argument on appeal by including the "unaware of the risk" instruction in his juror confusion point.  In Point II of his brief, Mr. Hollenberg argued that Ms. Lewis' confusion about whether depraved indifference murder was equivalent to "accidental death" was exacerbated by the "51 percent" instruction on reasonable doubt.  While the "51 percent" instruction was indeed an egregious error, it occurred at the very beginning of the proceedings and did not directly concern the elements of the charge.  The "unaware of the risk" instruction, in contrast, *did* concern the elements of the offense, and could easily have given juror Lewis exactly the misimpression to which she testified – i.e., that depraved indifference murder was equivalent to

accidental death.

22. Consequently, had Mr. Hollenberg discussed this instruction in conjunction with the juror confusion point, it would have established reversible error in two respects. First, it would have corroborated Ms. Lewis' testimony that she was indeed confused during deliberations rather than suffering from an "afterthought" or change of heart after delivering her verdict. The trial court's decision denying defendant's CPL § 330.30 motion rested in part on its conclusion that Ms. Lewis had no basis for her misimpression about the elements of the crime. In fact, however, the trial judge's own instructions gave Ms. Lewis this basis, and allowed her (and possibly other jurors) to deliberate under the mistaken belief that an accidental killing in which the defendant was "unaware of the risk" posed by his conduct could rise to the level of depraved indifference murder.

23. Moreover, had the "unaware of the risk" charge been properly raised, this Court would not have found that the prejudice caused by the pretrial "51 percent" instruction was "obviated" by the instructions given at the close of trial. Indeed, this Court would have had to confront the fact that, far from "obviating" the jury's confusion and prejudice, the closing instruction *compounded* the prejudice and confused the jurors even further. Under those circumstances, it is difficult to believe that this Court would not have found reversible error. Hence, Mr. Hollenberg's inexplicable

failure to raise or even mention the "unaware of the risk" instruction, either as an independent point or in conjunction with Point II, constitutes ineffective assistance of appellate counsel.

### POINT II

### APPELLATE COUNSEL SHOULD HAVE ARGUED THAT THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION OF DEPRAVED INDIFFERENCE MURDER

24. Second, appellate counsel should have argued the fully preserved point raised by trial counsel in his motion to dismiss: that the evidence was legally insufficient to sustain a conviction of depraved indifference murder. As defense counsel correctly pointed out at trial, the cases in which the Court of Appeals has sustained depraved indifference murder convictions in connection with the instant case have involved far more egregious conduct, such as repeated beatings of a helpless infant over a period of weeks or months.[6] The instant case, in contrast, involved a single albeit severe beating. While defendant does not minimize the seriousness of the conduct with which he was charged, the fact remains that it does not rise to the level of egregiousness

---

[6] For instance, the recent decision of People v. Suarez, 6 N.Y.3d 202 (2005), in elucidating the degree of conduct that constituted "uncommon brutality" for purposes of depraved indifference murder, cited People v. Poplis, 30 N.Y.2d 85 (1972) (3½–year-old child continuously beaten over a period of five days) and People v. Best, 85 N.Y.2d 826 (1995) (defendant beat 9-year-old child over a period of months despite being aware of his deteriorating condition). Likewise, People v. Taylor, 169 A.D.2d 743 (2d Dept. 1991), which was cited by this Court in affirming defendant's conviction, arose from the beating death of a young child over the course of several days.

necessary to constitute depraved indifference murder.

25.  Notably, not only did defendant's trial counsel preserve this meritorious issue on the record, but by the time Mr. Hollenberg litigated defendant's appeal, the New York Court of Appeals had begun to drastically narrow the circumstances under which a depraved indifference murder conviction could be sustained. When the appellate brief was filed on May 4, 2004, the Court of Appeals had already decided <u>People v. Hafeez</u>, 100 N.Y.2d 256 (2003), which held, directly contrary to the pre-existing doctrine of <u>People v. Register</u>, 60 N.Y.2d 270 (1983), that "quintessentially intentional" conduct directed at a particular victim did not qualify as depraved indifference to human life.  By the time Mr. Hollenberg filed a reply brief on defendant's behalf, the court had further decided <u>People v. Gonzalez</u>, 1 N.Y.3d 464 (2004), which unanimously reaffirmed <u>Hafeez</u>.

26.  Moreover, when this case was orally argued before this Court on November 15, 2004, the Court of Appeals had recently decided <u>People v. Payne</u>, 3 N.Y.3d 266 (2004).  In an even more unequivocal rejection of <u>Register</u>, the <u>Payne</u> court categorically held that depraved indifference murder could only be charged under three circumstances: (1) conduct that endangers the general public; (2) abandonment of a helpless victim under circumstances likely to cause his death; and (3) acts of "uncommon brutality" directed toward an exceedingly vulnerable victim.  <u>Id.</u> at 271-72.  The <u>Payne</u>

court further illustrated the "uncommon brutality" category by citing three cases in which the defendant "inflicted continuous beating on a three-year-old child... fractured the skull of a seven-week-old baby... [or] repeatedly beat a nine year old." <u>Id.</u> (citations omitted).

27. Thus, at the time the instant appeal was argued, the Court of Appeals had issued an authoritative decision supporting the exact argument made by defendant's trial counsel: that only *repeated and severe* beatings of a child could rise to the level of depraved indifference, and that deaths resulting from a single beating must be classified as manslaughter in the first or second degree.[7] Had Mr. Hollenberg included a sufficiency point in his brief, this Court would have had to analyze the evidence in light of the Court of Appeals' changing jurisprudence, and would perforce have had to vacate the depraved indifference murder conviction.

28. It should be noted that Mr. Hollenberg would not have been required to anticipate unforeseen changes in the law in order to raise this argument. The argument had already been made and preserved on the record by trial counsel, and it was thus present for any appellate attorney to see. Furthermore, as set forth

---

[7] In <u>People v. Maddox</u>, 31 A.D.3d 970 (3d Dept. 2006), the only post-<u>Payne</u> appellate decision to sustain a depraved indifference murder conviction in connection with the beating of a child, the evidence likewise revealed that the infant victim had numerous wounds and bone fractures that had been inflicted over an extended period of time.

above, the line of Court of Appeals cases that narrowed the application of the depraved indifference murder doctrine was well under way by the time the instant appeal was litigated and argued.

29. Indeed, the prejudice resulting from Mr. Hollenberg's departure from professional norms is even greater, because defendant's conviction became final after the "point of no return" at which the Register doctrine was overruled. This means that, had the point been properly raised on direct appeal, defendant would not only have been entitled to the benefit of Payne but to the subsequent clarifying decisions of People v. Suarez, 6 N.Y.3d 202 (2005) and People v. Feingold, 7 N.Y.3d 288 (2006). This would in turn have been critical because Suarez reaffirmed that the "uncommon brutality" doctrine applies only to repeated and egregious beatings, and Feingold held that depraved indifference to human life is a state of mind which is characterized by "not caring" whether a victim lives or dies. Given that defendant clearly *did* care about his daughter's fate, as evidenced by his rushing her to the hospital and his near-suicidal hysteria upon learning of her death, this would have entitled him to vacatur on collateral review even assuming *arguendo* that he would not have been so entitled on direct appeal.[8]

30. The "point of no return" concept was articulated in the

---

[8] As set forth above, defendant contends that the issue is sufficiently preserved for habeas corpus review in any event.

recent decision of <u>Policano v. Herbert</u>, 7 N.Y.3d 588 (2006), in which a majority of the Court of Appeals affirmed that the New York doctrine of depraved indifference murder **"*gradually and perceptibly changed*** from an objectively determined degree-of-risk standard (the Register formulation) to a mens rea, ***beginning with our decision in Hafeez in 2003***, continuing in our decisions in <u>Gonzalez</u>, <u>Payne</u> and <u>Suarez</u> in 2004 and 2005, and ending with our decision in <u>Feingold</u> in 2006." <u>Id.</u> at 602-03 (emphasis added). The court then determined that the "new precedent" – i.e., the rule established in the Court of Appeals' "post-<u>Sanchez</u> caselaw"[9] – was not retroactive to convictions that became final before the change occurred. <u>See id.</u> at 603.

31. However, the <u>Policano</u> majority did not define the exact point between 2003 and 2006 at which the law changed. Indeed, the majority opinion explicitly declined to make a decision as to when the change occurred:

> [I]ndividual judges hold differing views as to where along this trajectory a majority of the court may have effectively passed the point of no return – the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing caselaw with Register and Sanchez.

<u>Id.</u> Therefore, while the <u>Policano</u> decision held that the "post-

---

[9] The term "post-<u>Sanchez</u> caselaw" refers to depraved indifference cases decided after <u>People v. Sanchez</u>, 98 N.Y.2d 373 (2002), which was the last New York decision to reaffirm the <u>Register</u> rule.

Sanchez caselaw" should not be applied retroactively to convictions that became final before the law changed (such as Policano's own conviction, which became final in 2001), it **did not** preclude the new rule from being applied to defendants whose convictions became final *after* the "point of no return."

32.  In the instant case, as set forth above, defendant's conviction became final after the Court of Appeals decided Payne. The Payne decision – which did not discuss or even cite Register – stated that "[t]his Court's recent holdings... have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York," and articulated a theory of depraved indifference that was based on the nature of the *actus reus* rather than the objective degree of risk created by the defendant's conduct.  Moreover, the majority opinion in Payne was written by Judge Albert Rosenblatt, an outspoken critic of the Register doctrine, and cited with approval a pre-Register Law Revision Commission statement that characterized depraved indifference as analogous to "opening the lion's cage at the zoo."  Thus, by the time of Payne if not earlier, the "point of no return" had been passed and the New York doctrine of depraved indifference to human life had irrevocably changed.

33.  This is critical since, once a new rule of law has been established, any subsequent decisions applying that rule must be

regarded as clarifications rather than further changes. See Policano v. Herbert, 430 F.3d 82, 88 n.1 (2d Cir. 2005) (court on collateral review may rely upon cases decided after defendant's conviction became final if they "explain and reaffirm the principles of New York law" that existed at that time); see also Fiore v. White, 531 U.S. 225, 228 (2001) (decisions handed down after defendant's conviction becomes final are retroactively applicable if they clarify existing law). Therefore, had Mr. Hollenberg raised the sufficiency point that had been preserved on the record by trial counsel, defendant would have been entitled to vacatur of his conviction either on direct appeal or on collateral review, and his failure to do so can only be deemed ineffective.

## **CONCLUSION**

34. In light of the foregoing, this Court should issue an order granting the instant motion in its entirety.

Dated:    New York, NY
          March 7, 2007

_____
ABRAHAM ABRAMOVSKY

```
SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------X
                                            Case Nos.
PEOPLE OF THE STATE OF NEW YORK             2003-00251
                                            2004-00848

            - against -                     Rockland Co.
                                            Ind. No.
                                            2001-321
DARIUS JEAN,
                                            NOTICE
                        Defendant.          OF MOTION

-----------------------------------------X
```

**TO THE PEOPLE OF THE STATE OF NEW YORK:**

**PLEASE TAKE NOTICE** that upon the annexed affirmation of Abraham Abramovsky dated March 7, 2006, upon the exhibits annexed thereto, and upon all other papers and proceedings heretofore had herein, the defendant in the above captioned action will move this Court at the Courthouse located at 45 Monroe Place, Brooklyn, NY 11201, on the fifth day of April 2007, at 9:30 a.m. on that day or as soon thereafter as counsel may be heard:

**FOR AN ORDER** granting a writ of error coram nobis to defendant on the ground of ineffective assistance of counsel, vacating this Court's decision of December 13, 2004 that affirmed his conviction, reinstating his direct appeal, scheduling further briefing and argument thereon, and granting such other and further relief as this Court may deem just and proper.

```
Dated:   New York, NY
         March 7, 2007
```

-1-

_____

ABRAHAM ABRAMOVSKY
Attorney for Defendant
140 West 62nd Street
New York, NY 10023
(212) 636-6863

To:  Rockland County District Attorney
     Attorney for the People
     One South Main Street, Suite 500
     New City, NY 10956-3556
     Attn: Stephanie A. Small, Esq.

     Harvard Hollenberg, Esq.
     Former Appellate Counsel
     320 East 22nd Street, Suite 2K
     New York, NY 10010

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

|  |  |
|---|---|
| Respondents, | AFFIRMATION IN OPPOSITION TO DEFENDANT'S MOTION FOR A WRIT OF ERROR CORAM NOBIS |
| -against- | |
| DARIUS JEAN, | |
| Defendant. | A.D. No. 2003-0251 & 2004-0848 |

-------------------------------------------------------------------X

ARGIRO KOSMETATOS, an attorney duly admitted to practice before the courts of the State of New York, affirms under penalties of perjury that:

1.    I am a Supervising Assistant District Attorney in the County of Rockland, of counsel to District Attorney Michael E. Bongiorno, and I am fully familiar with the facts of this case.

2.    I submit this affirmation in opposition to defendant's petition for a writ of error coram nobis, wherein defendant seeks to set aside a Decision and Order of this Court dated December 13, 2004, which affirmed defendant's judgment of conviction in the Rockland County Court (Kelly, J.) rendered November 21, 2002.

3.    I have prepared this affirmation upon information and belief, based on information contained in the District Attorney's files, the court papers, my

familiarity with the proceedings in this Court and in the County Court, and my personal involvement in the handling of these matters.

4.      Defendant's judgment of conviction arose from the beating of his nine-year-old stepdaughter, Kyona Fredericks, causing her death, and the beating of his eight-year-old biological daughter, Mendissa Jean, causing her physical injury.  These incidents occurred on October 11 and 12, 2001, at the family home located at 9 Innington Court in Hillcrest, New York.  Using a braided leather belt and an amplifier cord, defendant repeatedly struck Kyona and Mendissa in order to "discipline" them.  His fatal beating of Kyona caused her to suffer from internal bleeding and a collapsed lung.

5.      On October 23, 2001, by Indictment Number 2001-321, a Rockland County grand jury charged defendant with one count of Murder in the Second Degree (Penal Law §125.25[2]), Manslaughter in the First Degree (Penal Law §125.20[4]), Assault in the Second Degree (Penal Law §120.05[2]), Assault in the Third Degree (Penal Law §120.00[2]), and two counts of Endangering the Welfare of a Child (Penal Law §260.10[1]).

6.      Thereafter, defendant moved to suppress statements he gave to the police, as well as evidence that the police recovered from his house.  By a Decision and Order dated February 19, 2002, the Honorable William A. Kelly granted a hearing on the matter.  On July 1, 2002, a <u>Huntley</u> and <u>Mapp</u> hearing

commenced. On July 30, 2002, Judge Kelly issued a fourteen-page written decision denying defendant's motion to suppress in its entirety.

7.    On August 5, 2002, an eight-day jury trial commenced before Judge Kelly. On August 19, 2002, the jury found defendant guilty of all counts in the indictment.

8.    On November 21, 2002, Judge Kelly sentenced defendant to an indeterminate state prison term of from twenty-five years to life on the second degree murder count, to run concurrently with an indeterminate term of from eight and one-third to twenty-five years on the first degree manslaughter count and determinate terms of seven years on the second degree assault count and one year on each of the remaining misdemeanor counts. Because defendant's sentence on the manslaughter charge was improper, Judge Kelly resentenced defendant on March 12, 2003 to a determinate term of twenty years for that crime.[1] Defendant is presently serving that sentence.

9.    On or about November 24, 2002, defendant, through his trial counsel, filed a Notice of Appeal from his conviction.

10.    Before perfecting his direct appeal, defendant, through his attorney, Harvard Hollenberg, Esq., moved to vacate his judgment of conviction in the Rockland County Court pursuant to Criminal Procedure Law ("C.P.L.")

---

[1] At the resentencing proceeding, defendant was represented by Harvard Hollenberg, Esq., who also represented defendant on his direct appeal.

§440.10(1)(h) (see Exhibit 1, Defendant's Motion to Vacate). In the motion, defendant alleged that he was denied the effective assistance of trial counsel, and cited to eight specific examples of counsel's alleged errors in support of his claim (see Exhibit 1, p.3, ¶ 8). The People opposed defendant's motion, and Mr. Hollenberg submitted an Affirmation in Reply (see Exhibit 2, People's Affirmation in Opposition dated July 21, 2003; Exhibit 3, Hollenberg's Affirmation in Reply dated July 29, 2003).

11.    By Decision and Order dated August 23, 2003, the Rockland County Court (Kelly, J.) denied defendant's motion without a hearing on both procedural and substantive grounds. Mr. Hollenberg thereafter moved before this Court for leave to appeal Judge Kelly's decision (see Exhibit 4, Hollenberg's Notice of Application and Supporting Affirmation). Respondent filed papers in opposition. By Decision and Order dated December 3, 2003, this Court denied defendant's motion for leave to appeal.

12.    On May 4, 2004, Mr. Hollenberg filed an appellate brief raising numerous issues.[2] In ten separate point headings, defendant claimed that: (1) the hearing court improperly denied his motion to suppress statements he made to the police and his motion to suppress physical evidence recovered from his house; (2) the trial court's reasonable doubt charge confused the jury; (3) trial

---

[2] Mr. Hollenberg filed an Amended Brief in May of 2004.

4

counsel did not provide him with meaningful representation; (4) trial counsel was ineffective for neither preparing nor mounting a defense to allegations that he abused Mendissa Jean, and for tainting the defense relating to Kyona by ineptly cross-examining Mendissa at trial; (5) trial counsel was ineffective for failing to object to the entry of contradictory, repugnant and inconsistent verdicts; (6) trial counsel was ineffective for failing to challenge the constitutionality of New York's "depraved indifference" murder statute as applied to this case; (7) the trial court's refusal to disqualify defense counsel despite counsel's conflict of interest in simultaneously representing a key prosecution witness in a criminal matter deprived him of meaningful representation; (8) trial counsel's inattentive cross-examination of the medical examiner was ineffective; (9) trial counsel's summation was ineffectual; and (10) trial counsel's failure to object to the prosecutor's prejudicial misstatement, on summation, of Mendissa Jean's testimony constituted reversible error (see Exhibit 5, Defendant's Amended Brief to the Appellate Division). On or about July 2, 2004, respondent filed its brief addressing each of those claims (see Exhibit 6, Brief for Respondent).

13.    After hearing oral argument on the matter, a unanimous panel of this Court, by Decision and Order dated December 13, 2004, affirmed defendant's conviction. People v. Jean, 299 A.D.2d 426 (2d Dept. 2002).

Defendant moved, pro se, to renew and reargue that decision. Mr. Hollenberg filed papers in support (see Exhibit 7, Hollenberg's Affirmation in Support, dated February 18, 2004), but the Court denied the motion.

14.    Defendant thereafter sought leave to appeal to the Court of Appeals, which the People opposed (see Exhibits 8, 9 and 10, copies of Hollenberg's Letters to the Court of Appeals). The Court denied the application. See People v. Jean, 5 N.Y.3d 764 (2005). The Court also denied defendant's motion for reconsideration of its June 24, 2005 decision. See People v. Jean, 5 N.Y.3d 807 (2005).

15.    In the instant petition for a writ of error coram nobis, defendant now contends that appellate counsel deprived him of meaningful representation because: (1) counsel should have argued, either as a separate point or as part of the juror confusion point in his brief, that the trial court's "unaware of the risk" instruction was reversible error; and (2) counsel should have argued that the evidence was legally insufficient to sustain a conviction for depraved indifference (see Affirmation of Abraham Abramovsky [hereinafter "Abramovsky Affirmation"], pp. 6-8, 10-11, ¶¶ 10-11, 14, 18-19).

16.    As argued more fully in the accompanying Memorandum of Law, this Court should deny defendant's application for a writ of error coram nobis because the totality of the circumstances clearly shows that Mr. Hollenberg

provided defendant with meaningful representation.     Furthermore, Mr. Hollenberg was justified in not raising the arguments alluded to in this petition as those claims were unpreserved and utterly devoid of any merit.

17.     In support of the People's Affirmation in Opposition to defendant's petition for a writ of error coram nobis, I have submitted the following exhibits:

Exhibit 1:     A copy of defendant's Notice of Motion to vacate his judgment of conviction pursuant to C.P.L. §440.10 and supporting papers;

Exhibit 2:     A copy of the People's Affirmation in Opposition to defendant's Motion to Vacate Judgment dated July 21, 2003;

Exhibit 3:     A copy of defendant's Affirmation in Reply the People's Response to Defendant's C.P.L. §440.10 motion dated July 29, 2003;

Exhibit 4:     A copy of defendant's Notice of Application for leave to appeal the denial of defendant's C.P.L. §440.10 motion;

Exhibit 5:     A copy of defendant's Amended Brief to the Appellate Division, Second Department;

Exhibit 6:     A copy of the Brief for Respondent filed with the Appellate Division, Second Department;

Exhibit 7:     A copy of Mr. Hollenberg's Affirmation dated February 18, 2004 [sic] in support of defendant's pro se Motion to Renew and Reargue this Court's Decision and Order dated December 13, 2005 affirming his conviction;

Exhibit 8:     A copy of Mr. Hollenberg's letter to the Court of Appeals dated January 18, 2005 seeking leave of appeal;

Exhibit 9:   A copy of Mr. Hollenberg's letter to the Court of Appeals dated February 8, 2005 in further support of his application seeking leave of appeal;

Exhibit 10:   A copy of Mr. Hollenberg's letters to the Court of Appeals dated April 22, 2005 and August 15, 2005 regarding defendant's pro se application seeking reconsideration of the denial of his application for leave of appeal;

Exhibit 11:   A copy of the trial court's final instructions to the jury.

**WHEREFORE**, the People of the State of New York respectfully request that this Court deny defendant's application for a writ of error coram nobis in it entirety.

Dated:          New City, New York
                May 2, 2007


                                                Argiro Kosmetatos
                                                Supervising Assistant District Attorney


cc:    Abraham Abramovsky, Esq.
       154 West 70th Street
       New York, N.Y. 10023

8

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
--------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                        Respondent,

                                     **MEMORANDUM**
                                     **OF LAW**

      -against-

                                     Indictment No. 2001-321
DARIUS JEAN,                             A.D. Nos. 2003-251 &
                                       2004-848

                        Defendant.
--------------------------------------------------------------------X

## ARGUMENT

### DEFENDANT RECEIVED THE EFFECTIVE
### ASSISTANCE OF APPELLATE COUNSEL

In his application for <u>coram nobis</u> relief, defendant complains that appellate

deprived him of meaningful representation because (1) counsel did not argue in his

brief that the trial court's erroneous instruction on the definition of "recklessness"

as "unaware of the risk" was reversible error in that it reduced the *mens rea* of the

crime of depraved indifference murder from recklessness to criminal negligence;

and (2) counsel did not argue that the evidence presented at trial was legally

insufficient to sustain a conviction for depraved indifference murder on the ground

that the beatings did not take place over the course of a week but only took place

over the course of one to two days (<u>see</u> Abramovsky Affirmation, pp. 11-20).

None of these two claims support defendant's contention that he was denied the effective assistance of appellate counsel.

## A.    Defendant Received Effective Representation Of Appellate Counsel

It is well-settled that a defendant is entitled to effective assistance of appellate counsel on his direct appeal to the Appellate Division. Evitts v. Lucey, 469 U.S. 387 (1985), reh'g denied, 470 U.S. 1065 (1985); People v. Casiano, 67 N.Y.2d 906 (1986). In determining whether a defendant received the effective assistance of appellate counsel, the New York Court of Appeals has held that an appellate attorney shall be judged by the same standard that applies to trial attorneys. See People v. Stultz, 2 N.Y.3d 277, 284 (2004). Thus, in reviewing a defendant's coram nobis application, an appellate court must determine whether the defendant's appellate attorney provided "meaningful representation." Id. To assist courts in reviewing these types of claims, the Court of Appeals has set forth certain general guidelines as to what constitutes "meaningful representation" in appellate advocacy:

> Appellate advocacy is meaningful if it reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument. Effective appellate representation by no means requires counsel to brief or argue every issue that may have merit. When it comes to the choice of issues, appellate lawyers have latitude in deciding which points to advance and how to order them.

Id. at 285.  See also People v. Turner, 5 N.Y.3d 476 (2005).  In other words, an appellate attorney need not raise every colorable claim, for effective advocacy involves "winnowing out weaker arguments" and focusing on a few key issues. See Jones v. Barnes, 463 U.S. 745, 751 (1983).  Judged by these standards, defendant's application for a writ of error coram nobis must fail.

Contrary to defendant's contention, a review of appellate counsel's performance clearly establishes that counsel provided defendant with "meaningful representation" on appeal and otherwise.  To begin, this Court should note that defendant's attorney, Harvard Hollenberg, Esq., filed two briefs on defendant's behalf, which both complied with the rules of this Court.  Pursuant to 22 NYCRR 670.10.3(g), the briefs, viewed together, contained a CPLR 5531 statement, a three-page table of contents, a forward and an introduction, a concise statement of the issues involved, as well as a concise statement of the nature of the proceeding and the facts.  Following these essential requirements, Mr. Hollenberg set forth his appellate argument in ten separate point headings (See Exhibit 5).

In his first point, Mr. Hollenberg argued that the trial court erred in denying defendant's motion to suppress his statements and physical evidence.  Mr. Hollenberg highlighted the relevant hearing testimony to support his argument that defendant's constitutional rights were violated.  In fact, he made numerous

references to the hearing record and cited to relevant case law (see Exhibit 5, pp. 5-12). Mr. Hollenberg also vigorously argued in his second point that the court's charge to the jury on reasonable doubt caused "profound confusion," leading to their "compromise verdict." Mr. Hollenberg cited to various portions of the post-conviction hearing, as well as to relevant case law. In further support of his claim of jury confusion, Mr. Hollenberg also argued that the trial court's definition of "depraved indifference" further compounded the jury's confusion. Again, he cited to relevant case law, as well as to the trial and post-conviction hearing transcripts (see Exhibit 5, pp. 12-19). Lastly, counsel argued, in Points Three through Ten, that defendant was denied the effective assistance of trial counsel for a variety of reasons. Specifically, Mr. Hollenberg argued that trial counsel's ineffectiveness was apparent from: the manner in which counsel cross-examined Mendissa Jean and Dr. Frederick Zugibe, the medical examiner, and counsel's failure to present a defense (Points Four and Eight); counsel's failure to object to the verdict (Point Five); counsel's failure to challenge the constitutionality of the depraved indifference murder statute as it applied to defendant (Point Six); counsel's failure to consent to his own disqualification (Point Seven); counsel's failure to deliver an effective closing argument (Point Nine); and, finally, counsel's failure to object to the prosecutor's remarks in summation (Point Ten) (see Exhibit 5, pp. 19-47). In each of these points, Mr. Hollenberg cited to applicable portions of the record and

relevant case law.  Since appellate counsel obviously researched the legal issues and presented those issues in a thoughtful and cogent manner, it is clear that defendant received the effective assistance of appellate counsel.  The fact that this Court rejected appellate counsel's arguments in no way demonstrates that the representation he provided was ineffective.

Significantly, Mr. Hollenberg's involvement in this case did not end when this Court affirmed defendant's conviction.  When defendant moved, pro se, to have this Court reconsider its Decision and Order dated December 14, 2004, upholding defendant's conviction, Mr. Hollenberg submitted an affirmation in support of defendant's motion, which he was not required to do.  By filing this affirmation, Mr. Hollenberg demonstrated just how committed he was to the arguments he raised before the County Court on post-judgment review and before this Court in the direct appeal (see Exhibit 7).

Furthermore, Mr. Hollenberg's representation was not limited to defendant's direct appeal.  Mr. Hollenberg appeared in County Court when the court re-sentenced defendant on the manslaughter count, which, when initially imposed, was an improper sentence.  As his appellate advocate, Mr. Hollenberg moved to dismiss the murder and manslaughter charges, albeit unsuccessfully, but obviously recognized early on that he intended to argue that issue on direct appeal.  Shortly

5

thereafter, Mr. Hollenberg filed a notice of motion to vacate defendant's judgment pursuant to C.P.L. §440.10(1)(h), in which he prepared and submitted a twenty-page affirmation in support thereof, with exhibits, as well as a fourteen-page affidavit signed by the defendant, and a thirty-four page memorandum of law. The legal basis upon which he sought to vacate defendant's conviction was that defendant was deprived of the effective assistance of trial counsel (see Exhibit 1). After respondent filed its papers in opposition, Mr. Hollenberg submitted a Reply Affirmation in which he specifically addressed the points raised by respondent (see Exhibit 3).

Moreover, after this Court affirmed defendant's conviction, Mr. Hollenberg filed an application for leave to appeal to the Court of Appeals, and submitted several letters to that Court in support of that application (see Exhibits 8, 9 and 10).

In reviewing ineffective assistance of appellate counsel claims, the Court of Appeals has recognized that the "focus is on the fairness of the proceeding as a whole," which is the same standard for reviewing ineffective assistance of trial counsel claims enunciated in People v. Baldi, 54 N.Y.2d 137 (1981). Here, a review of Mr. Hollenberg's performance throughout all of defendant's post-conviction proceedings plainly demonstrates that defendant received "meaningful representation."

6

**B.**    **Since The Two Claims At Issue Are Either Unpreserved, Meritless or Both, Appellate Counsel Cannot Be Faulted For Not Arguing Them On Appeal**

Notwithstanding the above, defendant insists that Mr. Hollenberg was ineffective because Mr. Hollenberg did not argue two additional issues on direct appeal before this Court.  Specifically, notes defendant, Mr. Hollenberg should have argued, either as a separate point on appeal or as part of the jury confusion point, that the trial court committed reversible error in instructing the jury that the jury could find defendant guilty of depraved indifference murder if he was "unaware of the risk" created by his conduct.  According to defendant, by giving this charge, the court reduced the *mens rea* of depraved indifference murder from recklessness to criminal negligence (see Abramovsky Affirmation, p. 11, ¶¶19-20). Second, defendant contends that Mr. Hollenberg should have argued that the evidence at trial was legally insufficient to sustain defendant's conviction for depraved indifference murder, because in all of the cases in which courts have sustained a depraved indifference murder conviction, the beatings took place over the course of several days or months, whereas the instant case involved "a single albeit severe beating" (see Abramovsky Affirmation, p. 3, ¶6, p. 14, ¶24).  Since neither of these two claims have any merit, the fact that Mr. Hollenberg did not assert them in his brief did not render him incompetent nor did it deprive defendant of meaningful representation.

7

1. <u>The trial court properly charged the jury on the elements of depraved indifference murder and any claim that the court's instructions were erroneous would have failed on appeal.</u>

Preliminarily, Mr. Hollenberg would not have prevailed on appeal had he argued in his brief that the trial court committed reversible error in instructing the jury that it could find defendant guilty of depraved indifference murder if he was "unaware of the risk" created by his conduct. This claim is unpreserved because defendant did not timely object to the court's charge and, he failed to argue with specificity the exact claims he raises now – namely, that the court reduced the *mens rea* of the crime from recklessness to criminal negligence and thus relieved the prosecution from having to prove the culpable mental state of recklessness and thereby impermissibly reduced the burden of proof. <u>See</u> C.P.L. §470.05(2); <u>People v. Gray</u>, 86 N.Y.2d 10, 19 (1995)("the preservation requirement compels that the argument be specifically directed at the alleged error"); <u>see also People v. Bynum</u>, 70 N.Y.2d 858 (1987); <u>People v. Dekle</u>, 56 N.Y.2d 835, 836 (1982).

Moreover, although the court below later cured the "error" by giving the correct charge to the jury, defendant failed to request curative instructions or move for a mistrial when he belatedly took exception to the charge. In sum, because defendant made a general objection based on the fact that the court said "unaware" instead of "aware," and the objection was not specifically directed at the alleged error he complains of now, this Court would have likely rejected the claim for lack

8

of preservation. <u>People v. Gray</u>, 86 N.Y.2d at 19. And, since defendant failed to preserve the argument during trial, his appellate attorney will not be deemed ineffective for omitting the waived – and thus futile – argument on appeal. <u>See</u> <u>Brito v. Phillips</u>, 2007 U.S. Dist. Lexis 29935, at *11 (S.D.N.Y. April 23, 2007).

Even if counsel had asserted the claim in his brief and this Court reached the claim in the interest of justice, it would undoubtedly have found that the claim was devoid of merit. The record reveals that the trial court initially gave the correct charge to the jury, and that it was only after the court re-read the charge on the definition of "recklessly" that the court inadvertently misspoke when it said that the wrongdoer must be "unaware of the risk" as opposed to "aware of the risk." Indeed, when the court initially charged the jury on the elements of Murder in the Second Degree, the court stated:

> "[A] person is guilty of murder in the second degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the [death] of that person."

(Exhibit 11, p. 921). The court correctly defined the term "recklessly" as follows:

> A person acts recklessly with respect to another person's death when that person engages in conduct which creates a substantial, unjustifiable, and grave risk that another person's death will occur **or when he is aware of and** **consciously disregards** that risk and when that risk is of such nature and degree that disregard of it constitutes a

> gross deviation from the standard of conduct that a
> reasonable person would observe in that situation. A
> person also acts recklessly when he creates such a risk
> but is unaware of that risk solely because of his voluntary
> intoxication. We don't have any testimony of that regard
> in this case.

(Exhibit 11, pp. 921-22) (emphasis added). Thereafter, defense counsel asked for a

bench conference, at which point he advised the court that it had inappropriately

used the word "or" instead of "and" when it linked the wrongdoer's conduct (*i.e.*,

"conduct which creates a substantial, unjustifiable, and grave risk that another

person's death will occur") with the wrongdoer's awareness and conscious

disregard of that risk. Not recalling whether it had in fact used the word "and"

instead of "or," the court resolved to re-read the definition of "recklessly" to the

jury. It was then that the court misspoke and instructed the jury as follows:

> A person acts recklessly with respect to another person's
> death when that person engages in conduct which creates
> a substantial, unjustifiable, and grave risk that another
> person's death will occur *and* **when he or she is
> unaware of and consciously disregards** that risk and
> when that risk is of such nature and degree that disregard
> of it constitutes a gross deviation from the standard of
> conduct that a reasonable person would observe in the
> situation.

(Exhibit 11, p. 923).

It is clear from the record that the court inadvertently misspoke when it said

"unaware of" instead of "aware of." In any event, defense counsel did not object

to this instruction, nor did he ask for a bench conference to timely alert the court to the error. It was only after the court finished reading the final instructions to the jury that counsel took exception to the charge on the ground that the court said "unaware of the risk" as opposed to "aware of the risk" (Exhibit 11, p. 952). Counsel did not state why he was challenging the instruction, other than to obviously imply that the charge was wrong.

In response to counsel's complaint, the court initially stated that it had "definitely said aware and consciously disregards that risk" and that this kind of error would have been a "biggy" (Exhibit 11, p. 952). But during jury deliberations, the court revisited the issue after receiving a note from the jury requesting that the court re-read the instructions and definitions with regard to the elements of Murder in the Second Degree. Thus, defendant's claim that "the judge flatly refused to correct the erroneous charge after it was brought to his attention" (Abramovsky Affirmation, p. 12, ¶20) is not true. In fact, the court acknowledged that counsel might have been correct, and stated that it would instruct the jury again on the elements of depraved indifference murder and the definition of "recklessly." The following colloquy ensued:

> MR. GOLDSTEIN: You used the word unaware instead of aware.
>
> THE COURT: I'm going to reread that to them right now. I don't know if I did nor not. You may be right, so

> I'll reread it using the word aware again since that's the charge they're asking to have reread, and I'll read this note Courts Exhibit 5. We received a note. Says, "In regard to the first . . . count in the indictment, please redefine depraved indifference and please read the elements to prove that." That's marked Court Exhibit 5. I'll comply by rereading to them now.

(Exhibit 11, p. 959). The court then read the jury's note into the record and correctly instructed the jury on the elements of depraved indifference murder and the definition of "recklessly":

> I told you that under our law a person is guilty of murder in the second degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the death of that person. I gave you the definition of recklessly and depraved indifference to human life. I told you that a person acts recklessly with respect to another person's death when that person engages in conduct which creates a substantial, unjustifiable, and grave risk that another person's death will occur, and **when he is aware of and consciously disregards** that risk, and when that risk is of such nature and degree that it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation.

(Exhibit 11, pp. 960-61) (emphasis added). Because the court reinstructed the jury on the correct definition of "recklessly," and the jury is presumed to have followed the court's instructions (see People v. Davis, 58 N.Y.2d 1102 [1983]), any prejudice to defendant that may have resulted from the court's prior misstatement with regard to the actor's awareness of the risk was obviated. See People v.

Valdes, 283 A.D.2d 187 (1st Dept.), lv. denied, 97 N.Y.2d 688 (2001); People v. Simon, 224 A.D.2d 458, 459 (2d Dept.), lv. denied, 88 N.Y.2d 855 (1996).

Furthermore, as the record makes clear, the court's inadvertent misstatement with regard to the wrongdoer being "unaware of the risk" as opposed to being "aware of the risk" was a single isolated instance that could not have possibly misled the jury in its deliberations. The fact that the jury deliberated for only three hours before rendering a guilty verdict on the murder charge clearly demonstrates that the jury understood the charge. There was no confusion, as defendant maintains. Indeed, the court's repeated instructions with regard to the definition of the term "recklessly" alleviated any possible confusion that may have resulted when the court misspoke about the actor's awareness of the risk. In charging the jury on the elements of first-degree manslaughter, for example, the court correctly defined "recklessly" as "conduct which creates or contributes to a substantial and unjustifiable risk that another person will suffer serious physical injury, and when he or she is **aware** of and consciously disregards that risk...(Exhibit 11, p. 928) (emphasis added). And, when the court charged the jury on the elements of second-degree manslaughter, it again correctly defined the term "recklessly" as follows:

13

> A person acts recklessly with respect to a death when that person engages in conduct which creates or contributes to a substantial and unjustifiable risk that another person's death will occur, and when **he is aware of** and consciously disregards that risk. . .

(Exhibit 11, p. 930).

Certainly, by repeatedly reading the correct definition of "recklessly" to the jury, the court did not reduce the *mens rea* of depraved indifference murder from recklessness to criminal negligence, nor did it give the jurors the impression that an accidental killing in which the defendant was unaware of the risk posed by his conduct could ever rise to the level of depraved indifference murder (see Abramovsky Affirmation, p. 13, ¶22). Rather, as the court's instructions make clear, "recklessly" was ranked much higher than "criminal negligence" on the *mens rea* spectrum, and based on this clear distinction, no reasonable juror could have possibly concluded that depraved indifference was equivalent to accidental death (see Abramovsky Affirmation, pp. 12-13, ¶21). The court defined criminal negligence as follows:

> A person acts with criminal negligence with respect to a death when that person engages in conduct which creates or contributes to a substantial and unjustifiable risk that another person's death will occur, and when he or she **fails to perceive that risk**. . .

(Exhibit 11, p. 932). Since the court defined "recklessly" as a state of mind where the actor perceives the risk to the victim, and "criminal negligence," as a state of

mind where the actor "fails to perceive" the risk, there was a clear, marked distinction between the two *mens rei*, such that no possible juror confusion could have occurred.

Furthermore, the court's instructions on depraved indifference murder plainly underscored the remarkable distinction between depraved indifference and criminally negligent homicide. During its initial charge on depraved indifference murder and the definition of "recklessly," the court charged the jury that "although a crime committed recklessly is generally regarded as less serious and blameworthy than a crime committed intentionally . . . when reckless conduct is engaged in under circumstances evincing a depraved indifference to human life, the law regards that conduct as so serious, so egregious, as to be the equivalent of intentional conduct" (Exhibit 11, p. 923). And, the court further charged that "[c]onduct evincing a depraved indifference to human life *is more serious and blameworthy than conduct which is merely reckless. It is conduct which, beyond being reckless, is so wanton, so deficient in a moral sense and concern, so devoid of regard for the life of another, as to be equal in blameworthiness to intentional conduct, which produces the same result (emphasis added)" (Exhibit 11, p. 923-24). Significantly, the court repeated this charge when the jury asked for a read-back on the elements of depraved indifference murder (Exhibit 11, p. 961-62).

Under these circumstances, and since the court affirmatively cured any error by reading the correct definition of "recklessly" to the jury in response to the jury's request for a readback during deliberations, any claim on appeal that the jurors were confused and that they deliberated "under the mistaken belief that an accidental killing in which the defendant was 'unaware of the risk' posed by his conduct could rise to the level of depraved indifference murder" (see Abramovsky Affirmation, p. 13, ¶22) would have failed on appeal. Thus, defendant's appellate attorney provided his client with meaningful representation by properly winnowing out this significantly weaker argument and by focusing, instead, on ten key issues that he believed, in his professional opinion, had merit. Jones v. Barnes, 464 U.S. at 751; People v. Stultz, 2 N.Y.3d at 285. The fact that defendant did not win those claims did not render counsel ineffective.

In sum, even if appellate counsel had argued that the court committed reversible error in instructing the jury that "recklessly" means that the wrongdoer was "unaware of the risk" of his conduct to the victim, this argument would not have won defendant a new trial. Thus, defendant has not overcome his burden of proving that counsel was ineffective for not raising this claim, and his application for a writ of error coram nobis should be denied.

2. <u>The change in the law on depraved indifference is not retroactive to the instant collateral review proceedings; in any event, under the law as it existed at the time of defendant's direct appeal, the evidence at trial was legally sufficient to support defendant's conviction for depraved indifference murder.</u>

Defendant contends that appellate counsel should have argued that the evidence was legally insufficient to sustain his conviction of depraved indifference murder because this case involved "a single, albeit severe beating" that did not rise to the level of egregiousness necessary to constitute depraved indifference murder. By contrast, notes defendant, the child victim cases in which the Court of Appeals has sustained depraved indifference murder convictions involved far more egregious conduct such as repeated beatings of a helpless infant over a period of weeks or months (<u>see</u> Abramovsky Affirmation, p. 14, ¶24). Defendant argues that at the time his direct appeal was argued, the Court of Appeals had issued an authoritative decision holding that only repeated and severe beatings of a child could rise to the level of depraved indifference, and that deaths resulting from a single beating must be classified as manslaughter in the first or second degree (Abramovsky Affirmation, p. 16, ¶27). But the case law does not support that proposition. Thus, counsel can hardly be called ineffective for omitting these meritless claims from his brief on direct appeal.

a.    <u>The change in the law on depraved indifference is not retroactive.</u>

At the outset, defendant is not entitled to the relief he seeks in this petition

for a writ of error <u>coram</u> <u>nobis</u> because the Court of Appeals expressly held, in

<u>Policano v. Herbert</u>, 7 N.Y.3d 588, 603-04 (2006), that its recent case law

addressing depraved indifference does not apply retroactively.  <u>See</u> <u>also</u> <u>People v.</u>

<u>Stewart</u>, 36 A.D.3d 1156, 1162 (3d Dept. 2007).  Defendant correctly notes that the

doctrine of depraved indifference murder gradually changed from an objectively

determined degree-of-risk standard to a *mens rea*, beginning with the Court of

Appeals' decision in <u>People v. Hafeez</u>, 100 N.Y.2d 253 (2003) in 2003, continuing

with the Court's decisions in <u>People v. Gonzalez</u>, 1 N.Y.3d 464 (2003), <u>People v.</u>

<u>Payne</u>, 3 N.Y.3d 266 (2004) and <u>People v. Suarez</u>, 6 N.Y.3d 202 (2005) in 2004

and 2005, and ending with the Court's decision in <u>People v. Feingold</u>, 7 N.Y.3d

288 (2006) in 2006 (<u>see</u> Abramovsky Affirmation, p. 18).   But contrary to

defendant's claim, the Court explicitly stated in <u>Policano</u> that the law changed with

<u>People v. Feingold</u>.  <u>See</u> <u>Policano v. Herbert</u>, 7 N.Y.3d at 595.  Thus, <u>Feingold</u> was

the "point of no return."

The <u>Policano</u> majority explained that in 2001, the law of the State of New

York was governed by <u>People v. Register</u>, 60 N.Y.2d 270 (1983), <u>cert. denied</u>, 466

U.S. 953 (1984), and that the law remained static through the Court's decision in

<u>People v. Sanchez</u>, 98 N.Y.2d 373 (2002), which reaffirmed <u>Register</u>.  The Court

acknowledged that after <u>Sanchez</u>, a series of decisions distinguishing intent and depraved indifference incrementally pointed the law in a different direction, ultimately culminating in <u>Feingold</u>, which expressly overruled <u>Register</u> and <u>Sanchez</u>.  <u>See</u> <u>Policano v. Herbert</u>, 7 N.Y.3d at 595.  Those decisions – <u>Hafeez</u>, <u>Gonzalez</u>, <u>Payne</u> and <u>Suarez</u> – did not implicitly or explicitly declare depraved indifference to be a *mens rea* element.  <u>Feingold</u>, however, did.  Thus, said the Court in <u>Policano</u>, <u>Feingold</u> was to serve as the marker for a change in the law, but it would not apply retroactively to defendants whose convictions became final before <u>Feingold</u>.  <u>Policano v. Herbert</u>, 7 N.Y.3d at 603 ("There is no doubt, however, that a majority of the court explicitly overruled <u>Register</u> and <u>Sanchez</u> in <u>Feingold</u>, holding that "'depraved indifference to human life' is a culpable mental state" [citations omitted]).

Applying the three factors set forth in <u>People v. Pepper</u>, 53 N.Y.2d 213, 220 (1981), <u>cert. denied</u>, 454 U.S. 967 (1981),[1] the <u>Policano</u> majority justified non-retroactivity as a measure to prevent a flood of post-judgment motions made under C.P.L. §440.10 from overwhelming the court system.  The majority also reiterated its determination that defendants convicted of depraved indifference murder are "'not attractive candidates for collateral relief" and concluded that, "non-

---

[1] Those three factors are: (1) the purpose to be served by the new standard; (2) the extent of the reliance by law enforcement authorities on the old standard; and (3) the effect on the administration of justice of a retroactive application of the new standard.  <u>People v. Pepper</u>, 53 N.Y.2d at 220.

retroactivity poses no danger of a miscarriage of justice." Policano v. Herbert, 7 N.Y.3d at 604, quoting People v. Suarez, 6 N.Y.3d at 217-18 (G.B. Smith, Rosenblatt and R.S. Smith, JJ., concurring).  This reasoning holds true here. Defendant, whose conviction for depraved indifference murder became final in 2005, well before Feingold was decided, is likewise not an attractive candidate for collateral relief vis-à-vis his petition for a writ of error coram nobis.

To be sure, Chief Judge Judith Kaye's explicit statement, in her dissent, that Hafeez, Gonzalez and their progeny did not change the law, and that Feingold overruled well-settled precedent, underscores the Policano majority's determination that Feingold represents the "point of no return" at which the law with respect to depraved indifference changed.  And, Judge Kaye's insistence that Hafeez, Gonzalez, Payne and Suarez did not constitute any change in the law, but merely applied long-settled New York law to new facts thoroughly discredits defendant's claim that "by the time of Payne if not earlier, 'the point of no return' had been passed and the New York doctrine of depraved indifference to human life had irrevocably changed" (Abramovsky Affirmation, p. 19, ¶32).  Consequently, under either the majority's or Chief Judge Kaye's view in Policano, the change in the law on depraved indifference is not retroactive on collateral review, and thus has no bearing on defendant's conviction, which became final in 2005, well before Feingold was decided.  Policano v. Herbert, 7 N.Y.3d at 603; People v. Rodriguez,

2007 N.Y. Misc. Lexis 2228, at *15 (Sup. Ct. Bronx Co. March 6, 2007); Nicholas v. Smith, 2007 U.S. Dist. Lexis 30078, at *18 (U.S. Dist. Ct, E.D.N.Y. Apr. 20, 2007); People v. James, 2007 NY Slip Op 50635U, at *4 (Sup. Ct. Kings Co. Mar. 30, 2007); see also People v. Pepper, 53 N.Y.2d at 220 (holding that absent manifest injustice, retroactive application of a judicial decision is not available in those cases where the normal appeals process has ended).

In sum, even if appellate counsel had raised the issue of the sufficiency of the evidence before the appellate court, he would not have prevailed on the issue since the Court of Appeals clearly stated that Feingold was not to be applied retroactively. Thus, counsel can hardly be called ineffective for not arguing that the doctrine of depraved indifference to human life had irrevocably changed "by the time of Payne if not earlier" (see Abramovsky Affirmation, p. 19), since Policano did not support such a claim.

b. Defendant's sufficiency claim lacks merit, and thus, counsel cannot be faulted for omitting the claim from his brief.

Nor would appellate counsel have prevailed on the merits had he argued in his brief that the evidence was legally insufficient to sustain his conviction for depraved indifference murder on the ground he now alleges in the instant coram application – namely, that the single, albeit severe beating of nine-year-old Kyona Fredericks did not constitute depraved indifference murder since the cases in which the Court of Appeals has sustained depraved indifference murder convictions

involved far more egregious conduct, such as repeated beatings of a helpless infant over a period of weeks or months (see Abramovsky Affirmation, p. 14, ¶24). The case law does not support this theory.

When appellate counsel filed defendant's brief in the Appellate Division, Second Department on May 4, 2004, the law of the State of New York on depraved indifference was governed by People v. Register, 60 N.Y.2d 270 (1983), which held that the applicable mental state of depraved indifference murder was recklessness, and that "depraved indifference" concerned the objective circumstances of the crime. In Register, the Court of Appeals upheld a conviction for depraved indifference murder where the defendant fired a gun in a crowded bar during an argument, killing one person and injuring two others. In so doing, the Court noted that Penal Law §125.25(2) defined depraved indifference murder "by reference to the circumstances under which it occur[ed] and expressly state[d] that recklessness is the element of mental culpability required." People v. Register, 60 N.Y.2d at 277. The Court reasoned that "[t]he concept of depraved indifference was retained in the new statute not to function as a *mens rea* element, but to objectively define the circumstances" (that is, the factual setting) which must exist "to elevate a homicide from manslaughter to murder." Id. at 276-77.

The Court of Appeals reaffirmed Register in 2002 in People v. Sanchez, 98 N.Y.2d 373 (2002), when it upheld a conviction for depraved indifference murder

22

based on the defendant's single shot to the victim's chest from point blank range. The Court concluded, based on the circumstances of that case, that there was a rational view of the evidence supporting the jury's conclusion that the defendant did not intend to kill the deceased but that his conduct was so wanton as to constitute depraved indifference. In so holding, the Court explained that depraved indifference was not a *mens rea* element but required only a showing of a heightened degree of recklessness consisting of the "grave" risk of death and the existence of objective circumstances evincing a depraved indifference to human life. People v. Sanchez, 98 N.Y.2d at 379-80.

After Sanchez, a series of decisions – People v. Hafeez, 100 N.Y.2d 253 (2003), People v. Gonzalez, 1 N.Y.3d 464 (2004), People v. Payne, 3 N.Y.3d 266 (2004) and People v. Suarez, 6 N.Y.3d 202 (2005) – "incrementally 'pointed the law in a different direction'" by suggesting that "depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York." See People v. Payne, 3 N.Y.3d at 270; see also Policano v. Herbert, 7 N.Y.3d 588, 595 (2006), quoting People v. Feingold, 7 N.Y.3d at 294. Nonetheless, when defendant's conviction became final on September 22, 2005, ninety days after the Court of Appeals denied his application for leave to appeal the Appellate Division's decision affirming his conviction, Register was still good law. In Hafeez, for example, the Court relied on Register

when it held that to meet their burden of proof, the People had to show that the defendant's acts were "imminently dangerous and presented a very high risk of death to others." Id. citing People v. Register, 60 N.Y.2d at 274. And the Court in Gonzalez similarly relied on Register when it explained that,

> Depraved indifference murder does not mean an extremely, even heinously, intentional killing. Rather, it involves a killing in which the defendant does not have a conscious objective to cause death but instead is recklessly indifferent, depravedly so, as to whether death occurs. When defendant shot his victim at close range, he was not recklessly creating a grave risk of death, but was creating a virtual certainty of death born of an intent to kill. There is no record evidence that defendant "consciously disregarded" that certainty.

People v. Gonzalez, 1 N.Y.3d at 468. In distinguishing depraved indifference murder from intentional murder, the Gonzalez Court explained that depraved indifference murder was exemplified by a defendant who, unconcerned with the consequences to others, fires a gun into a crowd of people; drives an automobile down a crowded sidewalk at high speed; shoots a partially loaded gun at a person's chest during a game of Russian roulette; abandons a helplessly intoxicated person on a snowy highway at night; or repeatedly beats a young child over a period of several days. Id. at 467. In each of those five scenarios, including the beating of a young child, the depravity of the defendant's acts stemmed from conduct that was "'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability

24

as that which the law imposes upon a person who intentionally causes the death of another.'" Id. at 468 (citations omitted).

Although the Court in Payne, supra, further limited the scope of depraved indifference murder when it held that a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder, the Court recognized "another species of depraved indifference murder in which the acts of the defendant are directed against a particular victim but are marked by uncommon brutality. . . coupled not with an intent to kill. . . but with depraved indifference to the victim's plight." People v. Payne, 3 N.Y.3d at 272. Child victim cases fell within this category.

Indeed, the Court of Appeals has consistently held that the corporal beating or abuse of a child that results in the child's death is a scenario in which a conviction of depraved indifference murder is appropriate. In Payne, the Court gave the following examples of these types of child victim cases: People v. Poplis, 30 N.Y.2d 85 (1972), where the defendant inflicted a continuous beating on a three-year-old child; People v. Bryce, 88 N.Y.2d 124 (1996), where the defendant fractured the skull of a seven-week-old baby; and People v. Best, 85 N.Y.2d 826 (1995), where the defendant repeatedly beat a nine-year-old child. The Court did not, as defendant contends, limit the application of depraved indifference to *prolonged* fatal beatings of a child. Nowhere in Hafeez, Gonzalez, Payne or

Suarez did the Court ever suggest that "*only* repeated and severe beatings of a child could rise to the level of depraved indifference, and that deaths resulting from a single beating must be classified as manslaughter in the first or second degree" (Abramovsky Affirmation, p. 16, ¶27).  See, e.g., People v. Bryce, 88 N.Y.2d at 124; see also People v. Maddox, 31 A.D.3d 970 (3d Dept.)(defendant struck infant in head and vigorously shook her before throwing her head first into a bassinet within hours of her death), lv. denied, 7 N.Y.3d 868 (2006); People v. Casey, 37 A.D.3d 1113 (4th Dept. 2007)(conviction for depraved indifference murder upheld where evidence showed that defendant intentionally caused an apartment fire that killed her baby).   In fact, in citing to Poplis, Bryce and Best as examples of scenarios where courts have sustained depraved indifference murder convictions, the Court specifically used the following words: "[i]nstances *include* where, without the intent to kill, the defendant inflicted continuous beating on a three-year-old child. . . fractured the skull of a seven-week-old baby . . . repeatedly beat a nine-year-old . . ." People v. Payne, 3 N.Y.3d at 271-72.  Had the Court intended to limit the scope of depraved indifference murder to "repeated and severe" beatings of a child, as opposed to deaths resulting from a single beating, it would have said so, by including specific language such as, "instances are limited to those situations where, without the intent to kill, the defendant..."

Significantly, moreover, the Payne Court's reference to People v. Bryce, supra, which involved a single, albeit fatal beating of a newborn, underscores the Court of Appeals' intent to include within the umbrella of depraved indifference murder cases like this one, where defendant repeatedly beat his nine-year-old stepdaughter to death over the course of one night. The defendant in Bryce was convicted of depraved indifference murder for fracturing the skull of his seven-week-old son, who died because of a massive brain hemorrhage that resulted from the trauma. People v. Bryce, 88 N.Y.2d at 126. Bryce alleged that he dropped the child to the ground and shook him because he thought that the child was choking. Id. Since the defendant was alone with the infant, the proof rested primarily on the medical evidence that the child victim's fracture could not have been accidental and "resulted from excessive blows to the head." Id. at 127. As the facts make clear, the abuse of the infant in Bryce did not take place over a prolonged period of time. Thus, by citing to Bryce, the Court of Appeals has kept among the rare examples of depraved indifference conduct, a single vicious act by a defendant against a helpless victim.

In carving out and affording unique treatment to child victim cases, the Court of Appeals focused not so much on the length or duration of the abuse that led to the child's death, but on the acts of "uncommon brutality" directed toward the exceedingly vulnerable child victim. People v. Payne, 3 N.Y.3d at 272. In

*Poplis*, for example, which the Court cited to in *Payne*, the Court described the defendant's repeated physical beatings of his wife's three-and-a-half-year-old little girl as "brutal, callous and inhuman." *People v. Poplis*, 30 N.Y.2d at 88. The Court reasoned that "[t]he continued brutality toward a child. . . fits within the accepted understanding of the kind of recklessness involving a 'depraved indifference to human life.'" *Id*. So too, here, defendant's repeated all-night beatings of his nine-year-old stepdaughter were just as "brutal, callous and inhuman." Surely, the fact that defendant beat Kyona for one night as opposed to "over a period of weeks or months" (*see* Abramovsky Affirmation, p. 14, ¶24) did not render the beating any less egregious or brutal, callous or inhuman. To suggest, as defendant does here, that his conduct "does not rise to the level of egregiousness necessary to constitute depraved indifference murder" simply because it was a one-time incident (Abramovsky Affirmation, pp. 14-15, ¶24) ignores the long standing principle of depraved indifference as conduct that "reflect[s] wanton cruelty, brutality or callousness directed against a particularly vulnerable victim combined with utter indifference to the life or safety of the elpless target of the perpetrator's inexcusable acts." *People v. Suarez*, 6 N.Y.3d ?, 213 (2005); *see People v. Sanchez*, 98 N.Y.2d 373, 379-80 (2002); *see, e.g.,* le v. Scott, 288 A.D.2d 846 (4th Dept. 2001)(death of sixteen-month-old from orce trauma); *People v. Dexheimer*, 214 A.D.2d 898 (3d Dept. 1995)(single

beating of a twenty-three-month-old); <u>People v. Paul</u>, 209 A.D.2d 447 (2d Dept. 1994)(on four occasions within twenty-four hours, defendant either dropped his four-day-old daughter, or tripped with her, causing her to hit her head and suffer permanent injuries); <u>People v. Brammer</u>, 189 A.D.2d 885 (2d Dept. 1993)(defendant hit, threw and dropped infant before squeezing her neck, resulting in her death); <u>People v. Kalwasinski</u>, 160 A.D.2d 732 (2d Dept. 1990)(defendant struck three-year-old infant more than twice; child died from injuries); <u>People v. Curry</u>, 158 A.D.2d 466 (2d Dept. 1990)(defendant struck three-year-old repeatedly in head and face).

The facts of this case are squarely analogous to those in <u>People v. Best</u>, 85 N.Y.2d 826 (1995), which the Court of Appeals cited in <u>Payne</u> as an example of a child victim situation where a conviction for depraved indifference murder is appropriate. In <u>Best</u>, the defendant severely beat her nine-year-old son in order to discipline him. The Court affirmed the defendant's conviction for depraved indifference murder, noting that the defendant continued to beat the child severely even after she saw that the child became so sick that he began to vomit; and even after he became so weak that he was unable to expel his vomit and choked to death. The Court held that the jury reasonably concluded that defendant evinced a depraved indifference to her son's life in light of her repeated beatings of the sick and helpless boy, and that defendant's wanton conduct was equivalent to

intentional murder.  People v. Best, 85 N.Y.2d at 826.  Here, Kyona Fredericks was similarly "sick and helpless" and subject to excessive and repeated physical beatings that ultimately killed her.  Like the defendant in Best, defendant in the instant case claimed that he beat Kyona in order to discipline her.  But contrary to defendant's assertion, the evidence at trial overwhelmingly established that defendant did not care about his stepdaughter's fate.  Throughout the night of October 11, 2001 and into the early morning hours the next day, defendant repeatedly beat the little girl on the head and back with an amplifier cord and a braided leather belt because she could not complete her homework.  According to Kyona's sister, defendant inflicted nearly *twenty* blows to the child's head and back.  Mercilessly, defendant continued to beat Kyona even after Kyona told him she could no longer breathe, move, write, or see.  It was not until several hours later that defendant finally "noticed" that something was wrong with Kyona and, it was only at defendant's girlfriend's insistence that they called 911.

Contrary to defendant's claim, it was the paramedics, not defendant, who rushed Kyona to the hospital, where she was pronounced dead on arrival.[2]  And, according to Dr. Eric Silva, the emergency room physician who examined Kyona, the little girl, who exhibited more than twenty injuries to her back, had been dead "somewhere between two to four hours prior to her arrival in the emergency room"

---

[2] Dr. Frederick Zugibe, the Chief Medical Examiner for Rockland County, testified that Kyona died as a result of blunt force trauma that caused hemorrhages and pneumothoraces.

(see Exhibit 6, p. 21). This testimony, together with other compelling and overwhelming evidence, conclusively proved that defendant was indifferent to whether Kyona lived or died. To suggest otherwise, given that he mercilessly continued to beat the little girl even after she told him she could no longer breathe, move, write, or see, defies logic. Given these facts, defendant's alleged "near-suicidal hysteria" upon learning of his stepdaughter's death, suggested by him as an example of how much he did care about her fate (see Abramovsky Affirmation, p. 17, ¶29), is unpersuasive.

Kyona Fredericks, the epitomy of the "sick and helpless" child, is precisely the sort of victim that the Court sought to protect in defining the types of cases where a defendant's conduct could rise to the level of depraved indifference murder. Indeed, the Court reiterated this rationale in People v. Suarez, 6 N.Y.3d 202, 212 (2005), where it noted that "[w]hen a defendant's actions serve to intensify or prolong a victim's suffering, they bespeak a level of cruelty that establishes the depravity mandated by statute." In Suarez, the Court outlined the following specific, very limited categories of cases in which depraved indifference murder can apply: 1) the defendant abandons a helpless victim where the victim is likely to die but the defendant has no intent to kill or injure; 2) the defendant commits a "brutal course of conduct" against a vulnerable victim seeking to prolong suffering; 3) the defendant plays Russian roulette; or 4) the defendant

endangers the lives of multiple individuals.[3] <u>People v. Suarez</u>, 6 N.Y.3d at 211-13. These categories of cases, held the Court, "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts." <u>Id</u>. at 213.    Clearly, as <u>Payne</u> and <u>Suarez</u> make clear, the "uncommon brutality" doctrine applies not only to days-long, week-long, months-long or other prolonged repeated and egregious beatings, but to situations like this one, where defendant brutally beat his nine-year-old stepdaughter to the point where the little girl was rendered blind by blows from defendant's belt before becoming unconscious and eventually succumbing to her injuries.

Although the Court of Appeals explicitly overruled <u>Register</u> and <u>Sanchez</u> in 2006, when it ruled, in <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006), that depraved indifference murder is a culpable mental state, it did not change the law with regard to cases involving the beating of a child.  Though the Court in <u>Feingold</u> defined depraved indifference as a *mens rea* rather than an objective assessment of the risk attending the defendant's conduct, the Court nonetheless adopted the definition of depraved indifference set forth in <u>Suarez</u>:  "depraved indifference is

---

[3] In <u>Suarez</u>, the Court continued to restrict the scope of depraved indifference murder, reasserting that that crime can virtually never be charged in a one-on-one shooting or stabbing and outlining specific, very limited categories of cases in which depraved indifference murder can apply.  In a concurrence, three judges of the Court indicated that they would explicitly overrule <u>Register</u> and <u>Sanchez</u>.   <u>People v. Suarez</u>, 6 N.Y.3d at 217 (G.B. Smith, Rosenblatt and R.S. Smith, JJ., concurring).

best understood as an utter disregard for the value of human life – a willingness to act not because one intends harm, but because one simply doesn't care whether harm results or not." <u>People v. Feingold</u>, 7 N.Y.3d at 296, <u>citing</u> <u>People v. Suarez</u>, 6 N.Y.3d at 214.  This definition holds true in the child victim cases, which the Court, even in <u>Feingold</u>, afforded special treatment by explaining that a conviction for depraved indifference murder can be sustained in these types of situations.

Consequently, even if <u>Feingold</u> was retroactive to defendant's case, the evidence was legally sufficient – even under <u>Feingold</u> – to sustain his conviction for depraved indifference murder.  Thus, had appellate counsel argued that the evidence was legally insufficient on the ground he now alleges in this <u>coram</u> application, the claim would have had little or no chance of success.  In short, Mr. Hollenberg cannot be faulted omitting a losing claim from his brief.

## C.    <u>Conclusion</u>

Since the Court of Appeals has recognized that "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success,'" <u>People v. Caban</u>, 5 N.Y.3d at 143, 152 (2005), <u>quoting</u>, <u>People v. Stultz</u>, 2 N.Y.3d, 277, 287 (2004), the same standard should similarly apply to appellate counsel: that there can be no denial of effective assistance of appellate counsel arising from counsel's failure to

argue a point that has little or no chance of success.  For, as one federal court

recently noted:

> "[t]his process of 'winnowing out weaker arguments on
> appeal and focusing on' those more likely to prevail, far
> from being evidence of incompetence, is the hallmark of
> effective appellate advocacy. . . It will often be the case
> that even the most informed counsel will fail to anticipate
> a state appellate court's willingness to reconsider a prior
> holding or will underestimate the likelihood that a federal
> habeas court will repudiate an established state rule.  But,
> as <u>Strickland v. Washington</u> made clear, '[a] fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time (citations omitted).'

<u>Fernandez v. Artus</u>, 2006 U.S. Dist. Lexis 94628, at *1-3 (E.D.N.Y. 2006), <u>quoting</u>

<u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986).

Here, defendant is correct in noting that his legal sufficiency claim on the

specific ground he alleges in the instant application (*i.e.*, that this "single, albeit

severe beating" does not fit within the rubric of cases that have sustained depraved

indifference convictions where the beatings were prolonged, repeated, and took

place over a period of weeks or months) is preserved.  Nevertheless, appellate

counsel's decision not to raise this argument in his brief fell within the "wide range

of professionally competent assistance" required under the Sixth Amendment to

the Federal Constitution.  <u>Strickland v. Washington</u>, 466 U.S. at 689.  "The recent

Court of Appeals opinion in *Policano* establishes clearly that the state of the law at

34

the time of [defendant's] appeal foreclose[d] a successful appeal claiming insufficient evidence as to his depraved indifference murder conviction." <u>Chung v. Filion</u>, 2007 U.S. Dist. Lexis 17072, at *11 (E.D.N.Y. March 7, 2007). And, even if <u>Policano</u> was retroactive and <u>Feingold</u> applied, defendant would still lose on the merits with regard to a sufficiency claim.

Lastly, to the extent that defendant disagrees with the manner in which Mr. Hollenberg presented certain issues, that claim is also of no moment. "Just as defense attorneys enjoy a wide latitude in defending clients at the trial level, appellate lawyers vary in style and approach." <u>People v. Stultz</u>, 2 N.Y.3d at 285. So long as appellate counsel has "a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument," then the appellate advocacy is meaningful. <u>Id.</u> Here, a review of the record, as well as the numerous submissions by Mr. Hollenberg, establishes that Mr. Hollenberg provided defendant with "meaningful representation." Mr. Hollenberg's decision to focus on the points he raised in both his C.P.L. §440.10 motion and on direct appeal, and the style in which he presented them, should not be second-guessed in a <u>coram nobis</u> proceeding. <u>See</u>, <u>People v. Turner</u>, 5 N.Y.3d 476, 484-485 (2005).

In sum, it is clear that all of the issues raised by defendant in support of his claim that he received the ineffective assistance of appellate counsel are without merit. Appellate counsel provided defendant with zealous and effective

representation. His decision to focus on the claims he did raise before this Court was a reasonable determination in view of the record. In addition, defendant cannot sustain his burden of showing a greater likelihood that the judgment would have been reversed or modified had Mr. Hollenberg raised each of defendant's claims on direct appeal in the manner and substance that defendant would have preferred. Accordingly, none of defendant's claims provide a basis for <u>coram nobis</u> relief.

**CONCLUSION**

Defendant's petition for a writ of error <u>coram nobis</u> should be denied, and the judgment appealed from should be affirmed.

Respectfully submitted,

MICHAEL E. BONGIORNO
District Attorney
Rockland County


ARGIRO KOSMETATOS
Supervising Assistant District Attorney
Of Counsel

May 2, 2007

cc:  Abraham Abramovsky, Esq.
     Attorney for Defendant
     154 West 70th Street
     New York, N.Y. 10023

```
SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------X
                                              Case Nos.
PEOPLE OF THE STATE OF NEW YORK               2003-00251
                                              2004-00848
          - against -


DARIUS JEAN,
                                              DEFENDANT'S
                          Defendant.          REPLY
                                              AFFIRMATION
-----------------------------------------X
```

**JONATHAN I. EDELSTEIN,** an attorney admitted to practice in the courts of the State of New York, affirms under penalty of perjury pursuant to CPLR § 2106 that the following is true and correct to the extent of his knowledge:

1.  I am the attorney for the defendant in the above captioned matter and as such am fully familiar with the facts and circumstances thereof.  I make this Affirmation in further support of defendant's motion for an Order granting a writ of error coram nobis.  The sources for the allegations of fact made herein include review of documents contained in the case file.

**A.  The Failure of Defendant's Appellate Counsel to Raise Fully Preserved, Clear-Cut and Dispositive Errors Rendered Him Constitutionally Ineffective.**

2.  First, contrary to the prosecution's argument, the mere fact that appellate counsel Harvard Hollenberg filed a brief on defendant's behalf which "complied with the rules of this court" and contained ten point headings, see Opp. Mem. at 3-6, is not

-1-

enough to render his representation constitutionally effective.  It is well settled that the standard for effective assistance of appellate counsel is not met merely by filing a brief or raising a certain number of points, but instead requires "competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument."  <u>People v. Stultz</u>, 2 N.Y.3d 277, 285 (2004).  That standard was not met in the instant case, since Mr. Hollenberg unreasonably focused on weaker arguments while ignoring the fully preserved and clear-cut issues discussed in the instant motion.

3.  Although the role of appellate counsel may include "winnowing out weaker arguments and focusing on a few key issues" as the prosecution suggests, <u>see</u> Opp. Mem. at 3, it certainly does not include winnowing out the stronger arguments and focusing on the weaker ones.  Thus, the New York Court of Appeals has held that an appellate attorney who ignores a "clear-cut and completely dispositive" argument is constitutionally ineffective even if he raises and competently argues other points on appeal.  <u>See</u> <u>People v. Turner</u>, 5 N.Y.3d 476, 481 (2005).  This is particularly true where, as in the instant case, there was "no reasonable basis for concluding that the brief would suffer from having [another] point, where an argument as strong as the one that [was] omitted was available."  <u>Id.</u> at 485; <u>see also</u> <u>People v. Georgiou</u>, 828 N.Y.S.2d 541, 545 (2d Dept. 2007) (dispositive omission by counsel

-2-

constitutes ineffective assistance even in the context of "otherwise entirely competent representation").

4. In the instant case, Mr. Hollenberg filed a brief that was 48 pages long, well within the page and word limits set by this Court. Moreover, the ten point headings in his brief could easily have been consolidated into three, because eight of those ten points pertained to various specific instances of ineffective assistance of trial counsel. Mr. Hollenberg could easily have made room for two more arguments that were stronger than the ones he actually raised, and could indeed have done so within the context of a more streamlined and effective brief. Indeed, one of these two arguments, involving the trial court's "unaware of the risk" instruction on the *mens rea* of recklessness, could have been combined to devastating effect with Mr. Hollenberg's argument concerning the pretrial reasonable doubt charge. Consequently, given the absence of a "solid legal basis for appellate counsel's strategy" in not raising the issues discussed herein, see People v. Ramchair, 8 N.Y.3d 313, 317 (2007),[1] this Court should find that his failure to do so was constitutionally ineffective notwithstanding the fact that he raised other points on appeal.[2]

---

[1] It should be noted that, despite being served with a copy of defendant's coram nobis motion, Mr. Hollenberg has not articulated any strategic justification for failing to raise the additional issues discussed herein.

[2] Needless to say, the fact that Mr. Hollenberg represented defendant at his resentencing, filed a CPL § 440.10 motion on his

**B.    The Trial Court's "Unaware of the Risk" Charge Would Have Mandated Reversal Had it Been Raised on Appeal.**

5.    Moreover, the prosecution is also incorrect in its analysis of the merits of the issues that Mr. Hollenberg failed to raise.  The first of these issues, as discussed in defendant's original moving papers, is the fact that the trial court erroneously instructed the jury that the *mens rea* of recklessness could be established when "the defendant ***is unaware of*** and consciously disregards [a] risk." (T.923) (emphasis added).  This instruction effectively downgraded the *mens rea* of depraved indifference murder from recklessness to criminal negligence, thus drastically reducing the prosecution's burden of proof.

6.    Although the prosecutor concedes that this instruction was erroneous, <u>see</u> Opp. Mem. at 10, she argues that the error would not have resulted in reversal on appeal because it was unpreserved and because the trial court effectively cured it.  In fact, however, an analysis of the record and of applicable law reveals that this egregious error was fully preserved, and that it was indeed sufficiently prejudicial to have warranted reversal if properly raised before this Court.

---

behalf and sought leave to appeal tot he Court of Appeals, <u>see</u> Opp. Mem. at 5-6, is irrelevant to whether he provided effective representation *on appeal to this Court*.  The fact that Mr. Hollenberg represented defendant in other contexts, and may even have done so effectively, does not diminish defendant's Federal and New York State constitutional right to effective representation on direct appeal.  <u>See</u> <u>Ramchair</u>, 8 N.Y.3d at 315.

7.   The prosecution suggests that trial counsel's objection was untimely because he registered his protest at the close of the charge rather than interrupting immediately when the offending words were uttered.  _See_ Opp. Mem. at 8.  It is well settled, however, that an objection in a criminal case is timely if it is "registered... at the time of the [error] _or at any subsequent time when the court had an opportunity of effectively changing the same_."  People v. Robinson, 36 N.Y.2d 224, 228 (1975) (emphasis in original), quoting CPL § 470.05(2).  In the context of an erroneous jury charge, New York courts have specifically held that an objection is timely if raised "after the charge was completed and prior to submission of the case to the jury."  _See_ People v. Williams, 10 A.D.3d 213, 216 (1st Dept. 2004); _see also_ People v. Graves, 159 A.D.2d 637, 637–38 (2d Dept. 1990) (objection to jury instruction can be made "at the conclusion of the court's charge").  Given that this is precisely when defendant's trial counsel objected to the court's erroneous charge, his objection was timely.

8.   Trial counsel's objection was also, contrary to the prosecutor's contention, far more than "general."  A general objection is one that simply requests relief and does not specify the grounds upon which relief is sought, as when a defendant makes a trial motion to dismiss for insufficient evidence but fails to explain the deficiencies in the proof.  _See_ People v. Gray, 86 N.Y.2d 10 (1995).  In contrast, in the instant case, defendant's

–5–

trial attorney specifically pinpointed the error in the court's charge, arguing that "under recklessly... you used unaware as opposed to aware." (T.952). In other words, defense counsel alerted the court that, during its charge on the *mens rea* of recklessness, it had erroneously informed the jury that the defendant could be convicted even if he were unaware of the risk. Moreover, although the trial court denied having made this error, it clearly recognized that an incorrect *mens rea* instruction "would have been a biggy." (T.952).

9.   It thus cannot be contended that defense counsel failed to alert the trial court to the erroneous instruction or that the court itself was unaware of the error's nature or magnitude. Although the prosecution now faults defense counsel for not explicitly stating that the "unaware of the risk" instruction reduced the burden of proof to criminal negligence, <u>see</u> Opp. Mem. at 8, criminal defendants are simply not required to articulate objections with such surgical precision. Instead, "in order to preserve [an] error for appeal... [an objection] must be more than general... *but is sufficient if the party made his position with respect to the ruling or instruction known to the court.*" <u>People v. Jean-Baptiste</u>, 2007 N.Y. App. Div. LEXIS 3864, *2 (1st Dept. 2007) (emphasis added). The objection "need not be overly expansive" as long as it alerts the court to the essence of the error. <u>See</u> <u>id.</u> For instance, where a defendant objected to the

exclusion of his children from the courtroom, this objection adequately preserved an issue of law even though it was made "without specific reference to the right to a public trial." People v. Richardson, 296 A.D.2d 334 (1st Dept. 2002).

10.  In the instant case, defendant's trial counsel brought to the court's attention the fact that it had characterized the *mens rea* of recklessness as being "unaware of the risk."  Although defense counsel may not have explicitly stated that this instruction effectively downgraded the *mens rea* to criminal negligence, such a reduction in the burden of proof was inherent in the objection he raised.  Just as the removal of a defendant's children from the courtroom inherently implicates the right to a public trial, a *mens rea* instruction that contains the words "unaware of the risk" is inherently a criminal negligence instruction.  Defense counsel's objection conveyed the essence of the error to the court below, and it was fully preserved for this Court's review if only Mr. Hollenberg had raised it.

11.  Moreover, contrary to the prosecution's contention, see Opp. Mem. at 12, 14-15, the fact that the court subsequently gave a correct recharge on recklessness did not cure the prejudice that arose from this error.  It should be noted that the court did not give this recharge until it received a note from the jury during deliberations.  (T.959).  Thus, by the time the court attempted to cure its egregious burden-of-proof error, the jury had already

deliberated for a considerable time under the erroneous impression that it could convict defendant of depraved indifference murder based on mere negligence. The court's erroneous "unaware of the risk" instruction had already fatally infected the jury's deliberations, and the prejudice could not be cured by the trial court's belated attempt to correct the record.

12. Even more importantly, an incorrect burden of proof instruction constitutes *per se* error under New York law even if it is preceded and/or followed by correct instructions. In the recent case of <u>Brown v. Greene</u>, 2007 U.S. Dist. LEXIS 34460 (S.D.N.Y. May 11, 2007), United States Magistrate Judge Andrew J. Peck conducted an exhaustive analysis of New York law relating to burden-of-proof charges. After examining relevant case law, the court concluded that the charge at issue misdirected the jury so egregiously that it constituted reversible error despite prior and subsequent curative instructions. <u>See</u> <u>id.</u> at *84-85. Notably, the court stated that while it "[could not] be sure whether [the] jury actually misunderstood its obligations," it "need only determine whether there is a *reasonable likelihood*, *even if less than a probability*, that the jury misunderstood this principle of law." <u>Id.</u> at *85 (emphasis added). Here, where the court allowed the jury to commence its deliberations under the erroneous impression that the culpable mental state for depraved indifference was criminal negligence, there is certainly such a likelihood.

-8-

13.  Moreover, Judge Peck noted that when an incorrect burden of proof instruction is "compounded with other errors... New York courts have reversed convictions." <u>Id.</u> at *75, <u>citing</u> <u>People v. Allan</u>, 192 A.D.2d 433 (1st Dept. 1993).  The instant case, as discussed in defendant's original moving papers, contains precisely such an "other error" in the form of the trial court's instruction that "reasonable doubt... appears somewhere between 51 percent and 100 percent." (T.65).  The burden of proof in defendant Jean's case was reduced *twice,* first by the "51 percent" instruction and then by the reduction of the culpable mental state from recklessness to mere negligence.  It should further be noted that a "51 percent" instruction such as the one delivered in the instant case is precisely what Judge Peck condemned in the strongest terms as egregious constitutional error.  <u>See</u> <u>Brown</u>, 2007 U.S. Dist. LEXIS 34460, at *56-80.  Thus, had appellate counsel Hollenberg united the two errors in his brief and argued that the jury was irreparably confused by the combined effect of the "51 percent" and "unaware of the risk" instructions, he would have presented this Court with reversible error.

14.  Finally, the prosecution cannot rely on the fact that "the jury is presumed to have followed the court's [curative] instructions." <u>See</u> Opp. Mem. at 12-13.  Although such a presumption does exist, <u>see</u> <u>People v. Davis</u>, 58 N.Y.2d 1102 (1983), it is not a conclusive presumption and may be rebutted upon a

showing that the jurors in fact deliberated incorrectly.  In the instant case, such a showing in fact exists, in the form of juror Marie Lewis' post-trial letter and hearing testimony that she believed depraved indifference murder to be equivalent to "accidental death."  Given that an accident typically results from unawareness of the relevant risks, Ms. Lewis' letter represents actual proof that the jury was misdirected by the court's charge, and obviates any presumption that the prejudice was cured.

15.  In its opposition papers, the prosecution does not even address the effect of Ms. Lewis' revelation concerning the jury deliberations.  It is not difficult to see why.  Ms. Lewis' admissions constitute conclusive proof of exactly the deleterious effect discussed by Judge Peck: i.e., that an erroneous burden of proof instruction can fatally infect the jury's deliberations and prejudice the defendant notwithstanding subsequent and inadequate curative efforts.  This Court need not speculate about whether defendant was prejudiced by the trial court's "unaware the risk" instruction, nor would it have had to speculate if the issue had been raised on direct appeal, since the record contains actual proof.

16.  The inescapable conclusion is that defendant's conviction would have been reversed if Mr. Hollenberg had properly raised this issue on appeal, either as a stand-alone point or in combination with the "51 percent" instruction.  Consequently, as set forth in

<u>Turner</u>, Mr. Hollenberg's failure to raise this fully preserved, "clear-cut and dispositive issue" amounted to ineffective assistance of appellate counsel.

**C.  Defendant's Depraved Indifference Murder Conviction Would Have Been Reversed if Appellate Counsel had Raised a Sufficiency Point.**

17.  Second, Mr. Hollenberg was constitutionally ineffective for failing to argue that defendant's conduct in committing a single beating of Kyona Fredericks did not rise to the level of depraved indifference to human life.  As the prosecution does not dispute, defendant's trial counsel made a detailed motion to dismiss on exactly this ground, so the issue was fully preserved. Moreover, pursuant to New York law as it existed at the time defendant's conviction became final, this contention would have resulted in reversal had it been raised on direct appeal.

18.  The prosecutor argues extensively that the line of cases culminating in <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006) are not retroactively applicable on collateral review.  Defendant's motion, however, does not rest on the retroactivity of <u>Feingold</u>.  Rather, defendant contends that the New York Court of Appeals cases *actually decided* before his direct appeal was argued, particularly <u>People v. Payne</u>, 3 N.Y.3d 266 (2004), had *already* restricted depraved indifference murder to certain very narrow factual categories.  Moreover, the <u>Payne</u> decision, which listed "uncommon brutality" as one of the types of conduct that could fall within

the definition of depraved indifference to human life, illustrated this category by citing prior cases that involved *repeated* beatings of young children.

19. Furthermore, contrary to the prosecution's contention, Payne was not a mere restatement of the Register standard. As discussed at length in defendant's original moving papers, the Payne decision did not rely upon or even cite Register. Moreover, in contrast to the Register doctrine under which depraved indifference murder was applicable to a wide variety of homicides at the discretion of the jury, the Payne court restricted it to three narrow factual categories. See id. at 271-72. The Court of Appeals in Payne also cited with approval a pre-Register Law Revision Commission report that characterized depraved indifference as analogous to "opening the lion's cage at the zoo." Id. at 272. Consequently, by the time defendant's appeal was argued, much less when his conviction became final, the "point of no return" had been passed and Register was no longer good law.[3]

---

[3] Contrary to the prosecution's argument, the Court of Appeals in Policano v. Herbert, 7 N.Y.3d 588 (2006) did not "explicitly state... that the law changed with Feingold." The two *dissenting* judges indeed made this argument. However, the Policano majority rejected the position of the dissent, "disagree[ing] with the dissent's position that this quartet of cases does not represent a perceptible, evolving departure from... Register" and stating that "individual judges hold differing views as to where along this trajectory a majority of the court may have effectively passed the point of no return... beyond which, hard as we may have tried, it was simply not possible to reconcile our developing caselaw with Register and Sanchez." Id. at 603. Moreover, the subsequent Third Department decision in People v. Stewart, 36 A.D.3d 1156, 1160 (3d

20.  Consequently, it would not have been necessary for Mr. Hollenberg to anticipate a retroactive change in the law in order to argue this issue on appeal.  All he would have had to do was to construct a reasoned appellate argument based on case law that already existed.  The argument had already been laid out for Mr. Hollenberg by trial counsel's cogent motion to dismiss, and he would simply have had to transform that "clear-cut and dispositive" argument into appellate form.

21.  Moreover, there was no reason, strategic or otherwise, for Mr. Hollenberg not to have done so.  Notably, contrary to the prosecution's argument, the "uncommon brutality" prong of Payne and its progeny does not focus solely on the vulnerability of the victim.  Instead, in order to rise to the level of depraved indifference under this prong, the defendant must engage in "a *prolonged, brutal course of conduct* against a particularly vulnerable victim."  People v. Stewart, 36 A.D.3d 1156, 1160 (3d Dept. 2007); see also People v. Georgiou, 828 N.Y.S.2d 541, 544 (2d Dept. 2007).  Given that the instant case involved a single beating

---

Dept. 2007) stated that, although Feingold overruled Register *on the issue of the underlying culpable mental state*, the preceding line of cases had overturned "two additional hallmarks of Register" by restricting the factual circumstances under which depraved indifference could be charged.  Given that these factual restrictions were definitively set down by the Payne court, it is clear that the law changed no later than Payne and that subsequent cases regarding the "uncommon brutality" test constitute mere application and clarification of the Payne doctrine.  See Stewart, 36 A.D.3d at 1158 n.2.

rather than a "prolonged... course of conduct," the fact that the victim was a vulnerable child is not enough by itself to constitute depraved indifference under <u>Payne</u>.

22. The pre-<u>Payne</u> cases cited by the prosecution only bear this conclusion out, since none of them arose from a single incident such as the instant case. For instance, <u>People v. Best</u>, 85 N.Y.2d 826 (1995), which the prosecution characterizes as "squarely analogous" to the instant case, involved beatings inflicted on a nine-year-old child over a period of weeks, during which his condition steadily deteriorated. Likewise, <u>People v. Poplis</u>, 30 N.Y.2d 85 (1972) involved repeated beatings of a three-year-old girl over a period of five days. Thus, under the law as it existed at the time Mr. Hollenberg briefed and argued defendant's direct appeal, the conduct at issue in this case did not rise to the level of depraved indifference murder.[4]

23. Defendant does not deny that the fatal beating of a child is a serious offense. It is contended, however, that the offense he committed was manslaughter in the first or second degree rather than depraved indifference murder. Had Mr. Hollenberg raised the

---

[4] The sole apparent exception, <u>People v. Bryce</u>, 88 N.Y.2d 124 (1996), involves a seven-week-old baby, who is a far more vulnerable victim than Kyona Fredericks. It is reasonable to conclude that the length of the necessary "course of conduct" might become shorter as the victim becomes more vulnerable. In the instant case, however, did not involve a victim of the extreme vulnerability evinced in <u>Bryce</u>, and thus did not rise to the level of depraved indifference on the basis of a single beating.

fully preserved sufficiency argument made by trial counsel in his motion to dismiss, defendant's conviction would have been reduced to manslaughter on direct appeal. Consequently, this Court should find that in the absence of any valid reason for him not to raise this point, his performance was constitutionally ineffective.

**D.   Conclusion.**

24. In light of the foregoing, this Court should issue an order granting the instant motion in its entirety, reinstating defendant's direct appeal and scheduling further briefing.

Dated:     New York, NY
           May 30, 2007

_____
JONATHAN I. EDELSTEIN

43 A.D.3d 1076, 841 N.Y.S.2d 460, 2007 N.Y. Slip Op. 06898

**Briefs and Other Related Documents**

**View New York Official Reports version**

Supreme Court, Appellate Division, Second Department, New York.

The PEOPLE, etc., respondent,

v.

**Darius JEAN,** appellant.

Sept. 18, 2007.

Abraham Abramovsky, New York, N.Y. (Jonathan Edelstein of counsel), for appellant.

Michael E. Bongiorno, District Attorney, New City, N.Y. (Argiro Kosmetatos of counsel), for respondent.

Application by the appellant for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, a decision and order of this court dated December 13, 2004 *(People v. Jean,* 13 A.D.3d 466, 786 N.Y.S.2d 564), affirming a judgment of the County Court, Rockland County, rendered November 21, 2002, and a resentence of the same court imposed March 12, 2003. ORDERED that the application is denied.

The appellant has failed to establish that he was denied the effective assistance of appellate counsel (*see Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987; *People v. Stultz,* 2 N.Y.3d 277, 778 N.Y.S.2d 431, 810 N.E.2d 883).

MILLER, J.P., CRANE, GOLDSTEIN and SKELOS, JJ., concur.

N.Y.A.D. 2 Dept. 2007.

People v. Jean

43 A.D.3d 1076, 841 N.Y.S.2d 460, 2007 N.Y. Slip Op. 06898

## Briefs and Other Related Documents (Back to top)

- 2004 WL 3253048 (Appellate Brief) Amended Brief for Defendant-Appellant (May 4, 2004)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

October 5, 2007

<u>**VIA CERTIFIED MAIL**</u>
New York Court of Appeals
20 Eagle Street
Albany, NY 12207-1095
Attn: Clerk of the Court

> Re:     **People v. Darius Jean**
>         **Second Dep't Case Nos. 2003-00251, 2004-00848**
>         **Rockland County Ind. No. 2001-321**

Your Honor:

Defendant-appellant Darius Jean ("Defendant" or "Mr. Jean") respectfully requests leave to appeal from an order of the Appellate Division, Second Department, entered on September 18, 2007 and served by first-class mail with notice of entry on October 4, 2007, which denied his application for writ of error coram nobis and other relief.  As set forth below, defendant requests that this Court grant leave to appeal on all issues raised in the papers submitted to the Second Department.

<u>**STATEMENT OF RELEVANT FACTS**</u>

The charges in the instant case arise from defendant Darius Jean's alleged beating of his stepdaughter Kyona Fredericks and natural daughter Mendissa Jean.  It was alleged that on October 11, 2001,[1] defendant beat both children with a belt and/or lamp cord for failing to complete their homework correctly.  Subsequently, when it was discovered that Kyona was not breathing, defendant called 911 while his girlfriend Leslie Nicolas performed CPR on Kyona. The girls were rushed to the hospital, where Kyona was pronounced dead and Mendissa treated for physical injuries.

---

[1] It was alleged at trial that the beating continued into the early morning hours of October 12, but the testimony as to the time the beating began and ended was inconclusive.

-1-

When defendant learned that Kyona was dead, he became so distraught and hysterical that he had to be placed in four-point restraints due to the risk of suicide. While held in these restraints, he was questioned by detectives. At the urging of the detectives, Ms. Nicolas was sent into to the room to speak to the defendant and elicited further statements from him.

On October 23, 2001, an indictment was lodged against defendant charging him with depraved indifference murder, manslaughter in the first degree, assault in the first and second degrees, and two counts of endangering the welfare of a child. Defendant moved pretrial to suppress the statements he made while in restraints and the statements made under interrogation by Ms. Nicolas, as well as the fruits of a search that resulted directly from those statements. His motion was denied after a hearing, and the case proceeded to trial on August 5, 2002.

During its initial charge, the trial court instructed the jury that reasonable doubt was "higher than 51 percent and something less than 100 percent... to mathematize it, it is 51 percent that suffices." (T.51-53).[2] Following a lunch recess, the court further instructed the jury that "proof beyond a reasonable doubt... appears somewhere between 51 percent and 100 percent." (T.65). The trial court did not give any curative instruction despite being requested to do so by defense counsel.

The People's case was then presented and, after the prosecution rested, defense counsel moved to dismiss on the ground that the evidence was not legally sufficient to establish depraved indifference murder:

> MR. GOLDSTEIN: Your Honor, at this time we move for this Court to dismiss the charges against Mr. Jean. The People have failed to prove even a prima facie case at this time...
>
> Now that the evidence has been in, it's even more factually clear that this case is distinguishable from the cases that have dealt with depraved indifference in sustaining depraved indifference. What we have here is a case where there is allegedly, looking at the evidence in the light most favorable to the prosecution, a number of quote, beatings, maybe two or what have you, that took place between the 11[th] and 12[th] of October. In the cases where there was sustained depraved indifference, we had cases where beatings of a child took place almost over a week... beating a child over the course, continuously over the course of five days, if a week, that the Court of Appeals held was depraved indifference.

---

[2] Copies of relevant pages of the trial transcript are annexed as Exhibit A.

> In this case I don't believe depraved indifference factually fits this case. I still think factually, even in the light favorable to the prosecution, there is some distinguishing [sic] between depraved indifference and manslaughter in the first degree. The People are really proving the same exact set of facts that could fit the same exact set of circumstances, and this case has not gone as far as the cases that the Court of Appeals cited when they sustained depraved indifference, and as the Court knows, there is a tremendous amount of dissent, and Judge Brieant's opinion that came after that indicating that he could not even see a differnce between depraved indifference and reckless manslaughter,[3] but that it's factual in nature, and even he could not find a difference.

(T.762-64). The trial court denied this motion. (T.764).

At the conclusion of evidence and summations, the trial court gave its charge to the jury. Although the court did not repeat its "51 percent" instruction on reasonable doubt, it never recanted that instruction or informed the jury that it had misspoken. Moreover, the court compounded the error during its charge on depraved indifference murder, when it instructed the jury that "[a] person acts recklessly with respect to another person's death when that person... creates a substantial, unjustifiable and grave risk that another person's death will occur and when he or she is ***unaware of*** and consciously disregards that risk." (T.922-23) (emphasis added).

Defendant's trial counsel objected to this instruction but the court refused to correct its charge:

> MR. GOLDSTEIN: Judge, unbelievable, on that same exact statement under recklessly, when you corrected to "and," you stated "And when he is," and then you used unaware as opposed to aware.

> THE COURT: No. I definitely said aware. I definitely said, "aware and consciously disregards the risk" because that's different then when he perceives a risk. I'll totally stand on what I said because ***that would have been a biggy.***

(T.952) (emphasis added). In other words, although the court acknowledged that the erroneous

---

[3] The reference to "Judge Brieant's opinion" was clearly a reference to <u>Jones v. Keane</u>, N.Y.L.J., Jun. 7, 2002, p.25 (S.D.N.Y.), in which former Chief Judge Charles L. Brieant found that the New York depraved indifference murder statute, as then interpreted by the Court of Appeals, was unconstitutionally vague.

-3-

charge (which clearly appears on the face of the settled transcript) "would have been a biggy," it denied giving that instruction and refused to instruct the jurors correctly. On August 19, 2002, under the influence of these erroneous and misleading instructions, the jury convicted defendant on all counts.

On September 23, 2002, after defendant was convicted but before he was sentenced, the court received a letter from trial juror Marie Lewis. In the letter, Ms. Lewis stated that she had voted for depraved indifference murder under pressure from the other jurors because she "believed it was similar to accidental death." Thereafter, defendant moved pursuant to CPL § 330.30 to set aside the verdict based on juror confusion. A hearing was held on this motion, following which the trial court issued a written decision concluding that Ms. Lewis had experienced "juror afterthought" rather than being confused during deliberations. The County Court then proceeded, on November 21, 2002, to enter judgment pursuant to the jury verdict and sentence defendant to a term of 25 years to life.

Defendant, represented by Harvard Hollenberg, Esq., appealed his conviction and sentence to the Second Department. On May 4, 2004, Mr. Hollenberg filed a ten-point brief in support of the appeal. Eight of those points alleged that defendant's trial counsel was ineffective in various ways. The other two points argued that the trial court erroneously declined to suppress defendant's statements at the hospital, and that the verdict resulted from impermissible jury confusion compounded by erroneous instructions. However, despite the fact that defendant's trial counsel had made a detailed motion to dismiss the depraved indifference murder charge, Mr. Hollenberg did not argue that the evidence was insufficient to sustain a murder conviction. Remarkably, although Mr. Hollenberg raised the "51 percent" instruction in his juror confusion point, he failed to mention the "unaware of the risk" instruction, which had been objected to at trial.

Defendant's direct appeal was argued before the Second Department on November 15, 2004. On December 13, 2004, the Second Department issued a decision affirming defendant Jean's conviction. See People v. Jean, 13 A.D.3d 466 (2d Dept. 2004). The court did not reach the issue of sufficiency because it was not directly raised in defendant's brief.[4] Furthermore, with respect to the juror confusion issue, the court found that "[a]ny prejudice to the defendant resulting from the County Court's improper pretrial instruction was obviated by the final charge

---

[4] Mr. Hollenberg argued in Point VI of the brief that the depraved indifference murder statute, as interpreted under the doctrine of People v. Register, 60 N.Y.2d 270 (1983), was unconstitutionally vague. In addition, Mr. Hollenberg argued in Point II that the evidence suggested an accidental death and that defendant "could not be guilty of intentionally and recklessly causing a person's death." Plaintiff contends that these arguments sufficiently preserved the issue for subsequent habeas review. However, because no direct sufficiency point was raised in the brief, the Second Department did not consider the sufficiency of the evidence in its December 13, 2004 decision.

given to the jury at the trial." Id. at 468. Obviously, the court's conclusion that the final charge "obviated" the prejudice would have been seen in a different light had Mr. Hollenberg highlighted the fundamental errors in that charge.

Defendant sought leave to appeal to the Court of Appeals on all issues raised in the brief. This Court denied leave on June 24, 2005, and a motion for reconsideration was subsequently denied on August 29, 2005. See People v. Jean, 5 N.Y.3d 764 (2005); Also See People v. Jean, 5 N.Y.3d 807 (2005).

On or about June 12, 2006, defendant filed a *pro se* motion for writ of error coram nobis before the Appellate Division, Second Department. In July 2006, before the motion was decided, defendant retained the Abraham Abramovsky, Esq. as counsel and withdrew the motion without prejudice in order to provide counsel with an opportunity to review the record. [5] Subsequently, Mr. Abramovsky determined that a CPL § 440.10 motion should be litigated first, and filed such a motion in the Rockland County Court seeking relief on various grounds. That motion was denied on October 25, 2006, and the Second Department denied leave to appeal on February 13, 2007.

On March 7, 2007, defendant moved for a writ of error coram nobis on the ground that defendant received ineffective assistance of appellate counsel for (1) not raising the "unaware of the risk" instruction either as a separate point on appeal or as part of the jury confusion point, and (2) not arguing that the evidence at trial was insufficient to sustain a conviction of depraved indifference murder. The prosecution opposed the motion, arguing (1) that any sufficiency claim raised by Mr. Hollenberg would have been without merit because this case involved the beating of a child, and (2) that the "unaware of the risk" charge, albeit erroneous, was subsequently cured by the court and in any event was unpreserved for appellate review. Defendant submitted reply papers contending (1) that a single beating of a child, as opposed to an extended course of conduct, doesn't rise to the level of depraved indifference to human life under the law in effect at the time of the direct appeal, and (2) that the "unaware of the risk" instruction was preserved by timely objection and that the manifest confusion of juror Marie Lewis showed that the error was not cured.

On September 18, 2007, the second department issued an order denying defendant's coram nobis motion without opinion. The order was served by first-class mail with notice of entry on October 4, 2007. Accordingly, defendant now requests that this Court grant leave to

---

[5] The undersigned served as of counsel on CPL § 440.10 motion and subsequent writ of error coram nobis. Upon the untimely death of Mr. Abramovsky, defendant retained the undersigned as counsel.

appeal on all issues raised before the Appellate Division.[6]  For the reasons set forth below, this Court should find that the issues raised herein are meritorious and worthy of appellate review, and warrant reversal and/or vacatur of defendant's conviction.

## STANDARD OF REVIEW

A defendant in a criminal case has a Sixth Amendment right to effective assistance of counsel on his direct appeal.  See People v. Bachert, 69 N.Y.2d 593 (1987); see also People v. Bowen, 234 A.D.2d 161 (1st Dept. 1996); Jones v. Barnes, 463 U.S. 745 (1983).  This requires that appellate counsel provide "meaningful representation" to the defendant that "reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument."  People v. Stultz, 2 N.Y.3d 277, 285 (2004)

A defendant is entitled to a writ of error coram nobis if "significant issues [exist] which *may have merit* and were not raised by appellate counsel on direct appeal."  People v. Smith, 21 A.D.3d 599 (3d Dept. 2005) (emphasis added); see also People v. Nuness, 698 N.Y.S.2d 175 (4th Dept. 1999) (same).  "[I]t is well-settled that the unexplained failure of counsel to raise issues which, if raised, would have rendered a reversal or modification likely, constitutes a sufficient ground upon which to predicate a finding of ineffective assistance of appellate counsel."  People v. Rutter, 202 A.D.2d 123, 131 (1st Dept. 1994); see also People v. Hacker, 162 A.D.2d 815 (3d Dept. 1990) (granting writ of error coram nobis where his brief on appeal did not argue issues that "may have merit and should have been raised by appellate counsel").  Moreover, a writ of error coram nobis is an available remedy even where appellate counsel "raised and competently argued other claims... on direct appeal," as long as a potentially meritorious claim was omitted. Bowen, 234 A.D.2d at 162.

Moreover, although the role of appellate counsel may include "winnowing out weaker arguments and focusing on a few key issues" as the prosecution suggested below, it certainly does not include winnowing out the stronger arguments and focusing on the weaker ones.  Thus, the New York Court of Appeals has held that an appellate attorney who ignores a "clear-cut and completely dispositive" argument is constitutionally ineffective even if he raises and competently argues other points on appeal.  See People v. Turner, 5 N.Y.3d 476, 481 (2005).  This is particularly true where, as in the instant case, there was "no reasonable basis for concluding that the brief would suffer from having [another] point, where an argument as strong as the one that

---

[6] This Court has jurisdiction, pursuant to CPL § 450.90(1) as amended in 2002, to entertain appeals from orders denying coram nobis relief.  See People v. Stultz, 2 N.Y.3d 277 (2004).  In addition, to the extent that defendant's motion in the Second  Department sought vacatur of its decision on direct appeal, this Court has jurisdiction by operation of CPL §§ 450.90(1) and 450.15(1).

[was] omitted was available." Id. at 485; see also People v. Georgiou, 828 N.Y.S.2d 541, 545 (2d Dept. 2007) (dispositive omission by counsel constitutes ineffective assistance even in the context of "otherwise entirely competent representation").

In the instant case, Mr. Hollenberg filed a brief that was 48 pages long, well within the page and word limits set by the Second Department. The ten point headings in his brief could easily have been consolidated into three, because eight of those ten points pertained to various specific instances of ineffective assistance of trial counsel. Furthermore, many of the issues raised in the brief were of marginal merit. Mr. Hollenberg could easily have made room for two more arguments that were stronger than the ones he actually raised, and could indeed have done so within the context of a more streamlined and effective brief. Indeed, one of these two arguments, involving the trial court's "unaware of the risk" instruction on the *mens rea* of recklessness, could have been combined to devastating effect with Mr. Hollenberg's argument concerning the pretrial reasonable doubt charge. Consequently, given the absence of a "solid legal basis for appellate counsel's strategy" in not raising the issues discussed herein, see People v. Ramchair, 8 N.Y.3d 313, 317 (2007),[7] this Court should find that his failure to do so was constitutionally ineffective notwithstanding the fact that he raised other points on appeal.[2]

In the instant case, appellate counsel raised and argued ten points in his brief on direct appeal. The majority of these points, however, were really parts of a single point, because they were all predicated upon various claims of ineffective assistance of trial counsel. Moreover, these points raised issues of marginal merit. In contrast, Mr. Hollenberg *failed* to raise two issues that were both preserved and meritorious: the "unaware of the risk" instruction and the sufficiency of the evidence of depraved indifference murder. Under the authorities set forth above, his failure to raise these issues constitutes ineffective assistance of counsel despite the fact that he did raise and litigate other points on appeal.

---

[7] It should be noted that, despite being served with a copy of defendant's coram nobis motion, Mr. Hollenberg did not articulate any strategic justification for failing to raise the additional issues discussed herein.

[8] Needless to say, the fact that Mr. Hollenberg represented defendant at his resentencing, filed a CPL § 440.10 motion on his behalf and sought leave to appeal to this Court, all of which the prosecution alleged below, is irrelevant to whether he provided effective representation *on appeal to the Second Department*. The fact that Mr. Hollenberg represented defendant in other contexts, and may even have done so effectively, does not diminish defendant's Federal and New York State constitutional right to effective representation on direct appeal. See Ramchair, 8 N.Y.3d at 315.

-7-

**POINT I**

**APPELLATE COUNSEL SHOULD HAVE ARGUED, EITHER AS A SEPARATE POINT OR AS PART OF THE JUROR CONFUSION POINT, THAT THE "UNAWARE OF THE RISK" INSTRUCTION WAS REVERSIBLE ERROR**

First, Mr. Hollenberg should have argued that the trial court committed reversible error in instructing the jury that it could find defendant guilty of depraved indifference murder if he was "unaware of the risk" created by his conduct. This error is clearly preserved by trial counsel and was not cured by the trial court. Indeed, even though the trial judge acknowledged that such an instruction "would have been a biggy," he insisted that he had given no such charge and refused to correct the record. The transcript of the trial belies the trial judge's contention, so the error - which was indeed a "biggy" - was left uncorrected to influence the trial jury's deliberations.

This erroneous instruction, standing alone, would have been sufficient to constitute reversible error. It is well settled that recklessness is a "higher [and] more culpable" mental state than negligence, and that awareness of the risk is the very crux of the distinction between the two. People v. Montanez, 41 N.Y.2d 53, 56 (1976); see also People v. Roe, 74 N.Y.2d 20, 27 n.7 (1989) (awareness of the risk is "essential" to proving recklessness). Consequently, by charging the jury that defendant could be convicted of depraved indifference murder despite being "unaware of the risk," the court reduced the *mens rea* of the crime from recklessness to criminal negligence. The court thus relieved the prosecution of having to prove an element of the offense charged - i.e., the culpable mental state of recklessness - and thereby impermissibly reduced the burden of proof and caused reversible error. See People v. Kennedy, 242 A.D.2d 876 (1st Dept. 1997). Moreover, the judge flatly refused to correct the erroneous charge after it was brought to his attention, thus violating his obligation to make the law meaningful to the jury and instruct the jurors correctly. See, e.g., People v. Peterson, 233 A.D.2d 533 (2d Dept. 1996). Thus, had Mr. Hollenberg argued this point on appeal, he could and would have won reversal for his client.

Moreover, Mr. Hollenberg could have made an even stronger argument on appeal by including the "unaware of the risk" instruction in his juror confusion point. In Point II of his brief, Mr. Hollenberg argued that Ms. Lewis' confusion about whether depraved indifference murder was equivalent to "accidental death" was exacerbated by the "51 percent" instruction on reasonable doubt. While the "51 percent" instruction was indeed an egregious error, it occurred at the very beginning of the proceedings and did not directly concern the elements of the charge. The "unaware of the risk" instruction, in contrast, *did* concern the elements of the offense, and could easily have given juror Lewis exactly the misimpression to which she testified - i.e., that depraved indifference murder was equivalent to accidental death.

Consequently, had Mr. Hollenberg discussed this instruction in conjunction with the juror confusion point, it would have established reversible error in two respects. First, it would have corroborated Ms. Lewis' testimony that she was indeed confused during deliberations rather than suffering from an "afterthought" or change of heart after delivering her verdict. The trial court's decision denying defendant's CPL § 330.30 motion rested in part on its conclusion that Ms. Lewis had no basis for her misimpression about the elements of the crime. In fact, however, the trial judge's own instructions gave Ms. Lewis this basis, and allowed her (and possibly other jurors) to deliberate under the mistaken belief that an accidental killing in which the defendant was "unaware of the risk" posed by his conduct could rise to the level of depraved indifference murder.

Moreover, it is well settled that an incorrect burden of proof instruction constitutes *per se* error under New York law even if it is preceded and/or followed by correct instructions. In the recent case of <u>Brown v. Greene</u>, 2007 U.S. Dist. LEXIS 34460 (S.D.N.Y. May 11, 2007), United States Magistrate Judge Andrew J. Peck conducted an exhaustive analysis of New York law relating to burden-of-proof charges. After examining relevant case law, the court concluded that the charge at issue misdirected the jury so egregiously that it constituted reversible error despite prior and subsequent curative instructions. <u>See</u> <u>id.</u> at *84-85. Notably, the court stated that while it "[could not] be sure whether [the] jury actually misunderstood its obligations," it "need only determine whether there is a *reasonable likelihood*, *even if less than a probability*, that the jury misunderstood this principle of law." <u>Id.</u> at *85 (emphasis added). Here, where the court allowed the jury to commence its deliberations under the erroneous impression that the culpable mental state for depraved indifference was criminal negligence, there is certainly such a likelihood.

Moreover, Judge Peck noted that when an incorrect burden of proof instruction is "compounded with other errors... New York courts have reversed convictions." <u>Id.</u> at *75, <u>citing</u> <u>People v. Allan</u>, 192 A.D.2d 433 (1st Dept. 1993). The instant case contains precisely such an "other error" in the form of the trial court's instruction that "reasonable doubt... appears somewhere between 51 percent and 100 percent." (T.65). The burden of proof in defendant Jean's case was reduced *twice*, first by the "51 percent" instruction and then by the reduction of the culpable mental state from recklessness to mere negligence. <u>See</u> <u>Also</u> <u>People v. Chesnut</u>, 99 A.D. 2d 515, 516 (2d Dept. 1984) (Multiple errors in jury instructions that effected crucial issues in case could not be deemed harmless and mandated reversal.) It should further be noted that a "51 percent" instruction such as the one delivered in the instant case is precisely what Judge Peck condemned in the strongest terms as egregious constitutional error. <u>See</u> <u>Brown</u>, 2007 U.S. Dist. LEXIS 34460, at *56-80.

This is particularly true where, as here, the manifest confusion of a member of the jury shows that defendant was indeed prejudiced by the trial court's burden-shifting. This is demonstrated by juror Marie Lewis' post-trial letter and hearing testimony that she believed depraved indifference murder to be equivalent to "accidental death." Given that an accident

typically results from unawareness of the relevant risks, Ms. Lewis' letter represents actual proof that the jury was misdirected by the court's charge, and obviates any presumption that the prejudice was cured.

In its opposition papers below, the prosecution did not even address the effect of Ms. Lewis' revelation concerning the jury deliberations. It is not difficult to see why. Ms. Lewis' admissions constitute conclusive proof of exactly the deleterious effect discussed by Judge Peck: i.e., that an erroneous burden of proof instruction can fatally infect the jury's deliberations and prejudice the defendant notwithstanding subsequent and inadequate curative efforts. This Court need not speculate about whether defendant was prejudiced by the trial court's "unaware of the risk" instruction, nor would it have had to speculate if the issue had been raised on direct appeal, since the record contains actual proof.

Thus, contrary to the prosecution's argument below, the fact that the trial court ultimately recharged the jury on the *mens rea* of recklessness was insufficient to alleviate the prejudice, because Ms. Lewis' manifest confusion rebutted any presumption that the jurors followed this "curative" instruction. Moreover, it should be noted that the court did not give this recharge until it received a note from the jury during deliberations. (T.959). Thus, by the time the court attempted to cure its egregious burden-of-proof error, the jury had already deliberated for a considerable time under the erroneous impression that it could convict defendant of depraved indifference murder based on mere negligence. The court's erroneous "unaware of the risk" instruction had already fatally infected the jury's deliberations, and the prejudice could not be cured by the trial court's belated attempt to correct the record.

Finally, the prosecution's contention that the error was have been unpreserved is completely without merit. In particular, the prosecution suggested that trial counsel's objection was untimely because he registered his protest at the close of the charge rather than interrupting immediately when the offending words were uttered. It is well settled, however, that an objection in a criminal case is timely if it is "registered... at the time of the [error] *or at any subsequent time when the court had an opportunity of effectively changing the same*." People v. Robinson, 36 N.Y.2d 224, 228 (1975) (emphasis in original), quoting CPL § 470.05(2). In the context of an erroneous jury charge, New York courts have specifically held that an objection is timely if raised "after the charge was completed and prior to submission of the case to the jury." See People v. Williams, 10 A.D.3d 213, 216 (1st Dept. 2004); see also People v. Graves, 159 A.D.2d 637, 637-38 (2d Dept. 1990) (objection to jury instruction can be made "at the conclusion of the court's charge"). Given that this is precisely when defendant's trial counsel objected to the court's erroneous charge, his objection was timely.

Trial counsel's objection was also, contrary to the prosecutor's contention, far more than "general." A general objection is one that simply requests relief and does not specify the grounds upon which relief is sought, as when a defendant makes a trial motion to dismiss for insufficient evidence but fails to explain the deficiencies in the proof. See People v. Gray, 86 N.Y.2d 10

(1995).  In contrast, in the instant case, defendant's trial attorney specifically pinpointed the error in the court's charge, arguing that "under recklessly... you used unaware as opposed to aware." (T.952).  In other words, defense counsel alerted the court that, during its charge on the *mens rea* of recklessness, it had erroneously informed the jury that the defendant could be convicted even if he were unaware of the risk.  Moreover, although the trial court denied having made this error, it clearly recognized that an incorrect *mens rea* instruction "would have been a biggy." (T.952).  It thus cannot be contended that defense counsel failed to alert the trial court to the erroneous instruction or that the court itself was unaware of the error's nature or magnitude.  The issue was fully preserved for appeal if Mr. Hollenberg had only argued it.

Thus, had the "unaware of the risk" charge been properly raised, the Second Department would not have found that the prejudice caused by the pretrial "51 percent" instruction was "obviated" by the instructions given at the close of trial.  Indeed, the court would have had to confront the fact that, far from "obviating" the jury's confusion and prejudice, the closing instruction *compounded* the prejudice and confused the jurors even further.  Under those circumstances, it is difficult to believe that the Second Department would not have found reversible error.  Hence, Mr. Hollenberg's inexplicable failure to raise or even mention the "unaware of the risk" instruction, either as an independent point or in conjunction with Point II, constitutes ineffective assistance of appellate counsel, and this Court should grant the instant application for leave to appeal.

### POINT II

### APPELLATE COUNSEL SHOULD HAVE ARGUED THAT THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION OF DEPRAVED INDIFFERENCE MURDER

Second, appellate counsel should have argued the fully preserved point raised by trial counsel in his motion to dismiss: that the evidence was legally insufficient to sustain a conviction of depraved indifference murder.  As defense counsel correctly pointed out at trial, the cases in which the Court of Appeals has sustained depraved indifference murder convictions in connection with the instant case have involved far more egregious conduct, such as repeated beatings of a helpless infant over a period of weeks or months.[8]  The instant case, in contrast,

---

[8]    For instance, the recent decision of People v. Suarez, 6 N.Y.3d 202 (2005), in elucidating the degree of conduct that constituted "uncommon brutality" for purposes of depraved indifference murder, cited People v. Poplis, 30 N.Y.2d 85 (1972) (3½-year-old child continuously beaten over a period of five days) and People v. Best, 85 N.Y.2d 826 (1995) (defendant beat 9-year-old child over a period of months despite being aware of his deteriorating condition).  Likewise, People v. Taylor, 169 A.D.2d 743 (2d Dept. 1991), which was cited by the Second Department in affirming defendant's conviction, arose from the beating death of a young child over the course of several days.

involved a single albeit severe beating.  While defendant does not minimize the seriousness of the conduct with which he was charged, the fact remains that it does not rise to the level of egregiousness necessary to constitute depraved indifference murder.

Notably, not only did defendant's trial counsel preserve this meritorious issue on the record, but by the time Mr. Hollenberg litigated defendant's appeal, this Court had begun to drastically narrow the circumstances under which a depraved indifference murder conviction could be sustained.  When the appellate brief was filed on May 4, 2004, this Court had already decided People v. Hafeez, 100 N.Y.2d 256 (2003), which held, directly contrary to the pre-existing doctrine of People v. Register, 60 N.Y.2d 270 (1983), that "quintessentially intentional" conduct directed at a particular victim did not qualify as depraved indifference to human life.  By the time Mr. Hollenberg filed a reply brief on defendant's behalf, the court had further decided People v. Gonzalez, 1 N.Y.3d 464 (2004), which unanimously reaffirmed Hafeez.

Moreover, when this case was orally argued before the Second Department on November 15, 2004, this Court had recently decided People v. Payne, 3 N.Y.3d 266 (2004).  In an even more unequivocal rejection of Register, the Payne court categorically held that depraved indifference murder could only be charged under three circumstances: (1) conduct that endangers the general public; (2) abandonment of a helpless victim under circumstances likely to cause his death; and (3) acts of "uncommon brutality" directed toward an exceedingly vulnerable victim.  Id. at 271-72.  The Payne court further illustrated the "uncommon brutality" category by citing three cases in which the defendant "inflicted continuous beating on a three-year-old child... fractured the skull of a seven-week-old baby... [or] repeatedly beat a nine year old."  Id. (citations omitted).

Thus, at the time the instant appeal was argued, this Court had issued an authoritative decision supporting the exact argument made by defendant's trial counsel: that only *repeated and severe* beatings of a child could rise to the level of depraved indifference, and that deaths resulting from a single beating must be classified as manslaughter in the first or second degree.[9] Had Mr. Hollenberg included a sufficiency point in his brief, the Second Department would have had to analyze the evidence in light of the Court of Appeals' changing jurisprudence, and would

_____

[9]  In People v. Maddox, 31 A.D.3d 970 (3d Dept. 2006), the only post-Payne appellate decision to sustain a depraved indifference murder conviction in connection with the beating of a child, the evidence likewise revealed that the infant victim had numerous wounds and bone fractures that had been inflicted over an extended period of time.  **Error! Main Document Only.** The sole apparent exception to this rule, People v. Bryce, 88 N.Y.2d 124 (1996), involves a seven-week-old baby, who is a far more vulnerable victim than Kyona Fredericks.  It is reasonable to conclude that the length of the necessary "course of conduct" might become shorter as the victim becomes more vulnerable.  In the instant case, however, did not involve a victim of the extreme vulnerability evinced in Bryce, and thus did not rise to the level of depraved indifference on the basis of a single beating.

perforce have had to vacate the depraved indifference murder conviction.

It should be noted that Mr. Hollenberg would not have been required to anticipate unforeseen changes in the law in order to raise this argument. The argument had already been made and preserved on the record by trial counsel, and it was thus present for any appellate attorney to see. Furthermore, as set forth above, the line of Court of Appeals cases that narrowed the application of the depraved indifference murder doctrine was well under way by the time the instant appeal was litigated and argued.

Thus, defendant was severely prejudiced since appellate counsel's failure to argue sufficiency denied him the benefit of the landmark Payne decision. Indeed, the prejudice resulting from Mr. Hollenberg's departure from professional norms is even greater, because defendant's conviction became final after the "point of no return" at which the Register doctrine was overruled. This means that, had the point been properly raised on direct appeal, defendant would not only have been entitled to the benefit of Payne but to the subsequent clarifying decisions of People v. Suarez, 6 N.Y.3d 202 (2005) and People v. Feingold, 7 N.Y.3d 288 (2006). This would in turn have been critical because Suarez reaffirmed that the "uncommon brutality" doctrine applies only to repeated and egregious beatings. Instead, in order to rise to the level of depraved indifference under this prong, the defendant must engage in "a *prolonged, brutal course of conduct* against a particularly vulnerable victim." People v. Stewart, 36 A.D.3d 1156, 1160 (3d Dept. 2007); see also People v. Georgiou, 828 N.Y.S.2d 541, 544 (2d Dept. 2007). Given that the instant case involved a single beating rather than a "prolonged... course of conduct," the fact that the victim was a vulnerable child is not enough by itself to constitute depraved indifference not only under Payne, but also its progeny.[10]

The "point of no return" concept was articulated in the recent decision of Policano v. Herbert, 7 N.Y.3d 588 (2006), in which a majority of this Court affirmed that the New York doctrine of depraved indifference murder "*gradually and perceptibly changed* from an objectively determined degree-of-risk standard (the Register formulation) to a mens rea, *beginning with our decision in Hafeez in 2003*, continuing in our decisions in Gonzalez, Payne and Suarez in 2004 and 2005, and ending with our decision in Feingold in 2006." Id. at 602-03 (emphasis added). This Court then determined that the "new precedent" - i.e., the rule established in its "post-Sanchez caselaw" - was not retroactive to convictions that became final before the change occurred. See id. at 603.

---

[10]    Defendant does not deny that the fatal beating of a child is a serious offense. It is contended, however, that the offense he committed was manslaughter in the first or second degree rather than depraved indifference murder. Had Mr. Hollenberg raised the fully preserved sufficiency argument made by trial counsel in his motion to dismiss, defendant's conviction would have been reduced to manslaughter on direct appeal. Consequently, this Court should find that in the absence of any valid reason for him not to raise this point, his performance was constitutionally ineffective.

However, the <u>Policano</u> majority did not define the exact point between 2003 and 2006 at which the law changed. [11]    Therefore, while the <u>Policano</u> decision held that the "post-<u>Sanchez</u> caselaw" should not be applied retroactively to convictions that became final before the law changed (such as Policano's own conviction, which became final in 2001), it ***did not*** preclude the new rule from being applied to defendants whose convictions became final *after* the "point of no return."

In the instant case, as set forth above, defendant's conviction became final after this Court decided <u>Payne</u>.  The <u>Payne</u> decision - which did not discuss or even cite <u>Register</u> - stated that "[t]his Court's recent holdings...  have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York," and articulated a theory of depraved indifference that was based on the nature of the *actus reus* rather than the objective degree of risk created by the defendant's conduct.  Moreover, the majority opinion in <u>Payne</u> was written by Judge Albert Rosenblatt, an outspoken critic of the <u>Register</u> doctrine, and cited with approval a pre-<u>Register</u> Law Revision Commission statement that characterized depraved indifference as analogous to "opening the lion's cage at the zoo." Thus, if Mr. Hollenberg had argued the issue of sufficiency of evidence solely under <u>Payne</u>, the appellate court would have had to reverse the depraved indifference murder conviction.

Moreover, once a new rule of law has been established, any subsequent decisions applying that rule must be regarded as clarifications rather than further changes.  See <u>Policano v. Herbert</u>, 430 F.3d 82, 88 n.1 (2d Cir. 2005) (court on collateral review may rely upon cases decided after defendant's conviction became final if they "explain and reaffirm the principles of New York law" that existed at that time); <u>see also</u> <u>Fiore v. White</u>, 531 U.S. 225, 228 (2001) (decisions handed down after defendant's conviction becomes final are retroactively applicable if they clarify existing law).  Consequently, Mr. Jean would also have had the benefit of the post-<u>Payne</u> depraved indifference jurisprudence.

Therefore, had Mr. Hollenberg raised the sufficiency point that had been preserved on the record by trial counsel, defendant would have been entitled to vacatur of his conviction either on direct appeal or on collateral review, and his failure to do so can only be deemed ineffective. This Court should therefore find that defendant received ineffective assistance of appellate counsel and grant the instant application for leave to appeal.

## <u>CONCLUSION</u>

---

[11]  Indeed, the majority opinion explicitly declined to make a decision as to when the change occurred when they wrote that "[I]ndividual judges hold differing views as to where along this trajectory a majority of the court may have effectively passed the point of no return - the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing caselaw with Register and Sanchez." <u>Policano v. Herbert</u>, 7 N.Y.3d at 603.

In light of the foregoing, this Court should issue an order granting leave to appeal the Second Department's denial of his motion for writ of error coram nobis and other relief and, upon appellate review, dismiss the charges against defendant or reinstate his direct appeal.

Dated: New York, NY
        October 5, 2007

                                                    _____
                                                    JONATHAN I. EDELSTEIN

# State of New York

# Court of Appeals

BEFORE:  HON. CARMEN BEAUCHAMP CIPARICK,
                              Associate Judge
_____

THE PEOPLE OF THE STATE OF NEW YORK,

                                        Respondent,

                    -against-

DARIUS JEAN,

_____
                                        Appellant.

**CERTIFICATE
DENYING
LEAVE**

            I, CARMEN BEAUCHAMP CIPARICK, Associate Judge of the Court of Appeals of the State of New York, do hereby certify that upon application timely made by the above-named appellant for a certificate pursuant to CPL 460.20 and upon the record and proceedings herein,* there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied.


Dated: December 18, 2007
            at New York, New York

                              _____
                                        Associate Judge


**\* Description of Order:**        Order of the Appellate Division, Second Judicial Department, entered September 18, 2007, denying appellant's application for a writ of error coram nobis.